STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,
smanning@ilgrp.com
TESS HELLGREN, OSB No. 191622
tess@innovationlawlab.org
JORDAN CUNNINGS, OSB No. 182928
jordan@innovationlawlab.org
KELSEY LYNN PROVO, OSB No. 145107
kelsey@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No. 223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| CLEAR CLINIC and PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE; <br> *Plaintiffs,* <br><br> v. <br><br> KRISTI NOEM, Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); TODD LYONS, Acting Director of Immigration Customs Enforcement; CAMMILLA WAMSLEY, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"); PETE FLORES, Acting Commissioner of Customs and Border Protection; and U.S. CUSTOMS AND BORDER PROTECTION ("CBP"), <br> *Defendants.* | Case No. 25-1906 <br><br> **PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND MEMORANDUM OF LAW IN SUPPORT OF MOTION** |

## MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiffs move for an immediate temporary order restraining the Defendants or any of their delegates, agents, or entities working in concert with them from transferring out of the District of Oregon for a period of three (3) business days: any individual who (a) was apprehended by Defendants without a valid judicial warrant and taken into civil immigration custody in the District of Oregon on or after October 15, 2025, (b) is in the District at the time this motion is filed, and (c) has not knowingly and affirmatively waived in writing their right to representation by counsel under the Fifth Amendment of the United States Constitution.

**Period to access counsel**. Plaintiffs further move for an order requiring Defendants to allow the described individuals to receive constitutionally sufficient access to prospective or retained counsel while in Defendants' custody. Plaintiffs further move for an order requiring Defendants to allow the described individuals to receive constitutionally sufficient access to prospective or retained counsel while in Defendants' custody.

**Notice.** Plaintiffs further move for an order requiring Defendants to provide to the Court and Plaintiffs the following information: the identity of individuals who are apprehended and against whom Defendants are restrained from transferring, as well as such individuals' location and site of detention. Plaintiffs move for an order requiring that Defendants provide this information to the Court and to Plaintiffs' counsel within three (3) hours of apprehension.[1]

---

[1] Conferral is not required under L.R. 7-1(a)(1). Plaintiffs' counsel will immediately email this motion and the related complaint to the U.S. Attorneys Office of Oregon by email upon filing.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION**

I.      **Introduction**

In the District of Oregon, Defendants are rounding up community members across the region, holding them incommunicado by fiat, and then moving them swiftly out of district – before they have even had a chance to make a phone call to a lawyer, let alone to consult with one. Defendants take these actions in order "to do all in their power to achieve the very important goal of delivering the single largest Mass Deportation Program in History."[2]

The Oregonians caught up in these violent sweeps—citizen and immigrant alike[3]— find themselves trapped in the Defendants' vast detention network: a network that spans from Tacoma, Washington, to Guantanamo Bay, Cuba, to Sudan to Libya to CECOT—a notorious torture center in El Salvador. Once detained by Defendants, these Oregonians are swiftly transferred away from their legal resources and their communities of support, lost in a detention-to-deportation pipeline in which they may find themselves, in the government's view, beyond the reach of this Court's jurisdiction and ability to remedy any unlawful detention, transfer, or removal.

Defendants' policies and practices are designed to subvert the U.S. Constitution because in their lawless view, detentions and deportations are only about "numbers, pure numbers, [q]uantity over quality."[4] Defendants' policies and practices that deny access to counsel cause irreparable

---

[2] Pres. Donald Trump, @realDonaldTrump, Truth Social (June 15, 2025, 5:43pm) ("ICE Officers are herewith ordered, by notice of this TRUTH, to do all in their power to achieve the very important goal of delivering the single largest Mass Deportation Program in History.").

[3] Claire Rush, *US citizen detained and held at ICE building in Portland for hours before release, lawyer says*, AP News, October 10, 2025, https://apnews.com/article/us-citizen-detained-ice-portland-oregon-646ac425d32902b5f447e021f70da7df (last visited Oct. 15, 2025).

[4] Jennie Taer, *Trump admin's 3,000 ICE arrests per day quota is taking focus off criminals and 'killing morale': insiders warn*, NY Post, June 17, 2025, https://nypost.com/2025/06/17/us-news/trump-admins-3000-ice-arrests-per-day-quota-is-taking-focus-off-criminals-and-killing-morale-insiders/, https://perma.cc/DB9R-MJUC (last visited Oct. 15, 2025) ("The Trump administration's mandate to arrest 3,000 illegal migrants per day is forcing ICE agents to deprioritize going after dangerous criminals and targets with deportation orders, insiders warn. Instead, federal immigration officers are spending more time rounding up people off the streets,

3

harm to Oregon's community: the people, the organizations, and all the entities that make up Oregon's civil society. On information and belief, in some instances Defendants have purposely transferred detained people outside the state of Oregon as quickly as possible in order to thwart attorneys' efforts to offer detained people legal representation and in an effort to manipulate this Court's jurisdiction.

