STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,
smanning@ilgrp.com
TESS HELLGREN, OSB No. 191622
tess@innovationlawlab.org
JORDAN CUNNINGS, OSB No. 182928
jordan@innovationlawlab.org
KELSEY LYNN PROVO, OSB No. 145107
kelsey@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No. 223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| CLEAR CLINIC and PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE;<br><br>*Plaintiffs,*<br><br>v.<br><br>KRISTI NOEM, Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); TODD LYONS, Acting Director of Immigration Customs Enforcement; CAMMILLA WAMSLEY, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"); PETE FLORES, Acting Commissioner of Customs and Border Protection; and U.S. | Case No. 25-1906<br><br>**DECLARATION OF JOSEPHINE MOBERG IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** |

| CUSTOMS AND BORDER PROTECTION ("CBP"), |
| |
| *Defendants*. |

### DECLARATION OF JOSEPHINE MOBERG

I, Josephine Moberg, upon my personal knowledge, hereby declare under penalty of perjury as follows:

1. I am over the age of eighteen and make this declaration based upon my own personal knowledge.

2. I am a licensed attorney and member in good standing of the Oregon State Bar, and I am admitted to practice in the state of Oregon.

3. I am a staff attorney for the full-scope removal defense team and the criminal record relief team at the CLEAR Clinic. I have been a practicing attorney since February 5th, 2024.

4. I have provided or attempted to provide rapid response legal interventions at the ICE field office on S.W. Macadam on multiple occasions, and I have been repeatedly denied meaningful access to clients or prospective clients. Below are three such examples.

**Denial of Access at the Portland ICE facility on July 30, 2025**

5. On July 30, 2025, I responded to reports of detentions of community members.

6. At around 10:09am, community members staffing a table outside of the Portland ICE Facility on Macadam reported to CLEAR Clinic that prospective client A.C.J. had likely been detained, as she had been inside the building for her ICE check-in since 8:35am.

7. At around 10:17am, community members reported to CLEAR Clinic that another prospective client, V.A.G.M., was also being detained at the Portland ICE facility.

8. In response to these reports, I rearranged pre-existing work commitments in order to travel to the Portland ICE Facility. In line with our organization's role of offering and providing legal representation to Oregonians detained by ICE, I intended to advise the detained community members of their rights, to conduct legal intakes, and to see if CLEAR Clinic could offer further legal representation.

9. At around 11:05am, I arrived at the Portland ICE facility and presented a G-28 for both prospective clients, which had all of the requisite information but still needed the prospective clients' signatures. I went through security and was told by officers to wait in

the lobby and that my prospective clients would be brought to see me so that they could sign the G-28 forms.

10. At around 11:30am, I requested to speak with the front desk ICE agent's supervisor to confirm that my prospective clients would not be transported out of state while I waited to meet with them. After waiting a few minutes, the supervising agent came out to speak with me. I requested information about my prospective clients' booking and transport times. The supervising agent left to obtain that information and came back a few minutes later, saying that he could not share that information.

11. At around 11:48am, a GEO Group van 61738 (Back) 1705757 (Front) C53129N (WA Plate) left the Portland ICE facility with a masculine-presenting person in the back seat. The community members documenting the transport outside told me that it looked like V.A.G.M.

12. At around 12:03pm, after I had waited in the lobby for about an hour, the supervising ICE agent came back out and told me that my prospective clients had both already been transported out of the facility. When I requested the names and titles of the ICE agents I had been speaking with, and who had ordered the transports for my prospective clients, I was told that such information was also confidential. The supervising agent left and refused to come back out to speak with me again. I requested his business card from the front desk agent.

13. I left the Portland ICE facility around 12:48pm, after the front desk agent provided me with his "supervisor's business card", which had no identifying information on it.

14. I later learned that my prospective clients were transported out-of-state without the opportunity to meet with counsel, presumably while I was waiting in the lobby to meet with them.

**Denial of Access at the Portland ICE facility on August 18, 2025**

15. I responded to another detention of a community member on August 18, 2025.

16. At around 10:31am, community members staffing a table outside of the Portland ICE facility reported that a client, D.J.R.T., had been detained. D.J.R.T. had previously signed a G-28 Notice of Representation for me to represent him in the event that he was detained.

17. I arrived at the Portland ICE facility at around 11:25am and presented my valid, signed G-28 to the ICE agent. I told the agent that I was D.J.R.T.'s attorney and needed to meet with him immediately. The agent took the form back inside and asked me to wait. He

came back out a few minutes later and told me that I had to come back in 15 minutes, without providing an explanation as to why.

