STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,
smanning@ilgrp.com
TESS HELLGREN, OSB No. 191622
tess@innovationlawlab.org
JORDAN CUNNINGS, OSB No. 182928
jordan@innovationlawlab.org
KELSEY LYNN PROVO, OSB No. 145107
kelsey@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No. 223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
### Eugene Division

| | |
|---|---|
| CLEAR CLINIC; PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE; and LEON X, on behalf of a class of all similarly situated people, | |
| *Plaintiffs,* | Case No. 6:25-cv-01906-AA |
| v. | |
| KRISTI NOEM, Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); TODD LYONS, Acting Director of Immigration Customs Enforcement; CAMMILLA WAMSLEY, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"); PETE FLORES, Acting Commissioner of | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Customs and Border Protection; and U.S.
CUSTOMS AND BORDER PROTECTION
("CBP"),

    *Defendants.*

## INTRODUCTION

1.  The U.S. Constitution requires that individuals subject to the government's unilateral power of detention, transfer, and extraordinary rendition must have the right to access counsel before any transfer or rendition. *See* U.S. Const. amend. V. The rule of law—and the principles embodied in the Administrative Procedure Act (APA), Immigration & Nationality Act (INA), numerous regulations, and formal federal agency policy—demands no less.

2.  Recent federal agency action, however, has undermined this sacrosanct safeguard.

3.  In the District of Oregon, federal agencies have commanded their vast resources and innumerable agents to assault the people—immigrants and non-immigrants alike. Undertaking the orders of the President "to do all in their power to achieve the very important goal of delivering the single largest Mass Deportation Program in History,"[1] federal agencies—which are mere creatures of law with an ironclad obligation to always obey the law—have largely abandoned the law, especially the law on immigrant detention, and their constitutional, statutory, and regulatory obligations.[2]

---

[1] Pres. Donald Trump, @realDonaldTrump, Truth Social (June 15, 2025, 5:43pm) ("ICE Officers are herewith ordered, by notice of this TRUTH, to do all in their power to achieve the very important goal of delivering the single largest Mass Deportation Program in History.").

[2] *See, e.g.*, Heather Knight and Hamed Aleaziz, *Trump Fired a U.S. Attorney Who Insisted on Following a Court Order*, New York Times (Sept. 26, 2025), https://www.nytimes.com/2025/09/26/us/trump-fires-us-attorney-california-immigration.html (describing how President Trump personally fired an acting U.S. Attorney merely for reminding

4.   In this spirit, federal agencies have adopted officially sanctioned policies, patterns, and practices designed to achieve quota deportations at all costs—even if that means violating the right to access counsel that is enshrined in the Fifth Amendment to the U.S. Constitution, in the Immigration and Nationality Act, and in our Nation's core legal traditions. *See Halvorsen v. Baird*, 146 F.3d 680, 688–89 (9th Cir. 1998) ("There is a well established tradition against holding prisoners incommunicado in the United States.").

5.   The stakes for Oregonians caught up in this unlawful dragnet are high. Individuals arrested in immigration enforcement actions may not only be rapidly transferred outside of Oregon and far from their communities of support, but they can also be sent quickly to third countries—like South Sudan, Eswatini, El Salvador, or Libya—where they have never been before and where the government takes the position that they are beyond the reach of this Court's jurisdiction and ability to remedy any unlawful detention or transfer.

---

the Border Patrol chief that his agency is required to follow a court order and the Constitution); Jennie Taer, *Trump admin's 3,000 ICE arrests per day quota is taking focus off criminals and 'killing morale': insiders warn*, NY Post (June 17, 2025), https://nypost.com/2025/06/17/usnews/trump-admins-3000-ice-arrests-per-day-quota-is-taking-focus-off-criminals-and-killing-morale-insiders/, https://perma.cc/DB9R-MJUC (last visited Sept. 18, 2025) ("The Trump administration's mandate to arrest 3,000 illegal migrants per day is forcing ICE agents to deprioritize going after dangerous criminals and targets with deportation orders, insiders warn. Instead, federal immigration officers are spending more time rounding up people off the streets, sources said. 'All that matters is numbers, pure numbers. Quantity over quality,' one Immigrations and Customs Enforcement insider told The Post."); NBC News, *DHS Secretary Kristi Noem Calls California Judge an "Idiot" Over Immigration Detention Ruling* (July 12, 2025), https://www.youtube.com/shorts/8iuX7h (showing Respondent Noem vowing that following district court ruling, "none of [the Government's] operations are going to change"); *see also* Debbie Cenziper et. al, *Under Trump, ICE aggressively recruited sheriffs as partners to question and detain undocumented immigrants*, The Washington Post (Nov. 23, 2021), https://www.washingtonpost.com/investigations/interactive/2021/trump-ice-sheriffs- immigrants-287g/ (quoting James Pendergraph, former Executive Director of ICE Office of State and Local Coordination, that "[i]f you don't have enough evidence to charge someone criminally but you think he's illegal, we can make him disappear").

6.   In recent months, Oregonians have been repeatedly denied access to counsel following their immigration arrests. Rapid transfers outside of Oregon, including deportations, have occurred before detained individuals have had any opportunity to obtain or communicate with counsel. On information and belief, in some instances Defendants have purposely transferred detained people outside the state of Oregon as quickly as possible in order to thwart attorneys' efforts to offer detained people legal representation and to undermine this Court's jurisdiction. *See, e.g.*, *E-M- v. Bostock*, No. 3:25-cv-01083-SI (D. Or. Aug. 12, 2025) (granting limited discovery based on "concerns and skepticism about the purported timing of Petitioner's removal from the Court's jurisdiction").

7.   Through increased arrests and sweeps over the past month, Defendants have escalated their assaults on Oregon's immigrant communities. Defendants' immigration enforcement practices across Oregon have become increasingly aggressive, with masked immigration agents targeting farmworkers and Latinx communities for illegal stops and arrests, followed by rapid transfers outside of Oregon before individuals arrested can speak with counsel. Many arrests have been violent. Transfers have proceeded not just to Washington, but onward to states including New Mexico, Louisiana, Mississippi, and Texas.

8.   Fundamental principles of constitutional law, statutory guarantees, and the federal government's own operative guidance governing individuals detained for immigration proceedings forbid the government from holding prisoners without permitting them an opportunity to communicate with attorneys. Defendants may not deprive Oregonians of their right to counsel – nor may they bar attorneys at the prison doors who seek to provide this legal assistance.

9.   Through this lawsuit, Plaintiffs seek to enforce meaningful access to counsel for Oregonians detained in civil immigration enforcement actions; to uphold their rights, their

members' rights, and the rights of the proposed class; and to protect attorneys' ability to provide legal representation to community members in government custody.

## JURISDICTION AND VENUE

10. This Court has federal question jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2241 (federal habeas statute); 8 U.S.C. § 1252(e), and the Suspension Clause of the United States Constitution, U.S. Const. art. I, § 9. I.

11. Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and federal officers of the United States acting in their official capacities, and because at least one of the plaintiffs resides in this district and no real property is involved in the action.

12. For these same reasons, divisional venue is proper under Local Rule 3-2.

13. This Court has the authority to grant the relief requested by Plaintiffs under the Administrative Procedure Act, 5. U.S.C. § 701, *et seq.*; Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable authority.

## PARTIES

14. Plaintiff **CLEAR Clinic ("CLEAR Clinic")** is a nonprofit organization having its principal place of business in Portland, Oregon. CLEAR Clinic was founded as a program of Portland Community College in 2020 and now is an independent 501(c)(3) nonprofit corporation. CLEAR Clinic provides free, barrier-reducing legal services to Oregonians in the practice areas of immigration justice, housing justice, and court record relief. It also works to find legal, educational, and systemic solutions to racial, social, and economic injustice, including by collaborating with community members and community-based organizations to dismantle systems of oppression. As part of its immigration justice program, CLEAR Clinic works to defend the rights of all noncitizens

in Oregon, regardless of immigration status or criminal history. Its staff includes attorneys who provide pro bono legal services to clients in removal proceedings, including those who are detained, and those who face the threat of removal and detention. CLEAR Clinic actively participates in and is a key member of the Oregon for All coalition, which includes a network of regional leads focused on rapid response. CLEAR Clinic's attorneys have repeatedly attempted to contact clients and prospective clients at Defendant U.S. Immigration and Customs Enforcement's (ICE's) facility in Portland, Oregon, but Defendants have repeatedly thwarted Clear Clinic's efforts to provide legal advice. As a result of Defendants' policies and practices denying access to counsel, CLEAR Clinic's staff members have been denied access to clients and prospective clients and its core business activities of providing free legal services have been impeded.

15. Plaintiff **Pineros y Campesinos Unidos del Noroeste ("PCUN")** is the largest Latino organization in the state of Oregon and is based in the city of Woodburn in Marion County, Oregon. Founded in the 1980s as a nonprofit labor union, PCUN is now a membership organization largely consisting of farmworkers and Latino working families; its programs and services also serve Oregon's Latino community at large through its main membership organization as well as its affiliates. PCUN's members work at agricultural sites as well as non-agricultural sites within the District of Oregon. Many of PCUN's members, including noncitizens with legal status and U.S. citizens, have been subjected to and continue to be at risk of unlawful stops, arrests, detentions, transfers, and deportations without the opportunity to access counsel. They are directly harmed by Defendants' denial of counsel policies and practices challenged in this case.

