STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,smanning@ilgrp.com
TESS HELLGREN, OSB No. 191622
tess@innovationlawlab.org
JORDAN CUNNINGS, OSB No. 182928
jordan@innovationlawlab.org
KELSEY LYNN PROVO, OSB No. 145107
kelsey@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No. 223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

#### Eugene Division

| | |
|---|---|
| CLEAR CLINIC, PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE, and LEON X, individually and on behalf of others similarly situated; <br><br> *Plaintiffs,* <br><br> v. <br><br> KRISTI NOEM, Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); TODD LYONS, Acting Director of Immigration Customs Enforcement; CAMMILLA WAMSLEY, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"); PETE FLORES, Acting Commissioner of Customs and Border Protection; and U.S. CUSTOMS AND BORDER PROTECTION ("CBP"), <br><br> *Defendants.* | Case No. 6:25-cv-01906-AA <br><br> **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION** |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................... ii

TABLE OF AUTHORITIES ....................................................................................... iii

I.     Introduction ........................................................................................................ 1

II.    Factual Background ......................................................................................... 4

    A.    Oregon's rapid response network provides access to free lawyers. ............................... 5

    B.    Rise in ICE enforcement activity and warrantless arrests in Oregon. ........................... 7

    C.    Defendants deny access to counsel at the Oregon ICE Field Offices. ........................... 9

    D.    Access to counsel post-transfer out of district is inadequate or illusory ...................... 15

III.   Legal Standard ................................................................................................ 18

IV.    Argument ........................................................................................................ 19

    A.    Plaintiffs are likely to succeed on the merits of their claims. ...................................... 19

    B.    Plaintiffs will likely suffer irreparable harm if not granted temporary relief. .............. 28

    C.    The balance of the equities and public interest factors tip sharply in favor of
preliminary relief. ................................................................................................ 31

V.     Conclusion ...................................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**

*Al Odah v. United States*, 346 F. Supp. 2d 1 (D.D.C. 2004) ........................................................ 31

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127  (9th Cir. 2011) .................................... 24

*Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ............................................ 33

*Arrey v. Barr*, 916 F.3d 1149 (9th Cir. 2019) ................................................................................ 25

*Arroyo v. United States Dep't of Homeland Sec.*, 2019 WL 2912848 (C.D. Cal. June 20, 2019) 34

*Biwot v. Gonzales*, 403 F.3d 1094 (9th Cir. 2005) ........................................................................ 25

*Bonilla Alvarez v. Noem*, No. 25-cv-03136 (D.D.C. Sept. 28, 2025) ...................................... 9, 29

*Castillo v. Nielsen*, No. 5:18-cv-01317, 2020 WL 2840065 (C.D. Cal. June 1, 2020) ................ 30

*Colmenar v. INS*, 210 F.3d 967 (9th Cir. 2000) ............................................................................ 25

*Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434 (9th Cir. 1986) .................................... 26, 34

*Cooper v. Aaron*, 358 U.S. 1  (1958) .............................................................................................. 7

*DeLoach v. Bevers*, 922 F.2d 618 (10th Cir. 1990) ...................................................................... 30

*Denius v. Dunlap*, 209 F.3d 944 (7th Cir. 2000) .......................................................................... 30

*Dep't Homeland Security v. D.V.D.*, 145 S.Ct.. 2153 (2025) ........................................................ 29

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ................ 7

*Doe v. ICE*, 490 F. Supp. 3d 672 (S.D.N.Y. 2020) ........................................................................ 30

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640  (9th Cir. 2021) ............................................ 33

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) ............................................ 35

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) .................................................................................... 33

*Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009) .............................................................................. 30

*Escobar-Grijalva v. I.N.S.*, 206 F.3d 1331, 1335 (9th Cir.) ........................................................ 34

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) ................................................. 24

*Halvorsen v. Baird*, 146 F.3d 680  (9th Cir. 1998)....................................................... 29

*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017) ................................................. 37

*Immigrant Defs. L. Ctr. v. Mayorkas*, No. 20-CV-9893 (JGB), 2023 WL 3149243  (C.D. Cal.
    March 15, 2023)....................................................................................................... 30, 31

*Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150 (D.Or. 2018) ............................. 25, 27, 37

*Marlyn Nutraceuticlas, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873  (9th Cir. 2009) ...... 24

*Mercado v. Noem*, No. 25-cv-06568, 2025 WL 2658779 (S.D.N.Y Sept. 17, 2025)............. 28, 30

*Moreno Gonzalez et al v. Noem*, No. 1:25-CV-13323 (N.D. Ill. Nov. 5, 2025)......................... 28

*Mothershed v. Justices of Supreme Court*, 410 F.3d 602 (9th Cir. 2005) ..................................... 30

*NAACP v. Button*, 371 U.S. 415 (1963), ......................................................................... 32

*Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829 (9th Cir. 2012) ............ 35

*Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990) ........................................ 24, 26

*Pell v. Procunier*, 417 U.S. 817 (1974)........................................................................... 31

*Rios-Berrios v. INS*, 776 F.2d 859 (9th Cir. 1985) ......................................................... 26

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ................................................... 37

*Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2002)............................................................. 31

*See In re Primus*, 436 U.S. 412 (1978) ......................................................................... 32

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011).......................................................... 32, 33

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ............................................. 23

*Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036  (C.D. Cal. 2019)25, 26, 31

*Usubakunov v. Garland*, 16 F.4th 1299 (9th Cir. 2021)................................................. 25

*Valdez v. Rosenbaum*, 302 F.3d 1039 (9th Cir. 2002) ................................................... 31

*Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850 (C.D. Cal. 2025) ........................................ 28, 30

*Zepeda v. United States Immigration & Naturalization Service*, 753 F.2d 719 (9th Cir. 1983) ... 37

**Statutes**

5 U.S.C. § 555(b)(1) ................................................................................................ 27

8 U.S.C. § 1229(b)(2) ............................................................................................. 11

**Other Authorities**

Claire Rush, *US citizen detained and held at ICE building in Portland for hours before release, lawyer says*, AP News, October 10, 2025 ................................................................... 6

Gabrielle LaMarr LeMee, *How ICE detainees are moved miles away from families and attorneys*, LA Times, Sept. 26, 2025 ...................................................................................... 22

Jennie Taer, *Trump admin's 3,000 ICE arrests per day quota is taking focus off criminals and 'killing morale': insiders warn*, NY Post, June 17, 2025 .......................................... 7

Madeleine Moore and Rachel Alexander, *Salem sees at least 16 immigrants arrested on Veterans Day, groups say,* Salem Reporter (Nov. 11, 2025) .................................................. 13

Mia Maldonado, "Oregon see largest immigration raid under Trump 2.0 in Woodburn, group says," Oregon Capital Chronicle (Oct. 31, 2025), .................................................. 13

Office of Inspector General, Dep't of Homeland Security, *Violations of ICE Detention Standards at Adams County Correctional Center* (July 14, 2021) ........................................... 23

The Federalist Paper No. 51 (James Madison) (Clinton Rossiter ed., 1961) ................................. 7

**Regulations**

8 C.F.R. § 1003.61 .................................................................................................. 11

8 C.F.R. § 287.3(c) .................................................................................................. 11

8 C.F.R. § 292.5(b)............................................................................................................... 26

## CERTIFICATION OF COMPLIANCE WITH LR 7-1

Pursuant to LR 7-1, counsel for Plaintiff certifies that they conferred with Defendants' counsel by video conference on November 12, 2025. Defendants' counsel represented that Defendants oppose this motion.

## MOTION

Plaintiffs respectfully request that this Court grant a preliminary order enjoining Defendants from transferring any and all individuals detained in Oregon for civil immigration violations, prior to providing notice, time, and space to provide access to counsel as described below.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION

### I.    Introduction

In the District of Oregon, Defendants are rounding up community members across the region, holding them incommunicado by fiat, and then moving them swiftly out of district – before they have even had a chance to make a phone call to a lawyer, let alone to consult with one. Defendants take these actions in order "to do all in their power to achieve the very important goal of delivering the single largest Mass Deportation Program in History."[1]

The Oregonians caught up in these violent sweeps—citizen and immigrant alike[2]— find themselves trapped in the Defendants' vast detention network: a network that spans from Tacoma, Washington, to Basile, Louisiana, to Natchez, Mississippi, to Guantanamo Bay, Cuba, to Sudan to

---

[1] Pres. Donald Trump, @realDonaldTrump, Truth Social (June 15, 2025, 5:43pm) ("ICE Officers are herewith ordered, by notice of this TRUTH, to do all in their power to achieve the very important goal of delivering the single largest Mass Deportation Program in History.").

[2] Claire Rush, *US citizen detained and held at ICE building in Portland for hours before release, lawyer says*, AP News, October 10, 2025, https://apnews.com/article/us-citizen-detained-ice-portland-oregon-646ac425d32902b5f447e021f70da7df (last visited Oct. 15, 2025).

Libya to CECOT—a notorious torture center in El Salvador. Once detained by Defendants, these Oregonians are swiftly transferred away from their legal resources and their communities of support, lost in a detention-to-deportation pipeline in which they may find themselves, in the government's view, beyond the reach of this Court's jurisdiction and ability to remedy any unlawful detention, transfer, or removal.

