STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,
smanning@ilgrp.com
TESS HELLGREN, OSB No. 191622
tess@innovationlawlab.org
JORDAN CUNNINGS, OSB No. 182928
jordan@innovationlawlab.org
KELSEY LYNN PROVO, OSB No. 145107
kelsey@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No. 223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## EUGENE DIVISION

CLEAR CLINIC, PINEROS Y CAMPESINOS
UNIDOS DEL NOROESTE and LEON X,
individually and on behalf of others similarly
situated,

    *Plaintiffs,*

    v.

KRISTI NOEM, Secretary of the Department of
Homeland Security; U.S. DEPARTMENT OF
HOMELAND SECURITY ("DHS"); TODD
LYONS, Acting Director of Immigration
Customs Enforcement; CAMMILLA
WAMSLEY, Seattle Field Office Director,
Immigration and Customs Enforcement and
Removal Operations; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT ("ICE");
PETE FLORES, Acting Commissioner of
Customs and Border Protection; and U.S.
CUSTOMS AND BORDER PROTECTION
("CBP"),

*Defendants.*

Case No.    6:25-cv-01906-AA

**DECLARATION OF NATALIE LERNER IN
SUPPORT OF PLAINTIFFS' MOTION FOR
A PRELIMINARY INJUNCTION**

**DECLARATION OF NATALIE LERNER IN SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

I, Natalie Lerner, upon my personal knowledge, hereby declare under penalty of perjury as
follows:

1. My name is Natalie Lerner. I am an attorney licensed by, and a member in good standing
   of, the Oregon State Bar. I am an attorney with Innovation Law Lab, which is an
   organization that provides services through the Equity Corps of Oregon ("ECO") universal
   representation program. I am over the age of eighteen and make this declaration based upon
   my own personal knowledge.

2. I write this declaration to update the facts previously shared in my declaration in support
   of Plaintiffs' Motion for a Temporary Restraining Order. I also attach as exhibits the
   declarations that my colleague, Kelsey Provo, and I have provided in *habeas corpus*
   litigation for three petitioners for whom I am immigration counsel. *See* Table of Exhibits.

3. Since October 17, 2025, I have attempted to access the Portland ICE Field Office on
   Macadam Avenue multiple times to speak with prospective clients. I also represent two
   clients who are currently in ICE detention, R-G-S- and M-L-G-G-.

4. On Saturday, October 25, I was contacted directly by the wife of a Venezuelan asylum
   seeker who had been detained that day. She initially called me to inform me that her
   husband was missing. We then spoke again at 3:27 PM and she informed me that her
   husband, a member of the Equity Corps of Oregon program, had been detained and that
   she wanted an attorney to try to meet with him. I shared this information with my
   colleagues, who conducted a quick analysis of his case and concluded that it was reasonable
   for me to attempt to meet with him.

**DECLARATION OF NATALIE LERNER IN SUPPORT OF PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**
Page 1

5. I arrived at the Portland ICE Office at approximately 5:10 PM. The building had multiple armed officers on its roof. I approached the building and attempted to shout up to the agents that I was an attorney there to see a man in detention. It took multiple attempts of yelling up at the officers, all while they were heavily armed and pointing their weapons down toward me, before I was motioned to go forward. I approached the gate at the facility, where another agent, wearing riot gear and surrounded by other armed agents, informed me that in general, the facility was closed on the weekends, so there would be no attorney access, and that I would only be permitted to access the facility on Monday. In addition to being extremely frustrating and disheartening to not be able to meet with a potential client for whom there seemed to be no apparent basis of his detention, it was also very alarming that in the course of doing my job – attempting to provide free immigration consultation and representation to detained Oregonians – I was confronted with heavily armed agents standing far above me and pointing weapons down at me. This experience left me feeling shaken.

6. The man I had attempted to see was transferred that day to Northwest ICE Processing Cetner (NWIPC) in Tacoma. On October 30, his wife informed me that he had called her the previous night and informed her that he would be transferred but that she did not know where to. Since then, he has been held in Cibola County Correctional Center in New Mexico, and as of November 10 has not been able to secure legal representation.

7. On October 28, through the Portland Immigrant Rights Coalition (PIRC) team, I received a request for legal assistance from a family whose member had been detained and was at the Portland ICE office. I arrived at approximately 2:40 PM with a pre-filled but unsigned Form G-28, Notice of Entrance of Appearance. I spoke with the security guard, who

**DECLARATION OF NATALIE LERNER IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**
Page 2

brought out an ICE officer to speak with me. The officer informed me that due to fire safety issues, the building was closed to visitors and attorneys and that I would not be able to enter. I was therefore not able to meet with the man I had been sent to see, and he was subsequently transferred to the NWIPC.

8.  While I was still near the Field Office, my colleagues at Innovation Law Lab reached out. Innovation Law Lab had submitted a petition for *habeas corpus* earlier that day for another man who had been detained and had just received an order from the District Court for the District of Oregon directing that the client could not be moved outside of the District of Oregon without first providing advance notice to the Court of the intended move. They asked me if I could print a copy of the order and attempt to deliver it to our client's deportation officer, to ensure that our client was not erroneously transferred in violation of the Court's order. At 3:05 PM, I again approached the Field Office, where I spoke with the security guard and explained that I was there on behalf of a client of my organization and was seeking to deliver the copy of a court order restraining transfer to his deportation officer, but that I was not requesting to meet with our client. The security guard informed me that because I personally did not have a signed Form G-28 and was not a federally approved courier service, I would not be permitted to drop off the document. He went to ask a supervisor, and at 3:21 PM returned and confirmed that I would not be able to deliver the document.

9.  On October 30, my colleague Kelsey Provo and I went to the Portland ICE Field Office to respond to the reported detention of over 30 people in Woodburn, Oregon. In the days following October 30, I learned of multiple detentions that occurred that same day of which we were not aware when we initially sought to enter the facility. On that day, we attempted

to visit at least 28 people that were reported through the hotline but we were only permitted to meet with 11.

10. On Monday, November 3, I met with my client M-J-M-A- and she gave me the names of two people who had been detained with her of whom we had not been aware. When I met with her the following day, November 4, she informed me that one of these individuals had already been deported. She also shared that almost everyone who had been detained in Woodburn that day had already been transferred to another facility.

11. One person detained with M-J-M-A- was her son, Z-B-M-. Z-B-M- was on the list of people we initially sought to meet with on October 30, but ICE informed us at approximately 12:10 PM that he was set to be transferred, and we had not yet been able to meet with him at that time. Z-B-M- is in the United States on a valid tourist visa, has no known criminal history, and was detained alongside M-J-M-A- and four other people on October 30. On November 4, attorneys at Northwest Immigrant Rights Project (NWIRP) informed my colleague in an email that was also shared with me that they would be taking on bond representation for Z-B-M-, for a hearing set on November 24. On November 9, my client M-J-M-A- messaged me to inform me that her son had been transferred to New Mexico. When I checked the ICE Online Detainee Locator System on November 10, Z-B-M- showed up in Otero County Processing Center in New Mexico. NWIRP only works in Washington State, so his attorney will no longer be able to represent him or advocate for him to request his release.