But, the United States of America has "a government of laws and not of men." *Cooper v. Aaron*, 358 U.S. 1, 23 (1958) (Frankfurter, J. Concurring) (cleaned up). Our system of laws and our national fabric rejects "rule by fiat[.]" *Id.* And "in framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself." Madison Federalist Paper No. 51 (1788).

Due process is not just a meaningless nod by Defendants that at some point, someone might be able to call out from some distant detention center to try to find a lawyer. Due process is *the* thing that provides for freedom in America. It is what keeps the government under the control of the people. It is the thing that requires the government, "particularly when so much is at stake, . . . [to] turn square corners in dealing with the people." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020) (internal quotations and citation omitted).

Plaintiffs are community organizations who represent two sides of the irreparable impacts of the Defendants' mass acts of lawlessness. **Plaintiff CLEAR Clinic** is a nonprofit organization working to protect the due process rights of immigrants through legal representation, community education, and rapid response services; it is among the network of legal service providers seeking access to prospective and current clients who are detained by Defendants. **Plaintiff Pineros y Campesinos Unidos del Noroeste ("PCUN")** is the largest farmworker and Latino organization in Oregon; its members and constituents are among the Oregonians who have already been, will

---

sources said. 'All that matters is numbers, pure numbers. Quantity over quality,' one Immigrations and Customs Enforcement insider told The Post.").

be, or fear that they will be swept up in immigration enforcement actions and, before they can speak to a lawyer, unlawfully absorbed into a vast detention network that separates them from their communities and legal resources. In light of acute and repeated deprivations of access to counsel at Defendants' Oregon facilities, both Plaintiffs seek temporary, interim relief to restore the *status quo ante litem* to minimize the harm to them and their members until Plaintiffs' broader claims against Defendants' lawless actions can be duly heard in court.

Plaintiffs seek to restore a vital aspect to the rule of law: constitutionally sufficient access to counsel in Oregon before any individual is swept away into Defendants' vast and labyrinthine executive detention scheme, which includes detention centers outside the United States. Such access to counsel is guaranteed by the First and Fifth Amendments to the United States Constitution, several provisions of the immigration laws, and Defendants' own policies.

The rule of law—and the principles embodied in the U.S. Constitution, the Administrative Procedure Act (APA), the Immigration & Nationality Act (INA), numerous regulations, and formal federal agency policy—demand no less.

## II.    Factual Background

In an effort to achieve a deportation quota for their mass deportation scheme, Defendants have adopted policies, patterns, and practices that sweep people into their vast executive detention scheme and outside of this district, including to distant and far-away places, before an individual can access counsel and, in the government's view, beyond the remedies otherwise available in the courts. *See, e.g., Bonilla Alvarez v. Noem*, No. 25-cv-03136 (D.D.C. Sept. 28, 2025) (finding that the court lacked jurisdiction to hear man's emergency request where he had been transferred to Mexico and would be imminently sent to El Salvador, even though immigration court had concluded that he was likely to be tortured in El Salvador). Defendants' policies, patterns, and practices thwart individuals from speaking in person with a lawyer before they are disappeared into the detention system. On information and belief, the fact that people are denied access to

counsel, and counsel is denied access to their clients and prospective clients, is an intentional *feature* of Defendants' current system, not a bug or unplanned collateral consequence.

Under the Fifth Amendment, the First Amendment, and the INA, detained noncitizens have a right to hire, consult, and communicate with an attorney. Nevertheless, Defendants have repeatedly denied Plaintiffs access to counsel by, *inter alia*, denying detained people the ability to communicate with their counsel; denying detained people meetings with their attorneys or counsel retained by their families, even when those attorneys are present at the detention facility and requesting a client meeting; turning attorneys away when they arrive to an ICE detention facility asking to speak with a detained client; declining to speak with attorneys who are denied access to detained clients, even when the attorney asks to speak with an ICE official; transferring detained people out of Oregon before they can speak with an attorney, even when an attorney is actively asking to speak with them; declining to tell detained people that an attorney is trying to speak with them; failing to list accurate information in the ICE Online Detainee Locator, https://locator.ice.gov/odls/#/search; and requiring attorneys to present a signed G-28 (a DHS form used to indicate an attorney or other authorized party is representing a person before the agency) before they can speak with a detained person, even when the attorney is requesting a pre-representational meeting with a prospective client.