18. At around 11:35am, I went back and again requested to see my client. The ICE agent told me that my client was being "uncooperative" and would be transported to Tacoma, where I could meet with him. I asked what "uncooperative" meant, and the agent said that he didn't know. I responded that I needed to speak with the ICE agent or supervisor who was giving the orders, since they were denying him access to counsel. The ICE agent replied that no other agents were available to speak with me and that his supervisors were all busy "trying to help my client." I was told that I could not enter the facility or meet with anyone inside.

19. At around 11:45am, I went back a third time and told the agent that I needed a printed out description of their authority to deny him counsel on the basis of lack of cooperation, detailing what actions were taken by ICE that day with respect to my client, including documentation of his booking and any transport orders. I also requested a business card with the names and titles of the ICE agents involved.

20. At around 12:04pm, the ICE agent came back out of the building. He handed me a blank piece of paper with "OPLA (503) 326-2059" handwritten on it. I told the agent that this was not what I asked for. He told me he didn't even know what OPLA stood for but that he wasn't able to give me anyone's names, any other information, and I could still not enter the building or speak with my client or any ICE agents.

21. My client was transported out-of-state without the opportunity to meet with counsel, despite our existing attorney-client relationship, my physical presence at the facility, and my repeated requests to meet with him.

**Denial of Access at the Portland ICE facility on September 30, 2025**

22. I responded to a detention of a community member on September 30, 2025.

23. At around 11:37am, I arrived at the Portland ICE facility and presented my G-28 to the ICE agent, requesting a meeting with my client A.J.R., who I was aware had been detained that day. I was told to wait outside.

24. At around 11:41am, the ICE agent returned and told me that my client was refusing the visit and did not want to meet with a lawyer, so I could not be let into the facility. I mentioned that I thought my client might have TPS (Temporary Protected Status), and therefore I was concerned that ICE did not have the authority to detain him. The ICE agent responded that he did not know what TPS stood for, he guessed "Third Party Spaghetti" and laughed. He closed the door without letting me inside.

25. I left the facility and began to drive back to my office. As I was driving, I decided to return to the Portland ICE facility to request at least a brief visit with my client, to advise him on the rights he was allegedly waiving.

26. I arrived back at the Portland ICE facility at around 12:15pm and re-presented my G-28. I requested a brief visit with my client to advise him of his rights. I was again told by the ICE agent to wait.

27. The ICE agent came back out at around 12:25pm to tell me that "no one is at their desks right now" so "they're trying to track him down but it's taking a while."

28. The ICE agent came back out at around 12:34pm and let me in to meet with my client. I was told by a second ICE agent, who walked me to the visiting room, that I had to be brief because my client was going to be transported to the Tacoma facility shortly.

29. When I spoke with my client, he said that he had never refused my visit. He confirmed this multiple times. He said that he had told the ICE agents that he did want to speak with an attorney, and that they had given him a list of low-cost law offices.

30. I met with my client for about 30 minutes, until we were cut off by an ICE agent at approximately 1:06pm.

31. My client was transported out-of-state after initially being denied counsel and then only being allowed to meet with counsel for about 30 minutes.

32. In order for access to counsel to be meaningful, it must be both timely and of adequate duration. In my experience as an immigration attorney, permitting an individual to meet with their attorney only after they have been transported out-of-state, or limiting access to only about 30 minutes, prevents an adequate advisal of the individual's rights and deprives the individual of any meaningful access to counsel.

33. Based on my previous experience as a criminal defense attorney in Portland, Oregon, I know that access to counsel is critical to ensure that detained individuals' rights are not violated. As a criminal defense attorney I was always immediately granted access to my detained clients upon request, due to their Sixth Amendment rights under the United States Constitution. While criminal and immigration law are distinct, the Immigration and Nationality Act guarantees noncitizens the privilege of representation of their choice, though such representation is not government-funded. ICE's National Detention Standards similarly provide detainees with an opportunity to meet privately with counsel, including prospective counsel.

34. Access to counsel has a material impact for individuals detained by ICE. Based on my experience and knowledge, people in detention are much more likely to be released from custody, and win their case on the merits, when represented.

I DECLARE UNDER PENALTY OF PERJURY AND UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Executed in Portland, Oregon on October 16, 2025.

*Josie Moberg*

JOSEPHINE MOBERG

Staff Attorney, CLEAR Clinic