16. Plaintiff **Leon X** is a 32-year-old resident of Oregon who came to the United States from Mexico when he was six years old.[3] He grew up in the farmworker community and is active in the immigrant rights movement. Because of his background and immigration status, he is at risk of and fears unlawful stops, arrests, detentions, transfers and deportations without the opportunity to access counsel. He is directly harmed by Defendants' denial of counsel policies and practices challenged in this case. He seeks to bring this action on his own behalf and on the behalf all similarly situated individuals who, since October 16, 2025, have been arrested or are at risk of arrest for alleged civil immigration violations in the District of Oregon by Defendants or entities working in concert with them. He seeks to proceed under pseudonym to protect himself from retaliation and to protect the sensitive personal details of his own immigration case.

17. Defendant **Kristi Noem** is sued in her official capacity as the Secretary of the U.S. Department of Homeland Security. Secretary Noem is responsible for the administration of U.S. immigration laws. She directs each of DHS's components, including the components responsible for the apprehension, detention, and removal of noncitizens. Secretary Noem is responsible for ensuring that DHS and its component agencies provide attorney access in accordance with law.

18. Defendant **U.S. Department of Homeland Security ("DHS")** is a federal cabinet-level department of the U.S. government. DHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1). It is the largest federal law enforcement agency, and it is responsible for administering U.S. immigration laws under the Immigration and Nationality Act ("INA") and federal regulations, including those relating to the apprehension, detention, and removal of noncitizens. Its components

---

[3] Plaintiff Leon X seeks leave of the Court to proceed under pseudonym in this matter, out of fear of retaliation and due to sensitive personal details in his immigration case. *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000). A Motion to Proceed Under Pseudonym is forthcoming.

include U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"). DHS is responsible for providing attorney access in accordance with law across all of its component agencies.

19. Defendant **Todd Lyons** is sued in his official capacity as the Acting Director of Immigration and Customs Enforcement. Acting Director Lyons oversees all ICE personnel and is a supervisory official responsible for overseeing immigration enforcement, including apprehension, detention, and removal of noncitizens both near the border and in the interior of the United States. Acting Director Lyons is responsible for ensuring that ICE and its detention facilities provide attorney access in accordance with law.

20. Defendant **Cammilla Wamsley** is the Field Office Director for the Seattle Field Office, Immigration and Customs Enforcement and Removal Operations. The Seattle Field Office is responsible for local custody decisions relating to non-citizens charged with being removable from the United States, including the arrest, detention, and custody status of noncitizens. The Seattle Field Office's area of responsibility includes Alaska, Oregon, and Washington, encompassing sites including the Portland and Eugene Field Offices at issue in this complaint. Director Wamsley is responsible for ensuring that the Seattle Field Office and its detention facilities provide attorney access in accordance with law.

21. Defendant **U.S. Immigration and Customs Enforcement ("ICE")** is a sub-agency of DHS and an "agency" within the meaning of the APA. 5 U.S.C. § 551(1). It is responsible for the apprehension, detention, and removal of noncitizens both near the border and in the interior of the United States. ICE is also responsible for ensuring its officers and facilities provide attorney access that complies with the rule of law, including at its Field Office sites at issue in this complaint.

22. Defendant **Pete R. Flores** is sued in his official capacity as the Acting Commissioner of Customs and Border Protection. Mr. Flores oversees all CBP personnel and is responsible for overseeing the apprehension, detention, and removal of noncitizens within 100 air miles of external boundaries of the United States. Acting Commissioner Flores is responsible for ensuring that CBP provides attorney access in accordance with law to individuals it has detained.

23. Defendant **U.S. Customs and Border Protection ("CBP")** is a sub-agency of DHS and an "agency" within the meaning of the APA. 5 U.S.C. § 551(1). It is responsible for the apprehension, detention, and removal of noncitizens within a "reasonable distance" of any external boundary of the United States, typically defined as 100 air miles. CBP is responsible for ensuring that its officers provide attorney access in accordance with law to individuals they have detained.

## LEGAL BACKGROUND

24. Detained noncitizens have a robust right to counsel that is enshrined in the Fifth and First Amendments to the U.S. Constitution, in the Immigration and Nationality Act ("INA"), and in ICE's own Performance Based National Detention Standards ("PBNDS").

25. Individuals subject to civil immigration detention have a right to counsel that is rooted in the Due Process Clause of the Fifth Amendment to the U.S. Constitution. *Usubakunov v. Garland*, 16 F.4th 1299, 1304 (9th Cir. 2021); *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005); *see also Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1060-61 (C.D. Cal. 2019).

26. When the government detains individuals as part of immigration enforcement efforts, it cannot impose restrictions on access to attorneys that undermine the opportunity to obtain counsel or communicate with retained counsel. *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 554, 565 (9th Cir. 1990); *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1439 (9th Cir. 1986)

(recognizing that impediments to communication, especially in connection with a difficult-to-access facility, can constitute a "constitutional deprivation" where they obstruct an "established on-going attorney-client relationship.").

27. Likewise, the First Amendment to the U.S. Constitution guarantees noncitizens the right to hire, consult, and communicate with an attorney. *See Immigrant Defs. L. Ctr. v. Mayorkas*, No. 20-CV-9893 (JGB), 2023 WL 3149243, at *34 (C.D. Cal. March 15, 2023) ("The First Amendment protects the right to hire and consult with counsel.") (citing *Mothershed v. Justices of Supreme Court*, 410 F.3d 602, 611 (9th Cir. 2005), as amended on denial of reh'g (9th Cir. July 21, 2005)) and *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009)); *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000) ("The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition."); *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) ("The right to retain and consult with an attorney, however, implicates . . . clearly established First Amendment rights of association and free speech."); *Barco Mercado v. Noem*, No. 25-cv-06568, at 80 (S.D.N.Y. Sept. 17, 2025) (finding that plaintiffs were likely to succeed in showing that ICE's restrictions on attorney-client communications in a New York detention facility violate the First Amendment); *cf. Doe v. ICE*, 490 F. Supp. 3d 672, 694 (S.D.N.Y. 2020) (where ICE arrests in and around courthouses prohibited legal services organizations from providing legal services to their clients and engendered an "atmosphere of fear," Defendants' actions were the "functional equivalent of a denial of access" to the courts).

28. The First Amendment also protects attorneys' right to engage in protected speech with their clients and prospective clients. *See NAACP v. Button*, 371 U.S. 415, 437 (1963) (protecting legal service providers from government interference when they are "advocating lawful means of vindicating legal rights"); *In re Primus*, 436 U.S. 412, 431 (1978) (explaining that the "efficacy of

litigation as a means of advancing the cause of civil liberties often depends on the ability to make legal assistance available to suitable litigants").

29. In keeping with these constitutional norms, the INA guarantees noncitizens the right to counsel in connection with inadmissibility and deportability proceedings. *See* 8 U.S.C. §1362; 8 U.S.C. § 1229a(b)(4)(A); *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 993 (9th Cir. 2025); *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005); *Orantes-Hernandez*, 919 F.2d at 564; *Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1060-61 (C.D. Cal. 2019). This statutory right to counsel is further delineated in federal regulations. *See, e.g.*, 8 C.F.R. § 1003.16(b); 8 C.F.R. § 1292.1; 8 C.F.R. § 1001.1(f).

30. Defendant ICE's Performance-Based National Detention Standards ("PBNDS") further govern attorney communication and access in immigration detention facilities nationwide. U.S. Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011* (rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

31. The PBNDS state that immigration detention facilities "may not limit a detainee's attempt to obtain legal representation" and "may neither restrict the number of calls a detainee places to his/her legal representatives, nor limit the duration of such calls by rule or automatic cut-off, unless necessary for security purposes or to maintain orderly and fair access to telephones." PBNDS 5.6(V)(E), (F)(1). For attorney visitation, the PBNDS require that facilities permit "legal visitation seven days a week, including holidays, for a minimum of eight hours per day on regular business days (Monday through Friday), and a minimum of four hours per day on weekends and holidays." PBNDS 5.7(V)(J)(2). Both the calls and visits must be conducted in confidential settings. PBNDS PBNDS 5.6(V)(F)(2), 5.7(V)(J)(9).

32. Under the PBNDS, immigration detention facilities must also allow pre-representational visits. For such visits, attorneys need not present a signed proof of appearance before the agency to access prospective clients. PBNDS 5.7(V)(J)(7).