Defendants' policies and practices are designed to subvert the U.S. Constitution because in their lawless view, detentions and deportations are only about "numbers, pure numbers, [q]uantity over quality."[3] Defendants' policies and practices that deny access to counsel cause irreparable harm to Oregon's community: the people, the organizations, and all the entities that make up Oregon's civil society. On information and belief, in some instances Defendants have purposely transferred detained people outside the state of Oregon as quickly as possible in order to thwart attorneys' efforts to offer detained people legal representation and in an effort to manipulate this Court's jurisdiction.

But, the United States of America has "a government of laws and not of men." *Cooper v. Aaron*, 358 U.S. 1, 23 (1958) (Frankfurter, J. Concurring) (cleaned up). Our system of laws and our national fabric rejects "rule by fiat[.]" *Id.* And "in framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself." The Federalist Paper No. 51 (James Madison) (Clinton Rossiter ed., 1961).

---

[3] Jennie Taer, *Trump admin's 3,000 ICE arrests per day quota is taking focus off criminals and 'killing morale': insiders warn*, NY Post, June 17, 2025, https://nypost.com/2025/06/17/us-news/trump-admins-3000-ice-arrests-per-day-quota-is-taking-focus-off-criminals-and-killing-morale-insiders/, https://perma.cc/DB9R-MJUC (last visited Oct. 15, 2025) ("The Trump administration's mandate to arrest 3,000 illegal migrants per day is forcing ICE agents to deprioritize going after dangerous criminals and targets with deportation orders, insiders warn. Instead, federal immigration officers are spending more time rounding up people off the streets, sources said. 'All that matters is numbers, pure numbers. Quantity over quality,' one Immigrations and Customs Enforcement insider told The Post.").

Due process is not just a meaningless nod by Defendants that at some point, someone might be able to call out from some distant detention center to try to find a lawyer. Due process is *the* thing that provides for freedom in America. It is what keeps the government under the control of the people. It is the thing that requires the government, "particularly when so much is at stake, . . . [to] turn square corners in dealing with the people." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020) (internal quotations and citation omitted).

Plaintiffs are two community organizations who represent both ends of the irreparable impacts of the Defendants' mass acts of lawlessness; and a third Oregon community member who fears immigration arrest without access to counsel; and a putative class of all persons, since October 16, 2025, who have been arrested or are at risk arrested for alleged civil immigration violations in this District by Defendants or entities working in concert with them. **Plaintiff CLEAR Clinic** is a nonprofit organization working to protect the due process rights of immigrants through legal representation, community education, and rapid response services; it is among the network of legal service providers seeking access to prospective and current clients who are detained by Defendants. **Plaintiff Pineros y Campesinos Unidos del Noroeste ("PCUN")** is the largest farmworker and Latino organization in Oregon; its members and constituents are among the Oregonians who have already been, will be, or fear that they will be swept up in immigration enforcement actions and, before they can speak to a lawyer, unlawfully absorbed into a vast detention network that separates them from their communities and legal resources. **Plaintiff Leon X** is an Oregonian who came to the United States from Mexico at the age of six and grew up in the farmworker community; he fears that he will be targeted by immigration enforcement actions, arrested without access to counsel, and transferred out of the state. In light of acute and repeated deprivations of access to counsel at Defendants' Oregon facilities, Organizational Plaintiffs, Plaintiff Leon X, and the putative class seek temporary, interim relief to restore the *status quo ante litem* to minimize the harm to them and their members until Plaintiffs' broader claims against Defendants' lawless actions can be duly heard in court.

3

Plaintiffs seek to restore a vital aspect to the rule of law: constitutionally sufficient access to counsel in Oregon before any individual is swept away into Defendants' vast and labyrinthine executive detention scheme, which includes detention centers outside the United States. Such access to counsel is guaranteed by the First and Fifth Amendments to the United States Constitution, several provisions of the immigration laws, and Defendants' own policies.

The rule of law—and the principles embodied in the U.S. Constitution, the Administrative Procedure Act (APA), the Immigration & Nationality Act (INA), numerous regulations, and formal federal agency policy—demand no less.

## II.    Factual Background

In an effort to achieve a deportation quota for their mass deportation scheme, Defendants have adopted policies, patterns, and practices that sweep people into their vast executive detention scheme and outside of this district, including to distant and far-away places, before an individual can access counsel and, in the government's view, beyond the remedies otherwise available in the courts. *See, e.g., Bonilla Alvarez v. Noem*, No. 25-cv-03136 (D.D.C. Sept. 28, 2025) (finding that the court lacked jurisdiction to hear man's emergency request where he had been transferred to Mexico and would be imminently sent to El Salvador, even though immigration court had concluded that he was likely to be tortured in El Salvador). Defendants' policies, patterns, and practices thwart individuals from speaking in person with a lawyer before they are disappeared into the detention system. On information and belief, the fact that people are denied access to counsel, and counsel is denied access to their clients and prospective clients, is an intentional *feature* of Defendants' current system, not a bug or unplanned collateral consequence.

Under the Fifth Amendment, the First Amendment, and the INA, detained noncitizens have a right to hire, consult, and communicate with an attorney. Nevertheless, Defendants have repeatedly denied people arrested in Oregon access to counsel by, *inter alia*, denying detained people the ability to call, meet with, or otherwise communicate with their counsel, even when those attorneys are present at the detention facility and requesting a client meeting; turning attorneys away when they arrive to an ICE detention facility asking to speak with a detained client; declining

to speak with attorneys who are denied access to detained clients, even when the attorney asks to speak with an ICE official; transferring detained people out of Oregon before they can speak with an attorney, even when an attorney is actively asking to speak with them; declining to tell detained people that an attorney is trying to speak with them; failing to list accurate information in the ICE Online Detainee Locator System, https://locator.ice.gov/odls/#/search; and requiring attorneys to present a signed G-28 (a DHS form used to indicate an attorney or other authorized party is representing a person before the agency) before they can speak with a detained person, even when it is not required.

Because of Defendants' policies, patterns, and practices of denying detained people access to counsel, Plaintiff PCUN's members, Plaintiff Leon X, and proposed class members are now living in fear. In recent weeks, Defendants' enforcement practices have become increasingly aggressive, with masked immigration agents targeting farmworkers and Latino communities for illegal stops and arrests, followed by rapid transfers outside of Oregon before those arrested can speak with counsel. Without the ability to speak with counsel before they are transferred away, those arrested lose the opportunity to raise the arguments that could keep them in Oregon and prevent them from disappearing into Defendants' vast detention apparatus. As a result, PCUN's members—who include Latino and mixed status families—are fearful that they will be subjected to unlawful arrests and denied the opportunity to work with counsel to fight to stay in Oregon with their families and community. To avoid this prospect, PCUN's members have stopped attending the organization's programming, stopped going to work, taking their children to school, or doing any activity that will require them to leave their homes. The same is true for Leon X, who every day has to convince himself to be able to leave his residence despite his deep fear of being detained and left helpless in immigration detention.

Additionally, Defendants' policies, patterns, and practices of denying detained people access to counsel have impaired Plaintiff CLEAR Clinic's ability to provide pro bono immigration legal services, including in a rapid response context.

**A.    Oregon's rapid response network provides access to free lawyers.**

Through a coalition of community-based organizations, non-profits and network of volunteers, a rapid response to immigration enforcement network is available to the immigrant community in Oregon. The Portland Immigrant Rights Coalition ("PIRC") operates a statewide, toll-free hotline as part of Oregon's rapid response system. ECF 6, Declaration of John Walsh ("Walsh Decl.") ¶ 4. The hotline is a free service for the community. It enables anyone impacted by an ICE detention or enforcement action to call a single number and get connected with necessary resources, including free legal representation through Equity Corps of Oregon ("ECO"), Oregon's statewide universal representation program. *Id.*

PIRC's rapid response hotline receives calls around the clock, with most of the calls reporting detentions and ICE encounters that occur in the morning or early afternoon. *Id.* ¶ 6. Most of the calls received by the hotline request connection to legal assistance—which is one of the most important parts of the operator's role: to collect all the information needed to activate the first responder lawyers. *Id.* ¶ 7. Usually, when the PIRC hotline receives a call to report a detention, the call comes from a family member or acquaintance of the person detained, who provides details on the detention and discloses whether the detained individual already has legal representation. *Id.* ¶ 8. Most of the people who call the hotline report that the detained person does not have an immigration attorney, so they request to be connected to the ECO program to obtain legal representation and make informed choices about their case. *Id.* After receiving the call and gathering sufficient information, the hotline operators activate the first responder lawyer system by transmitting the necessary information to ECO so they can send an attorney to the appropriate ICE facility ("Portland Office" and "Eugene Office"). *Id.* ¶ 10. The goal of the rapid response system is to get a lawyer to meet with the detained person and provide them with legal advice and a comprehensive legal screening before they must make any legal decisions about their case. *Id.* The lawyer can also legally advocate with ICE about alternatives to detention. *Id.* ¶¶ 10-11.

ECO is a referral organization recognized under 8 C.F.R. § 1292.2 to provide free legal services and appears on the list of Pro Bono Legal Services distributed by the Executive Office for Immigration Review (EOIR). 8 C.F.R. § 1003.61 (defining organizations, pro bono legal services

and qualifications); *see also* 8 U.S.C. § 1229(b)(2) (requiring the Attorney General to maintain and make available pro bono lists). Under 8 C.F.R. § 287.3(c), a list of available free legal services from EOIR recognized organizations or attorneys must be provided to all non-citizens that are under their custody. ECO is one of the organizations that appears on the list of local providers for the state of Oregon.