12. On November 7, my colleague and I went to the Portland ICE Office to respond to requests coming from PIRC regarding detained people who wanted access to an attorney. When we approached the building at 9:40 AM, I asked the security guard at the door if we would be

**DECLARATION OF NATALIE LERNER IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

permitted to enter and speak with those detained. He said we would only be permitted entry if we had a Form G-28 for each person, and that the G-28 "is the piece of paper that gets you in the door! That's what's posted." My colleague and I then provided unsigned but pre-filled forms for each person we sought to see. I was informed that none of the four people I aimed to meet with were at the facility, and that two of the four people for whom my colleague had filled Form G-28 were also not there, but that he could enter to meet with two people.

13. At 1:02 PM, my colleague and I again entered the building to meet with an additional set of detained people and were only permitted to enter by providing a Form G-28 for each person. One man I met with informed me that he had been detained that morning in Woodburn in a van with approximately six other people. He told me that the car he was in was stopped by agents who pulled the car over with flashing lights. The agents immediately began screaming at the driver to put down the window or they would break it. The agents then told everyone to get out of the car. At no point during the stop did they ask the name of the man with whom I was meeting, nor did they show a warrant or explain any reason for the arrest. He told me that they put all of those detained into cars and drove them to a field behind the Amazon warehouse in Woodburn. The agents were able to ascertain his identity only after taking a picture of him, but this was after he had already been stopped, handcuffed, and transported to a secondary location. The details he shared about his arrest are very similar to those my clients M-J-M-A-, R-G-S-, and M-L-G-G- have shared with me regarding their warrantless and unlawful arrests.

14. After I left the Field Office on November 7, a staff member from PIRC connected me with a woman who was looking for her brother, who had had been detained the previous day,

**DECLARATION OF NATALIE LERNER IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**
Page 5

November 6, during his check-in with ICE at 1:00 PM. By looking on the Online Detainee Locator System, I was able to confirm that the man had already been transferred to a detention facility in Louisiana. He had not been able to speak with an attorney prior to his transfer.

15. On November 8, another ECO participant was detained. The person is a Venezuelan asylum seeker with a pending application, no known criminal history, an upcoming non-detained Master Calendar Hearing in Portland in December, and an approved Employment Authorization Document. He is the father of two young boys and the primary breadwinner in his household. His wife called me to tell me that her husband had been detained a carwash in Portland, that neither he nor she had any idea why he had been detained, and that he desperately needed support. However, because the Portland ICE Office had previously informed me and my colleagues that there is no attorney access on weekends, there was nothing I could do, even though I believe this person was likely a strong candidate for relief.

16. On Monday, November 10, my colleagues at Innovation Law Lab attempted to attend the detained master calendar hearing of one of their clients at NWIPC, for which both had entered appearances. During the hearing they found out that their client had been transferred over the weekend to New Mexico, and his hearing would have to be transferred to another court.

17. Through both my work at Innovation Law Lab and my community connections, I have seen the profound negative impact the current sweeps, lack of meaningful access to counsel, and transfers to far away detention centers are having on the community here in Oregon. Through talking to M-J-M-A- and her family members, I have learned that people

**DECLARATION OF NATALIE LERNER IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**
Page 6

in Woodburn are afraid to leave their homes at all. Multiple of my non-detained clients have refused to attend in-person appointments at my office in Portland, for fear that they will be detained on their way, which is impeding and delaying their access to potential immigration relief. I am not able to assure my clients that they can safely come to my office because so many of the detentions I have become privy to are seemingly random, without an apparent legal basis. Many community volunteers with whom I am in contact have turned all of their time toward cold-calling immigration attorneys in other states in order to attempt to connect detained Oregonians with counsel, with mixed results. Family members of those detained in the October 30 sweep in Woodburn call me daily to ask for assistance in finding attorneys in Louisiana, Mississippi, Texas, New Mexico, or Arizona, or to inform me that their family members have chosen to accept deportation because they have been unable to find an attorney in these locations and cannot bear the prospect of indefinite or uncertain detention.

I DECLARE UNDER PENALTY OF PERJURY AND UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Executed in Portland, Oregon on November 12, 2025.


_/s/Natalie Lerner_____

Natalie Lerner
INNOVATION LAW LAB
PO Box 40204
Portland, OR 97204
Telephone: (503) 334-1300
natalie@innovationlawlab.org


**DECLARATION OF NATALIE LERNER IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**
Page 7

### TABLE OF EXHIBITS

| Exhibit Name | Description |
|---|---|
| Exhibit A | Declaration of Natalie Lerner in Support of Petitioner M-J-M-A-'s Motion for Temporary Restraining Order |
| Exhibit B | Declaration of Kelsey Provo in Support of Petitioner M-J-M-A-'s Motion for Temporary Restraining Order |
| Exhibit C | Declaration of Natalie Lerner in Support of Petitioners R-G-S- & M-L-G-G-'s Motion to Restrain Transfer from Tacoma Facility |
| Exhibit D | Declaration of Kelsey Provo in Support of Petitioners R-G-S- & M-L-G-G-'s Motion to Restrain Transfer from Tacoma Facility |
| Exhibit E | Declaration of Natalie Lerner in Support of Petitioners R-G-S- & M-L-G-G-'s Renewed Emergency Motion to Restrain Transfer |

STEPHEN W. MANNING, OSB # 013373
stephen@innovationlawlab.org
smanning@ilgrp.com
TESS HELLGREN, OSB #191622
tess@innovationlawlab.org
JORDAN CUNNINGS, OSB # 182928
jordan@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

Attorneys for Petitioner

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### Eugene Division

| | |
|---|---|
| M-J-M-A-, an adult,<br>                 Petitioner,<br><br>v.<br><br>CAMILLA WAMSLEY, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations ("ICE/ERO"); TODD LYONS, Acting Director of Immigration Customs Enforcement ("ICE"); U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; KRISTI NOEM, Secretary of the Department of Homeland Security ("DHS"); U.S. DEPARTMENT OF HOMELAND SECURITY; and PAMELA BONDI, Attorney General of the United States,<br>                 Respondents. | Case No. 6:25-cv-02011-MTK<br><br>Agency No. XXX-XXX-902<br><br>**DECLARATION OF NATALIE LERNER IN SUPPORT OF PETITIONER'S MOTION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Expedited Hearing: November 4, 2025 at 8:00 AM |

DECLARATION OF NATALIE LERNER ISO PETITIONER'S MOTION FOR TRO
Page 1 of 5

**DECLARATION OF NATALIE LERNER IN SUPPORT OF PETITIONER'S MOTION
FOR A TEMPORARY RESTRAINING ORDER**

I, Natalie Lerner, upon my personal knowledge, under penalty of perjury declare as follows:

1.   My name is Natalie Lerner. I am an attorney licensed by, and a member in good standing of, the Oregon State Bar. I am an attorney with Innovation Law Lab, which is an organization that provides services through the Equity Corps of Oregon ("ECO") universal representation program. I am over the age of eighteen and make this declaration based upon my own personal knowledge.