A.      **Oregon's rapid response network provides free access to lawyers.**

Through a coalition of community-based organizations, non-profits and network of volunteers, a rapid response to immigration enforcement network is available to the immigrant community in Oregon. The Portland Immigrant Rights Coalition ("PIRC") operates a statewide, toll-free hotline as part of Oregon's rapid response system. Declaration of John Walsh ("Walsh Decl.") ¶ 4. The hotline is a free service for the community. It enables anyone impacted by an ICE detention or enforcement action to call a single number and get connected with necessary resources, including legal representation through Equity Corps of Oregon (ECO), Oregon's statewide universal representation program. *Id.*

PIRC's rapid response hotline receives calls around the clock, with most of the calls reporting detentions and ICE encounters that occur in the morning or early afternoon. *Id.* ¶ 6. Most of the calls received by the hotline request connection to legal assistance—which is one of the most important parts of the operator's role: to collect all the information needed to activate the first responder lawyers. *Id*. ¶ 7. Usually, when the PIRC hotline receives a call to report a detention, the call comes from a family member or acquaintance of the person detained, who provides details on the detention and discloses whether the detained individual already has legal representation. *Id.* ¶ 8. Most of the people who call the hotline report that the detainee does not have an immigration attorney, so they request to be connected to the ECO program to obtain legal representation and make informed choices about their case. *Id.* After receiving the call and gathering sufficient information, the hotline operators activate the first responder lawyer system by securely transmitting the necessary information to ECO so they can send an attorney to the ICE facility in either Portland or Eugene ("Portland Office" and "Eugene Office", respectively). *Id.* ¶ 10. The goal of the rapid response system is to get a lawyer on site to meet with the detained person and provide them with legal advice and a comprehensive legal screening before they have to make any legal decisions about their case. *Id.* The lawyer can also legally advocate with ICE about alternatives to detention. *Id*. ¶¶ 10-11.

CLEAR Clinic attorneys are among the first responder lawyers who are part of Oregon's rapid response system for ICE detentions. Declaration of Alena A. Tupper ("Tupper Decl.") ¶ 11. Any community member detained by ICE in Oregon is eligible for free legal services through this rapid response system and thus is a prospective client of the CLEAR Clinic. *Id.* ¶ 12. CLEAR Clinic provides rapid response legal services that consist of a comprehensive legal screening and analysis and can include full or limited-scope representation on immigration applications, petitions, and litigation challenging detention. *Id.* These legal services also include advocacy to secure the community member's release from ICE custody prior to transfer to an out-of-state immigration detention center. *Id.*

Meaningful access to rapid response counsel for clients and prospective clients in ICE detention should include prompt, in-person contact with the detained person, in a confidential space, for a minimum of one hour, with appropriate language access, including interpretation if needed, before transfer to an overnight ICE detention center and review of the relevant legal documents served to the person by Defendants. *Id.* ¶ 19. These circumstances and this information constitute the bare minimum necessary for an attorney to provide effective and meaningful legal advocacy for clients. *Id.* Thorough immigration legal screenings typically take about an hour, due to the variety of pathways to relief, as well as any inadmissibility and custody issues that are screened for. *Id.* ¶ 16. Additionally, CLEAR Clinic attorneys are trained to provide trauma-informed legal care because most people they serve have suffered trauma, including the use of violence during their detention by ICE. *Id.* ¶ 17. To provide effective, trauma-informed legal services, CLEAR Clinic attorneys need to meet with clients in person, in a confidential setting, for a minimum of one hour. *Id*.

## B.     Defendants deny access to counsel at the Portland Office.

Defendants' policies and practices effectively deny access to counsel by completely denying or severely limiting attorney visitation hours; moreover, Defendants process noncitizens, with the intent of depriving them of counsel, at locations where telephones are not made available.

Over the past few months, CLEAR Clinic immigration attorneys have responded to ICE detentions for approximately twenty individuals. Tupper Decl. ¶ 23. On every occasion, they have been denied full, and often any, access to their clients and prospective clients at the Portland Office. *Id.* Whether or not attorneys arrive with a signed G-28 indicating they already represent a client, attorneys have been left waiting – sometimes while ICE actively transfers their client out of state. *Id.* ¶¶ 23, 26; Declaration of Josephine Moberg ("Moberg Decl.") ¶¶ 5-12. Even when ICE does grant access, it is never for more than 30 minutes and not in a confidential meeting space. Tupper Decl. ¶ 24. Attorneys are not told why their clients are being detained, nor are they allowed to receive and review critical documents pertaining to their clients' cases, which could allow attorneys to review the legality of their clients' detention. *Id.* ¶ 25. These restrictions prevent

CLEAR Clinic's attorneys from conducting full intakes, properly advising their clients, and fully advocating for their clients' interests. *Id.* ¶ 25; Moberg Decl. ¶ 32.