33. Despite the varied sources of law making clear that noncitizens must be allowed to consult with, retain, and communicate with counsel, Defendants have repeatedly denied people detained in this District access to counsel. Defendants have done so by, inter alia, denying detained people the ability to communicate with their counsel; denying detained people meetings with their attorneys, even when those attorneys are present at the ICE field office and requesting a client meeting; turning attorneys away when they arrive to an ICE field office asking to speak with a detained client or prospective client; declining to speak with attorneys who are denied access to detained clients or prospective clients, even when the attorney asks to speak with an ICE official; transferring detained people out of Oregon before they can speak with an attorney, even when an attorney is actively asking to speak with them; declining to tell detained people that an attorney is trying to speak with them; failing to list accurate information in the ICE Online Detainee Locator, https://locator.ice.gov/odls/#/search; and requiring that attorneys present unnecessary paperwork such as a signed G-28—a DHS form used to indicate an attorney or other authorized party is representing a person before the agency—before they can speak with a detained person, even when the attorney is requesting a pre-representational meeting with a prospective client.

34. The consequences of Defendants' policy, pattern, and practice of denying people access to counsel are grave: individuals denied the opportunity to meet with an attorney shortly after their arrest are deprived of the legal advice they need to properly challenge an unlawful detention or pursue any legal remedies they may have. As a result, individuals are left vulnerable to prolonged,

unlawful detention; rapid transfer to remote locations where they cannot access counsel;[4] and unlawful deportation, including to third countries where they have no ties.[5]

## FACTUAL BACKGROUND

35. In an effort to achieve quota deportations, Defendants have adopted policies, patterns, and practices resulting in the deprivation of badly needed and constitutionally guaranteed counsel. These policies and practices have subjected individual Oregonians to unlawful stops, arrests, detention, and transfers without access to counsel; impeded Plaintiff CLEAR Clinic's core business activities of providing free legal assistance to immigrant community members; and forced PCUN's members, Plaintiff Leon X and similarly situated persons to live in fear.

**Defendants Prioritize Mass Arrests and Deportations over the Demands of the Law**

---

[4] *See, e.g.*, Emma Janssen, *How ICE Hides Detainees From Their Lawyers*, The American Prospect (Oct. 6, 2025), https://prospect.org/justice/2025-10-06-how-ice-hides-detainees-from-their-lawyers/ (reporting on stories from around the United States indicating that ICE transfers isolate detained people from their attorneys and families and effectively deny people access to counsel); Carol Rosenberg, *ICE Sends More Migrants to Guantánamo Bay, Resuming Operations*, NY Times (Oct. 14, 2025), https://www.nytimes.com/2025/10/14/us/politics/ice-migrants-guantanamo-bay.html (explaining that ICE has resumed sending people to the U.S. naval base at Guantánamo Bay, Cuba).

[5] *See, e.g.*, Juan A. Lozano, *What to Know about Trump Deportation Policies that Could Send Kilmar Abrego Garcia to Uganda*, APNews (Aug. 25, 2025), https://apnews.com/article/third-country-agreements-abrego-garcia-deportation-76911317384dd329731246e607048f98 (reporting on countries that have agreed to accept deportations of people who are not their citizens) ("United Nations human rights experts have said such agreements have left people stranded in faraway places, arbitrarily detained for years on end, and at risk of torture and other inhuman treatment."); Joseph Stepansky and News Agencies, *US Sends Another 'Third-Country' Deportation Flight to Eswatini*, Aljazeera (Oct. 6, 2025), https://www.aljazeera.com/news/2025/10/6/us-sends-another-third-country-deportation-flight-to-eswatini (reporting on deportations of individuals to Eswatini who are not citizens of Eswatini, with one U.S. immigration attorney explaining, "I cannot call [my clients]. I cannot email them. I cannot communicate through local counsel because the Eswatini government blocks all attorney access.").

36. During his 2024 presidential campaign, President Trump promised that "on day one," he would "launch the largest deportation program of criminals in the history of America."[6]

37. In January 2025, the Trump administration gave ICE field offices an arrest quota of 75 arrests a day.[7]

38. As offices attempted to carry out this mandate, workplace raids increased,[8] ICE check-ins became traps,[9] and courthouse arrests surged.[10]

---

[6] Steve Inskeep & Christopher Thomas, *Trump promised the 'largest deportation' in US history. Here's how he might start*, Oregon Public Broadcasting (Nov. 15, 2024) available at https://www.opb.org/article/2024/11/15/trump-mass-deportation-immigration-border/.

[7] Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, The Washington Post (last updated Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota/.

[8] Marianne LeVine, et al*., ICE is Arresting Migrants in Worksite Raids. Employers are Largely Escaping Charges*, The Washington Post (June 30, 2025), https://www.washingtonpost.com/immigration/2025/06/30/ice-raids-arrests- workers-companies/ (noting an April announcement by ICE officials that the agency had arrested more than 1,000 workers during Trump's first 100 days and collecting stories of workplace raids across the country); Mark Moran, *ICE Detains More than 530 People in Workplace 'Raids' in U.S. Northeast*, United Press International (Jan. 23, 2025), https://www.upi.com/Top_News/US/2025/01/23/ice-details-538-ion- workplace-raids/7811737692376/.

[9] Maanvi Singh & Will Craft, *As deportations ramp up, immigrants increasingly fear Ice check-ins: 'All bets are off'*, The Guardian (Apr. 6, 2025), https://www.theguardian.com/us-news/2025/apr/06/deportations-immigrants-ice- trump; Nidia Cavazos, *Immigrants at ICE check-ins detained, held in basement of federal building in Los Angeles, some overnight*, CBS News (June 7, 2025), https://www.cbsnews.com/news/immigrants-at-ice-check-ins-detained-and-held-in- basement-of-federal-building-in-los-angeles/.

[10] Julia Ainsley, *Trump admin tells immigration judges to dismiss cases in tactic to speed up arrests*, NBC News (June 11, 2025), https://www.nbcnews.com/politics/national-security/trump-admin-tells- immigration-judges-dismiss-cases-tactic-speed-arrest-rcna212138; Luis Ferré-Sadurní, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, N.Y. Times (June 12, 2025), https://www.nytimes.com/2025/06/12/nyregion/immigration-courthouse-arrests- trump-deportation.html; Ximena Bustillo, *ICE's novel strategy allows for more arrests from inside immigration courts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/nx-s1-5409403/trump-immigration-courts-arrests; Martha Bellisle, et al., *Immigration officers intensify arrests in courthouse hallways on a fast track to deportation*, AP News (June 11, 2025),

39. Meanwhile, the administration began systematically dismantling internal accountability mechanisms and restraints on immigration agents' and officers' conduct. The administration shut down multiple oversight agencies (retaining only a version of their former selves after the administration was sued).[11] Investigations were closed.[12] Officers no longer had to abide by enforcement priorities.[13] Long-standing guidance restricting enforcement operations in sensitive locations—schools, hospitals, places of worship and public demonstrations—was rescinded.[14] And

---

https://apnews.com/article/immigration-court-arrests-ice-deportation-99d822cdc93ae7dc26026c27895d5ea1 (describing new tactic in which immigration judges grant a government motions dismiss deportation proceedings, enabling ICE

officers—often masked—to arrest noncitizens immediately outside in the hallway and place them on an expedited path to removal).

[11] Nicolae Viorel Butler, *Court Forces DHS to Preserve Immigrant Rights Offices*, Migrant Insider (May 27, 2025), https://migrantinsider.com/p/court-forces-dhs-to-preserve-immigrant?utm_source=CLINIC%2BMail&utm_campaign=f9e1ee6428-tips-6-2-25&utm_medium=email&utm_term=0_-663ab9ab77-284225192"https://migrantinsider.com/p/court-forces-dhs-to-preserve-immigrant?utm_source=CLINIC%2BMail&utm_campaign=f9e1ee6428-tips-6-2-25&utm_medium=email&utm_term=0_-663ab9ab77-284225192.

[12] Press Release, Government Accountability Project, *DHS Halted 500+ Civil Rights Investigations When It Shut Down Oversight Office, Whistleblowers Say* (May 15, 2025), https://whistleblower.org/press-release/dhs-halted-500-civil-rights-investigations-when-it-shut-down-oversight-office-whistleblowers-say/.

[13] Press Release, DHS, *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole* (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse (noting a directive "rescind[ing] the Biden Administration's guidelines for . . . enforcement actions that thwart law enforcement in or near so-called "sensitive" areas).

[14] Marisa Kabas, *ICE agents get green light to make unjustified warrantless arrests*, The Handbasket (June 12, 2025), https://www.thehandbasket.co/p/ice-warrantless-arrests-castanon-nava.

President Trump publicly questioned whether noncitizens are entitled to due process[15]—a principle that is well-established in the case law.

40. But these changes were not enough, according to the administration. In late May, White House Deputy Chief of Staff Stephen Miller summoned 25 Enforcement and Removal Operations (ERO) Field Office Directors and 25 Homeland Security Investigations (HSI) Special Agents to a meeting to demand that "everybody" be targeted.[16] He told officers to "just go out there and arrest illegal aliens," and he directed them to target Home Depot and 7-Eleven stores.[17] Under Miller's directive, agents no longer needed to develop vetted target lists of individuals suspected of being in the United States unlawfully.[18] Senior immigration officials also told agents in an email to "turn the creativity knob up to 11" and aggressively "push the envelope," including by pursuing "collaterals"—individuals that by definition would not have arrest warrants.[19] As another e-mail put it: "If it involves handcuffs on wrists, it's probably worth pursuing."[20]

---

[15] Interview with President Donald Trump, Meet the Press (May 4, 2025), *available at* https://www.nbcnews.com/politics/trump-administration/read-full-transcript-president-donald-trump-interviewed-meet-press-mod-rcna203514 (pressing President Trump on the fact that the Fifth Amendment states that non-citizens receive due process, and asking him whether he needed to uphold the Constitution, to which he replied, "I don't know.").