CLEAR Clinic attorneys are among the first responder lawyers on Oregon's rapid response system for ICE detentions and are part of the ECO program. ECF 7, Declaration of Alena A. Tupper ("Tupper Decl.") ¶ 11. Any community member detained by ICE in Oregon is eligible for free legal services through the rapid response system and, thus, a prospective client of the CLEAR Clinic. *Id.* ¶ 12. CLEAR Clinic provides rapid response legal services consisting of legal screenings and analyses and can include full or limited-scope representation on immigration matters in detention. *Id.* These legal services include advocating for the release of the individual from ICE custody prior to transfer out-of-state. *Id.*

Meaningful access to rapid response counsel for clients and prospective clients in ICE detention requires prompt, in-person contact with the detained person, in a confidential space, for a minimum of one hour, with appropriate language access, including interpretation if needed, and review of the relevant legal documents served to the person by Defendants before transfer to an overnight ICE detention center. *Id.* ¶ 19. Additionally, CLEAR Clinic attorneys are trained to provide trauma-informed legal care because most people they serve have suffered trauma, including the use of violence during their detention by ICE; for this, in-person meetings are necessary. *Id.* ¶ 17.

**B.    Rise in ICE enforcement activity and warrantless arrests in Oregon.**

Since the filing of this lawsuit—and in recent weeks—ICE presence in Latinx communities and enforcement activity have sharply risen. *See* ECF 3, Declaration of Reyna Lopez ("Lopez Decl.") ¶¶ 25, 28-29; ECF 34, Supplemental Declaration of Reyna Lopez ("Lopez Supp. Decl.) ¶¶ 4-5; ECF 24, Declaration of Alyssa Walker-Keller ("Walker Decl.") ¶ 4 (documenting over 1,500

calls to the PIRC hotline and 67 confirmed detentions where every caller requested legal assistance between October 16 and 21, 2025 alone);  Declaration of Merlina Campos ("Campos Decl.") ¶¶ 5-6; Supplemental Declaration of Natalie Lerner ("Supp. Lerner Decl.") ¶¶ 9-11.

On October 30, 2025, Defendants conducted the single largest immigration raid in Oregon under this administration, arresting over 30 people in Woodburn.[4] Campos Decl. ¶¶ 5-6; Supp. Lerner Decl. ¶¶ 9-11. On November 11, 2025, Defendants conducted one of the largest ICE raids in Salem, Oregon targeting farmworkers.[5]

Plaintiff PCUN has received increased calls asking for legal assistance, Lopez Decl. ¶¶ 31, 32, 34, and PCUN's members have expressed their fear of being detained and denied access to counsel, Lopez Supp Decl. ¶¶ 5, 9-10. Since October, Plaintiff PCUN reports a drastic increase in immigration enforcement in the Willamette Valley, including sweeps, that have overwhelmed their rapid response efforts and have made it difficult for them to assure their members that they will have access legal assistance in the event they are arrested or targeted by ICE. Campos Decl. ¶ 5. In particular, in the early morning of October 30, ICE conducted a series of arrests of farmworkers in Woodburn, Oregon and surrounding towns. PCUN confirmed at least two of its members were arrested in the October 30 sweep. *Id*. ¶¶ 6-7. That same day, pro bono lawyers with ECO, including two CLEAR Clinic attorneys, went to the Portland ICE office and attempted to provide legal orientations and legal advice to all those arrested that morning. Supp. Lerner Decl. ¶ 9; Supp. Lerner Decl. Ex. B. Of the more than thirty farmworkers and community members detained that day, the pro bono attorneys were permitted to meet with just eleven people. *Id.*

---

[4] *See* Mia Maldonado, "Oregon see largest immigration raid under Trump 2.0 in Woodburn, group says," Oregon Capital Chronicle (Oct. 31, 2025), https://oregoncapitalchronicle.com/2025/10/31/oregon-sees-largest-immigration-raid-under-trump-2-0-in-woodburn-group-says/.

[5] See Madeleine Moore and Rachel Alexander, *Salem sees at least 16 immigrants arrested on Veterans Day, groups say,* Salem Reporter (Nov. 11, 2025), https://www.salemreporter.com/2025/11/11/salem-sees-at-least-16-immigrants-arrested-on-veterans-day-groups-say/, https://perma.cc/AU9T-6TH3 (last visited Nov. 12, 2025)

On November 5, 2025, in response to the sharp increase in ICE arrests in Oregon and to facilitate meaningful access to counsel for those detained, CLEAR Clinic submitted a formal request to ICE Field Office Director Cammilla Wamsley and Assistant Field Office Director Jeffrey Chan seeking to conduct group legal rights presentations at the Portland ICE Office. Third Declaration of Alena Tupper ("Third Tupper Decl.") ¶ 7. In this request, CLEAR Clinic proposed to conduct "two 30-minute group legal rights presentations every day, twice a day, to provide detained people with basic know your rights information, including about how to get legal representation, forms of relief from removal, and how to request release from detention." *Id.* CLEAR Clinic further requested ICE "make available space for private meetings with people who choose to speak with an attorney or legal representative following the group presentations." *Id.* CLEAR Clinic's request remains pending. *Id.*

### C.     Defendants deny access to counsel at the Oregon ICE Field Offices.

Defendants' policies and practices effectively deny access to counsel by completely denying or severely limiting attorney visitation hours; moreover, Defendants process noncitizens, with the intent of depriving them of counsel, at locations where telephones are not made available. Without access to counsel, class members and Plaintiff PCUN's "members who may be taken into custody will be forced to make decisions about their rights without understanding what they may may be waiving or declining." Lopez Decl. ¶ 24; *see also* ECF 26, Declaration of Debbie Denise Cabrales ("Cabrales Decl.") ¶ 14 (PCUN member describing how important it is to assist members of the community to secure legal representation quickly to "access due process and be heard instead of being rapidly disappeared into the detention system"). Over the past weeks, Plaintiff PCUN had two members who were detained and were denied access to counsel; they are currently at the Northwest Immigration Processing Center ("NWIPC") in Tacoma, Washington and have not been able to connect with an attorney.  Campos Decl. ¶¶ 7-9. Even when the members' families and PCUN staff notified the hotline and the ECO program about the request for legal assistance, and the ECO program had attorneys readily available and had requested to meet with the PCUN members, Defendants denied them access. *Id.*

    **1.  Defendants have imposed a near blanket denial of access to counsel at the Eugene ICE Field Office.**

    Starting in January 2025, attorneys who are part of the ECO program in Eugene have reported consistent denials of access to prospective and current clients at the Eugene Office. *See* ECF 18-1, Declaration of Katrina Noel Kilgren ("Kilgren Decl.") ¶¶ 4; *see also* Declaration of Katrina Kilgren in Support of Preliminary Injunction ("Kilgren Supp. Decl.") ¶¶ 3-12. Moreover, their ability to even *access* the building has drastically been impeded by Defendants in the past six months. Kilgren Decl. ¶¶ 5-6; Kilgren Supp. Decl. ¶ 11. Since June 2025, ICE has been extremely inconsistent and arbitrary regarding attorney access to clients and prospective clients detained in the Eugene Office. Kilgren Decl. ¶ 6; Kilgren Supp. Decl. ¶ 6 (officer providing conflicting information about when he will permit an attorney to access a client or prospective client inside the facility). In response to a Congressional inquiry, the Field Office Director has confirmed that officers in Eugene do not allow attorneys to meet with clients or prospective clients in the "secure area" of the Eugene Office.[6] And according to the Eugene Office Supervisory Detention and Deportation Officer, people detained at the Eugene Office do not have the right to an attorney and ICE will not delay transport to provide detained individuals access to counsel. Kilgren Supp. Decl. ¶ 11.

    Denial of access at the Eugene Office has taken various forms, including security officers making attorneys wait outside the building while their clients enter for their appointments, declining to allow attorneys into the building or past the lobby without any further explanation, and advising attorneys that the person is no longer in custody after making the attorney wait while the security officers confirmed access with Defendants. *Id*. ¶¶ 10 (detailing repeated attempts to

---

[6] Troublingly, the Field Office Director also informed the Congressional office that there had been no check-ins involving attorneys at the Eugene Office for the past month – which is untrue based on the personal experience of attorney Katrina Kilgren. Kilgren Decl. ¶ 7. This is not the first time that Defendants have provided inaccurate information to another branch of government; they have previously asserted to this Court on a separate matter that ICE officers allow access to attorneys with a valid G-28 form, when local attorneys have been denied access consistently over the past four months even when providing such forms. *Id*. ¶¶ 8-12.

access detained client at the Eugene Office without any response, resulting in client's ultimate transfer to Tacoma, Washington, without prior access to counsel), 14 (describing how denial of access resulted in no attorneys being able to access and interview detained individuals at the Eugene Office on October 15, 2025); Kilgren Supp. Decl. ¶¶ 9-11 (detailing repeated attempts to access detained prospective clients on multiple occasions at the Eugene Office and each time being told "no one" was detained at the facility despite confirmed reports of detentions in the area). Recently, a security guard threatened to press trespassing charges against a Eugene attorney for requesting access to the building to represent two clients at their appointments with ICE. *See* Kilgren Supp. Decl. ¶ 8.