2.   On Thursday, October 30, I became aware of a large number of ICE detentions taking place in and near Woodburn, Oregon. With my colleague, Kelsey Provo, I went to the Portland ICE Office on Macadam Avenue to provide legal orientations, screening, and advice on legal rights to people who were detained and in need of counsel.

3.   As a part of this rapid response legal work, I am currently representing Petitioner M-J-M-A- in her immigration case.

4.   As detailed in the declaration of my colleague Kelsey Provo, I was able to meet very briefly with M-J-M-A- after her detention the morning of October 30. In the approximately 10 minutes Ms. Provo and I had with M-J-M-A-, we very quickly got her consent to file a writ of habeas corpus on her behalf, as well as basic details about the nature of the arrest and her potential avenues for immigration relief. We learned that she was traveling in a car with other people, on her way to work, in Woodburn. She told us that the car was stopped by immigration agents and that everyone in the car was detained. At no point did immigration agents say M-J-M-A-'s name or ask for her by name, nor did they explain why they were detaining her or provide her with any paperwork or show an arrest warrant. She shared that agents did not identify themselves and that she did not try to escape.

DECLARATION OF NATALIE LERNER ISO PETITIONER'S MOTION FOR TRO
Page 2 of 5

5.   As detailed in Ms. Provo's declaration, an ICE officer ended our meeting with M-J-M-A after only a few minutes and denied our request to meet with her for even an additional ten minutes. ICE removed her from our meeting before we were able to complete a full legal screen or advise her of her rights and options in her immigration case.  I believed, based on my experience, that she was likely being imminently transported, presumably to the Northwest ICE Processing Center in Tacoma, Washington.

6.   Ms. Provo and I found out at 2:09 PM that a no-transfer order had been issued in M-J-M-A-'s case. Ms. Provo went to speak with officers to ascertain whether M-J-M-A- had indeed been transferred or whether she was still in the building.

7.   At 4:15 PM, I found out that M-J-M-A- had been transported out of the state at 12:53 PM, and that Innovation Law Lab had filed her habeas petition at 12:45 PM.

8.   At that time, a colleague checked the Online ICE Detainee Locator System and confirmed that M-J-M-A- did not appear there. At approximately 8:50 PM, another colleague attempted to schedule a video call with M-J-M-A- through the ERO E-File online system. He was unable to do so and sent me a screenshot showing that the system reflected that M-J-M-A- was not currently in an ICE detention facility. Without knowledge of where she was being detained or her appearance in the ERO E-File online system, I could not schedule a call with her.

9.   At 7:51 AM on October 31, one of my colleagues attempted again to schedule a video visit through the ERO E-File system and again M-J-M-A- did not appear in the system. At the same time, another colleague checked the Online Detainee Locator System and sent me a photo indicating that M-J-M-A- was not showing up there either.

10. At 11:13 AM on October 31, after a status hearing in her habeas case, M-J-M-A- appeared in the Online Detainee Locator System, with her location reflected as the Northwest ICE

DECLARATION OF NATALIE LERNER ISO PETITIONER'S MOTION FOR TRO
Page 3 of 5

Processing Center. I was able to log in to the ERO E-File system and attempt to schedule a meeting with M-J-M-A- at approximately 12:05 PM. However, the earliest appointment to speak with her was Sunday, November 2 at 8:00 AM.

11. Because of the hasty nature of M-J-M-A-'s arrest, her disorientation and lack of access to her belongings in ICE custody, the brevity of the time in which we could meet with her, and the lack of clarity for the broader community regarding who had been detained, I have not been able to find a reliable contact number for M-J-M-A-'s family in order to speak with them about her case or to ask them to share my phone number with her so that she can call me from detention. As indicated above, I have also been unable to communicate with M-J-M-A- directly and presumably will not be able to until our scheduled appointment time on Sunday in order to inform her about the developments in her legal case. If I were to travel to the detention center in person – a two and a half hour drive from my office in Portland – I understand, from the experience of my colleagues, that I would face a two to five hour wait to meet with her in person, given the facility's overcrowding, limited attorney rooms, and disorganization.

12. It concerns me deeply that I have not yet been able to speak with her. From my experience and that of my colleagues, ICE will often pressure people in detention to quickly agree to deportation. In my experience, people who have a chance to understand their legal rights and remedies shortly after they are detained are much less likely to give up their rights and more likely to seek relief from deportation, and release from detention, if they are eligible to do so.

I DECLARE UNDER PENALTY OF PERJURY AND UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Executed in Portland, Oregon on November 1, 2025.

DECLARATION OF NATALIE LERNER ISO PETITIONER'S MOTION FOR TRO
Page 4 of 5

Natalie Lerner
INNOVATION LAW LAB
PO Box 40204
Portland, OR 97204
Telephone: (503) 334-1300
natalie@innovationlawlab.org

DECLARATION OF NATALIE LERNER ISO PETITIONER'S MOTION FOR TRO
Page 5 of 5

STEPHEN W. MANNING, OSB # 013373
stephen@innovationlawlab.org
smanning@ilgrp.com
TESS HELLGREN, OSB # 191622
tess@innovationlawlab.org
JORDAN CUNNINGS, OSB # 182928
jordan@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

Attorneys for Petitioner

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### Eugene Division

| | |
|---|---|
| M-J-M-A-, an adult,<br>                Petitioner,<br><br>v.<br><br>CAMILLA WAMSLEY, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations ("ICE/ERO"); TODD LYONS, Acting Director of Immigration Customs Enforcement ("ICE"); U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; KRISTI NOEM, Secretary of the Department of Homeland Security ("DHS"); U.S. DEPARTMENT OF HOMELAND SECURITY; and PAMELA BONDI, Attorney General of the United States,<br>                Respondents. | Case No. 6:25-cv-02011-MTK<br><br>Agency No. XXX-XXX-902<br><br>**DECLARATION OF KELSEY PROVO IN SUPPORT OF PETITIONER'S MOTION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Expedited Hearing: November 4, 2025 at 8:00 AM |

DECLARATION OF KELSEY PROVO ISO PETITIONER'S MOTION FOR TRO
Page 1 of 10

**DECLARATION OF KELSEY PROVO IN SUPPORT OF PETITIONER'S MOTION
FOR A TEMPORARY RESTRAINING ORDER**

I, Kelsey Lynn Provo, upon my personal knowledge, under penalty of perjury declare as follows:

1.   I am an attorney licensed and in good standing to practice in the State of Oregon and the State of California. I am a member of the American Immigration Lawyer's Association ("AILA"). I am an Associate Legal Director at Innovation Law Lab ("Law Lab"), a nonprofit organization that provides services through the Equity Corps of Oregon ("ECO") universal representation program. I am over 18 years of age and have personal knowledge of the facts described herein.

2.   On October 30, 2025, at approximately 8:15 AM, upon arriving at Law Lab's Portland, Oregon office, I learned that Immigration and Customs Enforcement ("ICE") had detained at least 15 community members in the Portland Metro area earlier that morning. At approximately 8:30 AM, I attended a meeting with other lawyers at my office, where we determined that two to three attorneys from Innovation Law Lab would go to the Portland ICE facility to provide legal orientations, legal screenings, and offers of representation to all community members in ICE custody at the Portland ICE facility.