### C.     Defendants deny access to counsel at the Eugene Office.

Starting in January 2025, attorneys who are part of the ECO program in Eugene have reported consistent denials of access to prospective and current clients at the Eugene Office. *See* Declaration of Katrina Noel Kilgren ("Kilgren Decl.") ¶¶ 4. However, the ability to even access the building has drastically been impeded by Defendants in the past six months. *Id.* ¶¶ 5-6. Since June 2025, ICE has been extremely inconsistent regarding attorney access to clients and prospective clients held in the Eugene Office. *Id.* ¶ 6. In response to a Congressional inquiry, the Field Office Director has confirmed that officers in Eugene do not allow attorneys to meet with clients or prospective clients in the "secure area" of the Eugene Office.[5]

Denial of access at the Eugene Office has taken various forms, including officers making attorneys wait outside the building while their clients enter their appointments, declining to allow attorneys in without any further explanation, and advising attorneys that the person is no longer in custody after making the attorney wait while the security officers confirmed access with Defendants. *Id*. ¶¶ 10 (detailing repeated attempts to access detained client at the Eugene Office without any response, resulting in client's ultimate transfer to Tacoma, Washington, without prior access to counsel), 14 (describing how denial of access resulted in no attorneys being able to access and interview detained individuals at the Eugene Office on October 15, 2025).

---

[5] Troublingly, the Field Office Director also informed the Congressional office that there had been no check-ins involving attorneys at the Eugene Office for the past month – which is untrue based on the personal experience of attorney Katrina Kilgren. Kilgren Decl. ¶ 7. This is not the first time that Defendants have provided inaccurate information to another branch of government; they have previously asserted to this Court on a separate matter that ICE officers allow access to attorneys with a valid G-28 form, when local attorneys have been denied access consistently over the past four months even when providing such forms. *Id.* ¶¶ 8-12.

### III.    Legal Standard

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977). A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "The proper legal standard for preliminary injunctive relief requires a party to demonstrate (1) 'that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (*citing Winter*, 555 U.S. at 20).

As an alternative to this test, a temporary restraining order or preliminary injunction is appropriate if "serious questions going to the merits were raised and the balance of the hardships tips sharply in the plaintiff's favor," thereby allowing preservation of the status quo when complex legal questions require further inspection or deliberation. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

### IV.    Argument

Plaintiffs' Motion for a Temporary Restraining Order should be granted because they are likely to succeed on the merits of their four claims; they are suffering irreparable harm in the absence of preliminary relief; and the balance of the equities and public interest weigh strongly in favor of a restraining order pending the Court's adjudication of the complaint. Plaintiffs also satisfy the alternative test for a temporary restraining order.

### A.    Plaintiffs are likely to succeed on their access to counsel claims.

The Due Process Clause of the Fifth Amendment, the First Amendment, and the INA, all guarantee individuals detained in immigration operations the right to access counsel. Because Plaintiffs are likely to show that Defendants have denied them the ability to obtain and meaningfully communicate with counsel before their transfer out of district, Plaintiffs are likely to succeed on all five counts.

### 1.  Plaintiffs are likely to succeed on Count 1 (Fifth Amendment)

Individuals detained in immigration operations have a right to counsel that is rooted in the Due Process Clause of the Fifth Amendment. *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1162 (D.Or. 2018); *Usubakunov v. Garland*, 16 F.4th 1299, 1303 (9th Cir. 2021) ("As we have stressed, the importance of the right to counsel … cannot be overstated." (cleaned up)); *Arrey v. Barr*, 916 F.3d 1149, 1157 (9th Cir. 2019) ("Both Congress and [the Ninth Circuit] have recognized the right to retained counsel as being among the rights that due process guarantees to petitioners in immigration proceedings."); *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) (The right to counsel in immigration proceedings is rooted in the [Fifth Amendment] Due Process Clause[.]"); *see also Torres v. United States Dep't of Homeland Sec*., 411 F. Supp. 3d 1036, 1060-61 (C.D. Cal. 2019); *cf. Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) ("[A]n alien who faces deportation is entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf."). "The high stakes of a removal proceeding and the maze of immigration rules and regulations make evident the necessity of the right to counsel." *Biwot*, 403 F.3d at 1098; *see Usubakunov*, 16 F.4th at 1300 ("Navigating the asylum system with an attorney is hard enough; navigating it without an attorney is a Herculean task.").

To effectuate this right, individuals detained as part of immigration enforcement efforts must be allowed to obtain and communicate with retained counsel. The Ninth Circuit "has upheld mandatory injunctions designed to remedy government practices when the 'cumulative effect' of such practices 'was to prevent [noncitizens] from contacting counsel and receiving any legal advice." *Innovation Law Lab*, 310 F. Supp. 3d at 1162 (citing *Orantes-Hernandez*, 919 F.2d 549, 554, 565 (9th Cir. 1990))*; Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 554, 565 (9th Cir. 1990) (granting injunction because noncitizens "have a due process right to obtain counsel of their choice at their own expense," and affirming injunction against government practices "the cumulative effect of which was to prevent aliens from contacting counsel and receiving any legal advice," including the practice of denying visits with counsel); *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1439 (9th Cir. 1986). Individuals detained in immigration enforcement

operations must thus be provided a "reasonable time to locate counsel," *Rios-Berrios v. INS*, 776 F.2d 859, 863 (9th Cir. 1985); *Torres*, 411 F. Supp. 3d at 1060–61, and the government cannot impose restrictions that undermine a detained person's opportunity to obtain or communicate with counsel. *See Orantes-Hernandez*, 919 F.2d at 554, 565. Impediments to communication, including through detention in a difficult-to-access facility, can constitute a "constitutional deprivation" where they obstruct an "established on-going attorney-client relationship." *Comm. of Cent. Am. Refugees*, 795 F.2d at 1439.