[16] Stuard Anderson, *Stephen Miller's Order Likely Sparked Immigration Raids and Protests*, Forbes, Jun. 9, 2025, https://www.forbes.com/sites/stuartanderson/2025/06/09/stephen-millers-order- likely-sparked-immigration-arrests-and-protests/; Brittany Gibson & Stef W. Kight, *Scoop: Stephen Miller, Noem tell ICE to supercharge immigration arrests*, Axios (May 28, 2025), available at https://www.axios.com/2025/05/28/immigration-ice-deportations-stephen-miller.

[17] Elizabeth Findell, et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, The Wall Street Journal (June 9, 2025), https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877.

[18] *Id.* (reporting that agents were no longer required to develop target lists of noncitizens unlawfully present in the U.S., marking a shift from longstanding policy).

[19] José Olivares, *US immigration officers ordered to arrest more people even without warrants*, The Guardian (June 4, 2025), https://www.theguardian.com/us- news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests.

[20] *Id.*

41. The administration set a new arrest quota of 3,000 arrests per day and reportedly threatened job consequences if officials failed to meet arrest quotas.[21] As Deputy Chief of Staff Miller stated, "Under President Trump's leadership, we are looking to set a goal of a minimum of 3,000 arrests for ICE every day, and President Trump is going to keep pushing to get that number up higher each and every single day."[22]

42. The overriding message to agents and officers carrying out immigration operations on the ground was to prioritize arrest numbers, regardless of the law. As one ICE official put it earlier this year, all that matters is "numbers, pure numbers, [q]uantity over quality."[23] Agents and officers were granted sweeping discretion to achieve this goal.

43. Administration officials also indicated that particularly punitive enforcement would be directed to places like Portland, Oregon and other so-called "sanctuary cities."

---

[21] Elizabeth Findell, et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, The Wall Street Journal (June 9, 2025), https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877; Julia Ainsley, et al., *A sweeping new ICE operation shows how Trump's focus on immigration is reshaping federal law enforcement*, NBC News (June 4, 2025), https://www.nbcnews.com/politics/justicedepartment/ice-operation-trump-focus-immigration-reshape-federal-lawenforcement-rcna193494; Brittany Gibson & Stef W. Kight, *Scoop: Stephen Miller, Noem tell ICE to supercharge immigration arrests*, Axios (May 28, 2025), available at https://www.axios.com/2025/05/28/immigration-ice-deportations-stephen-miller.

[22] Hannity, *Stephen Miller says the admin wants to create the strongest immigration system in US History*, Fox News (May 28, 2025), available at https://www.foxnews.com/video/6373591405112 (last visited Aug. 24, 2025).

[23] Jennie Taer, *Trump admin's 3,000 ICE arrests per day quota is taking focus off criminals and 'killing morale': insiders warn*, NY Post, June 17, 2025, https://nypost.com/2025/06/17/us-news/trump-admins-3000-ice-arrests-per-day-quota-is-taking-focus-off-criminals-and-killing-morale-insiders/, https://perma.cc/DB9R-MJUC (last visited Oct. 15, 2025) ("The Trump administration's mandate to arrest 3,000 illegal migrants per day is forcing ICE agents to deprioritize going after dangerous criminals and targets with deportation orders, insiders warn. Instead, federal immigration officers are spending more time rounding up people off the streets, sources said. 'All that matters is numbers, pure numbers. Quantity over quality,' one Immigrations and Customs Enforcement insider told The Post.").

44. In repeated messaging, White House "Border Czar" Tom Homan indicated that Portland would be targeted for punitive immigration operations including collateral arrests. On July 8, 2025, Homan stated, "I'm gonna head to Portland. . . . We're going to double down and triple down on sanctuary cities. If we can't arrest a bad guy in a jail, then we'll go to a community, and we'll find him. Or we'll do more worksite enforcement, and we'll find him at the worksite. And when we do these things and we ramp up that enforcement, we're gonna find others. Others who aren't a criminal target but who are in the country illegally. We're gonna arrest them too. So what you're gonna get, sanctuary cities, is exactly what you don't want. More agents in your communities and more collateral arrests."[24]

45. On July 21, Homan declared, "The sanctuary cities are now our priority. We're gonna flood the zone."[25] He explained that he would be sending more agents to sanctuary cities to make arrests "on the streets" where it would be "unsafe for the alien" because "anything could happen in on-the-street arrests."[26] Again, he reiterated that sanctuary cities would get "exactly what they don't want—more agents in the community and more agents in the worksite. "If we can't arrest a bad guy in the safety and security of the county jail, then we'll arrest him in the community. . . And when we arrest him in the community, if he's with others that are in the country illegally, they're

---

[24] Kudlow, *This rhetoric needs to be tamped down or you will see more bloodshed, Trump border 'czar' says*, FOX NEWS (JULY 8, 2025), available at https://www.foxbusiness.com/video/6375389812112 (last visited Aug. 24, 2025).

[25] *Homan: Trump administration to 'flood the zone' in New York*, THE WASHINGTON POST (July 21, 2025), available at https://www.washingtonpost.com/video/politics/homan-trump-administration-to-flood-the-zone-in-new-york/2025/07/21/30907a7f-0430-4688-a3c0-40f1231a20d9_video.html (last visited Aug. 24, 2025).

[26] *Id.*

coming too."[27] A few days later, Border Patrol sector chief Gregory Bovino, posing with a gun on his hip and canisters on his vest, declared in a social media video, "Folks, there is no such thing as a sanctuary city," before leading a warrantless raid at a Sacramento County Home Depot.[28]

46. Defendant Kristi Noem similarly emphasized that severe forms of enforcement would be directed at sanctuary jurisdictions, stating, "What we'll do in a [sanctuary city like New York] is we'll double down. We'll put more agents here. We'll put more personnel here."[29]

47. The resounding theme coming from the administration is that immigration agents should do whatever they need to do to deliver mass arrests and detentions—especially in places like Oregon, which have been identified as sanctuary jurisdictions.[30] They have quotas to meet, little accountability, and a mandate to ensure that "everybody" is targeted.[31]

---

[27] *Id. See also* Lauren Irwin, *Homan: Sanctuary cities will see more 'collateral arrests,'* The Hill (Jan. 21, 2025), available at https://thehill.com/homenews/administration/5098555-trump-immigration-plan-sanctuary-cities/ (last visited Aug. 24, 2025); Matt Schooley & Logan Hall, *Tom Homan, President Trump's border czar, says he's "bringing hell" to sanctuary city Boston*, CBSNews (Feb. 23, 2025), available at https://www.cbsnews.com/boston/news/immigration-tom-homan-president-trump-sanctuary-city-boston/ (last visited Aug. 24, 2025).

[28] Heather Knight and Hamed Aleaziz, *Trump Fired a U.S. Attorney Who Insisted on Following a Court Order*, New York Times (Sept. 26, 2025), https://www.nytimes.com/2025/09/26/us/trump-fires-us-attorney-california-immigration.html.

[29] Jeff Coltin, *ICE will 'flood the zone' in NYC*, Politico (July 21, 2025), available at https://www.politico.com/news/2025/07/21/ice-new-york-city-enforcement-00465313?utm (last visited Aug. 25, 2025).

[30] *See* Dep't of Justice*, Justice Department Publishes List of Sanctuary Jurisdictions* (Aug. 5, 2025), available at https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions (designating Oregon and Portland as "sanctuary jurisdictions").

[31] Stuard Anderson, *Stephen Miller's Order Likely Sparked Immigration Raids and Protests*, Forbes, Jun. 9, 2025, https://www.forbes.com/sites/stuartanderson/2025/06/09/stephen-millers-order- likely-sparked-immigration-arrests-and-protests/; Brittany Gibson & Stef W. Kight, *Scoop: Stephen Miller, Noem tell ICE to supercharge immigration arrests*, Axios (May 28, 2025), available at https://www.axios.com/2025/05/28/immigration-ice-deportations-stephen-miller.

48. Defendant Cammilla Wamsley has received specific instructions "to double [her] numbers" of arrests and has been urged to increase her goal of 30 immigration arrests a day to 50 immigration arrests a day.[32]

49. Against this backdrop, Defendants have conducted widespread stops, arrests, and detentions of individuals across Oregon and denied those arrested access to counsel.

50. On October 15, 2025, Defendants launched a wave of coordinated assaults on the people of Oregon with arrests that swept through the Willamette Valley. Individuals caught up in these arrests were detained and swiftly transferred out of state. Attorneys seeking to meet with individuals held at Defendants' Portland and Eugene Field Offices were denied access. In Portland, a responding attorney watched as officers loaded community members into vans with Washington plates and drove them away.