### 2. Access to counsel at the Portland ICE Field Office is so arbitrary that it amounts to a blanket denial.

Attorneys with ECO, including CLEAR Clinic attorneys, have repeatedly attempted to contact clients, prospective clients, and class members at the Portland Office, but Defendants have thwarted their efforts. *See, e.g.*, ECF 7, Declaration of Alena Tupper ("Tupper Decl.") ¶¶ 9, 30-36; ECF 33, Supplemental Declaration of Josephine Moberg ("Moberg Supp. Decl.") ¶¶ 7-19 (deprivation of access to U.S.-citizen client on October 17); ECF 5, Declaration of Josephine Moberg ("Moberg Decl.") ¶ 4 (summarizing multiple denials); ¶¶ 15-21 (denying access and falsely telling Moberg that her client refused a visit). Defendants have repeatedly denied client meetings, *see* Moberg Decl. ¶ 21; Tupper Decl. ¶ 26; ECF 31, Declaration of Sara Eddie ("Eddie Decl.") ¶¶ 2-10; Declaration of Yessenia Martinez ("Martinez Decl.") ¶ 6, and pre-representational meetings alike, *see* Tupper Decl. ¶¶ 22-23, 28-29, Moberg Decl. ¶¶ 30-3, Supp. Lerner Decl. ¶¶ 3-5, 9, 12.

Attorneys are often denied access to the building entirely or are forced to wait for hours, including outside. *See, e.g.,* Martinez Decl. ¶ 6; Tupper Decl. ¶ 23, *id.* ¶ 27 (ICE transferred client out the back door while attorney waited in the lobby); Moberg Supp Decl. ¶ 8 ("ICE did not permit me to enter the building")*;* Declaration of Claire Fawcett ("Fawcett Decl.") ¶ 7. Defendants also withhold the whereabouts of clients and provide false information in a hide-and-seek practice in

which the individual is present in the district when the attorney makes contact, but DHS hides this fact. Eddie Decl. ¶¶ 2-10 (ICE transferred client out of state after falsely telling her client was not being held at Portland ICE Office); ECF 27, Declaration of Emma Gill ("Emma Gill Decl.") ¶ 8 (withholding client's whereabouts and giving her false information); Tupper Decl. ¶¶ 26-27 (ICE transferred client out of state after alleging person had "refused" a visit when client had actually repeatedly requested to speak with a lawyer); Moberg Supp Decl. ¶¶8-12, 19 (ICE provided conflicting and non-responsive information when she sought to meet with her U.S. Citizen client). These restrictions prevent CLEAR Clinic's attorneys from conducting full intakes, properly advising their clients, and fully advocating for their clients' interests. Tupper Decl. *Id.* ¶ 25; Moberg Decl. ¶ 32.

### a. Defendants impose a presumptive denial of access rule.

Defendants use a default policy that access should be denied, and access is only viewed as a discretionary exercise by the jailers themselves. *See* Moberg. Decl. ¶¶ 4-31; Tupper Decl. ¶¶ 22-29. For example, on June 18, counsel was present when ICE detained an Oregonian after his immigration hearing. Martinez Decl. ¶ 4. The arresting officer gave inconsistent reasons for the detention and informed counsel that her client would be taken to the Portland ICE Office and she could meet with him there. *Id.* However, upon her arrival at the ICE Office and request to meet with her client, she was given false and conflicting information that "no one had been detained that day and there were no detainees at the facility" and then that "the facility was closed due to protestors." *Id.* at ¶ 6. While advocating for her right to speak with her client, counsel was asked to step aside as an unmarked vehicle left the facility. *Id.* She later learned that her client was inside that vehicle and was transferred to the NWIPC. *Id.* ¶ 7.

### b. Defendants impose limited hours for weekday access and a blanket ban on access outside these hours.

Defendants have further limited access to happen only between 8:30 am and 3:00 pm, and impose a blanket ban on any access on weekends or any holiday even when Defendants are still detaining class members at those times. Attorneys describe that when trying to access the facility near 3:00pm, they are often turned away or, in the occasions when they have met with individuals nearing that time, the meetings have been abruptly interrupted. Supp. Lerner Decl. Exs. A-B.

An ECO attorney stated that she had been denied entrance during the weekend, even though her client was present and detained in the facility, under the pretext that the office was closed. Lerner Supp. Decl. ¶¶ 4-6. The attorney was confronted with Defendants' heavily armed agents pointing their weapons at her while attempting to access her clients. *Id*. ¶5.

Another attorney explains that ICE detained her client on Sunday, October 19 and when she went to the Portland ICE Office to meet with him, DHS incorrectly stated that he was not at the facility. Eddie Decl. ¶ 5. The attorney pressed for access and was rebuffed again; DHS falsely stated the client was not present at the facility and the attorney was even then misdirected by DHS who said her client was likely in police, not ICE custody. *Id.* ¶ 7. The attorney left the facility, only to receive a call from her client an hour later, informing her that he was indeed at the Portland ICE office and had been detained there for over four hours. *Id.* ¶ 8. He was then transferred to Tacoma. *Id.*

Similarly on October 30, attorneys from the ECO program attempted to meet with a list of 28 individuals who were detained that day but were only allowed to meet with 11 of them. Supp. Lerner Decl. ¶ 9. Two of the people who were on their list but attorneys could not access, are PCUN members. Campos Decl. ¶¶ 8-9.

CLEAR Clinic attorneys were denied access to seven prospective clients on Monday, November 11, with officers telling them the building was closed for the Veteran's Day. Third Declaration of Josephine Moberg ("Third Moberg Decl.") ¶ 6. As the CLEAR Clinic attorneys continued to press for access, they witnessed several large vans with tinted windows entering and then leaving the facility. *Id.* ¶¶ 6-14.

### c.   Defendants impose arbitrary time limits.

13

Where ICE does provide detained individuals access to counsel, the length of that access varies greatly, is left to the discretion and control of the jailer, and does not take into account representational needs.   Even when ICE does grant access, meetings can be as little as 60 seconds, Supp. Lerner Decl., Ex. B ¶ 15, and not more than 30 minutes and not in a confidential meeting space, Tupper Decl. ¶ 24. *See also* Tupper Supp. Decl. ¶ 9 (explaining that when attorneys are not entirely denied access to clients and prospective clients, access is "restricted to about a ten-minute meeting with each person"); Moberg Decl. ¶¶ 30-31 (recounting prospective client meeting being cut visit short, preventing provision of meaningful legal advice); Declaration of Esmeralda Santos ("Santos Decl.") ¶ 3 (recounting client's transfer to Tacoma immediately following ICE officer's termination of client meeting after only four minutes);   Supp. Lerner Decl. Exs. A-D (attorneys describing their experience on October 30, 2025 when ICE interrupted their interview with a client after only a few minutes, and when they requested more time, the ICE officer said they could have just 60 seconds before ICE transported their client out of the facility).

### d.  Defendants impose blanket denial on pre-representational or pro bono screening.

Defendants have consistently denied ECO attorneys, including CLEAR Clinic attorneys, pre-representational meetings and only allow access to attorneys when they present a Form G-28 Notice of Entry of Appearance, which under their own guidelines, is not required. CLEAR Clinic's prospective clients include "all Oregonians at risk of ICE detention of deportation." Tupper Decl. ¶ 22. "On every occasion, our attorneys have been denied full, and often any, access to our clients and prospective clients at the Portland ICE field office[.]" *Id.* ¶ 23; *see also id.* ¶¶ 28-29 (denial of access to four prospective clients on October 15, 2025); Moberg Decl. ¶¶ 5-14 (denial of access to counsel to two prospective clients after waiting in lobby for over an hour); Moberg Decl. ¶¶ 22-31 (denial of access to prospective client with TPS before transferring out of state). Defendants have also required G-28s even for pre-representational meetings. Moberg Supp Decl. ¶ 8; ECF 39, Declaration of Natalie Lerner ("Lerner Decl.") ¶¶ 3, 5; Lerner Supp. Decl. ¶ 8.

14

**D.    Access to counsel post-transfer out of district is inadequate or illusory**

Defendants' policies and practices following transfer outside of Oregon continue to deny access to counsel by limiting access at detention facilities and disappearing detained class members at ICE facilities across the country within its expansive detention network. While there is rapid movement from the Oregon ICE Facilities to the NWIPC, Defendants further limit access to counsel through delays in updating the ICE Online Detainee Locator System ("ODLS"), by providing limited availability for prompt virtual access, and through significant delays for in-person visits at the NWIPC. Further, rapid transfers from NWIPC to other detention locations across the country effectively prevent attorneys from accessing their clients, and Defendants do not provide timely updates on a detained person's whereabouts.

After ICE transfers class members who are detained in Oregon out of the district, these class members become lost within ICE's vast detention network. *See* ECF 28, Declaration of Kathleen Pritchard ("Pritchard Decl.") ¶ 4. While Defendants claim the ICE Online Detainee Locator System ("ODLS") allows attorneys and members of the public to locate individuals in ICE custody, *see* ECF 21 at ¶ 21, locating individuals with ODLS is difficult at best. ECF 32, Supplemental Declaration of Alena A. Tupper ("Tupper Supp. Decl.") ¶ 19; Third Tupper Decl. ¶ 5 (describing example of ODLS inaccuracy where CLEAR Clinic client detained on October 14 was still not reflected in the ODLS as of November 6); Declaration of Jose G. Miranda ("Miranda Decl.") (describing ODLS as the "least reliable" of the systems for locating a detained person) ¶¶ 4-5; Fawcett Decl. ¶ 5; Declaration of Luis Garcia ("Garcia Decl.") ¶ 12; Declaration of Elisabeth Sethi ("Sethi Decl.") ¶ 5 (recounting a delay of over 48 hours in updating client's location on ODLS); Supplemental Declaration of Sara Denniston Eddie ("Eddie Supp. Decl.") ¶ 8; Pritchard Decl. ¶ 4; Gill Decl. ¶ 7-13. Indeed, it can take many days or more—if ever—for ICE to update the ODLS to accurately reflect a person's location and custody status. Sethi Decl. ¶ 5; Miranda Decl. ¶ 5; Third Tupper Decl. ¶ 5; Lerner Decl. ¶¶ 14-18. Importantly, even with these well-documented shortcomings, ODLS is not a replacement for the Fifth Amendment right to access

counsel. That is, knowing where DHS has disappeared an Oregonian is one thing; having meaningful access to counsel is another.