3.   At approximately 8:55 AM, I left my office to meet my colleague, Natalie Lerner, at a location near the Portland ICE facility to coordinate our attempt to provide legal services to the community members at the Portland ICE facility.

4.   I met Ms. Lerner at approximately 9:15 AM. Ms. Lerner and I immediately began compiling a list of the community members who had been reported detained that morning. We compiled a list of 28 names. We understood that more than 28 community members had been detained, but at that time we had only 28 names. Of those 28, there was one that we understood

DECLARATION OF KELSEY PROVO ISO PETITIONER'S MOTION FOR TRO
Page 2 of 10

might be a U.S. citizen. Ms. Lerner and I completed pre-representational G-28 Forms (Notice of Entry of Appearance of Attorney or Accredited Representative) for all 28 people on our list, including the person who was possibly a U.S. citizen. I learned that two attorneys from the CLEAR Clinic would meet us at the Portland ICE facility to assist in providing legal orientations, screenings and to offer representation to the community members who were detained at the facility. CLEAR Clinic is another nonprofit organization and legal services provider associated with the Equity Corps of Oregon (ECO), the state's universal representation program for immigrants who cannot afford to hire private counsel.

5.   Ms. Lerner and I arrived at the entrance to the Portland ICE facility at approximately 10:05 AM. The front doors were locked and we rang a buzzer to request access to the building. A security guard opened the door but did not permit us to enter the building. Ms. Lerner and I identified ourselves as attorneys and asked to speak with the Assistant Field Office Director ("AFOD"), Officer Jeffrey Chan. The guard asked whether Officer Chan was expecting us. I explained that we were requesting access to the facility to provide legal orientations and legal screenings to all community members detained by ICE that morning and who were currently being held at the facility. The security guard asked for our business cards. I explained that I did not have a business card with me but offered to show him by Oregon State Bar card. The security guard declined to see my Bar card. He took our names, told us he would be back, and closed the front doors.

6.   At approximately 10:18 AM, the guard returned to the front doors and informed us that Officer Chan was not there. I asked to speak with the officer in charge in Officer Chan's absence. The guard told us he would be back and closed the front doors.

DECLARATION OF KELSEY PROVO ISO PETITIONER'S MOTION FOR TRO
Page 3 of 10

7.  At approximately 10:22 AM, the guard returned to the front doors. He said we needed G-28 forms for all of the people we wanted to meet with. I presented him with a list of the names of the 28 people we knew had been detained that morning and asked for access to those individuals, in addition to all other individuals who had been detained that morning, so that we could provide a legal orientation, legal screenings and offer representation. The guard told us we would not be permitted to meet with anyone for whom we did not have a G-28.

8.  I provided the guard with the 28 G-28 forms completed for the detained persons of whom we were aware and reiterated that we wanted to meet with all community members detained by ICE that morning who were still being held at the Portland ICE facility, not just the 28 for whom we had G-28 forms. The guard took the G-28 forms, told us he would be back, and closed the front doors.

9.  At approximately 10:30 AM, the guard returned to the front doors and permitted us to enter the facility. In the entryway to the building, I told the guard we expected that two other lawyers would arrive shortly to assist us and provided the guard with each lawyer's full name. Those lawyers were Natalie Webb and Doug Valladares with the CLEAR Clinic. The guard told me there was only one room available and said all the lawyers would need to share one room. I told him it was my understanding that there are three visitation rooms at the facility and asked about the availability of the other two rooms. The guard confirmed there are three visitation rooms but told us one room was occupied by the Guatemalan consulate. I asked if we could use the third room, and he said the third room was not available.

10. I then asked the guard if Ms. Lerner and I could meet with people in groups so that we could be more efficient with the time given the number of people we wanted to meet with and the time constraints we would be under. We understood from prior experience that ICE transfers

DECLARATION OF KELSEY PROVO ISO PETITIONER'S MOTION FOR TRO
Page 4 of 10

people out of the facility quickly and we wanted to ensure we could provide everyone with a

brief orientation and legal screening and offer representation if appropriate. We also understood

from prior experience that both prior to and after transfer, ICE pressures people to sign

documents waiving important rights. For those reasons, we knew it was imperative that we

provide a legal orientation and rights advisal to as many people as possible, as quickly as

possible. The guard said he would ask but that he did not think we would be permitted to meet

with more than one person at a time.

11. The guard led us back to the visitation area. I observed that there were three rooms. The

door to one room was closed and I could hear a woman speaking in Spanish, and I understood

her to be with the Guatemalan Consulate. The doors to the two remaining rooms were open.

Neither room was occupied. The guard led us to the smaller of the two open rooms. I observed

that the room we were provided was a no-contact room, meaning the room was separated in two

by a glass window. The glass window had a small area in the center with holes, which permitted

sound to pass through. There was no mechanism by which to pass papers back and forth.

12. Upon seeing the space, Ms. Lerner and I renewed our request to meet with people in

groups so that we could speak with as many people as possible. Our request was denied a second

time, citing confidentiality concerns. I explained that as lawyers, we were very familiar with

confidentiality and reiterated our request to meet with people in groups. Our request was again

denied. I then reiterated that we had two other lawyers who would be assisting us that day. The

guard questioned whether we would all fit in the room. I said we wanted our colleagues to be

permitted entry so they could support us. The guard provided a non-committal response.

DECLARATION OF KELSEY PROVO ISO PETITIONER'S MOTION FOR TRO
Page 5 of 10

13. Neither Ms. Lerner nor I had cell or internet service in the visitation room. I had minimal cell and internet service in a corner of the hallway. As a result, we were unable to communicate with lawyers from our office while in the visitation room.

14. An ICE officer entered the visitation room, entering on the other side of the glass divider. We asked him if we could choose which community member to meet with first and he said no. We were allowed to meet with the first community member they brought us at around 11 AM, approximately one hour after we arrived at the facility.

15. M-J-M-A- was the fourth person ICE allowed us to speak with. The ICE officer brought her into the room at approximately 12 PM. After only a few minutes, the ICE officer interrupted our meeting to tell us the meeting would be cut short because they were going to transfer M-J-M-A- out of the facility. We informed the officers we were not done advising her and requested more time, but the ICE officer denied our request. We then requested another ten minutes to meet with her so we could complete an abbreviated legal screening and provision of the legal advice most pertinent to her upcoming detention; the ICE officer told us we could have 60 seconds. At this point in time, I left Ms. Lerner in the room to continue the legal screening and advisals and went into the hallway to try and find cell service. From the hallway, I shared M-J-M-A-'s facts with my colleagues and we determined we would file a petition for habeas corpus for her if she agreed. I went back into the room to offer her representation. Ms. Lerner and I then attempted to quickly advise M-J-M-A- of her rights, complete an abbreviated legal screening, and advise her of her legal options. We could not do so because the ICE officer ended the meeting and took M-J-M-A- out of the visitation room. In total, we were able to meet with M-J-M-A- for only about 10 minutes, and even this brief time was interrupted by the need to advocate (unsuccessfully) with ICE for more time to meet with her.