The cumulative effect of Defendants' pattern and practice is to constrain Plaintiff CLEAR Clinic's access to individuals and individuals' access to lawyers so much so that it has blocked any meaningful ability to provide advice and counsel. *See* Tupper Decl. ¶¶ 23-25 (describing ICE's practice of stonewalling attorneys, providing conflicting information about access and ultimately delaying attorney visits only to then allow attorneys ten minutes to meet with their clients); Moberg Decl. ¶¶ 30-31 (recounting one occasion where ICE delayed granting her access to a prospective client for about an hour and then cut the visit short, which prevented her from providing meaningful legal advice); *Innovation Law Lab*, 310 F. Supp. 3d at 1162 ("Government practices that effectively deny access to counsel include the detention of aliens far from where potential or existing counsel was located, limited attorney visitation hours, and the processing of aliens at locations where telephones were not available to them."). For example, Defendants' practices force CLEAR Clinic's attorneys to wait for hours while ICE refuses to give them information about their detained clients. Tupper Decl. ¶ 23. In at least one instance, ICE transferred their prospective client out of state while a CLEAR attorney requested access to him at the Portland ICE facility. *See id.*; Moberg Decl. ¶ 5.

Members of Plaintiff PCUN reasonably fear that they will be unable to obtain and communicate with an attorney if they are detained by Defendants. After the surge in immigration enforcement became known, PCUN started to receive calls with questions from panicked members wanting to access immigration representation resources. Declaration of Reyna Lopez ("Lopez Decl.") ¶ 15. The organization is aware of warrantless arrests of farmworkers where, even when

they called the PIRC statewide hotline and were able to connect with an attorney, the attorney was not allowed to meet with the detained person before the person was moved out of state. *Id.* ¶ 16. This has made it even more difficult for families to find representation or resources to help their loved ones. *Id.*

Additionally, Defendants have a policy, pattern, and practice of rapidly transferring detained individuals outside this district before those individuals can obtain or communicate with counsel. Tupper Decl. ¶¶ 26, 28-29; Moberg Decl. ¶¶ 14, 21. Locations to which detained individuals may be sent include those outside the United States where access to U.S.-based counsel is nearly impossible. *See, e.g., Dep't Homeland Security v. D.V.D.*, 145 S.Ct.. 2153, 2156-57 (2025) (Sotomayor, J., dissenting) (describing Defendants' third-country removal practice); *Bonilla Alvarez v. Noem*, No. 25-cv-03136 (D.D.C. Sept. 28, 2025) (same).

Moreover, the limitations on access to counsel that Defendants have imposed in their Oregon facilities raise a question as to whether Defendants are detaining individuals incommunicado—a clear Fifth Amendment violation. *Halvorsen v. Baird*, 146 F.3d 680, 688–89 (9th Cir. 1998) ("It would be hard to find an American who thought people could be picked up by a policeman and held incommunicado, without the opportunity to let anyone know where they were, and without the opportunity for anyone on the outside looking for them to confirm where they were."); *Castillo v. Nielsen*, No. 5:18-cv-01317, 2020 WL 2840065, at *5 (C.D. Cal. June 1, 2020) ("Defendants do not and cannot dispute that holding civil immigration detainees incommunicado for such prolonged periods implicates due process concerns.").

The practices described above undermine detained individuals' ability to retain and communicate with counsel and obstruct the attorney-client relationship in violation of the Fifth Amendment. *See Vasquez Perdomo v. Noem*, No. 2:25-CV-05605-MEMF-SP, 2025 WL 1915964, at *12 (C.D. Cal. July 11, 2025), *stay of temporary restraining order granted by Noem v. Vasquez Perdomo*, 2025 WL 2585637 (S. Ct. Sept. 8, 2025) (finding likelihood of success on Fifth Amendment claim where immigration detainees alleged near total prohibition on attorney access).

**2. Plaintiff PCUN is likely to succeed on Count 2 (First Amendment)**

The First Amendment guarantees noncitizens the right to hire, consult, and communicate with an attorney. *See Immigrant Defs. L. Ctr. v. Mayorkas*, No. 20-CV-9893 (JGB), 2023 WL 3149243, at *34 (C.D. Cal. March 15, 2023) ("The First Amendment protects the right to hire and consult with counsel.") (citing *Mothershed v. Justices of Supreme Court*, 410 F.3d 602, 611 (9th Cir. 2005), *as amended on denial of reh'g* (9th Cir. July 21, 2005)) and *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009)); *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000) ("The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition."); *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) ("The right to retain and consult with an attorney, however, implicates . . . clearly established First Amendment rights of association and free speech."); *Mercado v. Noem*, No. 25-cv-06568, 2025 WL 2658770, at *80 (S.D.N.Y. Sept. 17, 2025) (finding that plaintiffs were likely to succeed in showing that ICE's restrictions on attorney-client communications in a New York detention facility violate the First Amendment); *cf. Doe v. ICE*, 490 F. Supp. 3d 672, 694 (S.D.N.Y. 2020) (where ICE arrests in and around courthouses prohibited legal services organizations from providing legal services to their clients and engendered an "atmosphere of fear," Defendants' actions were the "functional equivalent of a denial of access" to the courts).