51. On October 30, 2025, Defendants conducted what is believed to be the single largest immigration raid in Oregon under this administration, arresting over 30 people in Woodburn.[33]

52. On November 11, 2025, Defendants conducted one of the largest ICE raids in Salem, Oregon targeting farmworkers.[34]

53. Defendants' drastic increase in immigration enforcement across Oregon, including in the Willamette Valley, including sweeps, has been characterized by warrantless arrests, vehicle stops, violent tactics, and rapid transfers of detained individuals out of Oregon.

---

[32] *See State of Oregon v. Trump*, No. 3:25-cv-1756-IM, Dkt. 146, at 52 (D.Or. Nov. 7, 2025).
[33] *See* Mia Maldonado, "Oregon see largest immigration raid under Trump 2.0 in Woodburn, group says," Oregon Capital Chronicle (Oct. 31, 2025), https://oregoncapitalchronicle.com/2025/10/31/oregon-sees-largest-immigration-raid-under-trump-2-0-in-woodburn-group-says/ (last visited Nov. 12, 2025).
[34] See Madeleine Moore and Rachel Alexander, *Salem sees at least 16 immigrants arrested on Veterans Day, groups say,* Salem Reporter (Nov. 11, 2025), https://www.salemreporter.com/2025/11/11/salem-sees-at-least-16-immigrants-arrested-on-veterans-day-groups-say/, https://perma.cc/AU9T-6TH3 (last visited Nov. 12, 2025)

**Defendants Deprive Detained Oregonians of Access to Counsel**

54. After conducting immigration arrests, Defendants have repeatedly held individuals incommunicado, despite attempts by counsel to meet with them at ICE field office sites, and then rapidly transferred them out of the state.

55. Defendants maintain policies, patterns, and practices denying access to counsel to individuals detained in their Portland and Eugene field offices. Whether detained individuals already have counsel or their families have arranged for an attorney to meet with them after learning of their arrest, Defendants have set up new "requirements" to frustrate attorneys' efforts to even make contact with the people they seek or have been retained to represent.

56. In Oregon, the Portland Immigrant Rights Coalition ("PIRC") runs a state-wide toll-free hotline to receive community reports of ICE detentions and other enforcement actions and to field requests for assistance from families impacted by detentions. Most of those requests are for legal assistance and representation. PIRC is also part of Oregon For All, a larger statewide coalition of organizations that have joined efforts to form a rapid response network to assist Oregonians facing immigration encounters or enforcement. Through this coalition, PIRC sends requests for assistance to the Equity Corps of Oregon ("ECO"), which runs the universal representation program in Oregon, and ECO arranges individual attorneys or organizations, such as from Plaintiff CLEAR Clinic, to provide legal representation to Oregonians who have been detained.

57. In Oregon, Defendant ICE has three field offices where the agency holds and processes detainees before transferring them out of the state of Oregon: the Portland ICE/ERO Field Office ("Portland Office"), the Eugene ICE/ERO Field Office ("Eugene Office"), and the Medford ICE/ERO Field Office. On information and belief, Defendants arrest people, bring them into those facilities, and detain them. The Portland and Eugene Offices have attorney visiting rooms. In the past, attorneys could access these rooms and request visitation with their prospective and current

clients without issue. However, that access is now being denied, as Defendants have adopted a policy, pattern, and practice of limiting and outright denying attorneys access to their facilities.

58. At the Portland Office, ICE maintains a policy, pattern, and practice of generally denying attorneys access to prospective clients and largely denying access to current clients, with representational visits allowed only at the discretion of an ICE officer. ICE officers employ this discretionary in an arbitrary manner, sometimes only allowing visits after an attorney repeatedly insists to speak with the detained person. Attorneys have no telephone access to clients and prospective clients and there is not a stated policy regarding attorney visitation hours.

59. ICE has consistently turned away, and even prevented from entering the building, Portland-based attorneys responding to ICE detentions that are identified through Oregon's rapid response network. On other occasions, Defendants have repeatedly prohibited attorney presence during interactions between ICE and their clients or have allowed attorneys only a brief period – sometimes just 10 minutes – to meet with prospective clients for whom they have been retained by family or close acquaintances.

60. Over the past four to five months, CLEAR Clinic immigration attorneys have responded or attempted to respond to ICE detentions for dozens of individuals held in custody at the Portland Office, and they have been repeatedly denied full, and often any, access to their current or prospective clients.

61. On many occasions, CLEAR Clinic attorneys have arrived at the Portland Office, asked to meet with their clients, and been denied access. Sometimes, attorneys have waited hours in the lobby while ICE agents gave them conflicting information for why they could not meet with their clients. In one instance, a CLEAR Clinic attorney was waiting in the lobby after requesting access to her client; while she was waiting, Defendant ICE took her client out the back door of the field

office and transferred him to the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington.

62. ICE agents at the Portland Office have denied CLEAR Clinic attorneys access to their clients even when the attorney presented a form G-28 signed by both the client and the attorney. Form G-28 indicates that the attorney has already established a formal attorney-client relationship and agreed to represent the client on a particular immigration matter.

63. ICE agents at the Portland Office have also denied CLEAR Clinic attorneys the ability to "pass papers back and forth" with current and prospective clients. As a result, those attorneys were unable to review critical documents, such as documents pertaining to the reason for the detention, allegations or charges of inadmissibility or removability, and other documents that would allow the attorney to review the legality of the client's detention, to advise them on their options, or otherwise engage in effective legal advocacy.

64. Further, despite CLEAR Clinic attorneys repeatedly asking why their clients and prospective clients are being detained, ICE officials have refused to offer an explanation, undermining CLEAR Clinic attorneys' ability to identify what legal authority might possibly justify custody and whether custody was even lawful to begin with.

65. For example, on July 30, 2025, CLEAR Clinic attorney Josephine Moberg went to the Portland Office to meet with prospective clients to conduct a legal screening and advocate for their release from ICE custody. Despite having prepared G-28s with her signature and requesting to meet with her prospective clients, ICE left her waiting in the lobby for about an hour before informing her that ICE had transported her prospective clients out of the facility. When Mx. Moberg requested information about who had authorized the transport and information about their booking and transport times, ICE refused to provide her with this information. Community

members outside of the facility reported to Mx. Moberg that while she was inside the facility, a GEO Group van left the facility with a person who appeared to be one of her prospective clients.

66. Similarly, on August 18, 2025, shortly after CLEAR Clinic attorney Josephine Moberg learned that ICE had detained one of her clients and was holding him at the Portland Office, Mx. Moberg arrived at the facility with a properly executed G-28 containing her and her client's signature. Despite the G-28 and her repeated requests to meet with her client, ICE transferred her client out of state without permitting her to speak with him.

67. On September 30, 2025, CLEAR attorney Josephine Moberg went to the Portland Office upon learning of a community member and prospective client's detention. She presented a G-28 with her signature and requested to meet with her prospective client, and informed ICE that her prospective client may have Temporary Protected Status and that she was concerned his detention was unlawful. ICE told Mx. Moberg that her client had refused her visit, and the officer denied her access to even enter the facility. Mx. Moberg left and then returned about thirty minutes later to again request access to her prospective client to advise him of the rights he was allegedly waiving. ICE ultimately permitted Mx. Moberg access to her prospective client, at which point she learned that her client had never refused her visit and had in fact requested to speak with an attorney. ICE cut the visit short after approximately thirty minutes, and as a result, Mx. Moberg was unable to properly advise her client of his rights.

68. Similarly, ICE's Eugene Office maintains a policy, pattern, and practice of denying attorneys access to both prospective and current clients. On information and belief, there are no attorney visitation hours and no telephone access to anyone detained in the hold room. Moreover, attorneys have been completely denied entry to the building even if they show that they are a detained person's attorney of record or that they have been formally retained.

69. Although the Eugene Office contains a secure area where attorneys were once allowed to enter and meet with clients, attorneys are no longer allowed to enter this area.  Similarly, attorneys who presented a properly executed DHS Form G-28, Notice of Entry of Appearance of Attorney or Accredited Representative, were previously allowed to meet with their clients, provide them with information and legal advice, and advocate on their behalf. Now, however, ICE agents at the Eugene Office routinely deny attorneys the ability to enter any portion of the Eugene Office or provide any legal representation to individuals detained there.

70. For example, ICE has denied immigration attorney Katrina Kilgren access to her clients detained at the Eugene Office on multiple separate occasions.

71. On June 26, 2025, ICE officials at the Eugene Office denied, without explanation, Ms. Kilgren's request to conduct a pre-representational interview with a detained community member.

72. On July 1, 2025, ICE refused to allow Ms. Kilgren to enter the building to represent her client during an ICE appointment, even though she presented a valid, signed Form G-28. On the same day, ICE would not allow Ms. Kilgren to access an individual who had been arrested by ICE and was being held in the hold room of the Eugene Office. Although she repeatedly requested to meet with the detained person either in-person, virtually, or by phone, ICE never responded to her requests.