### 1. Defendants restrict access to counsel for individuals transferred to the NWIPC

There is rapid movement of people from Portland or Eugene to the NWIPC in Tacoma, Washington. To achieve this transfer, Defendants deny access to counsel, as set forth above. That is, the Defendants treat the Fifth Amendment's guarantee of due process and access to counsel as discretionary because of their detention quota system.

Plaintiff PCUN detained members who are currently at NWIPC have not yet been able to meet with an attorney. Campos Decl. ¶ 9. Attorneys have also reported difficulties accessing clients and class members detained at the NWIPC both in virtual and in-person visitation. *See* Pritchard Decl. ¶¶ 4, 8, 10-17; Tupper Supp Decl. ¶ 13-18. Attorneys experience days-long delays in scheduling confidential video consultations. Sethi Decl. ¶ 2; Declaration of Anthony Lee ("Lee Decl.") ¶¶ 5-6 (recounting a ten-day wait to be able to speak confidentially with his client); Sethi Decl. ¶¶ 3-4 (noting the earliest available consultation slot was in five days, and counsel's client was transferred before the scheduled consultation). Remote confidential video or phone meetings are rarely available on short notice and are limited to one hour, which is often insufficient, particularly when the use of an interpreter is required. Eddie Supp. Decl. ¶ 4. Further, NWIPC does not provide a way for attorneys to exchange documents for review and signature with their detained clients during virtual meetings. *Id.* While in-person client consultations at NWIPC are permitted, the remote location of the facility and significant delays accessing clients present additional access obstacles. NWIPC staff have forced attorneys to wait for hours before being able to meet with clients. Martinez Decl. ¶¶ 10, 12 (describing over four-hour wait on two occasions); Pritchard Decl. ¶ 3 (describing routinely waiting over three hours to see a single client in person).

### 2. Defendants rapid transfer of detained persons to ICE facilities across the country obstructs access to counsel

Once a class member leaves the district of Oregon to NWIPC, DHS routinely transfers them to other detention facilities across the country. *See* Pritchard Decl. ¶¶ 4 (describing ICE practice of transferring clients and prospective clients from Tacoma to detention centers across the country and even outside of the country), 17 (client transferred to Fort Bliss); Lerner Decl. ¶¶ 14-19 (Oregonian transferred to Arizona and then to Mississippi); Gill Decl. ¶ 15 (multiple Oregonians transferred to facilities in Louisianna, Mississippi, and Texas); Eddie Supp. Decl. ¶¶ 6-9 (client transferred from Tacoma to various locations in New Mexico); Sethi Decl. ¶ 2, 6 (client transferred from Tacoma to "staging" area in Arizona, then to the Florence Corrections Center); Garcia Decl. ¶¶ 6-13 (client transferred from Tacoma to New Mexico); Santos Decl. ¶¶ 6-7 (client transferred from Tacoma to Louisiana within a week of detention; another client transferred back and forth between Tacoma and Alaska). This state of motion operates as a continuous obstruction of access to counsel because the individual is never anywhere long enough to find and to make the arrangements—if there is counsel available—to provide representation. Miranda Decl. ¶¶ 8-9 (detailing difficulty in connecting Oregonians with counsel when their location is unknown or where ICE re-transfers between facilities); *see*, e.g., Gabrielle LaMarr LeMee, *How ICE detainees are moved miles away from families and attorneys*, LA Times, Sept. 26, 2025, https://www.latimes.com/politics/story/2025-09-26/faster-more-frequent-transfers-of-immigrant-ice-detainees-sow-fear-and-cut-off-resources, https://perma.cc/B6GP-PY57 (last visited 10/22/2025) (data analysis that transfers between ICE facilities "are happening faster and more frequently" and "[t]ransfers move people from places where they may already have an attorney or where there are established legal-services organizations to a place ... where there may be fewer resources."). This is exactly what Plaintiff Leon X fears: that he will be transferred rapidly and lose access to his attorneys. Declaration of Leon X ("Leon Decl.") ¶¶ 7-8.

For example, on October 15, 2025, DHS arrested an Oregonian and moved him out of the district the same day to the NWIPC. Lerner Decl. ¶¶ 14-15. Days later, Defendants moved him to Arizona where he was held in seemingly a bunker with approximately 50 other men. *Id.* ¶ 16. On October 20, 2025—five days after his detention—there was still no public information about his

whereabouts. *Id.* ¶ 17. At some point between October 17 and October 21, Defendants moved him to Adams County Correctional Center in Mississippi.[7]  Within just a few days, DHS has secretly spirited him some 2,800 miles from where originally detained.[8]

CLEAR Clinic attorneys and other attorneys report rapid transfers impede their access to and representation of clients. Tupper Decl. ¶ 29; Tupper Supp. Decl. ¶¶ 12, 35; Sethi Decl.  ¶¶ 2, 3, 8 (reporting rapid transfer from NWIPC to Florence Correctional Center impeded access to her client and significantly impaired her representation); Santos Decl. ¶¶ 6-7; Lee Decl. ¶ 7; Garcia Decl. ¶¶ 16-18.

These transfers also interfere with counsel's ability to submit filings and appear on behalf of their clients. Santos Decl. ¶ 7 (indicating counsel filed at least three motions for bond which were repeatedly rejected for lack of jurisdiction due to client's transfer from NWIPC to Anchorage, and then back to NWIPC); Garcia Decl. ¶¶ 6, 15, 17 (similarly recounting rejection of bond request following transfer out of NWIPC to the Otero County Processing Center in New Mexico and indicating that at least one judge prohibits representation at hearings, impacting his ability to continue representing his client post-transfer); Eddie Supp. Decl. ¶¶ 10-11 (describing inability to file habeas petition in a different jurisdiction and the difficulties in maintaining access and providing pro-bono representation following rapid transfers).

## III.    Legal Standard

"The proper legal standard for preliminary injunctive relief requires a party to demonstrate (1) 'that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009)

---

[7] Adams County Correctional has a history for violations that have "threatened the health, safety and rights of detainees." *See* Office of Inspector General, Dep't of Homeland Security, *Violations of ICE Detention Standards at Adams County Correctional Center* (July 14, 2021) at 3, https://www.oig.dhs.gov/sites/default/files/assets/2021-07/OIG-21-46-Jul21.pdf.

[8] Once individuals leave the district, without early access to counsel, they are often pressured into signing deportation orders. *See* Pritchard Decl. ¶ 10.

(*citing Winter*, 555 U.S. at 20). As an alternative to this test, a preliminary injunction is appropriate if "serious questions going to the merits were raised and the balance of the hardships tips sharply in the plaintiff's favor," thereby allowing preservation of the status quo when complex legal questions require further inspection or deliberation. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

To obtain a mandatory injunction, Plaintiffs must "establish that the law and facts *clearly favor* [their] position." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Such injunctions are "not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticlas, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009).

## IV.    Argument

Defendants are engaged in a policy and practice of functionally denying access to counsel to Oregonians detained in civil immigration enforcement actions. As with the practices at issue in the *Orantes-Hernandez* case, the "cumulative effect" of Defendants' actions is "to prevent [noncitizens] from contacting counsel and receiving any legal advice." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 565 (9th Cir. 1990). The relief that Plaintiffs seek is necessary and appropriate to uphold noncitizens' meaningful right to counsel by enabling them to connect with free, available legal service providers who seek to provide legal representation before they may be coerced to sign away their rights, disappeared for days into Defendants' detention system, and transferred beyond this Court's jurisdiction. Without it, PCUN's members, Plaintiff Leon X, and proposed class members will continue living in fear that they will be arrested, denied access to counsel, and ferreted away without legal help, and CLEAR Clinic will be unable to provide the legal services that constitute a core part of its business activities.

### A.    Plaintiffs are likely to succeed on the merits of their claims.

The Due Process Clause of the Fifth Amendment, the First Amendment, and the INA, all guarantee individuals detained in immigration operations the right to access counsel. Because Plaintiffs and proposed class members are likely to show that Defendants have denied individuals

detained in civil immigration enforcement actions the ability to obtain and meaningfully communicate with counsel before their transfer out of district, Plaintiffs are likely to succeed on all three of their constitutional claims.

### 1. Plaintiffs are likely to succeed on Count 1 (Fifth Amendment)

Individuals detained in immigration operations have a right to counsel that is rooted in the Due Process Clause of the Fifth Amendment. *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1162 (D.Or. 2018); *Usubakunov v. Garland*, 16 F.4th 1299, 1303 (9th Cir. 2021) ("As we have stressed, the importance of the right to counsel … cannot be overstated." (cleaned up)); *Arrey v. Barr*, 916 F.3d 1149, 1157 (9th Cir. 2019) ("Both Congress and [the Ninth Circuit] have recognized the right to retained counsel as being among the rights that due process guarantees to petitioners in immigration proceedings."); *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) (The right to counsel in immigration proceedings is rooted in the [Fifth Amendment] Due Process Clause[.]"); *see also Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1060-61 (C.D. Cal. 2019); *cf. Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) ("[A]n alien who faces deportation is entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf."). "The high stakes of a removal proceeding and the maze of immigration rules and regulations make evident the necessity of the right to counsel." *Biwot*, 403 F.3d at 1098; *see Usubakunov*, 16 F.4th at 1300 ("Navigating the asylum system with an attorney is hard enough; navigating it without an attorney is a Herculean task.").