DECLARATION OF KELSEY PROVO ISO PETITIONER'S MOTION FOR TRO
Page 6 of 10

16. We asked the officers if they could provide us with a list of the people they were transferring out of the facility. They provided us with a list of four people, all of whom were on our list of 28 people. One of the four names was the person who we had been told was a U.S. citizen. We alerted the officer that one person on their list might be a U.S. citizen and we asked to speak with her before transfer. The officer left the room and came back shortly thereafter to tell us that she was not a U.S. citizen. We asked to speak with her so that we could confirm that she was not a U.S. citizen and advise her of her rights before she was transferred. The officer denied our request.

17. Ms. Lerner and I continued meeting with other community members on our list. After ICE cut our meeting with M-J-M-A- short and transferred three other people on our list before we could meet with them, we felt that we had to move more quickly than was appropriate given the rights and liberty interests at stake. We were particularly concerned because after speaking with several people, we believed many of the detentions by ICE that morning were unlawful.

18. At approximately 12:24 PM, when I went into the hallway to try and get cell and internet service, I learned that the two CLEAR Clinic lawyers had been denied access to the building. At this time, I observed that the third visitation room was still empty. It had been empty since we were permitted access earlier that morning.

19. At approximately 2:09 PM, I learned of this Court's no-transfer order. At approximately this time, my colleague, Stephen Manning, indicated the Court had alerted the government of the order by email.

20. I was not able to get any ICE officer's attention from our side of the visitation room, so I had to leave the visitation area to find an ICE officer so that I could alert them of the Court's no-transfer order. I could not find any ICE officers outside of the visitation area and alerted one of

DECLARATION OF KELSEY PROVO ISO PETITIONER'S MOTION FOR TRO
Page 7 of 10

the guards at the front entryway that we had a no-transfer order for M-J-M-A- and asked to speak with an officer. He told me to wait and left me at the front entryway. An officer came to speak with me, I provided him with M-J-M-A-'s name, told him we had a no-transfer order, and I asked if he could confirm whether M-J-M-A- was still at the facility. He said he didn't know. I was directed to a lobby where I waited for a short time. A different officer came to the window. I again provided M-J-M-A-'s name and informed the officer of this Court's no transfer order. I asked the officer if she could confirm whether M-J-M-A- was still at the facility. She said she didn't know. She asked me if I had a copy of the order and I confirmed that I did. She told me I would need to email the order to them. She left and a short time later another person came to the window, wrote down an email address on a sticky note, and asked me to email the order to that email address. Because I only had my cell phone, and had limited cell phone service at the facility, I asked my colleague, Mr. Manning, to email a copy of the order to the email address I was provided. Mr. Manning sent the email, with a copy of the order, at 2:25 PM. We did not receive any response to that email.

21. At approximately 2:58 PM, Natalie Webb, one of the CLEAR Clinic attorneys who had been requesting access since approximately 12 PM, was finally allowed into the building and permitted to use the third visitation room. This third room had been empty since approximately 10:35 AM.

22. At 3:02 PM, the guard entered the visitation room and told us the building was closing and that we had to leave. At this time, we had met with only 11 of the 28 people on our list. An ICE officer entered the visitation room to take the person we were meeting with. We asked the ICE officer for additional time to meet with the people on our list; the officer denied our request. We asked the ICE officer if he could tell us who from our list was still present at the facility. He

DECLARATION OF KELSEY PROVO ISO PETITIONER'S MOTION FOR TRO
Page 8 of 10

denied our request. We were led out of the visitation area and told to wait in the front entryway. We requested copies of documents for those we had spoken with an offered representation to, including any arrest warrants, charging documents, and custody determination documents. Our request was denied. We again asked the ICE officer if he could provide us with the names of those on our list who were still at the facility. He denied our request. At approximately 3:10 PM, we were ushered out of the facility.

23. When we left the facility, we attempted to locate M-J-M-A- via ICE's Online Detainee Locator System but our searches returned zero results. Because we believed she would be transferred to the Northwest Immigration Processing Center (NWIPC) in Tacoma, Washington, Ms. Lerner and another colleague at our office have attempted to make contact with M-J-M-A- at the NWIPC with no success. I am concerned that ICE may be pressuring M-J-M-A- to sign her deportation or other documents waiving her rights. Because ICE cut our meeting short, I was not able to fully advise M-J-M-A- of her rights. I am aware of numerous examples of where ICE has pressured or coerced people to sign deportation orders or waive the right to a hearing before a judge even when the person has asked to speak with, and ICE knows they have, counsel. M-J-M-A- signed a G-28 form consenting to representation and ICE is therefore aware that she has retained counsel. Despite this, because I am aware of ICE's practices to pressure people into signing away their rights, I am concerned that M-J-M-A- may have signed documents that impact her case.

I DECLARE UNDER PENALTY OF PERJURY AND UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Executed in Portland, Oregon on November 1, 2025.

Kelsey Provo

DECLARATION OF KELSEY PROVO ISO PETITIONER'S MOTION FOR TRO
Page 9 of 10

INNOVATION LAW LAB
PO Box 40204
Portland, OR 97204
Telephone: (503) 922-3042
kelsey@innovationlawlab.org

DECLARATION OF KELSEY PROVO ISO PETITIONER'S MOTION FOR TRO
Page 10 of 10

STEPHEN W. MANNING, OSB # 013373
stephen@innovationlawlab.org
smanning@ilgrp.com
TESS HELLGREN, OSB #191622
tess@innovationlawlab.org
JORDAN CUNNINGS, OSB # 182928
jordan@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

 Attorneys for Petitioner

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### Eugene Division

| | |
|---|---|
| M-L-G-G-, an adult, and R-G-S-, an adult<br>　　　　Petitioners,<br><br>v.<br><br>CAMILLA WAMSLEY, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations ("ICE/ERO"); TODD LYONS, Acting Director of Immigration Customs Enforcement ("ICE"); U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; KRISTI NOEM, Secretary of the Department of Homeland Security ("DHS"); U.S. DEPARTMENT OF HOMELAND SECURITY; and PAMELA BONDI, Attorney General of the United States,<br>　　　　Respondents. | Case No. 6:25-cv-02012-AA<br><br>Agency Nos. XXX-XXX-344<br>　　　　　　　XXX-XXX-516<br><br>**DECLARATION OF NATALIE LERNER IN SUPPORT OF PETITIONERS' MOTION TO RESTRAIN TRANSFER FROM TACOMA FACILITY** |

Exhibit C - Pg. 1

**DECLARATION OF NATALIE LERNER IN SUPPORT OF PETITIONER'S
MOTION TO RESTRAIN TRANSFER FROM TACOMA FACILITY**

I, Natalie Lerner, upon my personal knowledge, under penalty of perjury declare as follows:

1.  My name is Natalie Lerner. I am an attorney licensed by, and a member in good standing of, the Oregon State Bar. I am an attorney with Innovation Law Lab, which is an organization that provides services through the Equity Corps of Oregon ("ECO") universal representation program. I am over the age of eighteen and make this declaration based upon my own personal knowledge.