This right extends to all persons, including noncitizens who are detained and imprisoned. *See Pell v. Procunier*, 417 U.S. 817, 822 (1974) (recognizing that all persons, including prisoners, have First Amendment rights); *Torres*, 411 F. Supp. 3d at 1061-62 (finding class of immigration detainees had adequately alleged First and Fifth Amendment violation where contact with counsel was subject to significant restrictions in terms of timing, duration, access to confidential space, and promptness). Detained persons have a First Amendment right to "communicate with persons outside prison walls," *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002); and barriers to legal communication between a prisoner and counsel merit "heightened concern" given the "import for the prisoner's legal rights[.]" *Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2002); *see also Al Odah v. United States*, 346 F. Supp. 2d 1, 9 (D.D.C. 2004) (holding that government may

not "inappropriately burden th[e] [attorney–client] relationship" for individuals detained at Guantanamo).

To ensure that the First Amendment right to hire, consult, and communicate with an attorney is upheld, the government cannot unnecessarily burden a detained person's access to counsel. Thus, in *Torres v. U.S. Department of Homeland Security*, 411 F. Supp. 3d at 1067-68, the court rejected the government's argument that only an "outright ban on communication" would violate the plaintiffs' First Amendment rights. Instead, it concluded that even where detained people had some ability to communicate with counsel, restrictive conditions on access to counsel—such as restrictions on phone calls, email, and mail; lack of proper confidentiality; and delays in appointment times—impermissibly burdened plaintiffs' First Amendment rights to communicate with the outside world, including with attorneys. *Id.* at 1045, 1067–68; *see also Immigrant Defs. L. Ctr. v. Mayorkas*, No. 20-CV-9893 (JGB), 2023 WL 3149243 at *33–35 (detained individuals adequately alleged First Amendment violation where represented individuals could only speak with their lawyers non-confidentially for up to an hour, and unrepresented individuals could not access counsel at all).

By restraining the ability of PCUN's members to access counsel if they are detained, Defendants' policies and practices violate their First Amendment right to communicate with counsel. *See* Lopez Decl. Most of PCUN's members need assistance navigating everyday processes ranging from something as simple as reading a telephone bill to explaining medical records and instructions. *Id.* ¶ 23. For those members in these circumstances, it is especially harmful to not have access to an attorney when they are going through a complicated legal process and in the custody of the government. *Id.* If the immigration system is complex enough to a person who is fairly educated and literate in English, there is a heightened level of harm to an individual who is trying to understand what is happening after a detention while not being able to even read the documents provided to them. *Id.* ¶ 24. Without the support of attorneys, PCUN's members who may be taken into custody will be forced to make decisions about their rights without understanding what they might be waiving or declining. *Id.* Not having access to counsel can mean

that their members of all immigration statuses may be unlawfully detained or deported without recourse, because they are targeted based on the color of their skin and their type of job. *Id.*

### 3. Plaintiff CLEAR Clinic is likely to succeed on Count 3 (First Amendment)

The First Amendment also protects legal service providers from government interference when they are "advocating lawful means of vindicating legal rights," *NAACP v. Button*, 371 U.S. 415, 437 (1963), or engaged in the "creation and dissemination of information", *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). First Amendment protections extend to organizations' right to solicit potential clients. *See In re Primus*, 436 U.S. 412, 431 (1978) (explaining that the "efficacy of litigation as a means of advancing the cause of civil liberties often depends on the ability to make legal assistance available to suitable litigants"). Moreover, by advising, assisting, and consulting with potential and existing clients, attorneys disseminate important legal information, and the "creation and dissemination of information are speech within the meaning of the First Amendment." *IMS Health Inc.*, 564 U.S. at 570.