73. On July 2, 2025, Ms. Kilgren was again denied entry to the building to accompany a client during an ICE appointment, despite presenting a valid Form G-28. Security guards told her that the policy for the week was that no one could be accompanied.

74. On July 10, 2025, Ms. Kilgren requested access to a detained individual by email. ICE did not respond to the email, so Ms. Kilgren went to the Eugene Office. She was informed there that

the person was no longer in Eugene That detained person was transported out of the Eugene area and was not allowed to call anyone until she had already been transferred.

75. Ms. Kilgren's experiences at the Eugene Office are not unique. Other attorneys, including Christine Zeller-Powell, have been denied entry to the building and prevented from representing their clients before Eugene ICE—even when they presented a valid Form G-28 as evidence of their representation.

76. ICE has made contradictory statements about access to counsel at the Eugene Office, leaving attorneys unable to properly access their clients. The Eugene Supervisory Detention and Deportation Officer and his supervisor have stated that only the person with an ICE appointment— thus not that person's attorney—may enter the secure area of the Eugene ICE office where the appointment will occur. Conversely, another deportation officer has stated that attorneys may enter with a valid Form G-28. Although attorneys have presented valid Form G-28s and asked ICE how to request pre-authorization for legal representation, ICE has never responded with information explaining how they can represent clients during their appointments.

**Defendants' Unlawful Practices Have Harmed Plaintiffs**

77. Defendants' patterns, practices, and policies denying individuals detained at their Portland and Eugene Offices access to counsel cause profound harm. Legal assistance in the hours following an immigration arrest can mean the difference between immediate release from custody on the one hand and months of detention or rapid deportation, including to countries to which individuals have no ties, on the other.

78. When an attorney has access to an individual detained by ICE, the attorney can quickly assess whether there was a lawful arrest; whether Defendants have any lawful authority to hold the detained person in custody; whether the detained person has any medical needs or special circumstances that require release or particular services during detention; whether the person is

entitled to immediate release; and whether the detained person is entitled to participate in formal removal proceedings, eligible for immigration relief, or even is a U.S. citizen. When detained individuals are denied the opportunity to meet with an attorney shortly after their arrest, they are denied the legal advice they need to properly challenge any unlawful detention or pursue any legal remedies they may have.

79. Denying detained people access to counsel shortly after their arrest is particularly harmful because Defendants regularly make unlawful arrests,[35] rapidly transfer people to remote locations where they cannot access counsel,[36] and may deport individuals to third countries where they have no ties.[37] If attorneys cannot access people detained in Oregon shortly after their arrest, those

---

[35] *See, e.g.*, Geoff Pursinger, *After ICE Arrest U.S. Citizen in Milwaukie, Officials Call for Investigation*, Oregon Capital Insider (Oct. 10, 2025), https://oregoncapitalinsider.com/2025/10/10/after-ice-arrest-u-s-citizen-in-milwaukie-officials-call-for-investigation/ (describing ICE arrest of U.S. citizen despite the fact that he presented officers with an Oregon driver's license and explained that he was born in California);

[36] *See, e.g.*, Emma Janssen, *How ICE Hides Detainees From Their Lawyers*, The American Prospect (Oct. 6, 2025), https://prospect.org/justice/2025-10-06-how-ice-hides-detainees-from-their-lawyers/ (reporting on stories from around the United States indicating that ICE transfers isolate detained people from their attorneys and families and effectively deny people access to counsel); Carol Rosenberg, *ICE Sends More Migrants to Guantánamo Bay, Resuming Operations*, NY Times (Oct. 14, 2025), https://www.nytimes.com/2025/10/14/us/politics/ice-migrants-guantanamo-bay.html (explaining that ICE has resumed sending people to the U.S. naval base at Guantánamo Bay, Cuba).

[37] *See, e.g.*, Juan A. Lozano, *What to Know about Trump Deportation Policies that Could Send Kilmar Abrego Garcia to Uganda*, APNews (Aug. 25, 2025), https://apnews.com/article/third-country-agreements-abrego-garcia-deportation-76911317384dd329731246e607048f98 (reporting on countries that have agreed to accept deportations of people who are not their citizens) ("United Nations human rights experts have said such agreements have left people stranded in faraway places, arbitrarily detained for years on end, and at risk of torture and other inhuman treatment."); Joseph Stepansky and News Agencies, *US Sends Another 'Third-Country' Deportation Flight to Eswatini*, Aljazeera (Oct. 6, 2025), https://www.aljazeera.com/news/2025/10/6/us-sends-another-third-country-deportation-flight-to-eswatini (reporting on deportations of individuals to Eswatini who are not citizens of Eswatini, with one U.S. immigration attorney explaining, "I cannot call [my clients]. I cannot email them. I cannot communicate through local counsel because the Eswatini government blocks all attorney access.").

detained people thus become vulnerable to wrongful transfer beyond the reach of counsel and beyond any remedies a court may provide.[38]

80. Plaintiffs are among the organizations and individuals harmed by Defendants' unlawful denials of access to counsel.

81. **Plaintiff CLEAR Clinic ("Clear Clinic")** is a nonprofit organization working to protect the due process rights of immigrants through legal representation, community education, and rapid response services. Its core business activities consist of providing free legal services to Oregonians typically excluded from social support systems, including immigrant Oregonians. CLEAR Clinic's staff includes attorneys who provide pro bono legal services to clients in removal proceedings, including those who are detained. CLEAR Clinic is also a member of the Oregon for All Coalition, which includes a network of regional leads focused on rapid response. Additionally, CLEAR Clinic educates the broader community through workshops, social media, and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement.

82. CLEAR Clinic provides "Know Your Rights" trainings throughout the state of Oregon. These trainings aim to educate immigrant community members about the immigration system and about their due process and civil rights. CLEAR Clinic's rapid response team receives notifications from a rapid response hotline and responds to notifications about individuals detained in ICE enforcement actions. When possible, CLEAR Clinic takes referrals to represent detained individuals at the Portland Office with pro bono representation.

---

[38] *See, e.g., Bonilla Alvarez v. Noem*, No. 25-cv-03136 (D.D.C. Sept. 28, 2025) (finding that the court lacked jurisdiction to hear man's emergency request where he had been transferred to Mexico and would be imminently sent to El Salvador, even though immigration court had concluded that he was likely to be tortured in El Salvador).

83. As described above, CLEAR Clinic's attorneys have repeatedly attempted to visit and contact clients and prospective clients at the Portland Office, but Defendants have thwarted their efforts.

84. In recent months, the CLEAR Clinic has diverted significant time, money, and resources to seek to overcome barriers to access to counsel that impede them from providing legal representation to retained and prospective clients detained at the Portland Office. CLEAR Clinic's attorneys have spent an estimated 65+ hours of attorney time attempting access clients in Defendants' custody at the Portland Office – most of which has been spent waiting to access clients, often unsuccessfully.

85. CLEAR Clinic attorneys have also spent many additional hours strategizing and advocating in order to attempt to overcome the barriers to access to counsel that Defendants have imposed at the Portland Office. These efforts take time away from their ability to engage in their core activity of actually providing legal services to immigrant Oregonians.

86. Defendants' access to counsel denials at the Portland Office have obstructed CLEAR Clinic attorneys from providing the legal intake services and follow-on representation that they otherwise would intend to offer as part of their core business activities. Defendants' restrictions on access to counsel also impede CLEAR attorneys' ability to challenge individuals' unlawful detention before they are transferred out of state, often precluding CLEAR Clinic attorneys from filing such challenges altogether, due to barriers including the heightened burden of finding out-of-state counsel.

87. As a result of Defendants' denial of counsel policies and practices, CLEAR Clinic's staff members have been denied access to clients and prospective clients, and its core business activities of providing legal services to these individuals are being impeded.

88. **Plaintiff Pineros y Campesinos Unidos del Noroeste ("PCUN")** is the largest farmworker and Latino organization in Oregon. Founded in the 1980s, PCUN's work is inspired by the "Sí, se puede" ("Yes, we can") spirit of Dolores Huerta and Cesar Chavez. Their mission is to empower farmworkers and working Latino families in Oregon by building community, increasing Latino representation in elections, and engaging in policy advocacy on both the national and state levels. PCUN is known for its organizing work, outreach, and community events that promote workers' rights, immigrant rights, environmental justice, and gender justice. PCUN has been doing community work for forty years by hosting key events throughout the year and working with other community organizations to provide services and advocacy opportunities for their members and the community at large. Although PCUN's membership is mostly comprised of individual farmworkers—many of whom are noncitizens—its programming also serves Oregon's Latino community more broadly.

89. PCUN brings this action on behalf of its members. PCUN's members have been harmed by the Defendants' ongoing practices and policies of denying access to counsel and rapid transfers. They fear that they are at risk to be subjected to unlawful detentions and transfers, including rapid deportations, which have already happened amongst the farmworker community. They are terrified that masked and unidentifiable immigration agents will invade their workplaces without a warrant, grab them, handcuff them, and take them away without an opportunity to consult with an attorney.