To effectuate this right, individuals detained as part of immigration enforcement efforts must be allowed to obtain and communicate with counsel. The Ninth Circuit "has upheld mandatory injunctions designed to remedy government practices when the 'cumulative effect' of such practices 'was to prevent [noncitizens] from contacting counsel and receiving any legal advice." *Innovation Law Lab*, 310 F. Supp. 3d at 1162 *; Orantes-Hernandez v.*, 919 F.2d at 554, 565 (granting injunction because noncitizens "have a due process right to obtain counsel of their choice at their own expense," and affirming injunction against government practices "the

cumulative effect of which was to prevent aliens from contacting counsel and receiving any legal advice," including the practice of denying visits with counsel); *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1439 (9th Cir. 1986). Individuals detained in immigration enforcement operations must thus be provided a "reasonable time to locate counsel," *Rios-Berrios v. INS*, 776 F.2d 859, 863 (9th Cir. 1985); *Torres*, 411 F. Supp. 3d at 1060–61, and the government cannot impose restrictions that undermine a detained person's opportunity to obtain or communicate with counsel. *See Orantes-Hernandez*, 919 F.2d at 554, 565. Impediments to communication, including through detention in a difficult-to-access facility, can constitute a "constitutional deprivation" where they obstruct an "established on-going attorney-client relationship." *Comm. of Cent. Am. Refugees*, 795 F.2d at 1439.

A noncitizen's right to counsel begins at minimum, at the moment of detention. *See Torres*, 411 F. Supp. 3d at 1061–62 (the right to counsel "begins before any court proceeding, with notices from the agency to the immigrant and with the detention itself."). Indeed, where ICE officers first engage in questioning a noncitizen for purposes of immigration enforcement, the right to counsel begins even earlier. *See* 8 C.F.R. § 292.5(b) ("Whenever an examination is provided for in this chapter, the person involved shall have the right to be represented by an attorney.").[9]

Noncitizens detained by ICE and held at an ICE facility in Oregon have the right to access counsel before ICE transfers them out of the state and that meaningful access to counsel requires access to counsel prior to transfer. At the ICE facilities in Oregon, ICE officers are not only conducting examinations of detained individuals, *see* 8 C.F.R. § 292.5(b), but they are pressuring individuals to waive important rights, such as the right to seek asylum or other relief and the right to a hearing before an immigration judge, and to make important decisions about their case, including whether to accept a voluntary departure or an order of deportation. Gill Decl. ¶ 14; Pritchard Decl. ¶ 10; Declaration of R-J-S-V- ("RJSV Decl."); Tupper Supp. Dec. ¶ 35; Lerner

---

[9] 8 CFR 292.5(b) excludes from this right to counsel "any applicant for admission in either primary or secondary inspection...unless the applicant for admission has become the focus of a criminal investigation and has been taken into custody."

Supp. Decl. Ex. B ¶ 10. ICE officers engage in this practice even where the individual has requested to speak with counsel and where counsel is available at the facility to provide legal advice. Gill Decl. ¶ 14, Pritchard Decl. ¶¶ 10, 14, 16; RJSV Decl. ¶ 8; Tupper Supp. Decl. ¶ 12. Importantly, it is at these facilities that ICE is making a custody determination – formally deciding whether to release an individual after investigation and questioning or whether to keep that individual in ICE custody. Under 5 U.S.C. § 555(b)(1), "[a] person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel…" and further, "is entitled to appear in person or by or with counsel…in an agency proceeding." There is no question that an ICE arrest and the subsequent custody determination is the compulsion of an appearance before the immigration agency under 5 U.S.C. § 555(b). Clearly then, access to counsel at this stage, while an individual is in ICE custody in Oregon and prior to transfer, is not only required but is imperative for right to counsel to be meaningful.

The cumulative effect of Defendants' pattern and practice of deprivation of access to counsel at Oregon ICE facilities prevents noncitizens in ICE custody from communicating with and receiving advice from counsel. As a result, Plaintiff Leon X fears that he will be detained and swiftly transferred away from the state without the ability to consult his immigration counsel. Leon Decl. ¶ 7. Indeed, Defendants' practices have effectively blocked CLEAR Clinic's access to individuals and individuals' access to lawyers such that CLEAR Clinic cannot provide, and individuals in custody cannot receive, meaningful access to counsel. *See* Tupper Decl. ¶¶ 23-25 (describing ICE's practice of stonewalling attorneys, providing conflicting information about access and ultimately delaying attorney visits only to then allow attorneys ten minutes to meet with their clients); Moberg Decl. ¶¶ 30-31 (recounting one occasion where ICE delayed granting her access to a prospective client for about an hour and then cut the visit short, which prevented her from providing meaningful legal advice); *Innovation Law Lab*, 310 F. Supp. 3d at 1162 ("Government practices that effectively deny access to counsel include the detention of aliens far from where potential or existing counsel was located, limited attorney visitation hours, and the processing of aliens at locations where telephones were not available to them."). For example,

22

Defendants' practices force CLEAR Clinic's attorneys to wait for hours while ICE refuses to give them information about their detained clients. Tupper Decl. ¶ 23. In at least one instance, ICE transferred their prospective client out of state while a CLEAR Clinic attorney requested access to him at the Portland ICE office. *See id.*; Moberg Decl. ¶ 5. Similarly, on October 30, 2025, when ICE detained more than 30 people in a sweep of the Woodburn area, Plaintiff CLEAR Clinic was virtually blocked entirely from access to the Portland ICE facility that day. Lerner Supp. Decl. Ex. B ¶ 21; Webb Supp. Decl. ¶¶ 12-19. And importantly, when CLEAR Clinic lawyers do manage to finally access some of those individuals following their transfer out of state, many have already signed a deportation order and waived their right to defend against deportation. Tupper Supp. Decl. ¶ 12.

In response to ICE's increased enforcement and implementation of aggressive tactics to achieve its deportation numbers at any cost, district courts around the country have ordered the government to provide meaningful access to counsel at ICE facilities that serve as temporary processing facilities. *See Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 877 (C.D. Cal. 2025); *Mercado v. Noem*, No. 25-cv-06568, 2025 WL 2658779, *23, 36 (S.D.N.Y Sept. 17, 2025) (granting Plaintiffs' preliminary injunction and ordering the government to provide access to counsel, finding that lack of access to counsel at the temporary ICE facility at 26 Federal Plaza can have irreversible consequences); *Moreno Gonzalez et al v. Noem*, No. 1:25-CV-13323 (N.D. Ill. Nov. 5, 2025) (requiring the government to provide access to counsel for those detained at the Broadview ICE facility, a temporary processing facility). In *Vasquez Perdomo*, the Central District of California found that the injury-in-fact showing was sufficient where members had a "reasonable fear of imminent detention without access to counsel" at the B-18 ICE facility in downtown Los Angeles. 790 F. Supp. 3d at 877. The *Vasquez Perdomo* court ordered the government to provide attorneys access to meet with both current and prospective clients detained at the B-18 ICE facility prior to transfer. *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d at 896-97.

Like the plaintiffs in *Vasquez Perdomo*, Leon X and Plaintiff PCUN's members, including proposed class members, reasonably fear that they will be unable to obtain and communicate with

23

an attorney if they are detained by Defendants. Leon Decl. ¶ 7; Lopez Supp. Decl. ¶ 7. As news of the surge in immigration enforcement in Oregon spread, PCUN began receiving calls with questions from panicked members asking to access immigration representation resources. Lopez Decl. ¶ 15; Lopez Supp. Decl. ¶¶ 4-6. The organization is aware of warrantless arrests of farmworkers where, even when they called the PIRC statewide hotline and were able to connect with an attorney, the attorney was not allowed to meet with the detained person before the person was moved out of state. *Id.* ¶ 16. Unfortunately, this was the reality for two of PCUN's members detained on October 30, who are to this day unable to meet with an attorney at the NWIPC. Campos Decl. ¶ 9.

Additionally, Defendants have a policy, pattern, and practice of rapidly transferring detained individuals outside this district before those individuals can obtain or communicate with counsel. Moberg Decl. ¶¶ 14, 21; Moberg Supp. Decl. ¶¶ 7-19; Tupper Decl. ¶¶ 23-29; RJSV Decl. ¶¶ 8-9; Eddie Decl. ¶¶ 3-10; Gill Decl. ¶¶ 3-13; Miranda Decl. ¶¶ 6-7 ; Santos Decl. ¶¶ 6-7 (describing frequent re-transfers of clients from NWIPC, including one example where her client was transferred more than three times in the span of less than two months, impeding her ability to successfully file a motion for a bond hearing); Lerner Supp. Decl. Ex. C ¶¶ 5-12; Ex. D ¶¶ 3-6. Detained individuals may even be sent outside the United States where access to U.S.-based counsel is nearly impossible. *See, e.g., Dep't Homeland Security v. D.V.D.*, 145 S.Ct.. 2153, 2156-57 (2025) (Sotomayor, J., dissenting) (describing Defendants' third-country removal practice); *Bonilla Alvarez v. Noem*, No. 25-cv-03136 (D.D.C. Sept. 28, 2025) (same).