2.  On Thursday, October 30, I became aware of a large number of ICE detentions taking place in and near Woodburn, Oregon. With my colleague, Kelsey Provo, I went to the Portland ICE Field Office on Macadam Avenue to provide legal orientations, screening, and advice on legal rights to people who were detained and in need of counsel.

3.  As a part of this rapid response legal work, I am currently representing Petitioners M-L-G-G- and R-G-S- in their immigration cases. My colleague Kelsey Provo and I were able to meet very briefly with Petitioners R-G-S- and M-L-G-G- in the Portland ICE Field Office. In our meeting with R-G-S-, Ms. Provo and I were able to receive consent for legal representation, as well as to understand some of the basic facts of R-G-S-'s detention and potential relief. However, our ability to communicate with R-G-S- was significantly limited by the fact that she is primarily a Mam speaker and Ms. Provo and I do not speak Mam, nor could we access to interpretation because of the lack of cell phone and internet connectivity in the Field Office visitation rooms. In our meeting with M-L-G-G-, we were also able to collect basic information relating to her immigration history and arrest, as well as her consent to habeas representation. However, we were under significant time pressure which limited our ability to fully screen and advise M-L-G-G-. In addition, we were limited in our ability to understand both M-L-G-G-'s

DECLARATION OF NATALIE LERNER ISO PETITIONERS' MOTION
Page 1

Exhibit C - Pg. 2

and R-G-S-'s legal posture because, despite requesting charging documents at the end of our visit for each person with whom we had met, the ICE officer with whom we spoke refused to provide documents to us, saying that it would take too much time.

4.  At 4:21 PM, I found out that this Court had issued an order restricting transfer of both R-G-S- and M-L-G-G- out of the state of Oregon without notice to the Court. At 5:17 PM, I found out that at least one of them had been transferred out of state at 3:04 PM.

5.  Because R-G-S- and M-L-G-G- did not know their own A numbers and ICE refused to provide any documents relating to either of them, my colleagues and I were unaware of their A numbers. Using what we understood to be their names and dates of birth, around 8:30 PM, a colleague checked the Online ICE Detainee Locator System and confirmed that R-G-S- and M-L-G-G- did not appear there.

6.  At approximately 7:39 AM on November 3, my colleague again checked the Online ICE Detainee Locator System and could not find either R-G-S- or M-L-G-G- using what we understood to be their names and dates of birth.

7.  At 7:45 AM, I reached out to community volunteers who support people in ICE detention to ask if they had ideas on how to locate an A number with just someone's name. They advised me to visit the site Access Corrections and to act as though I were seeking to deposit money. In the last entry field, the person's A number then would appear alongside their name.

8.  At 8:05 AM, I proceeded to follow these steps and was able to find the A numbers for both R-G-S- and M-L-G-G-. Through this process I also learned that we had the incorrect first name for R-G-S-, a fact we had been unable to check because of the lack of documentation provided to us.

DECLARATION OF NATALIE LERNER ISO PETITIONERS' MOTION
Page 2

Exhibit C - Pg. 3

9. Following this process, I sought to schedule calls with M-L-G-G- and R-G-S- to advise them of their rights and speak with them about next steps in their respective cases.

10. At 9:30 AM on November 3, I was able to access R-G-S- on the ERO E-file system, which is used for making free, confidential attorney calls to people in detention. It is difficult, if not impossible, to schedule a call through this system without the client's A number. I scheduled the earliest appointment available, which was more than 48 hours later on Wednesday, November 5, at 5:30 PM. As of 1:11 PM on November 3, M-L-G-G- still did not appear in the ERO E-file system or ICE Detainee Locator. I continued to check the online system and it was not until 4:40 PM November 3 that I was finally able to schedule a visit with her; the earliest available appointment was at 6:30 PM on Thursday, November 6.

11. Because of the hasty nature of M-L-G-G-'s and R-G-S-'s arrests, their disorientation and lack of access to belongings in ICE custody, the brevity of the time in which we could meet with both of them, and the lack of clarity for the broader community regarding who had been detained, I have not been able to find a reliable contact number for either Petitioner's family in order to speak with them about their cases or to ask them to share my phone number with them so that they can call me from detention. As indicated above, I have also been unable to communicate with either R-G-S- or M-L-G-G- directly and presumably will not be able to until our scheduled appointment times on Wednesday and Thursday respectively in order to inform them about the developments in their legal cases or provide them with a rights advisal. If I were to travel to the detention center in person – a two-and-a-half-hour drive from my office in Portland – I understand, from the recent experiences of my colleagues, that I would face a two- to five- hour wait to meet with each of them in person, given the facility's overcrowding, limited attorney rooms, and disorganization.

DECLARATION OF NATALIE LERNER ISO PETITIONERS' MOTION
Page 3

Exhibit C - Pg. 4

12. It concerns me deeply that I have not yet been able to speak with either of my clients. From my experience and that of my colleagues, ICE will often pressure people in detention to quickly agree to deportation. I also just learned from the government's return, filed yesterday, that M-L-G-G- may have an unexecuted *in absentia* removal order, which means she could be removed very quickly without prompt legal action on my part. Similarly, I learned yesterday that the government is placing R-G-S- into expedited removal proceedings, which will also move very quickly and in which she may be extremely prejudiced if she proceeds without the advice and assistance of counsel. In my experience, people who have a chance to understand their legal rights and remedies shortly after they are detained are much less likely to give up their rights and more likely to seek relief from deportation, and release from detention, if they are eligible to do so.

I DECLARE UNDER PENALTY OF PERJURY AND UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Executed in Portland, Oregon on November 4, 2025.

Natalie Lerner
INNOVATION LAW LAB
PO Box 40204
Portland, OR 97204
Telephone: (503) 334-1300
natalie@innovationlawlab.org

DECLARATION OF NATALIE LERNER ISO PETITIONERS' MOTION
Page 4

Exhibit C - Pg. 5

STEPHEN W. MANNING, OSB # 013373
stephen@innovationlawlab.org
smanning@ilgrp.com
TESS HELLGREN, OSB # 191622
tess@innovationlawlab.org
JORDAN CUNNINGS, OSB # 182928
jordan@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

Attorneys for Petitioner

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### Eugene Division

| | |
|---|---|
| M-L-G-G-, an adult, and R-G-S-, an adult<br>Petitioners,<br><br>v.<br><br>CAMILLA WAMSLEY, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations ("ICE/ERO"); TODD LYONS, Acting Director of Immigration Customs Enforcement ("ICE"); U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; KRISTI NOEM, Secretary of the Department of Homeland Security ("DHS"); U.S. DEPARTMENT OF HOMELAND SECURITY; and PAMELA BONDI, Attorney General of the United States,<br>Respondents. | Case No. 6:25-cv-02012-AA<br><br>Agency Nos. XXX-XXX-344<br>XXX-XXX-516<br><br>**DECLARATION OF KELSEY PROVO IN SUPPORT OF PETITIONERS' MOTION TO RESTRAIN TRANSFER FROM TACOMA FACILITY** |

**DECLARATION OF KELSEY PROVO IN SUPPORT OF PETITIONERS'
MOTION TO RESTRAIN TRANSFER FROM TACOMA FACILITY**

I, Kelsey Lynn Provo, upon my personal knowledge, under penalty of perjury declare as follows:

1.  I am an attorney licensed and in good standing to practice in the State of Oregon and the State of California. I am a member of the American Immigration Lawyers Association ("AILA"). I am an Associate Legal Director at Innovation Law Lab ("Law Lab"), a nonprofit organization that provides services through the Equity Corps of Oregon ("ECO") universal representation program. I am over 18 years of age and have personal knowledge of the facts described herein.