On many occasions, CLEAR Clinic attorneys have been unable to communicate at all with prospective clients because of their imminent transfer from the Portland Office. *See* Tupper Decl. ¶ 22-29 (summarizing Defendants actions as "[o]n every occasion, our attorneys have been denied full, and often any, access to our clients and prospective clients at the Portland ICE field office[.]"); Moberg Decl. ¶ 5 (same). For example, on October 15, 2025, a CLEAR Clinic attorney arrived to meet with multiple prospective clients at the Portland Office, following community reports of immigration enforcement actions in Woodburn. Tupper Decl. ¶ 28. Although CLEAR Clinic was aware of at least four prospective clients who had been detained, the attorney was able to meet briefly with only one of them before officers told her that "everyone is already gone." *Id.* The attorney witnessed vans with Washington license plates pull up to the Portland Office and saw many men lined up be transferred, but she was unable to meet with them. *Id.* ¶ 29. Without access to those individuals, CLEAR Clinic lost the opportunity to advise these people of their legal rights and is unlikely, without great additional effort, to be able to locate them and provide follow-up legal services. *Id.*

16

### 4. Plaintiffs are likely to succeed on Count 4 (Violation of APA and INA)

In keeping with the right to counsel guaranteed by the Fifth and First Amendments, the INA guarantees noncitizens the right to counsel in connection with inadmissibility and deportability proceedings. 8 U.S.C. § 1362; 8 U.S.C. § 1229a(b)(4)(A); *see also Colmenar*, 210 F.3d at 971; *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 993 (9th Cir. 2025); *Biwot*, 403 F.3d at 1098; *Orantes-Hernandez*, 919 F.2d at 554; *Torres*, 411 F. Supp. 3d at 1060-61. This right— "integral to the INA's foundation," *id.* at 1060—is "protected as an incident of the right to a fair hearing under the Due Process Clause of the Fifth Amendment." *Gomez-Velazco v. Sessions*, 879 F.3d 989, 993 (9th Cir. 2018); *see also Biwot*, 403 F.3d at 1098 ("The right to counsel in immigration proceedings is rooted in the Due Process Clause and codified at 8 U.S.C. § 1362 and 8 U.S.C. § 1229a(b)(4)(A)."). Given the "grave consequences of removal," "[t]he right to counsel is a particularly important procedural safeguard." *Leslie v. Att'y Gen. of U.S.*, 611 F.3d 171, 180– 81 (3d Cir. 2010); *accord Escobar-Grijalva v. I.N.S.*, 206 F.3d 1331, 1335 (9th Cir.), *amended*, 213 F.3d 1221 (9th Cir. 2000) ("Deprivation of the statutory right to counsel deprives an alien asylum-seeker of the one hope she has to thread a labyrinth almost as impenetrable as the Internal Revenue Code."); *Biwot*, 403 F.3d at 1098–99 ("The high stakes of a removal proceeding and the maze of immigration rules and regulations make evident the necessity of the right to counsel."); *Baltazar-Alcazar v. I.N.S.*, 386 F.3d 940, 944 (9th Cir. 2004) ("In creating a statutory right to counsel, Congress recognized that aliens have a great deal at stake in removal proceedings and acknowledged the importance of representation by an attorney in those proceedings.").

The statutory right to counsel necessarily entails the right to consult with an attorney in advance of any hearing—especially a hearing at which a noncitizen faces potentially permanent banishment from the United States. *See Orantes-Hernandez*, 919 F.2d at 564-67 (concluding that errors in the lists of lawyers provided to noncitizens, detention far from potential or existing counsel, restrictions on consultation with counsel before signing voluntary departure documents, failures to notify attorneys of client location transfers, limited attorney visitation hours, and inadequate efforts to ensure the privacy of attorney-client interviews cumulatively deprived

noncitizens of their right to "consult with counsel"); *Rios-Berrios v. INS*, 776 F.2d 859, 862 (9th Cir. 1985) (requiring that individuals in removal proceedings be provided reasonable time to locate counsel and that counsel be provided reasonable time to prepare for any hearing); *Torres*, 411 F. Supp. 3d at 1061 ("[C]aselaw suggests the right to counsel codified in the INA extends beyond the removal proceeding itself."). For the right to counsel to be effective, access to counsel must be "meaningful"— noncitizens must thus be provided "the right to contact counsel and the time, space, and ability to consult with counsel safely and confidentially." *Immigrant Defs. L. Ctr. v. Noem*, 781 F. Supp. 3d 1011, 1050 (C.D. Cal. 2025). Immigration officials have an obligation to "protect the right, including providing notice of the right," and a non-citizen's custodians may not "effectively block access to counsel." *Torres*, 411 F. Supp. 3d at 1061.

Under the Administrative Procedure Act ("APA"), a court "shall . . . hold unlawful . . . agency action" that is "not in accordance with law;" "contrary to constitutional right;" "in excess of statutory jurisdiction, authority, or limitations;" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D). For all of the reasons explained above, Plaintiff PCUN's members and Plaintiff CLEAR Clinic are likely to succeed in showing that Defendants' policy and practice of impeding access to counsel is "final agency action" that is in excess of statutory authority because it violates the INA's right to counsel. *See* 5 U.S.C. §§ 704, 706(2)(C).