90. PCUN members know and rely on the rapid response network in Oregon when immigration enforcements occur. Their members know that if they witness or are impacted by an immigration detention, they should immediately call the PIRC hotline to report what happened and get connected to resources, including legal representation. Community members have reached out to

the hotline and have been connected with resources. Many of their members have limited literacy skills so access to legal representation proves more crucial to their ability to access due process.

91. PCUN's members are fearful of being racially profiled and stopped by immigration agents while in public or at their places of employment. As a result, they have changed their daily habits, including by taking different routes, avoiding leaving their home when not necessary, and declining to participate in activities that they once enjoyed—all so they can avoid Defendants' illegal conduct. These fears are present regardless of the permanence or stability of their immigration status. PCUN's members face irreparable harm from Defendants' unlawful practices.

92. PCUN also brings this action on behalf of itself as an organization. PCUN's core activities have been impacted by a surge of calls from members requesting legal assistance in the face of increased immigration enforcement. PCUN is a reliable source of information and resources for its members and the Latino community alike; as part of its core programming, PCUN helps facilitate individuals' access to legal assistance. To effectively play this role, PCUN heavily relies on the effective operation of Oregon's rapid response network, in particular its ability to connect PCUN's members to meaningful legal representation. When Defendants deny PCUN's members access to counsel following immigration enforcement actions, they hinder PCUN's efforts to serve its members and chip away at the trust that PCUN has worked hard to build with the community. PCUN as an organization is likewise harmed by Defendants' actions.

93. **Plaintiff Leon X** is a 32-year-old resident of Oregon who has lived in the United States since he was six years old. His parents were agricultural workers in the Willamette Valley for more than 15 years and were members of PCUN, Oregon's farmworker union. Leon X worked in different canneries and food processing plants sporadically from the ages of 16 to 20. He is active

in the immigrant rights movement and holds leadership roles in several organizations engaging in rapid response and immigrant protection work.

94. Leon X was granted Deferred Action for Childhood Arrivals (DACA) when he was 19 years old. He has also submitted an application for U Nonimmigrant Status because he was the victim of a serious crime when he was a child. He was granted deferred action based on his pending U Visa over three years ago, as he continues to wait for a U Visa to become available based on his qualifying application.

95. Despite his active grants of deferred action and his conscientious engagement in his own immigration processes, Leon X is terrified that ICE can arrest and detain him without a warrant or cause while he is living his daily life in Oregon. As a noncitizen who is active in the immigrant rights community in Oregon, including through leadership roles in organizations that have been engaged in rapid response and immigrant protection work, he believes that he may be targeted for unlawful arrest, detention, and the initiation of removal proceedings.

96. Leon X is particularly fearful that he is at risk of being detained in Oregon and swiftly transferred without the opportunity to consult with his existing immigration counsel, whom he relies on for guidance and representation in his pending immigration matters, and whom he would seek to immediately consult if he were detained.

97. Leon X seeks to bring this case on behalf of himself and all similarly situated individuals who have been arrested or are at risk of arrest for alleged civil immigration violations in this District by Defendants or entities working in concert with them.

## CLASS ACTION ALLEGATIONS

98.     Individual Plaintiff Leon X brings this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(1)(A) on behalf of himself and all other persons similarly situated.

99.     Individual Plaintiff Leon X seeks to represent a class of individuals who are risk or fear being subjected to Defendants' policies, patterns and practices that this Complaint challenges: arrests without probable cause of either unlawful immigration status or flight risk and deprivation of process due at each stage of arrest and detention.

100.    Petitioner seeks to represent the proposed "Access Class", defined as: All persons who have been arrested or are at risk of arrest for alleged civil immigration violations in the District of Oregon by Defendants or entities working in concert with them.

101.    *Numerosity:* The proposed class meets the numerosity requirements of Fed. R. Civ. P. 23(a)(1) because it consists of a large number of similarly situated individuals located within this District, such that joinder of all members of the class is impracticable. Although the number of individuals who have been or are at risk of arrest by Defendants for alleged civil immigration violations is not known with precision, class members likely number in the thousands.[39] Since October 16, 2025, federal agents have arrested dozens of people within the District of Oregon, the majority apparently in warrantless arrests. Proposed class members are located across the state of Oregon; a vast number of these individuals meet the income threshold to be eligible for free legal services through Equity Corps of Oregon, meaning their financial resources to independently

---

[39] An estimated over 400,000 Oregonians are foreign-born residents, approximately one quarter of whom are undocumented. An estimated 89,000 U.S.-citizen Oregon residents also live in mixed-status households. *See* American Immigration Council, Immigrants in Oregon, available at https://map.americanimmigrationcouncil.org/locations/oregon/.

pursue district court litigation are necessarily limited. Proposed class members, including Plaintiff Leon X, also rightfully fear retaliation through immigration enforcement actions if they come forward to bring a lawsuit of this kind.

102.    *Common Questions of Law and Fact:* The proposed class meets the commonality requirements of Fed. R. Civ. P. 23(a)(2) because all members of the proposed class have been or are at risk of being subjected to the same practices that violate the INA and its implementing regulations and the Constitution. Thus, there are numerous questions of law and fact common to the proposed class, which predominate over any individual questions. Common questions of law include whether Defendants are violating class members' right to counsel in contravention of the Fifth Amendment, the First Amendment, and the rights enshrined in the Immigration and Nationality Act ("INA") and its implementing regulations. Common answers as to the legality of Defendants' policies and practices and their implementation will drive the resolution of this litigation. Common questions of fact include:

    a.  Whether there is a policy/practice of denying access to counsel in Oregon before transferring detained noncitizens out of state;

    b.  Whether Defendants' policy/practice of denying access to counsel in Oregon is actively intended to undermine noncitizens' rights to counsel, including precluding their ability to timely file habeas petitions to challenge their unlawful custody in the District of Oregon;

    c.  Whether Defendants' widespread immigration arrests since October 15, 2025 are in accordance with law, including Defendants' statutory authority for warrantless arrest pursuant to 8 U.S.C. § 1157;

d.  Whether recent First Amendment activity outside the ICE Field Offices poses a security concern that reasonably requires ICE to rush individuals out of the state, and whether any such activity has been actually observed to "escalate" when an individual is detained at an ICE Office;

e.  Whether and when individuals detained by Defendants in Oregon can meaningfully access counsel after being transferred out of Oregon, including at the Tacoma NWIPC;

f.  Whether individuals detained by Defendants can be timely located by counsel following their transfer out of Oregon; and

g.  Whether class members have suffered harm as a result of Defendants' unlawful obstruction of access to counsel.

103.  *Typicality*: The proposed class meets the requirements of Fed. R. Civ. P. 23(a)(3). The legal claims of proposed class representative Leon X are typical to all members of the proposed class. Plaintiff Leon X asserts the same claims under the U.S. Constitution, the APA, and the INA as the members of the proposed class. These claims arise from the same course of Defendants' conduct, and Leon X is united with putative class members in his interest in his right to counsel and in the injury that would result from its obstruction.

104.  *Adequacy of class representation*: The putative class meets the requirements of Fed. R. Civ. P. 23(a)(4). Plaintiff Leon X has the requisite personal interest in the outcome of this action and knows of no interests adverse to the interests of the class. He seeks declaratory and injunctive relief that would benefit the class as a whole. Plaintiff Leon X will fairly and adequately represent the interests of the class.

105.    *Adequacy of Counsel for the class*: The proposed class is represented by counsel from Innovation Law Lab. Counsel collectively have extensive experience litigating class action lawsuits and other complex immigration-related cases in federal court, including on behalf of detained people and noncitizens.

106.    The proposed class satisfies Fed R. Civ. P. 23(b)(2) because Respondents have acted on grounds generally applicable to the class through their pattern or practice of denying access to counsel to individuals detained in civil immigration enforcement actions in Oregon, thereby making equitable relief appropriate with respect to the class as a whole. Declaratory and injunctive relief are therefore appropriate with respect to the class as a whole.

107.    Each of the members of the putative class is or will be entitled to bring a complaint for injunctive or declaratory relief to enforce their right to access counsel following their civil immigration arrest.

108.    The proposed class also satisfies Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individuals detained in civil immigration enforcement actions in Oregon would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for officers required to enable access to counsel for these individuals before their transfer out of Oregon.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of the Fifth Amendment to the U.S. Constitution**
**Right to Access to Counsel**
(On Behalf of All Plaintiffs and the Proposed Class Against All Defendants)

109.     Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

110.     Individuals detained by Defendants have the right to hire and consult with attorneys. Due process also requires that detained people have adequate opportunities to obtain counsel and to visit and communicate with counsel once counsel is retained.

111.     Defendants have a policy, pattern, and practice of denying detained people the ability to retain, consult, communicate with, and meet with their counsel. This lack of access to counsel has severe consequences. Detained people are forced to interact with federal immigration officials without the benefit of legal advice even though it is readily available.

112.     Plaintiff PCUN's individual members, Plaintiff Leon X, and proposed class members are harmed by these violations because they fear deprivation of their liberty through arrest, detention, transfer, and deportation without access to counsel as required by law. Such deprivation of counsel may deprive them of legal remedies, impose pressure to give up their legal claims, and preclude challenges to the lawfulness of their custody before they are transferred far away from their families and communities of support.