Moreover, the limitations on access to counsel that Defendants have imposed in their Oregon facilities raise a question as to whether Defendants are detaining individuals incommunicado—a clear Fifth Amendment violation. *Halvorsen v. Baird*, 146 F.3d 680, 688–89 (9th Cir. 1998) ("It would be hard to find an American who thought people could be picked up by a policeman and held incommunicado, without the opportunity to let anyone know where they were, and without the opportunity for anyone on the outside looking for them to confirm where they were."); *Castillo v. Nielsen*, No. 5:18-cv-01317, 2020 WL 2840065, at *5 (C.D. Cal. June 1,

2020) ("Defendants do not and cannot dispute that holding civil immigration detainees incommunicado for such prolonged periods implicates due process concerns.").

The practices described above undermine detained individuals' ability to retain and communicate with counsel and obstruct the attorney-client relationship in violation of the Fifth Amendment. *See Vasquez Perdomo v. Noem*, 790 F. Supp. 3d at 877 (*stay of temporary restraining order granted by Noem v. Vasquez Perdomo*, 2025 WL 2585637 (S. Ct. Sept. 8, 2025) (finding likelihood of success on Fifth Amendment claim where immigration detainees alleged near total prohibition on attorney access).

### 2. Plaintiff PCUN, Plaintiff Leon X and putative class members are likely to succeed on Count 2 (First Amendment)

The First Amendment guarantees noncitizens the right to hire, consult, and communicate with an attorney. *See Immigrant Defs. L. Ctr. v. Mayorkas*, No. 20-CV-9893 (JGB), 2023 WL 3149243, at *34 (C.D. Cal. March 15, 2023) ("The First Amendment protects the right to hire and consult with counsel.") (citing *Mothershed v. Justices of Supreme Court*, 410 F.3d 602, 611 (9th Cir. 2005), *as amended on denial of reh'g* (9th Cir. July 21, 2005)) and *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009)); *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000) ("The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition."); *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) ("The right to retain and consult with an attorney, however, implicates . . . clearly established First Amendment rights of association and free speech."); *Mercado v. Noem*, No. 25-cv-06568, 2025 WL 2658770, at *80 (S.D.N.Y. Sept. 17, 2025) (finding that plaintiffs were likely to succeed in showing that ICE's restrictions on attorney-client communications in a New York detention facility violate the First Amendment); *cf. Doe v. ICE*, 490 F. Supp. 3d 672, 694 (S.D.N.Y. 2020) (where ICE arrests in and around courthouses prohibited legal services organizations from providing legal services to their clients and engendered an "atmosphere of fear," Defendants' actions were the "functional equivalent of a denial of access" to the courts).

25

This right extends to all persons, including noncitizens who are detained and imprisoned. *See Pell v. Procunier*, 417 U.S. 817, 822 (1974) (recognizing that all persons, including prisoners, have First Amendment rights); *Torres*, 411 F. Supp. 3d at 1061-62 (finding class of immigration detainees had adequately alleged First and Fifth Amendment violation where contact with counsel was subject to significant restrictions in terms of timing, duration, access to confidential space, and promptness). Detained persons have a First Amendment right to "communicate with persons outside prison walls," *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002); and barriers to legal communication between a prisoner and counsel merit "heightened concern" given the "import for the prisoner's legal rights[.]" *Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2002); *see also Al Odah v. United States*, 346 F. Supp. 2d 1, 9 (D.D.C. 2004) (holding that government may not "inappropriately burden th[e] [attorney–client] relationship" for individuals detained at Guantanamo).

To ensure that the First Amendment right to hire, consult, and communicate with an attorney is upheld, the government cannot unnecessarily burden a detained person's access to counsel. Thus, in *Torres v. U.S. Department of Homeland Security*, 411 F. Supp. 3d at 1067-68, the court rejected the government's argument that only an "outright ban on communication" would violate the plaintiffs' First Amendment rights. Instead, it concluded that even where detained people had some ability to communicate with counsel, restrictive conditions on access to counsel—such as restrictions on phone calls, email, and mail; lack of proper confidentiality; and delays in appointment times—impermissibly burdened plaintiffs' First Amendment rights to communicate with the outside world, including with attorneys. *Id.* at 1045, 1067–68; *see also Immigrant Defs. L. Ctr. v. Mayorkas*, No. 20-CV-9893 (JGB), 2023 WL 3149243 at *33–35 (detained individuals adequately alleged First Amendment violation where represented individuals could only speak with their lawyers non-confidentially for up to an hour, and unrepresented individuals could not access counsel at all).

Because Plaintiff Leon X, PCUN's members, and proposed class members reasonably fear denial of to access to counsel if they are detained, Defendants' policies and practices violate their

First Amendment right to communicate with counsel. *See* Lopez Decl. ¶ 24-25; Lopez Supp Decl. ¶¶ 7-8.; Leon Decl. ¶ 7. Although Plaintiff Leon X has years of experience in the immigrant rights field, he "closely" relies on his immigration counsel "for guidance and representation", and would rely on them "even more in the case of [his] detention." *Id*. To date, the two PCUN members who were detained and were denied access to counsel on October 30, have not been able to meet with an attorney after transfer to Tacoma, WA. Campos Decl. ¶ 9. Most of PCUN's members need assistance navigating everyday processes ranging from something as simple as reading a telephone bill to explaining medical records and instructions. Lopez Supp Decl. ¶ 23. For those members in these circumstances, it is especially harmful to not have access to an attorney when they are going through a complicated legal process and in the custody of the government. *Id.* If the immigration system is complex enough to a person who is fairly educated and literate in English, there is a heightened level of harm to an individual who is trying to understand what is happening after a detention while not being able to even read the documents provided to them. *Id.* ¶ 24. Without the support of attorneys, PCUN's members, Leon X, and proposed class members who may be taken into custody will be forced to make decisions about their rights without understanding what they might be waiving or declining. *Id.* Not having access to counsel can mean that their members of all immigration statuses may be unlawfully detained or deported without recourse, because they are targeted based on the color of their skin and their type of job. *Id.; see also* Cabrales Decl. ¶ 14.

### 3.  **Plaintiff CLEAR Clinic is likely to succeed on Count 3 (First Amendment)**

The First Amendment also protects legal service providers from government interference when they are "advocating lawful means of vindicating legal rights," *NAACP v. Button*, 371 U.S. 415, 437 (1963), or engaged in the "creation and dissemination of information", *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). First Amendment protections extend to organizations' right to solicit potential clients. *See In re Primus*, 436 U.S. 412, 431 (1978) (explaining that the "efficacy of litigation as a means of advancing the cause of civil liberties often depends on the ability to make legal assistance available to suitable litigants"). Moreover, by advising, assisting, and

consulting with potential and existing clients, attorneys disseminate important legal information, and the "creation and dissemination of information are speech within the meaning of the First Amendment." *IMS Health Inc.*, 564 U.S. at 570.

On many occasions, CLEAR Clinic attorneys have been unable to communicate at all with prospective clients because of their imminent transfer from the Portland Office. *See* Tupper Decl. ¶ 22-29; Moberg Decl. ¶¶5-14; 22-315. For example, on October 15, 2025, a CLEAR Clinic attorney arrived to meet with multiple prospective clients at the Portland Office, following community reports of immigration enforcement actions in Woodburn. Tupper Decl. ¶ 28. Although CLEAR Clinic was aware of at least four prospective clients who had been detained, the attorney was able to meet briefly with only one of them before officers told her that "everyone is already gone." *Id.* The attorney witnessed vans with Washington license plates pull up to the Portland Office and saw many men lined up be transferred, but she was unable to meet with them. *Id.* ¶ 29. Without access to those individuals, CLEAR Clinic lost the opportunity to advise these people of their legal rights and is unlikely, without great additional effort, to be able to locate them and provide follow-up legal services. *Id.* Additionally, where some access has been granted, Defendants have required G-28s. Moberg Supp Decl. ¶ 8; Lerner Decl." ¶¶ 3, 5, Supp. Lerner Decl. ¶ 8

### B.    Plaintiffs will likely suffer irreparable harm if not granted temporary relief.

Irreparable harm is "harm for which there is no adequate legal remedy." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Violations of constitutional rights "unquestionably constitute[] irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Moreover, government action that frustrates an organization's core missions gives rise to irreparable harm. *See FDA v. Alliance for Hippocratic Medicine,* 602 U.S. 367, 395 (2024) (an organization has standing if the defendant "'perceptibly impair[s]' [its] 'core' and ongoing ability to provide counseling . . . services" to its constituents); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677-78 (9th Cir. 2021).

PCUN's organizational interests and its members' interests are irreparably harmed by Defendants' actions.