2.  On October 30, 2025, at approximately 8:15 AM, upon arriving at Law Lab's Portland, Oregon office, I learned that Immigration and Customs Enforcement ("ICE") had detained at least 15 community members in the Woodburn and Portland Metro areas earlier that morning. At approximately 8:30 AM, I attended a meeting with other lawyers at my office, where we determined that two to three attorneys from Innovation Law Lab would go to the Portland ICE Field Office to provide legal orientations, legal screenings, and offers of representation to all community members in ICE custody at the Portland ICE facility.

3.  At approximately 8:55 AM, I left my office to meet my colleague, Natalie Lerner, at a location near the Portland ICE facility to coordinate our attempt to provide legal services to the community members at the Portland ICE facility.

4.  I met Ms. Lerner at approximately 9:15 AM. Ms. Lerner and I immediately began compiling a list of the community members who had been reported detained that morning. We compiled a list of 28 names. We understood that more than 28 community members had been detained, but at that time we had only 28 names. M-L-G-G- and R-G-S- were on this list of

DECLARATION OF KELSEY PROVO ISO PETITIONERS' MOTION
Page 1

names. Ms. Lerner and I completed pre-representational G-28 Forms (Notice of Entry of Appearance of Attorney or Accredited Representative) for all 28 people on our list.

5.  Ms. Lerner and I arrived at the entrance to the Portland ICE facility at approximately 10:05 AM.

6.  At approximately 10:30 AM, Ms. Lerner and I were permitted to enter the facility. The guard told us there was only one room available and indicated we would need to share one room. I told him it was my understanding that there are three visitation rooms at the facility and asked about the availability of the other two rooms. The guard confirmed there are three visitation rooms but told us one room was occupied by the Guatemalan Consulate. I asked if we could use the third room, and he said the third room was not available.

7.  I then asked the guard if Ms. Lerner and I could meet with people in groups so that we could be more efficient with the time given the number of people we wanted to meet with and the time constraints we would be under. We understood from prior experience that ICE transfers people out of the facility quickly and we wanted to ensure we could provide everyone with a brief orientation and legal screening and offer representation if appropriate. We also understood from prior experience that both prior to and after transfer, ICE pressures people to sign documents waiving important rights. For those reasons, we knew it was imperative that we provide a legal orientation and rights advisal to as many people as possible, as quickly as possible. The guard said he would ask but that he did not think we would be permitted to meet with more than one person at a time.

8.  The guard led us back to the visitation area. I observed that there were three rooms. The door to one room was closed and I could hear a woman speaking in Spanish, and I understood her to be with the Guatemalan Consulate. The doors to the two remaining rooms were open.

DECLARATION OF KELSEY PROVO ISO PETITIONERS' MOTION
Page 2

Neither room was occupied. The guard led us to the smaller of the two open rooms. I observed

that the room we were provided was a no-contact room, meaning the room was separated in two

by a glass window. The glass window had a small area in the center with holes, which permitted

sound to pass through. There was no mechanism by which to pass papers back and forth.

9.   Upon seeing the space, Ms. Lerner and I renewed our request to meet with people in

groups so that we could speak with as many people as possible. Our request was denied a second

time, citing confidentiality concerns. I explained that as lawyers, we were very familiar with

confidentiality and reiterated our request to meet with people in groups. Our request was again

denied. I then reiterated that we had two other lawyers who would be assisting us that day. The

guard questioned whether we would all fit in the room. I said we wanted our colleagues to be

permitted entry so they could support us. The guard provided a non-committal response.

10. Neither Ms. Lerner nor I had cell or internet service in the visitation room. I had minimal

cell and internet service in a corner of the hallway. As a result, we were unable to communicate

with lawyers from our office while in the visitation room and were unable to access telephonic

interpretation services. Ms. Lerner and I are both fluent in English and Spanish. However, we

believed a number of the people on our list who had been detained that morning were indigenous

Guatemalan who may not be proficient in Spanish.

11. We were allowed to meet with the first community member they brought us at around 11

AM, approximately one hour after we arrived at the facility. Each community member we met

with was brought to the other side of the glass divider, making it impossible to pass papers back

and forth.

12. At approximately 12:15 PM, ICE permitted us to speak with R-G-S-. She was the fifth

person ICE allowed us to speak with. Prior to our meeting with R-G-S-, Ms. Lerner and I had

DECLARATION OF KELSEY PROVO ISO PETITIONERS' MOTION
Page 3

been meeting with another detained community member for only a few minutes when ICE interrupted our meeting, cut the meeting short and transferred this community member, along with three other people on our list who we had not yet met with, out of the facility and the district. When we had asked for just ten more minutes with that client, the officer told us we could have "60 seconds." As a result of this experience, Ms. Lerner and I felt that we had to move much more quickly through our legal advisals and screenings than was appropriate given the rights and liberty interests at stake. We were particularly concerned because after speaking with several people, we believed many of the detentions by ICE that morning were unlawful warrantless arrests.

13. R-G-S- spoke an indigenous language, Mam. She spoke very little Spanish and thus, while Ms. Lerner and I are fluent in Spanish, we had difficulty communicating with her in the Spanish language. Although we have access to telephonic interpretation via Law Lab and the state's universal representation program, Equity Corps of Oregon (ECO), we could not access this interpretation because we did not have cell or internet service in the visitation room to be able to call out to the indigenous language interpretation services we use. Prior to meeting with R-G-S-, while meeting with another community member who spoke an indigenous language, I had asked ICE about the availability of a telephone to call out from the visitation room to access interpretation services, but my request was denied. I had asked ICE if they had interpretation services available and was told me they did not. Because my interpretation request had just been denied, I did not try again to request an interpreter when I learned R-G-S- spoke an indigenous language. In Spanish, Ms. Lerner and I attempted to gather as much information as possible from R-G-S- about her detention.  In Spanish, R-G-S- communicated to us that the arresting officers did not ask for her name and did not ask her any questions before handcuffing her and taking her

DECLARATION OF KELSEY PROVO ISO PETITIONERS' MOTION
Page 4

into custody. R-G-S- was unaware of any prior or current immigration court proceedings and did not know the status of her case or whether she even had an A-number. She was able to communicate that she was afraid to return to Guatemala and that family members in Guatemala have suffered harm. She broke into tears while discussing her fear of return. But because R-G-S- spoke minimal Spanish and no English, neither Ms. Lerner nor I could complete a full rights advisal or legal screening. We met with R-G-S- for approximately 10 minutes.