**B.      Plaintiffs will likely suffer irreparable harm if not granted temporary relief.**

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Similarly, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Moreover, government action that frustrates an organization's core missions gives rise to irreparable harm. *See FDA v. Alliance for Hippocratic Medicine,* 602 U.S. 367, 395 (2024) (an organization has standing if the defendant "'perceptibly impair[s]' [its] 'core' and ongoing ability to provide counseling . . . services" to its constituents); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677-78 (9th Cir. 2021). Expediency in applying for a temporary

restraining order suggests "urgency and impending irreparable harm." *Id.* at 678; *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

Plaintiffs are among the organizations and individuals harmed by Defendants' unlawful denials of access to counsel. CLEAR Clinic's attorneys have repeatedly attempted to contact clients and prospective clients at the Portland Office, but Defendants have thwarted their efforts. Tupper Decl. ¶¶ 30-36. CLEAR's staff members have been denied access to clients and prospective clients by Defendants, and its core business activities of providing legal services to these individuals is being impeded. *Id.* ¶¶ 30 ("First and foremost, the inability to meet with clients and prospective clients prevents CLEAR Clinic from being able to prepare those individuals' immigration cases or seek their release from ICE detention."); ¶ 3 (describing core business activities of "provid[ing] immigration legal services"); ¶ 7 (describing how CLEAR Clinic "provides free, low-barrier legal services to our community members, including immigration legal needs" and enumerating those services); ¶¶ 13-17 (defining core business activity of rapid response services); Moberg Decl. ¶¶ 5, 15, 22 (detailing series of denials of access and harms).

PCUN's organizational interests and its members' interests are irreparably harmed by Defendants' actions. The "community trusts [PCUN] to provide them with support and information…part of [PCUN's] mission [is] to address the most pressing topics for our working families." Lopez Decl. ¶ 32. Because the denials of access, PCUN is frustrated in its core business activity. *Id.* ¶ 32-34. "For the immigrant community, any perceived barriers to access services will discourage any further efforts to reach out for assistance…[t]his in turns leaves farmworkers and immigrant families, one of the most marginalized and vulnerable groups, unprotected." *Id.* ¶ 35. Its members suffer infringements of their constitutional rights, particularly their Fifth Amendment due process rights. *Id.* ¶¶ 16 (describing how a member was denied access to counsel, transferred out of district, and separated from their family suffering harm); ¶ 24 (explaining that without access to counsel, "our members who may be taken into custody will be forced to make decisions about their rights without understanding what they be waiving or declining."); ¶ 25 (detailing how detained farmworkers were "denied the chance to timely meet with attorneys and

forced to make legal decisions without consulting with counsel—even though we confirmed that there were attorneys trying to access the farmworkers who were detained and taken to the Macadam ICE building to process them.").

**C.    The balance of the equities and public interest factors tip sharply in favor of preliminary relief.**

When the alleged action by the government violates federal law, the public interest factor generally weighs in favor of the plaintiffs. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). As the Ninth Circuit has observed, "[a] plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor." *Baird v. Bonta*, 81 F.4th 1036, 1036 (9th Cir. 2023).  Moreover, "it is always in the public interest to prevent the violation of a party's constitutional rights," *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (quoting *Melendres*, 695 F.3d at 1002); *see also Baird v. Bonta*, 81 F.4th at 1036, and the government suffers no harm from a court order that simply ensures that constitutional standards are upheld, *see Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *Zepeda v. United States Immigration & Naturalization Service*, 753 F.2d 719, 727 (9th Cir. 1983). The balance of the equities and public interest factors thus tip sharply in favor of temporary emergency relief to prevent ongoing irreparable harm to Plaintiffs and their members.

**V.    Conclusion**

For the foregoing reasons, Plaintiffs respectfully request that this Court *immediately* enter an order to restrain Defendants for three business days from transferring the above-described individuals out of the district; to order Defendants to enable these individuals to receive access to counsel while in Defendants' custody; and to direct Defendants to notify this Court and Plaintiffs within three hours of any new apprehension. After entering the restraining order, Plaintiffs respectfully request that the Court order Respondents to respond to this Motion by Friday, October 17, 2025; allow Petitioner to file a reply by Monday October 20, 2025; and hold a hearing by Tuesday, October 21, 2025, subject to the Court's availability.

Dated: October 16, 2025.                              Respectfully submitted,

                                                     /s/  Stephen W Manning

                                                     STEPHEN W MANNING, OSB No. 013373
                                                     stephen@innovationlawlab.org,
                                                     smanning@ilgrp.com
                                                     TESS HELLGREN, OSB No. 191622
                                                     tess@innovationlawlab.org
                                                     JORDAN CUNNINGS, OSB No. 182928
                                                     jordan@innovationlawlab.org
                                                     KELSEY LYNN PROVO, OSB No. 145107
                                                     kelsey@innovationlawlab.org
                                                     NELLY GARCIA ORJUELA, OSB No. 223308
                                                     nelly@innovationlawlab.org
                                                     INNOVATION LAW LAB
                                                     333 SW 5th Ave., Suite 200
                                                     Portland, OR 97204-1748
                                                     Telephone: +1 503-922-3042

                                                     Attorneys for Plaintiffs