113.     Plaintiff CLEAR Clinic is harmed by these violations because they are unable to provide pro bono legal services to people detained by ICE before they are transferred outside the state of Oregon, restricting their ability to access their clients and prospective clients and provide them with timely and responsive legal services.

114.    Defendants' actions violate the Fifth Amendment.

## COUNT II

**Violation of the First Amendment to the U.S. Constitution**
**Right to Hire, Consult, and Communicate with Counsel**
(On Behalf of Plaintiff PCUN, Plaintiff Leon X, and the Proposed Class Against All Defendants)

115.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

116.    The First Amendment guarantees individuals the right to hire, consult, and communicate with an attorney. *See Immigrant Defs. L. Ctr. v. Mayorkas*, No. 20-CV-9893 (JGB), 2023 WL 3149243, at *34 (C.D. Cal. March 15, 2023) ("The First Amendment protects the right to hire and consult with counsel.") (citing *Mothershed v. Justices of Supreme Court*, 410 F.3d 602, 611 (9th Cir. 2005), *as amended on denial of reh'g* (9th Cir. July 21, 2005)) and *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009)).

117.    The government may not unreasonably restrict this right.

118.    As described *supra*, Plaintiff PCUN's individual members, Plaintiff Leon X, and proposed class members are harmed by Defendants' restrictions on their communications with counsel and prospective counsel because they fear deprivation of their liberty without access to counsel as required by law.

119.    Defendants' actions violate the First Amendment.

## COUNT III

**Violation of the First Amendment**
**Right to Advise Potential and Existing Clients**
(On Behalf of Plaintiff CLEAR Clinic Against All Defendants/)

120.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

121.    The First Amendment protects legal service providers from government interference when they are "advocating lawful means of vindicating legal rights." *Button*, 371 U.S. at 437. Pro bono legal assistance to immigrants in removal proceedings falls within this zone of protection. *Nw. Immigrant Rights Project v. Sessions*, No. C17-716 RAJ, 2017 WL 3189032 at *3 (W.D. Wash. July 27, 2017).

122.    The protection afforded by the First Amendment extends to advising potential clients of their rights. *See*, *e.g.*, *In re Primus*, 436 U.S. 412, 431–32 (1978); *Nw. Immigrant Rights Project*, 2017 WL 3189032, at *2–3.

123.    The protection afforded by the First Amendment also includes providing legal assistance to existing clients. *See*, *e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001); *In re Primus*, 436 U.S. 412; *Button*, 371 U.S. 415; *Torres v. DHS*, 411 F. Supp. 3d 1036 (C.D. Cal. 2019).

124.    By advising, assisting, and consulting with potential and existing clients, attorneys disseminate important legal information, and the "creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011).

125.    The government may not unreasonably restrict attorneys' First Amendment rights.

126.    As described *supra*, Plaintiff CLEAR Clinic is harmed by Defendants' restrictions on their communications with clients and potential clients because Defendants limit their ability to access their clients and prospective clients and provide them with timely and responsive legal services, thus impeding their core business activities.

127.    Defendants' actions violate the First Amendment.

## COUNT IV

### Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)
### Not in Accordance with Law and in Excess of Statutory Authority
### Violation of Right to Counsel in Immigration and Nationality Act
(On Behalf of All Plaintiffs and Proposed Class Members Against All Defendants)

128.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

129.    Under the Administrative Procedure Act ("APA"), a court "shall . . . hold unlawful . . . agency action" that is "not in accordance with law;" "contrary to constitutional right;" "in excess of statutory jurisdiction, authority, or limitations;" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

130.    The INA guarantees noncitizens the right to counsel in connection with inadmissibility and deportability proceedings. 8 U.S.C. §1362; 8 U.S.C. § 1229a(b)(4)(A); *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 993 (9th Cir. 2025); *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005); *Orantes-Hernandez*, 919 F.2d at 564; *Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1060-61 (C.D. Cal. 2019).

131.    The same substantive standards that protect the Plaintiffs' right to counsel under the Due Process Clause apply to their statutory rights under the INA. *See Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) ("The right to counsel in immigration proceedings is rooted in the Due Process Clause and codified at 8 U.S.C. § 1362 and 8 U.S.C. § 1229a(b)(4)(A)."); *Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002) ("If a[] [noncitizen] is prejudiced by a denial of any of the applicable procedural protections, he is denied his constitutional guarantee of due process.").

132.    As described *supra*, Plaintiffs and proposed class members are harmed by Defendants' violations of the statutory right to counsel enshrined in the INA.

133.    Defendants' policy, pattern, and practice of denying detained individuals access to legal advice in violation of the INA is "final agency action" that is in excess of statutory authority. *See* 5 U.S.C. §§ 704, 706(2)(C).

**COUNT V**

**Violation of Fifth Amendment Due Process and the Administrative Procedure Act - 8 C.F.R. § 287.8(c)(2)(vii)**
**Coerced and Involuntary Waivers of Rights and Signatures**
(On Behalf of All Plaintiffs and the Proposed Class Against All Defendants)

134.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

135.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution forbids government officials from coercing signatures or a waiver of rights. In order to be valid, any waiver of rights must be both knowing and voluntary (and, thus, not coerced).

136.    This requirement is incorporated into Defendants' policies at 8 C.F.R. § 287.8(c)(2)(vi), which prohibits "[t]he use of threats, coercion, or physical abuse by the designated immigration officer to induce a suspect to waive his or her rights or to make a statement."

137.    Defendants have a policy and practice of coercing and threatening people they detain to sign papers that they cannot read or understand (because they are in English and no translation is provided) and to waive their right in immigration proceedings by agreeing to be deported as quickly as possible.

138.    As described *supra*, PCUN's individual members, Plaintiff Leon X, and proposed class members are harmed by Defendants' violations of their Fifth Amendment rights and rights under the INA because these practices cause imminent and irreparable injury in the form of deprivation of their procedural and substantive rights held in immigration removal proceedings,

affirmative immigration matters, and in detention. PCUN's individual members, Plaintiff Leon X, and proposed class members will be removed from the United States and lose many rights under immigration law if they are coerced or threatened into agreeing to deportation.

139.     As described *supra*, Plaintiff CLEAR Clinic is harmed by Defendants' policy and practice of coercing individuals to waive their rights because it directly impedes their attorneys' ability to provide clients and prospective clients with responsive and effective legal services, thus impeding their core business activities.

140.     Defendants' policy, pattern, and practice of coercing detained individuals to sign documents they do not understand and/or to waive their rights in violation of the Fifth Amendment's Due Process clause and 8 C.F.R. § 287.8(c)(2)(vi) is "final agency action" that is in excess of statutory authority. *See* 5 U.S.C. §§ 704, 706(2)(C).

141.     This final agency action is also arbitrary and capricious and an abuse of discretion. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Plaintiffs pray that this Court grant the following relief:

(1) Assume jurisdiction over this matter;

(2) Certify the following class: All persons who have been arrested or are at risk of arrest for alleged civil immigration violations in the District of Oregon by Defendants or entities working in concert with them.

(3) Name Individual Plaintiff Leon X as representative of the Access Class, and appoint Plaintiffs' counsel as class counsel;

(4) Declare that Defendants' denial of access to counsel violates the Due Process Clause of the Fifth Amendment to the United States Constitution;

(5) Declare that Defendants' denial of access to counsel violates the First Amendment to the United States Constitution;

(6) Declare that Defendants' policy and practice of denying access to counsel violates the statutory right to counsel enshrined in the Immigration and Nationality Act;

(7) Declare that Defendants' policy and practice of coercing and threatening detained immigrants to sign papers and to waive their rights violates the Due Process Clause of the Fifth Amendment to the United States Constitution and Defendants' own regulations;

(8) Issue a preliminary and permanent injunction enjoining further violations of Plaintiffs' rights by requiring Defendants to provide meaningful access to counsel for individuals held in their civil immigration custody before transferring such individuals outside of the District of Oregon;

(9) Vacate Defendants' unlawful policies and practices that violate statutory and regulatory law under the APA;

(10) Award Plaintiffs costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable statute or regulation; and

(11) Grant such further relief as the Court deems just, equitable, and proper.

Dated: November 12, 2025.                    Respectfully submitted,

                                             */s/  Stephen W Manning*

                                             STEPHEN W MANNING, OSB No. 013373
                                             stephen@innovationlawlab.org,
                                             smanning@ilgrp.com
                                             TESS HELLGREN, OSB No. 191622
                                             tess@innovationlawlab.org
                                             JORDAN CUNNINGS, OSB No. 182928
                                             jordan@innovationlawlab.org
                                             KELSEY LYNN PROVO, OSB No. 145107
                                             kelsey@innovationlawlab.org
                                             NELLY GARCIA ORJUELA, OSB No. 223308
                                             nelly@innovationlawlab.org
                                             INNOVATION LAW LAB
                                             333 SW 5th Ave., Suite 200
                                             Portland, OR 97204-1748
                                             Telephone: +1 503-922-3042

                                             Attorneys for Plaintiffs