Absent intervention from this Court, Plaintiffs and proposed class members will suffer irreparable harm through the deprivation of access to counsel, impeding their ability to contest unlawful custody and to assert their rights in ongoing immigration proceedings. *See Arroyo v. United States Dep't of Homeland Sec.*, 2019 WL 2912848, at *17 (C.D. Cal. June 20, 2019) (observing that "a significant burden on the attorney-client relationship, without a showing of underlying prejudice to the removal proceedings, may be sufficient to establish a legal injury sufficient to justify injunctive relief"), citing *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1439 (9th Cir. 1986), *amended on other grounds,* 807 F.2d 769 (9th Cir. 1986); *see also Escobar-Grijalva v. I.N.S.*, 206 F.3d 1331, 1335 (9th Cir.), *amended on other grounds*, 213 F.3d 1221 (9th Cir. 2000) ("Deprivation of the statutory right to counsel deprives [a noncitizen] asylum-seeker of the one hope she has to thread a labyrinth almost as impenetrable as the Internal Revenue Code."). PCUN's detained members have not been able to consult with an attorney after their detention and the organization is concerned that without help they will forfeit their legal rights. Campos Decl. ¶ 9. Absent relief from the Court, if these individuals are detained, they will be precluded from access to counsel that could allow them to seek release from unlawful detention, resulting in "a loss of liberty that is . . . irreparable." *Moreno Galvez v. Cuccinelli*, 492 F. Supp. 3d 1169, 1181 (W.D. Wash. 2020) (*Moreno II*), *aff'd in part, vacated in part on other grounds, remanded sub nom. Moreno Galvez v. Jaddou*, 52 F.4th 821 (9th Cir. 2022); *cf. Rodriguez v. Robbins*,[10] Lopez Decl. ¶¶ 16 (describing how a member was denied access to counsel, transferred out of district, and separated from their family suffering harm); ¶ 24 (explaining that without access to counsel, "our members who may be taken into custody will be forced to make decisions about their rights without understanding what they be waiving or declining."); ¶ 25 (detailing how detained

---

[10] Plaintiffs do not agree that "ICE arrests are overwhelmingly based on probable cause", *see* ECF 20 at 20. Plaintiffs' recent experiences suggest that Defendants' current warrantless arrests may be overwhelmingly unlawful because they occur to meet deportation quotas, rather than based on the requisite standard under 8 U.S.C. § 1357.

farmworkers were "denied the chance to timely meet with attorneys and forced to make legal decisions without consulting with counsel—even though we confirmed that there were attorneys trying to access the farmworkers who were detained and taken to the Macadam ICE building to process them.").They will also continue to suffer the psychic toll of Defendants' deprivations of liberty and rights. Plaintiff Leon X already describes the daily harm that he is "terrified that ICE will arrest and detain me without a warrant or cause while I am living my daily life in Oregon." Leon Decl. ¶ 4. He feels this fear so viscerally that he explains "[e]very morning when I wake up I need to have a conversation with myself that prepares me for the day because despite my body's desire to hide and not leave my residence." *Id.* ¶ 5. Similarly, PCUN members have stopped attending helpful programming because they are afraid that their family member can be detained for giving them a ride; they are afraid to get to work, going grocery shopping, taking their children to school or even leaving their house for any reason. Campos Decl. ¶ 12-15

Defendants' practices and policies also obstruct CLEAR Clinic and PCUN's ability to carry out their core activities, including impairing their ability to offer and to facilitate legal representation. These alleged harms are "definite and concrete, not hypothetical or abstract," *see Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 835 (9th Cir. 2012) (citation modified). Moreover, where parties cannot recover monetary damages from their injury, as in APA cases, economic harm can be considered irreparable. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). "Intangible injuries may also qualify as irreparable harm, because such injuries 'generally lack an adequate legal remedy.'" *Id*. CLEAR Clinic's attorneys have repeatedly attempted to contact clients and prospective clients at the Portland Office, but Defendants have thwarted their efforts. Tupper Decl. ¶¶ 30-36; Moberg Decl. ¶¶ 4, 30-21; Moberg Supp. Decl. ¶ 7-19. CLEAR's staff members have been denied access to clients and prospective clients by Defendants, and its core business activities of providing legal services to these individuals is being impeded. Tupper Decl. ¶¶ 30 ("First and foremost, the inability to meet with clients and prospective clients prevents CLEAR Clinic from being able to prepare those individuals' immigration cases or seek their release from ICE detention."); ¶ 3 (describing core

business activities of "provid[ing] immigration legal services"); ¶ 7 (describing how CLEAR Clinic "provides free, low-barrier legal services to our community members, including immigration legal needs" and enumerating those services); ¶¶ 13-17 (defining core business activity of rapid response services); Moberg Decl. ¶¶ 5, 15, 22 (detailing series of denials of access and harms).

Defendants' denial of access has also harmed PCUN as an organization by interfering with its core business activities, as described *supra*. Lopez Decl. ¶¶ 22, 32-34 (describing core mission " to address the most pressing topics for our working families"  and PCUN's programming to connect members to ECO). "For the immigrant community, any perceived barriers to access services will discourage any further efforts to reach out for assistance…[t]his in turns leaves farmworkers and immigrant families, one of the most marginalized and vulnerable groups, unprotected." *Id.* ¶ 35. Its members suffer infringements of their constitutional rights, particularly their Fifth Amendment due process rights. *Id.* ¶¶ 16; ¶ 24; Campos Decl. ¶ 9 (detailing how detained farmworkers were denied the chance to meet with attorneys even though there were attorneys trying to access them); Lopez Supp. Decl. ¶¶ 7-8 (describing fear among PCUN members of being detained and denied access to counsel and PCUN members "tremendous interest in receiving trusted information and turn[ing] to PCUN to accurately provide that information")

### C.    The balance of the equities and public interest factors tip sharply in favor of preliminary relief.

When the alleged action by the government violates federal law, the public interest factor generally weighs in favor of the plaintiffs. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). As the Ninth Circuit has observed, "[a] plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor." *Baird v. Bonta*, 81 F.4th 1036, 1036 (9th Cir. 2023).  Moreover, "it is always in the public interest to prevent the violation of a party's constitutional rights," *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (quoting *Melendres*, 695 F.3d at 1002); *see also Baird v. Bonta*, 81 F.4th at 1036, and the government suffers no harm from a court order that simply

ensures that constitutional standards are upheld, *see Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *Zepeda v. United States Immigration & Naturalization Service*, 753 F.2d 719, 727 (9th Cir. 1983). On the contrary, the "public interest benefits" when "individuals are not deprived of their liberty" by a "likely unconstitutional process". *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017); *see also Innovation Law Lab*, 310 F.Supp.3d at 1162 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). The balance of equities and public interest tip sharply in favor of Plaintiffs.

## V.    Conclusion

For the foregoing reasons, Plaintiffs respectfully request that this Court grant a preliminary order enjoining Defendants from transferring any and all individuals detained in Oregon for civil immigration violations, prior to providing notice, time, and space to provide access to counsel as follows:

1) **Notice.**

   a) **Individual requests after notice.** Prior to transporting people out of the district, Defendants shall provide notice to individuals whom they detain in Oregon that pro bono attorneys are available to provide independent, confidential legal advice. If the individual indicates they would like to speak with a lawyer, Defendants shall transmit their information to Plaintiffs and arrange sufficient time so that a pro bono attorney provided by Plaintiffs can see the individual.

   b) **Requests by lawyers.** Upon request by Plaintiffs who shall provide a name or list of names of individuals who have requested an independent, confidential legal meeting, Defendants shall promptly provide contact access (document passing) to the named individuals and shall provide both, the individuals and Plaintiffs, with any paperwork, charging documents, and written notices prepared for the arrest or detention, and permit the individual to share the documents or permit the lawyers to copy the documents at their own expense.

   c) **Notice of group orientation.** Prior to transporting individuals out of the District, Defendants shall provide notice to individuals whom they detain in Oregon that a free legal

orientation or Know Your Rights session ("KYR") will be provided by pro bono attorneys in Oregon where they may then request an individual meeting with a lawyer. For individuals who wish to access such free legal services, Defendants shall allow them to access such services before transporting them out of the District. Any declination of participation from individuals must be done in the presence of at least one of the pro bono attorneys of the program.

2) **Time.**

   a) **Hours for access.** Defendants shall provide 12 hours of continuous attorney access from 8:00am to 8:00pm, 7 days a week (or any day in which DHS is engaged in removal operations in the state) to individuals held at ICE facilities in Portland, Eugene, Medford, or any other locations in Oregon.

   b) **Who will have access.** Such access shall be extended to (1) licensed attorneys and accredited representatives, including attorneys from CLEAR Clinic and other attorney volunteers, seeking to have *pro bono* pre-representational meetings; and (2) licensed attorneys and accredited representatives, including attorneys from CLEAR Clinic, seeking to meet with existing clients.

   c) **Detentions outside regular hours.** Plaintiffs shall provide an emergency contact number and make ad hoc arrangements with Defendants to comply with the notice requirements above. Defendants shall ensure ad hoc access to Plaintiffs when individuals are detained and processed outside regular hours.

3) **Space.**

   a) **Group orientation.** Defendants shall provide an adequate space for group orientations to occur and shall facilitate contact for the provision of any handout materials.

   b) **Individual attorney access**. Defendants shall provide an individual and confidential space for meetings. Plaintiffs shall work in good faith with Defendants to coordinate the use of the available individual rooms for the use of foreign

consular corps and clergy, as well as ceding space for family visits. Defendants shall also provide and/or facilitate internet and phone service necessary to enable the provision of telephonic interpretation where necessary for the attorney.

Dated: November 12, 2025.                  Respectfully submitted,

/s/   *Stephen W Manning*

STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,
smanning@ilgrp.com
TESS HELLGREN, OSB No. 191622
tess@innovationlawlab.org
JORDAN CUNNINGS, OSB No. 182928
jordan@innovationlawlab.org
KELSEY LYNN PROVO, OSB No. 145107
kelsey@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No. 223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

Attorneys for Plaintiffs