14.  M-L-G-G- was the sixth person ICE permitted us to speak with. ICE brought M-L-G-G- into the visitation room between approximately 12:25 and 12:30 PM. Ms. Lerner and I spoke with M-L-G-G- in Spanish and attempted to ascertain information from M-L-G-G- about her immigration history; however, we did not have sufficient time to conduct a full legal screening due to our concern that ICE would interrupt us at any moment and transfer M-L-G-G- and others we were trying to meet with out of Oregon. M-L-G-G- confirmed her birth year was 2003 and indicated she entered with U.S. with her father in 2016, when she was approximately thirteen years old. M-L-G-G- further indicated that her father left the United States; it was unclear to me whether he left voluntarily or whether he was deported. Although Ms. Lerner and I tried to ascertain whether M-L-G-G- had any prior proceedings, we were unable to do so in the limited time we had to meet with her and due to the fact that, despite our request for her immigration documents, ICE would not provide them to us. We met with M-L-G-G- for less than 15 minutes.

15. From the government's return, I now understand that M-L-G-G- appears to have an unexecuted removal order from 2017. Had we been afforded more time to meet with her and had ICE provided us with the documents we requested, we could have advised M-L-G-G- on her immigration options, but if the government seeks to immediately execute her prior removal order we will have lost that chance. She could, for example, have a strong basis upon which to reopen

DECLARATION OF KELSEY PROVO ISO PETITIONERS' MOTION
Page 5

her prior proceedings (thereby dissolving the removal order) given her age and unaccompanied status at the time the removal order was entered, when she was approximately fourteen years old. Filing such a motion to reopen before the immigration court would stay her deportation while the immigration court considers the merits of her request.

16. When we left the facility, we attempted to locate M-L-G-G- and R-G-S- via ICE's Online Detainee Locator System but our searches returned zero results. Because we believed they would be transferred to the Northwest Immigration Processing Center (NWIPC) in Tacoma, Washington, Ms. Lerner has attempted to make contact with them at the NWIPC with no success. I am concerned that ICE may be pressuring M-L-G-G- to waive her rights. Because M-L-G-G- has a prior order of removal, she is at heightened risk of being quickly deported. I am also concerned that ICE may be pressuring R-G-S- to sign her deportation and waive her rights. I am aware of numerous examples of where ICE has pressured or coerced people to sign deportation orders or waive the right to a hearing before a judge even when the person has asked to speak with, and ICE knows they have, counsel. Both R-G-S- and M-L-G-G- signed a G-28 form consenting to representation and ICE is therefore aware that they have retained counsel. Despite this, because I am aware of ICE's practices to pressure people into signing away their rights, I am concerned that M-L-G-G- and R-G-S- may have signed documents that impact their case.

I DECLARE UNDER PENALTY OF PERJURY AND UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Executed in Portland, Oregon on November 4, 2025.

Kelsey Provo
INNOVATION LAW LAB
PO Box 40204

DECLARATION OF KELSEY PROVO ISO PETITIONERS' MOTION
Page 6

Portland, OR 97204
Telephone: (503) 922-3042
kelsey@innovationlawlab.org

DECLARATION OF KELSEY PROVO ISO PETITIONERS' MOTION
Page 7

STEPHEN W. MANNING, OSB # 013373
stephen@innovationlawlab.org
smanning@ilgrp.com
TESS HELLGREN, OSB #191622
tess@innovationlawlab.org
JORDAN CUNNINGS, OSB # 182928
jordan@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

Attorneys for Petitioner

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### Eugene Division

| | |
|---|---|
| M-L-G-G-, an adult, and R-G-S-, an adult<br>Petitioners,<br><br>v.<br><br>CAMILLA WAMSLEY, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations ("ICE/ERO"); TODD LYONS, Acting Director of Immigration Customs Enforcement ("ICE"); U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; KRISTI NOEM, Secretary of the Department of Homeland Security ("DHS"); U.S. DEPARTMENT OF HOMELAND SECURITY; and PAMELA BONDI, Attorney General of the United States,<br>Respondents. | Case No. 6:25-cv-02012-AA<br><br>Agency Nos. XXX-XXX-344<br>XXX-XXX-516<br><br>**DECLARATION OF NATALIE LERNER IN SUPPORT OF RENEWED EMERGENCY MOTION TO RESTRAIN TRANSFER** |

**DECLARATION OF NATALIE LERNER IN SUPPORT OF RENEWED EMERGENCY MOTION TO RESTRAIN TRANSFER**

I, Natalie Lerner, upon my personal knowledge, under penalty of perjury declare as follows:

1.  My name is Natalie Lerner. I am an attorney licensed by, and a member in good standing of, the Oregon State Bar. I am an attorney with Innovation Law Lab, which is an organization that provides services through the Equity Corps of Oregon ("ECO") universal representation program. I am over the age of eighteen and make this declaration based upon my own personal knowledge.

2.  I represent Petitioners M-L-G-G- and R-G-S- in their immigration cases.

3.  On November 5 at 12:52 PM, I checked the Online Detainee Locator System to confirm the locations of both M-L-G-G- and R-G-S-.  While R-G-S- appeared to remain in the Northwest ICE Processing Center (NWIPC), the system showed that M-L-G-G- has been transferred to the South Louisiana ICE Processing Center. A screenshot of M-L-G-G-'s currently reflected location is attached as Exhibit A.

4.  The earliest appointment that had been available for me to meet with M-L-G-G- at NWIPC was on November 6 at 6:30 PM, and I had scheduled an appointment for that day at 7:30 PM. However, now that she has been transferred, that appointment is unavailable.

5.  I immediately took steps to attempt to contact M-L-G-G- in the South Louisiana ICE Processing Center. I attempted to schedule via the ERO E-File system and received a message that this platform is not available at South Louisiana ICE Processing Center. I then followed the instructions on the South Louisiana ICE Processing Center website to schedule an attorney call. The website details that calls cannot be scheduled with less than 24 hours of notice. I sent

DECLARATION OF NATALIE LERNER ISO PETITIONERS' RENEWED EMERGENCY MOTION
Page 1

the required information at 1:08 PM via email on November 5 and requested a call for either 12:00 PM or between 3:00-5:00 PM pacific time on November 6, or between 7:00-8:30 AM on November 7 if the November 6 times were not available.

6.  At 1:17 PM I received a response offering me a meeting time on Monday, November 10 at 11:00 AM pacific time. I immediately responded and expressed that I had an urgent legal matter to discuss with my client if any earlier time was available. I received a response that November 10 at 11:00 AM pacific time was the earliest possible time.

7.  I am very concerned that ICE is staging M-L-G-G- for removal. She is eligible for, and likely has a strong case for, a motion to reopen because her removal order was entered against her when she was a child. The motion to reopen would stay M-L-G-G-'s removal from the United States. I have been drafting the motion but I absolutely cannot fully prepare and file such a motion without speaking to my client.


I DECLARE UNDER PENALTY OF PERJURY AND UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Executed in Portland, Oregon on November 5, 2025.


*/s/ Natalie Lerner_*

Natalie Lerner
INNOVATION LAW LAB
PO Box 40204
Portland, OR 97204
Telephone: (503) 334-1300
natalie@innovationlawlab.org


DECLARATION OF NATALIE LERNER ISO PETITIONERS' RENEWED EMERGENCY MOTION
Page 2