**SCOTT E. BRADFORD, OSB #062824**
United States Attorney
District of Oregon
**SARAH E. FELDMAN, OSB # 141458**
**MICHAEL J. JETER, OSB # 165413**
Assistant United States Attorneys
Sarah.Feldman@usdoj.gov
Michael.Jeter@usdoj.gov
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2936
Telephone: (503) 727-1000
        Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| CLEAR CLINIC; PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE; LEON X, on behalf of a class of all similarly situated people, | Case No. 6:25-cv-01906-AA |
| Plaintiffs, | **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| KRISTI NOEM; TODD LYONS; LAURA HERMOSILLO; PETE FLORES; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOM ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION, | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iii

INTRODUCTION ..................................................................................... 1

BACKGROUND ........................................................................................ 5

    I.      DHS's Authority to Arrest Individuals Based on
            Probable Cause Without a Judicial Warrant .............................. 5

    II.     DHS's Broad Discretionary Authority to Place and
            Transfer Detainees ................................................................... 6

    III.    The NWIPC ................................................................................ 7

            A. *The NWIPC's Facilities* ......................................................... 8

            B. *Access to Counsel at the NWIPC* ............................................. 9

            C. *Know Your Rights Presentations at the NWIPC* ................... 11

            D. *Transfer from the NWIPC to other ICE Detention Facilities* ............... 12

    IV.    The Oregon ICE Field Offices .................................................. 13

LEGAL STANDARDS .......................................................................... 19

ARGUMENT ........................................................................................ 20

    V.     Plaintiffs Are Unlikely to Succeed on the Merits ..................... 20

            A. *The Court Lacks Jurisdiction Over Plaintiffs' Claims* ........... 20

                i.     *8 U.S.C. § 1252(f)(1) Bars Class-Wide Relief and
                      Prohibits the District Court from Enjoining Defendants'
                      Actions to Commence Removal Proceedings and Execute
                      Removal Orders* ...................................................... 21

                ii.    *The INA's Zipper Clause, 8 U.S.C. § 1252(b)(9), Precludes
                      Judicial Review of Plaintiffs' Access-to-Counsel Claims and
                      Requires That Those Claims Be Consolidated with the
                      Individuals' Immigration Proceedings* ........................ 23

                iii.   *8 U.S.C. §§ 1252(a)(2)(B)(ii) and 1231(g)(1) Preclude*

       *Judicial Review DHS's Discretionary Authority to
Determine the Location of Detention and to Transfer
Aliens from One Locale to Another* ................................ 25

  B. *Plaintiffs Lack Article III Standing* ...................................... 25

  C. *Plaintiffs are Unlikely to Succeed on the Merits of Their Fifth
Amendment Right to Counsel Claim* ................................... 32

      i.    *The Due Process Right to Counsel Does Not Extend to All
Aliens Arrested and Detained by the ICE Oregon Field
Officers for Immigration Violations* ............................ 34

      ii.   *The Processing Procedures at the Oregon Field Offices
Do Not Violate the Remaining Plaintiffs' Fifth
Amendment Right to Access Counsel* ......................... 38

  D. *Plaintiffs are Unlikely to Succeed on the Mertis of Their First
Amendment Claims* ................................................................ 44

      i.    *Plaintiffs PCUN, Leon X, and Proposed Class Members are
Unlikely to Prevail on Their First Amendment Claims* ............. 44

      ii.   *Plaintiff CLEAR Clinic is Unlikely to Prevail on its First
Amendment Claim* ...................................................... 50

VI.   Plaintiffs Fail to Establish a Likelihood of Irreparable Harm .................. 54

VII.  The Balance of Equities and Public Interest Disfavor a Preliminary
Injunction ................................................................................................ 57

VIII. Plaintiffs' Proposed Injunction is Improper ................................. 60

  A. *Notice* ................................................................................... 61

  B. *Time* ...................................................................................... 63

  C. *Space* .................................................................................... 64

IX.   Plaintiffs Must Post a Bond ................................................................ 65

CONCLUSION ................................................................................................ 65

WORD COUNT CERTIFICATE ..................................................................... 66

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abel v. United States,*
362 U.S. 217 (1960) ................................................................................ 5

*Adderley v. State of Fla.,*
385 U.S. 39 (1966) ................................................................................ 53

*All. for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ............................................................... 20

*Allen v. Wright,*
468 U.S. 737 (1984) ......................................................................... 26, 27

*Arizona v. United States,*
567 U.S. 387 (2012) ................................................................................ 6

*Ass'n v. Reno,*
199 F.3d 1352 (D.C. Cir. 2000) ............................................................. 35

*Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity,*
950 F.2d 1401 (9th Cir. 1991) ............................................................... 54

*Assurance Wireless USA, L.P. v. Reynolds,*
100 F.4th 1024 (9th Cir. 2024) .............................................................. 20

*Bell v. Wolfish,*
441 U.S. 520 (1979) .............................................................................. 44

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
403 U.S. 388 (1971) .............................................................................. 57

*Biwot v. Gonzales,*
403 F.3d 1094 (9th Cir. 2005) ......................................................... 34, 40

*Blackie's House of Beef, Inc. v. Castillo,*
659 F.2d 1211 (D.C. Cir. 1981) ............................................................. 58

*Boy Scouts of Am. v. Dale,*
530 U.S. 640 (2000) .............................................................................. 45

*California v. Azar,*
911 F.3d 558 (9th Cir. 2018) ................................................................. 60

*Caribbean Marine Servs. Co. v. Baldrige,*
844 F.2d 668 (9th Cir. 1988) ................................................................. 54

*Casey v. Lewis,*
4 F.3d 1516 (9th Cir. 1993) ................................................................... 46

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez,*
561 U.S. 661 (2010) .............................................................................. 53

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) .......................................................................... 31, 55

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ....................................................... 26, 31, 32, 55

*Comm. of Cent. Am. Refugees v. I.N.S.*,
  795 F.2d 1434 (9th Cir.) ................................................................ 39, 40
*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985) ............................................................................ 53
*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ............................................................................ 25
*Demore v. Kim*,
  538 U.S. 510 (2003) ............................................................................ 58
*Dep't of Homeland Sec. v. Thuraissigiam*,
  591 U.S. 103 (2020) ............................................................................ 35
*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ........................................................ 26, 27, 28, 57
*Gandarillas-Zambrana v. Bd. of Immigr. Appeals*,
  44 F.3d 1251 (4th Cir. 1995) ............................................................ 25
*Garcia Uranga v. Barr*,
  No. 20-3162-JWL, 2020 WL 4334999 (D. Kan. July 28, 2020) ............ 36
*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ............................................................ 19
*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022) ........................................................ 21, 22, 23, 60
*Geo Grp., Inc. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) ......................................................... 7, 25
*Gill v. Whitford*,
  585 U.S. 48 (2018) .............................................................................. 60
*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ...................................................................... 28, 29
*I.N.S. v. St. Cyr*,
  533 U.S. 289 (2001) ............................................................................ 21
*Immigrant Defs. L. Ctr. v. Mayorkas*,
  No. CV209893JGBSHKX, 2023 WL 3149243 (C.D. Cal. Mar. 15, 2023) .............. 40
*Immigrant Defs. L. Ctr. v. Noem*,
  No. 25-2581, 2025 WL 2017247 (9th Cir. July 18, 2025) ...................... 41
*In re Primus*,
  436 U.S. 412 (1978) ............................................................................ 51
*Innovation L. Lab v. Nielsen*,
  310 F. Supp. 3d 1150 (D. Or. 2018) ................................................. 60
*J.E.F.M. v. Lynch*,
  837 F.3d 1026 (9th Cir. 2016) .............................................. 24, 25, 57
*Juliana v. United States*,
  947 F.3d 1159 (9th Cir. 2020) .......................................................... 26
*Kariye v. Mayorkas*,
  650 F. Supp. 3d 865 (C.D. Cal. 2022) .............................................. 46
*Laird v. Tatum*,
  408 U.S. 1 (1972) ......................................................................... 26, 31

*Landon v. Plasencia,*
  459 U.S. 21 (1982) ................................................................. 43, 44
*Las Americas Immigrant Advoc. Ctr. v. Wolf,*
  507 F. Supp. 3d 1 (D.D.C. 2020) .......................................... 33
*Laws. for Fair Reciprocal Admission v. United States,*
  141 F.4th 1056 (9th Cir. 2025) ............................................ 30
*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) .............................................................. 26, 32
*Lyon v. U.S. Immigr. & Customs Enf't,*
  171 F. Supp. 3d 961 (N.D. Cal. 2016) ............................ 33, 40, 41
*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
  571 F. 3d 873 (9th Cir. 2009) .............................................. 19
*Maryland v. King,*
  567 U.S. 1301 (2012) ............................................................ 58
*Mathews v. Diaz,*
  426 U.S. 67 (1976) ................................................................ 32
*Mathews v. Eldridge,*
  424 U.S. 319 (1976) .............................................................. 42
*Mercado v. Noem,*
  No. 25-CV-6568 (LAK), 2025 WL 2658779 (S.D.N.Y. Sept. 17, 2025) ................. 42
*Minn. Voters All. v. Mansky,*
  585 U.S. 1 (2018) .................................................................. 53
*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) .............................................................. 26, 54
*Morales-Izquierdo v. Gonzales,*
  486 F.3d 484 (9th Cir. 2007) ............................................... 35
*Morrissey v. Brewer,*
  408 U.S. 471 (1972) .............................................................. 32, 33
*Munaf v. Geren,*
  553 U.S. 674 (2008) .............................................................. 19
*NAACP v. Button,*
  371 U.S. 415 (1963) .............................................................. 45, 51
*Nevada v. United States,*
  364 F. Supp. 3d 1146 (D. Nev. 2019) .................................. 54
*Nken v. Holder,*
  556 U.S. 418 (2009) .............................................................. 58
*Noem v. Vasquez Perdomo,*
  No. 25A169, 2025 WL 2585637 (U.S. Sept. 8, 2025) ........... 59
*Orantes-Hernandez v. Thornburgh,*
  919 F.2d 549 (9th Cir 1990) ................................................ 41
*Orozco-Lopez v. Garland,*
  11 F.4th 764 (9th Cir. 2021) ................................................ 35
*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
  460 U.S. 37 (1983) ................................................................ 53

*Preminger v. Principi,*
  422 F.3d 815 (9th Cir. 2005) .................................................. 60

*Procunier v. Martinez,*
  416 U.S. 396 (1974) ............................................................ 59

*Reed v. Town of Gilbert, Ariz.,*
  135 S. Ct. 2218 (2015) ..................................................... 51, 52

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
  525 U.S. 471 (1999) ............................................................ 22

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) ............................................................ 45

*Sampson v. Murray,*
  415 U.S. 61 (1974) ............................................................. 56

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) ............................................................ 51

*Stanley v. Univ. of S. Cal.,*
  13 F.3d 1313 (9th Cir. 1994) .................................................. 19

*Stormans, Inc. v. Selecky,*
  586 F.3d 1109 (9th Cir. 2009) ................................................ 58

*Tejeda-Mata v. Immigr. & Naturalization Serv.,*
  626 F.2d 721 (9th Cir. 1980) ................................................... 6

*Torres v. United States Dep't of Homeland Sec.,*
  411 F. Supp. 3d 1036 (C.D. Cal. 2019) .......................... 39, 40, 48

*Trump v. CASA, Inc.,*
  145 S. Ct. 2540 (2025) ........................................................ 58

*Turner Broad. Sys., Inc. v. F.C.C.,*
  520 U.S. 180 (1997) ............................................................ 45

*Turner v. Safley,*
  482 U.S. 78 (1987) ........................................................ 45, 46

*U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns,*
  453 U.S. 114 (1981) ............................................................ 53

*Ubiquity Press Inc. v. Baran,*
  No 8:20-cv-01809-JLS-DFM, 2020 WL 8172983 (C.D. Cal. Dec. 10, 2020) ........... 58

*United States v. Arango,*
  No. CV 09-178 TUC DCB, 2015 WL 11120855 (D. Ariz. Jan. 9, 2015) ............... 58

*United States v. Arizona,*
  641 F.3d 339 (9th Cir. 2011) ................................................... 6

*United States v. Barajas-Alvarado,*
  655 F.3d 1077 (9th Cir. 2011) ............................................. 33, 35

*United States v. Brignoni-Ponce,*
  422 U.S. 873 (1975) ............................................................ 59

*United States v. De La Mora-Cobian,*
  18 F.4th 1141 (9th Cir. 2021) ................................................. 35

*United States v. Garcia-Villa,*
  2014 WL 4955703 (S.D. Cal. Sept. 30, 2014) ................................... 40

**PAGE vi -    DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

*United States v. Solano-Godines,*
  120 F.3d 957 (9th Cir. 1997) .................................................... 33
*Univ. of Hawai'i Pro. Assembly v. Cayetano,*
  183 F.3d 1096 (9th Cir. 1999) ................................................... 57
*Van Dinh v. Reno,*
  197 F.3d 427 (10th Cir. 1999) ................................................... 23
*Vasquez Perdomo v. Noem,*
  790 F. Supp. 3d 850 (C.D. Cal. 2025) ................................... 42, 56
*Warth v. Seldin,*
  422 U.S. 490 (1975) ................................................................. 27
*Wheeler v. Unknown Named Agents of Ice,*
  No. CV 16-6655 DOC (SS), 2016 WL 6126260 (C.D. Cal. Oct. 20, 2016) ............. 24
*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................... passim
*Wong Wing v. United States,*
  163 U.S. 228 (1896) ................................................................ 44
*Zadvydas v. Davis,*
  533 U.S. 678 (2001) .......................................................... 32, 36
*Zuniga v. Barr,*
  946 F.3d 464 (9th Cir. 2019) ................................................... 35

**Statutes**

8 U.S.C. § 1103(a) ..................................................................... 25
8 U.S.C. § 1225(b) ..................................................................... 35
8 U.S.C. § 1226(a) ................................................................. 5, 23
8 U.S.C. § 1226 (b) ................................................................... 23
8 U.S.C. § 1226 (c) ................................................................... 23
8 U.S.C. § 1228(b) ..................................................................... 35
8 U.S.C. § 1228(b)(4)(B) ............................................................. 35
8 U.S.C. § 1229a ....................................................................... 23
8 U.S.C. § 1229a(b)(4)(A) ........................................................... 34
8 U.S.C. § 1231 ......................................................................... 22
8 U.S.C. § 1231(a) ..................................................................... 36
8 U.S.C. § 1231(a)(5) ............................................................ 34, 35
8 U.S.C. § 1231(g) ............................................................. 6, 22, 23
8 U.S.C. § 1231(g)(1) ................................................................. 25
8 U.S.C. § 1252(a)(2)(B)(ii) ......................................................... 25
8 U.S.C. § 1252(b)(9) ........................................................... i, 21, 23
8 U.S.C. § 1252(f)(1) ........................................................ i, 20, 21, 60
8 U.S.C. § 1357(a)(2) .................................................................... 5
8 U.S.C. § 1221–32 ..................................................................... 22
8 U.S.C. § 1362 ......................................................................... 34

28 U.S.C. § 1346 ..................................................................................... 57
28 U.S.C. § 2671-80 ............................................................................... 57
Or. Rev. Stat § 180.805 ................................................................. 7, 8, 10
Or. Rev. Stat § 181A.820 ......................................................................... 7
Or. Rev. Stat § 181A.823 ......................................................................... 7
Or. Rev. Stat § 181A.826 ......................................................................... 7
U.S. Const. amend. V ............................................................................ 30

**Rules**

Fed. R. Civ. P. 65(c) .............................................................................. 65

**Regulations**

8 C.F.R. § 208.30 ............................................................................ 35, 38
8 C.F.R. § 208.31 ................................................................................... 38
8 C.F.R. § 235.3(b)(2)(ii) ...................................................................... 35
8 C.F.R. § 235.3(b)(4) ........................................................................... 35
8 C.F.R. § 235.6(a)(2) ........................................................................... 35
8 C.F.R. § 241.4(1) ................................................................................ 36
8 C.F.R. § 241.13(b) .............................................................................. 36
8 C.F.R. § 241.13(h) .............................................................................. 36
8 C.F.R. § 241.13(h)(4) .......................................................................... 36
8 C.F.R. § 241.13(i) ............................................................................... 36
8 C.F.R. § 1003.16 ................................................................................ 34

Defendants Kristi Noem, Todd Lyons, Laura Hermosillo, Peter Flores, U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP") (collectively, "Defendants"), hereby respond to Plaintiffs' Motion for Preliminary Injunction ("Pls.' Prelim. Inj. Mot."), ECF No. 40.

## INTRODUCTION

Individuals apprehended for civil immigration law violations by Defendants in Oregon are promptly brought to the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington where they receive robust access to counsel. The NWIPC offers detainees in-person attorney access 12 hours a day, seven days a week, and on holidays. Detainees can also use phones, tablets, and computers to arrange telephonic and virtual meetings with counsel. Further, detainees may voluntarily attend twice weekly "know your rights" presentations put on by immigration attorneys.

On their way to the NWIPC, detainees stop at one of ICE's three field offices in Oregon located in Portland, Eugene, and Medford respectively. At these field offices, detainees are fingerprinted, photographed, and processed for intake before being transferred to the NWIPC. This process is usually completed within hours of an individual's arrival at a field office and generally cannot exceed the 12-hour holding limit established by Oregon state law, leasing agreements, and local land use regulations.

Plaintiffs urge this Court to ignore the access to counsel provided at the

NWIPC and take a blinkered approach to the First and Fifth Amendments by considering the Oregon field offices in a vacuum. They claim the Constitution demands that the field offices provide, *inter alia*, 12-hour in-person attorney access, unfettered telephonic attorney access, and allow "know your rights" presentations—which is precisely what detainees receive at the NWIPC soon after their arrival. Unlike the NWIPC, the Oregon field offices are not detention centers and are not subject to ICE national detention standards (e.g., the 2011 Performance Based National Standards ("PBNDS") (rev. 2016) applicable to the NWIPC) concerning attorney access and legal rights group presentations.[1] These small and limited facilities are temporary stopovers used for ministerial tasks. While the Oregon field offices provide attorney access when feasible, these facilities should be viewed as part of a larger system that includes the NWIPC.

This case is not about access to counsel. Defendants do provide ample and flexible access at the NWIPC that far exceeds the Fifth Amendment's requirements. Rather, the goal of Plaintiffs' lawsuit is to grind immigration enforcement in Oregon to a halt and delay detainee transportation to Tacoma for as long as possible. This delay, in turn, allows Plaintiffs to file habeas petitions in Oregon accompanied by motions for temporary restraining orders. These are often submitted *ex parte* and some have been granted before the government has had an opportunity to respond. These orders typically require 48-hours' notice to the court prior to transferring the

---

[1] *See* ICE PBNDS §§ 1.1, 5.7, 6.4, *available at* *https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf*

detainee out of District. Because of Oregon's sanctuary laws, ICE has no detention facilities in the state and has a 12-hour holding limit at the field offices. The field offices are not equipped for routine overnight detention, as they lack beds, showers, and full-service kitchens. Thus, the court's 48-hour notice orders effectively require the detainees' immediate release without any individualized determination of whether that individual has lawful status to remain in the United States. Even though anyone transferred to Tacoma could seek to have their constitutional rights vindicated in the U.S. District Court for the Western District of Washington, Plaintiffs wish to flood this District with lawsuits in order to use Oregon's sanctuary laws and the courts' 48-hour notice orders to obtain immediate release for their clients. This would be an intolerable outcome that would effectively prevent ICE from enforcing immigration laws in Oregon and preempt the U.S. Immigration Court's jurisdiction to adjudicate detainees' immigration cases and to hold bond hearings.

On the merits, Plaintiffs cannot carry their burden of showing a likelihood of success. The Immigration and Nationality Act ("INA") precludes this Court's jurisdiction over Plaintiffs' claims and request for class-wide injunctive relief. Further, Plaintiffs lack standing primarily due to the lack of a concrete and particularized injury that is actual and imminent.

Even if Plaintiffs could establish jurisdiction and standing, their claims have no merit. The Fifth Amendment to the United States Constitution does not entitle detainees to unrestricted attorney access in the time, place, and manner of their

choosing. Any minor and temporary deferral of access to counsel at the Oregon field offices is not "tantamount" to denial of counsel, and Defendants' mechanisms for providing attorney access are more than sufficient to protect detainees' legitimate rights. Plaintiffs are unlikely to succeed on the merits of their First Amendment claims because any temporary, short-term restriction on access to counsel falls far short of government action that significantly burdens Plaintiffs' right to associate. And the government has important interests in enforcing the INA and safely transporting detainees from the field offices in Oregon to the detention center in Tacoma, which is equipped for longer-term stays.

Likewise, Plaintiffs have not demonstrated irreparable harm absent an injunction and the public interest favors the continued and unimpeded enforcement of this nation's immigration laws.

Finally, the injunctive relief Plaintiffs seek is grossly overbroad, unworkable, and does not match the alleged harms they identify. The thrust of Plaintiffs' complaint is that detainees are not being given sufficient access to attorneys. The way to remedy that harm would be to mandate increased access in some fashion. But there is absolutely no reason for the Court to impose a remedy that would effectively prevent ICE from using the Oregon field offices to process detainees for intake before being transferred to the NWIPC. Whether a detainee is held in Oregon or Washington does not impact their ability to interact with a lawyer; there is simply no connection between attorney access and whether an individual is transferred out of state. Indeed, at the NWIPC, ICE provides several flexible means

by which detainees may access their attorneys. Further, the notice Plaintiffs seek of detainees' identity and location is duplicative of DHS's preexisting online detainee locator system and would require ICE to give Plaintiffs exclusive access to the Portland field office to conduct multiple daily attorney advertising sessions to clients and unrepresented individuals alike. Plaintiffs do not have constitutional rights to the forms or relief they seek, which are impractical and infeasible given existing systems and facility limitations.

## BACKGROUND

I.    **DHS's Authority to Arrest Individuals Based on Probable Cause Without a Judicial Warrant**

DHS has clear statutory authority to arrest individuals who are believed to be removable from the United States. Specifically, 8 U.S.C. § 1226(a) grants DHS the authority to arrest with an administrative warrant and detain individuals pending a decision on their removal. Additionally, 8 U.S.C. § 1357(a)(2) authorizes immigration officers to arrest individuals without a warrant if there is reason to believe the individual is in violation of immigration laws and likely to escape before a warrant can be obtained. Importantly, arrests made for immigration enforcement purposes are administrative in nature and do not require a judicial warrant. The administrative nature of immigration arrests has been upheld by courts, which have recognized that immigration enforcement is distinct from criminal law enforcement. For example, in *Abel v. United States*, 362 U.S. 217 (1960), the Supreme Court held that immigration officers may arrest individuals without a warrant for administrative purposes, such as deportation proceedings, provided the

arrest complies with statutory requirements. The Court emphasized that administrative arrests are authorized under immigration law and do not require the same level of judicial oversight as criminal arrests. *See Arizona v. United States*, 567 U.S. 387 (2012); *United States v. Arizona*, 641 F.3d 339, 349–50 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded,* 567 U.S. 387 (2012); *Tejeda-Mata v. Immigr. & Naturalization Serv.*, 626 F.2d 721 (9th Cir. 1980).

II.    **DHS's Broad Discretionary Authority to Place and Transfer Detainees**

DHS has broad authority under 8 U.S.C. § 1231(g) to determine the placement and transfer of detainees to appropriate detention facilities. *See* 2011 U.S. Immigration and Customs Enforcement, Performance-Based National Detention Standards 2011 (rev. 2016) ("PBNDS"), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf. This includes the authority to acquire, build, lease, and operate detention facilities to meet operational needs. Placement and transfer decisions are made based on operational priorities, including proximity to immigration courts, facility capacity, security needs, medical care, and the ability to meet detention standards. For example, detainees may be placed in facilities near immigration courts to ensure efficient processing and participation in removal proceedings. Transfers occur when detainees need to be relocated to other facilities due to medical care, overcrowding, operational necessity, or security concerns. For instance, detainees requiring long-term or specialized medical care may be transferred to facilities like the NWIPC in Tacoma, Washington, which is equipped to provide advanced care.

The Ninth Circuit's decision in *Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022), further reinforces DHS/ICE's authority over detention and transfers. In *Geo Group*, the court held that California's AB 32, which banned private detention facilities, was preempted by federal law. The court emphasized that federal immigration law grants DHS/ICE's exclusive authority to manage detention operations, including the ability to contract with private entities and determine appropriate detention locations.

Based on the above, DHS has clear statutory and regulatory authority to arrest individuals, determine the location of detention, transfer detainees, and enforce detention standards.

## III.    The NWIPC

Oregon's Sanctuary laws and policies, including Or. Rev. Stat §§ 180.805, 181A.820, 181A.823, and 181A.826, prohibit local governments, private entities, and law enforcement agencies from entering into agreements with ICE for immigration detention services. Consequently, with no dedicated facilities in operation within Oregon, ICE is no longer capable of providing overnight or dedicated long-term immigration detention space in the state. *See* Second Declaration of Jeffrey Chan ("Second Chan Decl.") ¶ 7.

As a result, ICE relies solely on short-term, 12-hour maximum holding areas within ERO's three field offices in Portland, Medford and Eugene. The field offices are processing offices and, as such, the holding rooms within them are not designed or equipped for routine overnight or extended detention. They do not provide access

to beds, showers, on-site medical clinics and mental health care, full-service kitchens, law libraries, virtual visitation equipment, and recreational areas typically found in dedicated detention centers. Second Chan Decl. ¶ 8. The Portland office is leased pursuant to a conditional use permit that explicitly limits detainee holds to no more than 12 hours. Second Chan Decl. ¶ 10.

Due to the absence of in-state detention facilities and the 12-hour limit, detainees apprehended in Oregon are generally transferred to NWIPC within hours of processing. Second Chan Decl. ¶¶ 11–12. These transfers ensure compliance with local rules, leasing agreements, and detention standards.

### A.    *The NWIPC's Facilities*

The NWIPC is a private detention center run by The GEO Group, Inc., ("GEO"), an independent contractor that provides facility, management, and personnel services for the supervision of immigrant detainees in ICE Custody there. Declaration of Matthew Cantrell ("Cantrell Decl."), ¶ 5. Unlike the Oregon ICE field offices, the NWIPC is a detention facility generally subject to the 2011 Performance-Based National Detention Standards. Cantrell Decl. ¶ 6.

The NWIPC is much larger in scale and scope than the Oregon field offices, consisting of approximately 52,000 square feet of detention space, and it provides amenities unavailable in the field offices. Cantrell Decl. ¶ 10. The facility has capacity to house up to 1,575 detainees and historically operates near capacity. *Id.* As of November 21, 2025, the facility housed 1,350 detainees. *Id.* The average length of a detainee's stay at the NWIPC for the last six months has been 106 days.

Cantrell Decl. ¶ 25. Regarding amenities, the NWIPC has a full-scale commercial kitchen, outdoor and covered recreation areas, a law library stocked with various immigration applications and template motions, and access to online legal research materials. Cantrell Decl. ¶ 7. The NWIPC has a full medical clinic with eight patient rooms, a pharmacy, mental health services, and capabilities to handle complex medical needs in collaboration with nearby emergency departments and local specialty service providers. Cantrell Decl. ¶ 8, Ex. A., at 37–43. This facility also houses the Tacoma Immigration Court. Cantrell Decl. ¶ 9.

### B.     Access to Counsel at the NWIPC

The NWIPC provides detainees with robust and flexible access to counsel and ensures that all detainees have access to information apprising them of their rights in immigration proceedings. Cantrell Decl. ¶¶ 11–16. Upon admission to the NWIPC, all detainees receive a copy of ICE's National Detainee Handbook ("National Handbook"), published in multiple languages. Cantrell Decl. ¶ 11. The National Handbook informs detainees about the various legal resources at their disposal. Additionally, detainees receive the NWIPC-specific Supplement to the National Detainee Handbook ("NWIPC Handbook"). *See* Cantrell Decl. ¶ 11, Ex. A. The NWIPC Handbook provides specific instructions on how to arrange in-person, telephonic, virtual, and mail communications with attorneys. Cantrell Decl. Ex. A, at 11–18, 34–35.

NWIPC detainees may communicate with their families, attorneys, and others via in-person meetings, mail, phone, and virtual meetings. Cantrell Decl. ¶¶

12–14. This facility has 21 in-person visitation rooms, including seven rooms that can also be used for virtual attorney visitation ("VAV"). Cantrell Decl. ¶ 14. Visitation rooms are available 8:00a.m. – 10:00p.m., seven days per week including holidays. *Id.* Visitation appointments are on a first-come, first-serve basis with 9:00a.m. – 5:00p.m. weekday slots for VAV being the most popular. Cantrell Decl. ¶ 14, n. 2. Attorneys seeking weekday VAV appointments at the most popular times may wait longer than those who request meeting times during underutilized hours. Cantrell Decl. ¶¶ 14, n.2, 28.

Detainees can schedule representational and pre-representational visits online via ERO's Detention Facility Appointment Scheduler ("DFAS"). *Id.* Appointments can be scheduled up to 14 days in advance, but no later than 24 hours before the appointment time. *Id.* Extended and urgent visitation requests can be made by contacting the facility. *Id.* Appointments may be scheduled in 30-minute increments up to 60 minutes total in a single day, depending on availability. *Id.* Detainees are free to schedule as many once-per-day attorney visits as they like.

Phones are available in hold rooms within the intake unit and in every housing unit. Cantrell Decl. ¶ 12. All detainees are given prepaid calling cards with five minutes of time so that they can make a free phone call to the person of their choice. *Id.* In addition, all detainees may make free and direct calls to the pro-bono counsel included on the provided Executive Office for Immigration Review ("EOIR")

list of free legal service providers[2] for the purpose of obtaining legal representation. *Id.* The EOIR list of free legal service providers is posted in the NWIPC holding rooms and in every housing unit. *Id.* If a detainee does not have funds to call a legal representative who is not on the EOIR list, they may contact NWIPC staff for assistance to do so. Cantrell Decl. ¶ 12, Ex. A, at 11.

Additionally, each housing unit is outfitted with electronic tablets that allow for a range of activities, including video visitation, messaging, and entertainment. Cantrell Decl. ¶ 13. Video visitation calls on the tablets are free to any legal service provider on the EOIR list. *Id.* Other tablet video visitation calls require payment. *Id.* Attorneys not on the EOIR list may call in and pay under the attorney's account. *Id.* Funds can also be added to a detainee's facility account for video visitation calls or other purposes. *Id.* Email is also available on the tablets for a fee. *Id.*, Ex. A., at 13.

### C.     *Know Your Rights Presentations at the NWIPC*

The NWIPC also allows attorneys or legal representatives to provide legal rights presentations at the facility upon written request. Cantrell Decl. ¶ 15. The PBNDS sets out specifications for these "know your rights" ("KYR") presentations regarding presentation length, advertisement, question and answer sessions, and written materials. *Id.* Detainees may communicate and correspond with representatives from the legal groups that make KYR presentations. *Id.* Currently,

---

[2] ICE, List of Pro Bono Legal Service Providers (Oct. 2025), *available at* *https://www.justice.gov/eoir/file/probonofulllist/dl*

presentations are provided two days per week (Tuesdays and Thursdays) by the Northwest Immigrant Rights Project ("NWIRP"), a Washington State-based organization. *Id.* These KYR presentations are voluntary for detainees to attend and are held in the NWIPC's multipurpose room, which is much larger than the in-person meeting rooms. Cantrell Decl. ¶¶ 15–16 (stating the multipurpose room is permitted to hold up to 49 people). As of this writing, Plaintiff CLEAR Clinic has not requested to provide KYR presentations at the NWIPC. Cantrell Decl. ¶ 15.

### D. Transfer from the NWIPC to other ICE Detention Facilities

As stated above, over the past six months, the average detainee's stay at the NWIPC has been approximately 106 days. Cantrell Decl. ¶ 25. Under ICE policy, detainees generally are not transferred when there is documentation of the following in the area: immediate family, attorney of record, pending or ongoing removal proceedings, or where the detainee has been granted bond or has a bond hearing. Cantrell Decl. ¶ 23. Detainee transfers may be deemed necessary for a variety of reasons including detainee mental health, security and safety, EOIR proceedings in a different venue, detainee risk factors, failure to meet detention standards, lack of sufficient use of the facility, emergent situations, and to relieve or prevent overcrowding. Cantrell Decl. ¶ 23. In early November 2025, ICE transferred approximately 140 NWIPC detainees to other detention facilities after it was deemed necessary for decompression purposes. Cantrell Decl. ¶ 24. To the extent possible ICE prioritized transfers of those who were recently admitted because they were less likely to meet the policy criteria described above. *Id.*

After transfer, a detainee's location change is input into ICE's Online Detainee Locator System ("ODLS"). Cantrell Decl. ¶¶ 19–20. For security reasons ODLS does not provide information about planned or in-progress transfers. Cantrell Decl. ¶ 19. Once a person is booked into another ICE facility, ODLS is updated with that information. *Id.* In May 2025, ICE's ERO eFile system began generating automatic email transfer notices to attorneys registered as a detainee's legal representative following a book-in to a new facility. Cantrell Decl. ¶ 20. Upon email receipt, attorneys can log into the ERO eFile system to review the transfer notice along with the new facility's information. *Id.* Additionally, if attorneys have questions or concerns, they may contact ICE's Office of the Principal Legal Advisor ("OPLA"), which has branches located both in Portland, Oregon and within the NWIPC and which have publicly published duty attorney email addresses. Cantrell Decl. ¶ 22.

## IV.    The Oregon ICE Field Offices

Unlike the NWIPC, the Oregon ICE field offices are not detention centers and are not subject to the PBNDS or the ICE detainee transfer policy described above. *See* PBNDS § 1.1; Cantrell Decl. ¶ 23, n.3. The field offices are processing offices with holding rooms that are not designed or equipped for routine overnight or extended use. Second Chan Decl. ¶ 8. These facilities do not provide routine access to showers, beds, on-site medical clinics and mental health care, full-service kitchens, law libraries, VAV equipment, and recreation areas found at the NWIPC or other long-term detention centers. *Id.* None of the field offices are routinely

staffed on a 24-hour basis. Second Chan Decl. ¶ 9; Declaration of David Cabrera Jr. ("Cabrera Decl.") ¶ 5; Declaration of Jason Weiss ("Weiss Decl.") ¶ 5.

At all three field offices, most detainees are processed and transferred within hours of their arrival, in compliance with local rules and leasing agreements. Second Chan Decl. ¶ 13; Cabrera Decl. ¶ 8; Weiss Decl. ¶ 8. Processing can be completed in as little as 30 minutes to an hour. Second Chan Decl. ¶ 13; Cabrera Decl. ¶ 9; Weiss Decl. ¶ 9. The process includes recording personal information, conducting criminal history checks, taking photographs and fingerprints, and performing screening interviews for medical and mental health assessments. Second Chan Decl. ¶ 14; Cabrera Decl. ¶ 9; Weiss Decl. ¶ 9. This active booking accounts for the majority of the time a detainee spends at a field office prior to transfer. *Id.* Attorney access to individuals during active booking and processing is thus limited. *Id.*

Despite detainees' abbreviated stay at the ICE field offices and those facilities' limitations, detainees are afforded attorney access prior to transfer to the NWIPC when feasible. Individuals processed at the field offices are provided with the EOIR list of free legal service providers. Second Chan Decl. ¶ 17; Cabrera Decl. ¶ 10; Weiss Decl. ¶ 10. Detainees may contact counsel with phones available for their use via collect calls and one free call typically provided prior to transport at the NWIPC. Second Chan Decl. ¶ 18; Cabrera Decl. ¶ 11; Weiss Decl. ¶ 11. At the Portland office, phones are available in the holding rooms themselves near the EOIR list. Second Chan Decl. ¶ 19. At the Eugene and Medford offices, the holding

rooms do not have phones, but a free phone call is typically provided in the intake room prior to transfer. Cabrera Decl. ¶ 11; Weiss Decl. ¶ 11.

All three field offices allow in-person attorney visitation during public operating hours. Second Chan Decl. ¶¶ 20–23; Cabrera Decl. ¶¶ 12–15; Weiss Decl. ¶¶ 12–17. Eugene and Medford have one visitation room each and Portland has three. Second Chan Decl. ¶ 22; Cabrera Decl. ¶ 14; Weiss Decl. ¶ 14. None of these visitation rooms are large enough to accommodate group presentations. Second Chan Decl. ¶ 23; Cabrera Decl. ¶ 15; Weiss Decl. ¶ 15. The only other space in these field offices is occupied by the intake rooms and holding rooms located within secure areas which the public and attorneys are not permitted access for safety and security reasons. Second Chan Decl. ¶ 25; Cabrera Decl. ¶ 16; Weiss Decl. ¶ 16.

An attorney seeking to visit a detainee at an ICE field office must demonstrate an established attorney-client relationship with the individual. Second Chan Decl. ¶ 26; Cabrera Decl. ¶ 17; Weiss Decl. ¶ 17. This is most often done through a Notice of Attorney or Representation (Form G-28) signed by the detainee. *Id.* ICE will also accept other proof of representation such as a retainer agreement or a Notice of Entry of Appearance as an Attorney on file with the Executive Office of Immigration Review. Second Chan Decl. ¶ 26; Cabrera Decl. ¶ 17; Weiss Decl. ¶ 17. The Form G-28 contains several fields for biographic information to be provided about the individual by the attorney including name, A-number, date of birth, country of birth, and address. *Id.* ICE will accept unsigned Form G-28s for

detainees when the attorney can provide minimum basic biographic information about the individual. Second Chan Decl. ¶ 26; Cabrera Decl. ¶ 17; Weiss Decl. ¶ 17.

As a matter of policy, ICE does not deny access to counsel and grants access to attorneys presenting valid Form G-28s where feasible. Second Chan Decl. ¶ 27; Cabrera Decl. ¶ 18; Weiss Decl. ¶ 18. Denials, if any, are isolated incidents that may occur for legitimate reasons, such as incomplete documentation, ongoing processing, security risks, or the detainee's refusal. Second Chan Decl. ¶ 27; Cabrera Decl. ¶ 18; Weiss Decl. ¶ 18.

There are several operational, logistical, and security reasons that ICE cannot always accommodate immediate in-person visitation requests at the Oregon field offices prior to transport to NWIPC. Second Chan Decl. ¶¶ 28–32; Cabrera Decl. ¶¶ 19–23; Weiss Decl. ¶¶ 19–23. Transportation is limited and ICE coordinates transport between the three Oregon offices for efficiency and to minimize wait and transfer times for detainees. Second Chan Decl. ¶¶ 29–30. An independent contractor provides transport, its personnel are paid by the hour, and its drivers are subject to legal restrictions on the number of hours they can work. Second Chan Decl. ¶ 29. Given travel times and need to coordinate transport runs, ICE cannot always accommodate visitation requests at the field offices. Second Chan Decl. ¶ 30.

Safety and security concerns may also impact attorney access at Oregon's ICE offices. Since June 2025 protests have targeted all Oregon field offices, forcing ICE to close the field offices to the public temporarily to protect the safety of officers

and other individuals therein. Second Chan Decl. ¶ 31; Cabrera Decl. ¶ 23; Weiss Decl. ¶ 23. The Portland office was closed for three weeks from June 13 to July 7, 2025, as a result of physical damage inflicted by protestors on the building. Second Chan Decl. ¶ 31. On July 1, 2025, the Eugene office was closed to the public after protestors blockaded ICE personnel inside for several hours, preventing exit. Weiss Decl. ¶¶ 22–23.

There are numerous recent examples of criminal acts, often violent, perpetrated against ICE employees and ICE field offices in Oregon that have affected in-person access to those facilities and prompted efficient transfer to the NWIPC. Second Chan Decl. ¶ 32; Cabrera Decl. ¶ 23; Weiss Decl. ¶¶ 22–23.[3]

---

[3] *See e.g.* U.S. Attorney's Office, District of Oregon, News, *available at* https://www.justice.gov/usao-or/pr; U.S. Attorney's Office, *Press Release: Portland Man Charged with Violent Threats Against Federal Law Enforcement Officers* (Nov. 24, 2025), *available at* https://www.justice.gov/usao-or/pr/portland-man-charged-violent-threats-against-federal-law-enforcement-officers; U.S. Attorney's Office, *Press Release: Portland Man Pleads Guilty to Arson at the [ICE] Building* (Nov. 19, 2025), *available at* https://www.justice.gov/usao-or/pr/portland-man-pleads-guilty-arson-immigration-and-customs-enforcement-building; U.S. Attorney's Office, *Press Release: Portland Man Charged with Trespassing on Federal Property, Failing to Obey a Lawful Order, and Obstructing Federal Property*, (Nov. 18, 2025), *available at* https://www.justice.gov/usao-or/pr/portland-man-charged-trespassing-federal-property-failing-obey-lawful-order-and; U.S. Attorney's Office, *Press Release: Man Unlawfully Living in the United States Charged with Assaulting Federal Officers* (Nov. 14, 2025), *available at* https://www.justice.gov/usao-or/pr/man-unlawfully-living-united-states-charged-assaulting-federal-officers; U.S. Attorney's Office, *Press Release: Portland Woman Charged with Assaulting Federal Law Enforcement Officer Near Local ICE Office* (Nov. 3, 2025), *available at* https://www.justice.gov/usao-or/pr/portland-woman-charged-assaulting-federal-law-enforcement-officer-near-local-ice-3; U.S. Attorney's Office, *Press Release: Portland Woman Charged with Assault on a Federal Officer* (Oct. 24, 2025), *available at* https://www.justice.gov/usao-or/pr/portland-woman-charged-assault-federal-officer.

Between June 13 and November 3, 2025, 38 defendants were charged with federal crimes and offenses committed near ICE facilities, including assaulting federal officers, failure to comply, and depredation of government property.[4]

Consequently, ICE has had to prioritize speedy and efficient processing of those arrested in Oregon to minimize safety risks to its officers and individuals in ICE custody. Second Chan Decl. ¶ 32; Cabrera Decl. ¶ 23; Weiss Decl. ¶ 23. ICE officers and vehicles have become frequent targets for protestors who harass, vandalize, and attempt to prevent ICE from moving individuals from the Oregon facilities. Second Chan Decl. ¶ 32; Cabrera Decl. ¶ 23; Weiss Decl. ¶ 23. The longer an individual remains in custody at an Oregon ICE facility prior to transport, the greater the risk to officer and detainee safety as more protestors are drawn to those locations and become more likely to physically disrupt operations. Second Chan Decl. ¶ 32; Cabrera Decl. ¶ 23; Weiss Decl. ¶ 23. For this reason, among others, ICE has been expediting processing and transportation to NWIPC. Second Chan Decl. ¶ 32; Cabrera Decl. ¶ 23; Weiss Decl. ¶ 23.

As soon as practicable after detainee intake, typically within hours, the detainee's information is made publicly available on ODLS. Declaration of Jeffrey

---

[4] *See supra* fn. 3 (Nov. 3, 2025 press release); *United States v. Barker, et al.*, No. 25-cv-00439 (arson); *United States v. Griffin*, No. 25-cr-00474 (trespass and failure to comply with lawful order); *United States v. Shepherd*, No. 25-mj-00327 (assault on an ICE officer near an ICE facility); *United States v. Sidener*, No. 25-cr-00374 (property damage at ICE facility); *United States v. Miyamoto*, No. 25-cr-00451 (assault on a federal officer near ICE facility); *United States v. Leslie*, 25-mj-00303 (same); *United States v. Korol*, No. 25-cr-00469 (same); *United States v. Westcott*, No. 25-mj-00292 (same).

Chan ("Chan Decl.") ¶ 21, ECF No. 21; Cantrell Decl. ¶ 19. ODLS provides an efficient and streamlined means by which attorneys may locate and access their clients who are detained at ICE facilities. Cantrell Decl. ¶¶ 19–20.

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary and drastic remedy" that is never awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 688–90 (2008) (citations and quotation omitted). There are two types of preliminary injunctions: (1) a prohibitory injunction that "preserve[s] the status quo pending a determination of the action on the merits[,]" and (2) a mandatory injunction that "orders a responsible party to take action." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F. 3d 873, 878–79 (9th Cir. 2009) (citation modified) (alteration in original). A mandatory injunction "'goes well beyond simply maintaining the status quo pendente lite [and] is particularly disfavored.'" *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (cleaned up). Indeed, "[i]n general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases[.]" *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879 (internal quotation omitted). The moving party "must establish that the law and facts *clearly favor* [his] position, not simply that [he] is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis original). Where a plaintiff seeks mandatory injunctive relief, "courts should be extremely cautious[.]" *Stanley*, 13 F.3d at 1319.

Plaintiffs seeking a preliminary injunction must establish each of the following: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge where a government agency is a party." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024).

An injunction may be appropriate, alternatively, where: (1) Plaintiffs raise "serious questions going to the merits;" (2) the balance of equities "tips sharply" in the Plaintiffs' favor; and (3) Plaintiffs "satisfy the other *Winter* factors." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (citations omitted). Here, however, the "serious questions" standard does not apply because "[t]his 'less demanding' merits standard requires serious factual questions that need to be resolved in the case." *Assurance Wireless USA, L.P.*, 100 F.4th at 1031. "Thus, parties do not show serious questions when they raise a 'merely plausible claim,' nor can a district court 'forgo [sic] legal analysis just because it has not identified precedent that places the question beyond debate.'" *Id.*

## ARGUMENT

## V.   Plaintiffs Are Unlikely to Succeed on the Merits

### A.   *The Court Lacks Jurisdiction Over Plaintiffs' Claims.*

The INA contains three jurisdiction-stripping provisions that preclude Plaintiffs' claims. First, 8 U.S.C. § 1252(f)(1) precludes district courts from entering

injunctions to take or refrain from taking actions to carry out immigration laws governing the inspection, apprehension, examination, and removal of aliens. *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 548 (2022). Importantly, § 1252(f)(1) forecloses jurisdiction to grant class-wide injunctive relief. *Id.* Second, 8 U.S.C. § 1252(b)(9) precludes judicial review of all questions of law and fact, including the application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States. The Supreme Court has described § 1252(b)(9) as the INA's "zipper clause," the purpose of which is to consolidate judicial review of immigration proceedings into one action in the court of appeals. *I.N.S. v. St. Cyr*, 533 U.S. 289, 313 (2001). Access to counsel issues relating to removal proceedings must be considered as part of those proceedings and not in a separate suite. Finally, 8 U.S.C. § 1252(a)(2)(B)(ii) bars review of "any other decision or action of the [Executive] the authority for which is specified under this subchapter to be in the discretion of the [Executive]." Under § 1231(g)(1), Congress has granted DHS discretion to decide the location detention for individuals pending removal, thus falling within the scope of the review bar under § 1252(a)(2)(B)(ii).

  i.  *8 U.S.C. § 1252(f)(1) Bars Class-Wide Relief and Prohibits the District Court from Enjoining Defendants' Actions to Commence Removal Proceedings and Execute Removal Orders.*

Section 1252(f)(1) bars the injunctive relief Plaintiffs seek. That provision states "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" all statutory provisions governing the inspection, apprehension, examination, exclusion, or removal of aliens. 8 U.S.C. §

1252(f)(1). The Supreme Court held that this provision "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 550; *see also* 8 U.S.C. §§ 1221–32 (providing the covered statutory provisions). In *Aleman Gonzalez*, the Supreme Court made clear that § 1252(f)(1) "prohibits federal courts from granting classwide injunctive relief" but does not preclude injunctive relief on behalf of a particular individual alien. *Id.* (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481–482 (1999)). "Putting these terms together, § 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 550. This bar on class-wide injunctions applies to constitutional claims and covers the operation of a covered provision even if that operation is "unlawful" or "improper." *Id.* at 552–54.

The breadth of Plaintiffs' class-wide relief encompasses anyone apprehended based on the execution of a final order of removal, those subject to expedited removal proceedings, as well as removal proceedings. One of those "specified statutory provisions" is 8 U.S.C. § 1231, which authorizes the detention and removal of individuals ordered removed and specifies the government's discretion, among other things, to determine where to detain individuals who have been ordered removed. 8 U.S.C. § 1231(g) ("The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on

removal."). Actions taken to apprehend, process, and transfer detainees from the Oregon field offices to the NWIPC fall within that grant of discretionary authority to agencies under §§ 1226(a)–(c), 1226a, 1229a, 1231(g) and the mandatory injunctive relief delaying and preventing action would "restrain" and directly effects the government's ability to carry out those critical administrative functions. *See Aleman Gonzalez*, 596 U.S. at 550; *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999) (Section "1252(f) forecloses jurisdiction to grant class-wide injunctive relief to restrain operation of §§ 1221–31 by any court other than the Supreme Court. It is therefore apparent that a district court has no jurisdiction to restrain the Attorney General's power to transfer aliens to appropriate facilities by granting injunctive relief in a *Bivens* class action suit."). Such an injunction is plainly prohibited under § 1251(f)(1) and the Court should decline to grant it. *See Aleman Gonzalez*, 596 U.S. at 550.

ii.     *The INA's Zipper Clause, 8 U.S.C. § 1252(b)(9), Precludes Judicial Review of Plaintiffs' Access-to-Counsel Claims and Requires That Those Claims Be Consolidated with the Individuals' Immigration Proceedings.*

Section 1252(b)(9) precludes judicial review of Plaintiffs' challenge Defendants' initial location and intake procedures for individuals apprehended in Oregon prior to their transfer to the NWIPC. Under this provision, "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States" is only proper before the appropriate court of appeals via a petition for review of a final removal order. *See* 8

U.S.C. § 1252(b)(9). In other words, "*any* issue—whether legal or factual—arising from any removal-related activity can be reviewed only through the [petition-for-review] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016). The Ninth Circuit held that individuals' right-to-counsel claims "must be raised through the [petition-for-review] process[.]" *Id.* at 1032–33. "The counsel claims are not independent or ancillary to the removal proceedings. Rather, these claims are bound up in and an inextricable part of the administrative process." *Id.* at 1033. The Ninth Circuit explained that "Congress intended to channel all claims arising from removal proceedings, including right-to-counsel claims, to the federal courts of appeals and bypass the district courts." *Id.*; *see also Wheeler v. Unknown Named Agents of Ice*, No. CV 16-6655 DOC (SS), 2016 WL 6126260, at *3 (C.D. Cal. Oct. 20, 2016) (holding that the plaintiff's right-to-counsel claims arose directly from removal proceedings and were "therefore barred from district court review).

Plaintiffs' broadly-framed right-to-counsel claims and demands for class-wide relief sweeps in those apprehended for a variety of reasons, including the commencement of removal proceedings and execution of final orders of removal. Indeed, Plaintiffs argue that their right-to-counsel in immigration proceedings begins upon apprehension, and their claims are inextricably and necessarily tied to those removal proceedings. *See* Pl.'s Prelim. Inj. Mot. 21. Plaintiffs cannot have it both ways arguing that they have a right to counsel in immigration proceedings that begins at the moment of apprehension and intake processing, but that those same actions by Defendants are independent from and collateral to removal

activities subject to § 1252(b)(9). The Ninth Circuit squarely foreclosed on this argument in *J.E.F.M.*, 837 F.3d at 1031.

       *iii.*      *8 U.S.C. §§ 1252(a)(2)(B)(ii) and 1231(g)(1) Preclude Judicial Review DHS's Discretionary Authority to Determine the Location of Detention and to Transfer Aliens from One Locale to Another.*

Finally, § 1252(a)(2)(B)(ii) strips this Court of jurisdiction to review "any other decision or action of the [Executive] the authority for which is specified under this subchapter to be in the discretion of the [Executive]." 8 U.S.C. § 1252(a)(2)(B)(ii). As with § 1252(f)(1), the executive authority under § 1231(g) to decide the location of detention for individuals detained pending removal implicates the review bar under § 1252(a)(2)(B)(ii). Under § 1231(g), DHS "necessarily has the authority to determine the location of detention of an alien in deportation proceedings," including to transfer detainees from one detention site to another. *Gandarillas-Zambrana v. Bd. of Immigr. Appeals*, 44 F.3d 1251, 1256 (4th Cir. 1995); *see also Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 754 (9th Cir. 2022) (recognizing DHS's broad discretion in arranging detention and finding a state law banning private detention facilities preempted by federal law); 8 U.S.C. § 1103(a) (granting broad discretion to "perform such other acts as [she] deems necessary for carrying out [her] authority" under the INA).

## B.    *Plaintiffs Lack Article III Standing*

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341

(2006) (internal quotation marks omitted). This constitutional limitation requires plaintiffs to demonstrate they have standing to sue so that courts do not operate as an open forum for "general complaints about the way in which government goes about its business." *Allen v. Wright*, 468 U.S. 737, 760 (1984), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). "To have standing under Article III, a plaintiff must have (1) a concrete and particularized injury that (2) is caused by the challenged conduct and (3) is likely redressable by a favorable judicial decision." *Juliana v. United States*, 947 F.3d 1159, 1168 (9th Cir. 2020).

To support standing, an injury must be "concrete, particularized, and actual or imminent[.]" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). When the alleged injury arises from an "exercise of governmental power" that is "regulatory, proscriptive, or compulsory in nature," the "complainant" must be "presently or prospectively subject to the regulations, proscriptions, or compulsions" at issue. *Laird v. Tatum*, 408 U.S. 1, 11 (1972). "[T]he injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.*

Plaintiffs do not have standing to obtain relief on behalf of non-party hypothetical individuals, and anecdotal concerns about past conduct not before this

Court cannot supply a basis for injunctive relief for others. "[P]laintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

Organizations such as CLEAR Clinic and PCUN are held to the "usual standards for injury in fact, causation, and redressability that apply to individuals." *Id.* at 393–94. Where the Plaintiffs are not themselves "the object of the [challenged] government action or inaction" standing is "ordinarily 'substantially more difficult' to establish." *Lujan*, 504 at 462 (quoting *Allen*, 468 U.S. at 758).

Plaintiffs assert likelihood of success on the merits of Claims 1 through 3 to support their Preliminary Injunction Motion. Plaintiff CLEAR Clinic lacks standing to bring Claims 1 and 3. Claim 1 pertains to detainees' rights to counsel, not CLEAR Clinic's rights. Claim 3 concerns attorney rights to solicit clients, which, for the reasons discussed below, CLEAR Clinic also lacks standing to bring. *See infra* Part V.D.ii. Similarly, Plaintiff PCUN lacks organizational standing in this lawsuit. PCUN, as an organization, cannot bring claims on behalf of the First and Fifth Amendment rights of individuals detained by Defendants.

Plaintiffs rely primarily on *Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), to advance their cause. *See* Pls.' Prelim. Inj. Mot. 28. Plaintiffs' reliance on *Hippocratic Medicine* is misplaced. In fact, that decision undercuts their case. There, the Supreme Court considered plaintiff medical associations' claims of organizational standing in the context of government action

they claimed impaired their ability to provide services and achieve their organizational mission. 602 U.S. at 393–94. The medical associations argued that the government action caused them to "expend considerable time, energy, and resources" to the detriment of their other priorities. *Id.* at 394. The Supreme Court held that the argument "does not work to demonstrate standing[,]" explaining that an organization cannot "spend its way into standing" and "manufacture its own standing in that way." *Id.*

Plaintiffs invoke *Hippocratic Medicine* for the proposition that organizational standing may be established where government action impairs its core activities. That passage, however, was taken from *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), which the Court in *Hippocratic Medicine* was careful to distinguish. *Id.* at 395–96.

*Havens* concerned a housing counseling organization's claim that an apartment complex owner had provided plaintiff's black employees false information about apartment availability "a practice known as racial steering." *Id.* at 395. The Court recognized that when defendant gave plaintiff's employees false information about apartment availability, that interfered with the plaintiff's ability to provide counseling services. The Court analogized that scenario to "a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* In *Hippocratic Medicine*, however, the Supreme Court concluded that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." *Id.*

Here too, *Havens* should not be extended. Plaintiffs CLEAR Clinic and PCUN lack standing to bring the claims asserted in the Preliminary Injunction Motion. Any minor and temporary deferrals in attorney access at the Oregon field offices does not affect the core "business functions" of organizational Plaintiffs where they can easily and expediently access those same detainees at the NWIPC by phone, tablet, virtual visitation, or an in-person meeting. Cantrell Decl. ¶¶ 12–14. Virtual and in person attorney appointments may be arranged online and detainees have phone and tablet access in the NWIPC's housing units. *Id.* Because the NWIPC provides a variety of mechanisms for attorney access, including 21 visitation rooms open year-round compared with the one to three rooms at the Oregon field offices with limited operating hours, Plaintiffs should expect to expend less time, money, and resources to carry out their core business functions by utilizing the NWIPC's amenities.

In Claim 1, Plaintiffs allege that "[i]ndividuals detained by Defendants have a right to hire and consult with attorneys." Am. Compl. ¶ 110. They further allege that Plaintiffs PCUN's individual members, Leon X, and proposed class members are harmed by these violations because they fear deprivation of their liberty and that CLEAR is harmed because they are "unable to provide pro bono legal services to people detained by ICE before they are transferred outside the state of Oregon." Am Compl. ¶¶ 112–13. These allegations and Plaintiffs' declarations do not support concrete and particularized harms incurred by Plaintiffs sufficient to establish standing. As the face of the Amended Complaint and Plaintiffs' Motion state, the

Fifth Amendment right to counsel is a right held by detained individuals—not their attorneys nor community organizations. *See, e.g., Laws. for Fair Reciprocal Admission v. United States*, 141 F.4th 1056, 1065 (9th Cir. 2025) (denying organizational standing in the Sixth Amendment context and concluding that the right attaches to the individuals, "not their lawyers"); U.S. Const. amend. V ("No *person shall be deprived* of life, liberty, or property, without due process of law[.]") (emphasis added).

No detainee is a party to this case. No current or prospective[5] CLEAR client is a named Plaintiff, nor has CLEAR provided any admissible evidence that any particular individual client is, or will be, imminently detained in a manner inconsistent with the Fifth Amendment. Even if CLEAR supplied such evidence, CLEAR would still lack organizational standing. Declarations from CLEAR and non-CLEAR attorneys providing vague and unverifiable anecdotes about past detainees are insufficient to establish an unconstitutional government pattern or practice reviewable under the APA. *See* Cantrell Decl. ¶¶ 26–28; Second Chan Decl. ¶¶ 35–40.

Similarly, Leon X and PCUN's generalized claim that they fear possible

---

[5] "Prospective" clients do not include hypothetical individuals who may at some undetermined point in the future engage with CLEAR Clinic about retaining one of their attorneys for legal services. The term "prospective client" means an individual who discussed with a CLEAR Clinic attorney about the possibility of forming an attorney-client relationship. *See* Or. Rules of Prof'l Conduct R.1.18. It is unclear whether any of the "prospective" clients identified in Plaintiffs' declarations satisfy the true definition of prospective client under Oregon's Rules of Professional Conduct.

future deprivation of their Fifth Amendment rights does not describe a concrete and particularized injury under Article III. *See Laird*, 408 U.S. at 13–14 ("Allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; the federal courts established pursuant to Article III of the Constitution do not render advisory opinions." ) (quotation marks omitted). Here, too, neither Leon X nor any named plaintiff that is a PCUN member has supplied admissible evidence demonstrating a concrete and particularized imminent harm under the Fifth Amendment.  The alleged harms to Plaintiffs PCUN, Leon X and by extension the class he purports to represent are even more conjectural and speculative here because they are not only contingent on a hypothetical arrest but also require that said individual be brought to an Oregon ICE field office where conditions during that short period are "tantamount" to the denial of counsel. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111–13 (1983); *Clapper*, 568 U.S. at 409–10 (recognizing that an injury must be "*certainly impending*" to constitute injury in fact); *infra* Part VI (discussing the lack of irreparable harm).

The arguments above apply with equal force to Plaintiffs' First Amendment claims. The declarations contain claims about minor and temporary access to counsel issues that are easy to allege but impossible to disprove. The declarations do not supply any identifying information about the individuals processed at the Oregon ICE field offices and they provide no corroborating documentary evidence of any communications with Defendants or these individuals. *See e.g.*, Cantrell Decl.

¶¶ 26–28 (addressing Plaintiffs' declarations' vague anecdotal and circumstantial factual assertions regarding the NWIPC); Second Chan Decl. ¶¶ 35–40 (same as to the Portland field office). Plaintiffs' unsupported declarations broadly describing the organizations' activities and secondhand anonymous individuals' anecdotes are insufficient to establish injury in fact to warrant the extraordinary relief of a mandatory injunction against the government. *Lujan*, 504 U.S. at 562–65 (recognizing that where the plaintiff is not the object of the government action, standing is "substantially more difficult" and concrete and particularized evidence of "actual or imminent" injury is required); *Clapper*, 568 U.S. at 409 (reiterating that "threatened injury must be *certainly impending* to constitute injury in fact" and that "allegations of *possible* future injury" are not sufficient) (cleaned up) (citations omitted).

### C. Plaintiffs are Unlikely to Succeed on the Merits of Their Fifth Amendment Right to Counsel Claim.

It is well-settled that not all aliens are similarly situated for purposes of the Fifth Amendment Due Process Clause. *See Mathews v. Diaz*, 426 U.S. 67, 78 (1976) (the mere fact that aliens are "protected by the Due Process Clause" does not necessarily mean they are all entitled to the same treatment, i.e., "that all aliens must be placed in a single homogeneous legal classification"). "[D]ue process" does not mean the same thing in all contexts. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "[T]he nature of protection[s] may vary depending upon status and circumstance[s]." *Zadvydas v. Davis*, 533 U.S. 678, 694 (2001). "Once it is determined that due process applies, the question remains what process is due. It

has been said so often by [the Supreme Court] and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey*, 408 U.S. at 481. Simply put: "claims of [due process] constitutional violations…[are] not always fully available to every claimant." *Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 39 (D.D.C. 2020), *dismissed sub nom. Las Americas Immigrant Advoc. Ctr. v. Mayorkas*, No. 20-5386, 2024 WL 3632500 (D.C. Cir. Aug. 1, 2024).

Removal proceedings are civil in nature and litigants in those proceedings retain no right to counsel under the Sixth Amendment, are not entitled to *Miranda* warnings, and are otherwise not entitled to the "full panoply of procedural and substantive safeguards which are provided in criminal proceedings[.]" *Lyon v. U.S. Immigr. & Customs Enf't*, 171 F. Supp. 3d 961, 975 (N.D. Cal. 2016) (quoting *United States v. Solano-Godines*, 120 F.3d 957, 960 (9th Cir. 1997)); *see also United States v. Barajas-Alvarado*, 655 F.3d 1077, 1088 (9th Cir. 2011).

There is no dispute that aliens in the United States are entitled to due process. What is disputed is what process is due. In their broad request for relief, Plaintiffs ask this Court to ignore decades of Supreme Court and Ninth Circuit authority holding that aliens subject to removal are not a monolithic group entitled to the same process. This Court should reject Plaintiff's invitation to rewrite the immigration laws.

i.      *The Due Process Right to Counsel Does Not Extend to All Aliens Arrested and Detained by the ICE Oregon Field Officers for Immigration Violations.*

Plaintiffs broadly claim that all "[i]ndividuals subject to civil immigration detention have a right to counsel that is rooted in the Due Process Clause of the Fifth Amendment to the U.S. Constitution." ECF No. 39 at 9, ¶ 25. That is an incomplete overstatement of the law.

Aliens in removal proceedings *before an immigration judge* have a *statutory* right to counsel. 8 U.S.C. § 1362 (granting "the privilege of being represented (at no expense to the Government) by such counsel . . . as he shall choose" only "[i]n any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceeding"); *see also* 8 C.F.R. § 1003.16 ("[T]he alien may be represented in proceedings before an Immigration Judge by an attorney or other representative of his or her choice . . . at no expense to the government.").

This includes aliens in full removal proceedings, whose right stems from constitutional roots. *See* 8 U.S.C. § 1229a(b)(4)(A) (providing the right to counsel in immigration judge removal proceedings); *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) (discussing immigration judge removal proceedings). It also includes aliens who see an immigration judge for a more limited purpose: reasonable- or credible- fear reviews or proceedings after being placed in truncated administrative actions to reinstate a prior removal order or to expeditiously remove the alien. *See* 8 U.S.C. § 1231(a)(5) (governing reinstatement of removal); 8 U.S.C. § 1208.31 (same);

*Orozco-Lopez v. Garland*, 11 F.4th 764, 777 (9th Cir. 2021) (discussing reasonable fear proceedings flowing from reinstatement of removal); 8 U.S.C. § 1225(b) (governing expedited removal); 8 C.F.R. §§ 235.3(b)(4), 235.6(a)(2); 208.30 (same). And it includes aliens in administrative removal proceedings who are subject to a different set of expedited procedures based on their illegal status and aggravated felony convictions, pursuant to 8 U.S.C. § 1228(b). *See* 8 U.S.C. § 1228(b)(4)(B) (providing the right to counsel); *Zuniga v. Barr*, 946 F.3d 464, 468-69 (9th Cir. 2019) (finding the right attaches to the administrative removal proceeding and any associated reasonable fear proceeding).

However, aliens have no right to counsel during the reinstatement of removal proceeding itself. *See* 8 U.S.C. § 1231(a)(5); *Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 497 (9th Cir. 2007) (en banc). Same goes for aliens in expedited removal proceedings who entered the United States without admission and cannot establish they have been here for more than two years. 8 U.S.C. § 1225(b); 8 C.F.R. § 235.3(b)(2)(ii) (aliens in expedited removal are "not entitled to a hearing before an immigration judge" except regarding credible fear appeals); *United States v. De La Mora-Cobian*, 18 F.4th 1141, 1146 n.1 (9th Cir. 2021) (no right to see an immigration judge); *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1088 (9th Cir. 2011) (no right to counsel in expedited removal); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140 (2020) (an alien in expedited removal after illegally entering the United States "has only those rights regarding admission that Congress has provided by statute"); *Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d

1352, 1354–55 (D.C. Cir. 2000) (same).

Similarly, aliens who have final orders of removal and are awaiting removal after release on orders of supervision have no right to counsel when supervision is withdrawn or revoked. 8 U.S.C. § 1231(a) (authorizing detention while the government works to execute the removal order); 8 C.F.R. § 241.13(i). It works like this: when an alien cannot be removed within the statutory 90-day period and there is no significant likelihood of removal within a six-month period, generally due to an uncooperating country of removal, the alien is released to await removal in the community, typically subject to an Order of Supervision. *Zadvydas*, 533 U.S. at 701 ("[a]fter this 6–month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing"); 8 C.F.R. §§ 241.13(b) (permitting the alien's release under an order of supervision), 241.13(h) (providing for conditions of release). Release can be withdrawn or revoked, usually when circumstances change and the government becomes able to execute the removal order. Governing regulations dictate the process, which does not include the right to counsel. 8 C.F.R. §§ 241.13(h)(4), (i); *see also* 241.4(l); *Garcia Uranga v. Barr*, No. 20-3162-JWL, 2020 WL 4334999, at *7 (D. Kan. July 28, 2020) (finding no due process violation when an individual detained under § 1231(a)(6) did not have his attorney present for 90-day Post Order Custody review).

Plaintiffs' complaint broadly groups all these aliens into a single category of arrestees with standardized universal rights. Binding case law has unequivocally

rejected this approach. The conduct and period alleged—"arrests and sweeps" occurring "over the past month," Am. Compl. ¶ 7, and "in recent months," *id*. at ¶ 6, includes aliens processed for, and otherwise subject to, reinstatement of removal and expedited removal, and aliens with final orders of removal whose supervision is withdrawn or revoked. Second Chan Decl. ¶ 15; Cantrell Decl. ¶ 23. There is no Fifth Amendment right to counsel for that swath of aliens. Plaintiffs nevertheless shelter under their broad complaint every alien in Oregon who is at risk of administrative arrest for any violation of the immigration laws, regardless of circumstances. *See* Am. Compl. pp. 42–43 (describing prayers for relief in broad terms to benefit "[a]ll persons who have been arrested or are at risk of arrest for alleged civil immigration violations in the district of Oregon by [ICE]"). An injunction tethered to this broad interpretation of due process would be unprecedented and in conflict with Supreme Court and Ninth Circuit case law.

Moreover, the conditions necessary for the right to counsel to eventually attach for a subset of the aliens within this broad group—those who can see an immigration judge regarding their claim of reasonable- or credible- fear—do not perfect at the Oregon field offices. The alien must first express a fear of persecution or torture in his home country or an intent to apply for asylum; the alien must be interviewed by an asylum officer; and the asylum officer must find the alien has a reasonable fear (reinstatement) or credible fear (expedited removal) of persecution or torture and refer the case to the immigration judge *or* the asylum officer must find no reasonable or credible fear *and* the alien must request review of that

decision. 8 C.F.R. §§ 208.31 (providing for reasonable fear process), 208.30 (providing for credible fear process). An alien might express fear at the field office during processing, but the other steps do not happen in that limited stop-over period. Cantrell Decl. ¶ 26. No binding case imposes a right to counsel during initial ICE arrest, processing, service of paperwork, or other non-adjudicatory steps.

Plaintiffs' broad prayer for universal relief in requiring access to counsel at the Oregon field offices for aliens who have no statutory or due process right to it must be denied.

### ii. *The Processing Procedures at the Oregon Field Offices Do Not Violate the Remaining Plaintiffs' Fifth Amendment Right to Access Counsel.*

Plaintiffs' fatally broad claims for relief fail even for aliens who are processed for immigration judge proceedings. They cite no authority for the notion that unrepresented aliens "have the [absolute] right to hire and consult with attorneys" or that due process requires that aliens "have adequate opportunities to obtain counsel and to visit and communicate with counsel once counsel is retained" *at the transitional processing center* on their way to the detention facility. Am. Compl. ¶¶ 110, 111. At its core, organizational Plaintiffs without pre-existing representational relationships with arrested aliens seek the court-ordered opportunity to introduce themselves and solicit clients, while individual and asserted class Plaintiffs seek the opportunity to be solicited, even if they do not ultimately hire counsel. Due process does not extend so far.

There is a constitutional difference between attorney access to unrepresented

aliens and attorney access to serve an existing attorney-client relationship. *See Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434 (9th Cir.), *amended,* 807 F.2d 769 (9th Cir. 1986) (transfer of unrepresented aliens to detention facilities outside the district does not violate due process nor does a transfer of a represented alien where the movement does not interfere with existing attorney-client relationships); *Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1061 (C.D. Cal. 2019) (distinguishing standards for represented and unrepresented claims).

Here, named representational Plaintiff Leon X claims to be represented, to have already received an immigration benefit from the Department of Homeland Security ("DHS"), and to have another application for immigration benefits pending. Declaration of Leon X ("Leon Decl."), ¶ 3, ECF No. 46 (claiming to have valid DACA status through mid-summer 2026 as well as a pending U-visa application), ¶ 8 (claiming to have attorneys who represent him). He thus presumably already has a G-28 on file establishing his attorney relationship and is not situationally similar to unrepresented asserted class Plaintiffs or the organizational Plaintiffs seeking to represent them. His due process claim is not the same, notwithstanding the commonality that the claims as to all Plaintiffs are grounded in speculation. What *might* happen *if* he is arrested is different than what might happen to an unrepresented alien who is arrested,[6] given the access to pre-existing attorneys ICE permits absent safety threats or operational exigency. Cantrell Decl. ¶¶ 20, 23, 27;

---

[6] Leon X does not claim that he could not extend his DACA status again at that time. Nor does he claim that, even if he was inadvertently arrested, ICE would process him and transfer him to Tacoma for removal while his DACA status is valid.

Second Chan Decl. ¶¶ 26–28, 31–32, 38–39; Cabrera Decl. ¶¶ 9–10, 23; Weiss Decl. ¶¶ 17–19, 22–23.

Moreover, the right to access counsel is violated only when conditions are "tantamount to denial of counsel." *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005); *United States v. Garcia-Villa*, No. 14CR1481WQH, 2014 WL 4955703, at *4 (S.D. Cal. Sept. 30, 2014) (due process rights were not violated by not being informed of "[the] right to consult with counsel" because it is not "tantamount to the denial of counsel" when the alien is not entitled to counsel); *Lyon*, 171 F. Supp. 3d at 965 ("[t]he Ninth Circuit has thus far only found violations of the statutory right to counsel where conditions were 'tantamount to denial of counsel'"); *Torres,* 411 F. Supp. 3d at 1060 ("To state a claim under § 1229 involving access to counsel, unrepresented plaintiffs must sufficiently allege conditions that are tantamount to denial of counsel") (internal punctuation omitted); *Immigrant Defs. L. Ctr. v. Mayorkas*, No. CV209893JGBSHKX, 2023 WL 3149243, at *27 (C.D. Cal. Mar. 15, 2023) (acknowledging "tantamount to denial of counsel" standard).

The deferral of unrepresented aliens' opportunity to meet with unretained potential counsel for the few hours it takes to process and transfer them to Tacoma, where their rights are fully vindicated, is not "tantamount to denial of counsel." *Biwot*, 403 F.3d at 1098; *Comm. of Cent. Am. Refugees*, 795 F.2d 1434 (9th Cir.); *cf Torres*, 411 F. Supp. 3d at 1060 (facility failed to comply with PBNDS, resulting in "overly restrictive telephone policies . . . restrictions on telephone access as well as difficulty with legal mail, in-person meetings, and numerous other obstacles" that

resulted in the inability of the named plaintiff to complete eight calls to try to seek an attorney); *Lyon*, 171 F. Supp. 3d at 975 ("evidence that telephone restrictions result in difficulty locating, retaining, and consulting with counsel" does not establish that these restrictions were "tantamount to the denial of counsel"). No court has found that deferred access at a Field Office during ministerial processing is "tantamount to the denial of counsel" for represented aliens either.

The standard transitional processing and transfer of aliens from the ICE Oregon field offices to the Tacoma detention facility do not involve the type of extraordinary circumstances found to have constitutionally interfered with right-to-access counsel in other cases. *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 559-567 (9th Cir 1990) (involving prolonged and nearly total prevention of, and interference with, Salvadorans' access to counsel at every stage of the process from failing to advise of the right to counsel, problems with the contact information and service of the list of free legal services, inadequate phone access coupled with a prohibition on receiving written material other than the New Testament and in-person impediments including long delays and unduly limiting attorney visitation hours, coercion to sign voluntary departure forms in interference with the right to apply for asylum, and more); *Immigrant Defs. L. Ctr. v. Noem*, No. 25-2581, 2025 WL 2017247, at *13 (9th Cir. July 18, 2025) (finding substantial harms where "Remain in Mexico" policy for asylum-seekers only allows aliens to consult with attorneys for one hour prior to the final hearing, the consultations were not confidential, aliens had to remain in Mexico facing extraordinary risks to personal

safety while proceedings were pending, and faced significant difficulty communicating with attorneys who were in the United States given expensive and unreliable internet and phone access).

Nor does this claim implicate the due process issues in cases where the field office serves as a de facto detention center. *See Mercado v. Noem*, No. 25-CV-6568 (LAK), 2025 WL 2658779 (S.D.N.Y. Sept. 17, 2025) (where New York field office converted into short-term detention center holding aliens for multiple days or weeks was unequipped to meet basic needs and did not provide for in-person or phone communication with existing attorneys); *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 867 (C.D. Cal. 2025) (aliens held in basement of field office not meant for long-term detention; existing attorneys were severely restricted or prohibited from accessing them).

Here, Plaintiffs malign ICE Oregon's efficient processing at, and transfer from, its transitional field offices in compliance with federal rules and state lease requirements, but expeditious process avoids the conditions and deprivation risks that occurred in those cases and ensures swift vindication of rights within hours in Tacoma. *See supra* Part IV.

Under these circumstances, brief deferral of access to counsel is not denial of counsel reaching constitutional magnitude. Defendant's claim fails the interest-balancing test. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (determining whether administrative procedures are constitutionally sufficient for due process purposes requires interest-balancing between the government and alien's interest). The sole

private interest at issue here—at least for the unrepresented aliens—is the opportunity to be informed of their rights by a third party and be solicited as a client, and for the organization to offer that information and solicitation to unknown, unretained aliens. But Plaintiffs' do not claim that ICE Oregon has a pattern and practice of failing to serve aliens with notification of their rights in the proceeding for which they are being processed, and aliens processed at the ICE Oregon field offices will have access to third party know-your-rights presentations and possibly counsel once they reach the detention facility. Second Chan Decl. ¶ 34; Cantrell Decl. ¶¶ 15–16.

There is no constitutional right to be solicited by counsel, certainly not at any specific time or place, thus this private interest is low. And any risk of erroneous deprivation in the briefly deferred interest is nominal, given full vindication of their opportunity to seek counsel at the detention facility and their ability to pursue whatever release and relief may be available to them in their individual circumstances through the normal administrative process mandated by the immigration laws. Even represented aliens, as a group, cannot establish a broadly overreaching interest that is significant or is at high risk of erroneous deprivation, given their varied circumstances and the same vindication of rights at the detention facility.

On the other hand, ICE's interest in the safe and efficient processing and transfer of aliens is high. *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) ("[t]he government's interest in efficient administration of the immigration laws . . . is

weighty"); *Bell v. Wolfish*, 441 U.S. 520, 540 (1979) ("The Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained. . . . For example, the Government must be able to take steps to maintain security and order at the institution. . . ."); *see also Wong Wing v. United States*, 163 U.S. 228, 235 (1896) ("Proceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character and while arrangements were being made for their deportation").

"The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy." *Landon*, 459 U.S. at 34-35. "[I]t would be improper simply to impose deportation procedures here because the reviewing court may find them preferable." *Id*. At its core, fairness requires an alien have the "opportunity to present her case effectively" but it "cannot impose an undue burden on the government." *Id*. at 36. Plaintiffs' claim strikes an unjustified balance.

### D. *Plaintiffs are Unlikely to Succeed on the Merits of Their First Amendment Claims.*

#### i. *Plaintiffs PCUN, Leon X, and Proposed Class Members are Unlikely to Prevail on Their First Amendment Claims*

Plaintiffs PCUN, Plaintiff Leon X, and proposed class members assert that they reasonably fear denial of access to counsel if they are detained, and that Defendants' policies and practices violate their First Amendment right to communicate with counsel. *See* Pls.' Prelim. Inj. Mot. 26-27. This argument lacks

merit on several grounds.

"[I]mplicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (collecting cases). The right of expressive association, however, "is not absolute." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Content-neutral restrictions on speech (*i.e.*, time, place, and manner restrictions) are subject to an intermediate level of scrutiny, and will be upheld if they advance "important governmental interests unrelated to the suppression of free speech and do [ ] not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997).

More specifically, First Amendment interests are subject to reasonable restrictions that serve legitimate government interests, such as maintaining security, operational efficiency, and facilitating timely transfers. *See NAACP v. Button*, 371 U.S. 415, 437 (1963); *Turner v. Safley*, 482 U.S. 78, 89 (1987). Under the Supreme Court's test in *Turner v. Safley*, courts uphold detention regulations as long as they are "reasonably related to legitimate penological interests[,]" considering (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it[,]" (2) "whether there are alternative means of exercising the right that remain open to prison inmates[,]" (3) "the impact accommodation of the asserted constitutional

right will have on guards and other inmates, and on the allocation of prison resources generally[,]" and (4) "the absence of ready alternatives[.]" *Id.* at 107. In determining whether there is a rational connection between a detention regulation and the governmental interest said to justify it, officials "need merely put forward a legitimate government interest and provide some evidence that the interest put forward is the actual reason for the regulation." *Casey v. Lewis*, 4 F.3d 1516, 1520–21 (9th Cir. 1993) (internal citation omitted).

Plaintiffs assert that Defendants' policies and practices violate their First Amendment rights to communicate with counsel. *See* Pls.' Prelim. Inj. Mot. 26–27. This is simply not the case; any temporary burden on Plaintiffs' ability to consult with an attorney serves important governmental interests. It is well-established that the government has an important interest in protecting its borders and enforcing the nation's immigration laws. *Kariye v. Mayorkas*, 650 F. Supp. 3d 865, 909 (C.D. Cal. 2022) (collecting cases). The government also has an interest in protecting the safety and security of its law enforcement officers and those it detains.

These pressing government interests satisfy the first factor of the *Turner* test. Given that the field offices in Oregon are not equipped to hold detainees for more than 12 hours, and in light of the disruptive protests that have created unsafe situations at the Portland field office, the government has a significant interest in transporting detainees as quickly as possible to a detention facility. *See* Second Chan Decl. ¶ 37. Any short-lived disruptions in Plaintiffs' ability to consult with

counsel are the result of necessary booking and transfer activities and legitimate

safety-related concerns, and do not overly burden detainees' access to counsel in

connection with immigration proceedings. As a matter of policy, ICE does not deny

access to counsel and grants access to attorneys presenting valid Form G-28s where

feasible. Second Chan Decl. ¶ 27. However, some constraints on attorney access are

unavoidable due to operational, logistical, and security reasons. Second Chan Decl.

¶¶ 28–32; Cabrera Decl. ¶¶ 19–23; Weiss Decl. ¶¶ 19–23.

Likewise, factors two, three, and four of the *Turner* test are also satisfied.

Factor two considers whether there are alternative means of exercising the First

Amendment right that remain available to detainees. The Oregon field offices

accommodate in-person attorney visits and phone calls when feasible, but when

they are not possible, detainees have several options to communicate and meet with

counsel once they reach NWIPC. Cantrell Decl. ¶¶ 12–14; Second Chan Decl. ¶¶ 14–

18; Cabrera Decl. ¶¶ 9–14; Weiss Decl. ¶¶ 9–14. Factor three considers the impact

that accommodation of the asserted constitutional right will have on guards and

other inmates, and on the allocation of prison resources generally. Here, detainees

can be held for no more than twelve hours before they are transferred to NWPIC.

Second Chan Decl. ¶¶ 7–8. If their transit were delayed in order to permit all

detainees to first retain and consult with counsel, detainees not transported to

NWIPC within that time limit would have to be released regardless of any

individualized determination of whether that individual has lawful status to remain

in the United States. Factor four considers the absence of ready alternatives.

Because of the twelve-hour time limit and the time needed for booking and processing tasks, there are not viable alternatives to transporting detainees to NWIPC within that time limit.

Plaintiffs cite *Torres v. U.S. Department of Homeland Security* in support of their argument that even where detained people have some ability to communicate with counsel, restrictive conditions on access to counsel impermissibly burden their First Amendment rights. *See* Pls.' Prelim. Inj. Mot. 26-27 (citing *Torres v. U.S. Department of Homeland Security*, 411 F. Supp. 3d. 1036 (C.D. Cal. 2019)). However, *Torres* is inapplicable to the present situation at the Oregon field offices. The conditions at issue in *Torres* "hinder[ed] attorneys from speaking with clients for days or weeks." *Id.* at 1044. By contrast, due to the absence of in-state detention facilities and the 12-hour limit within ERO's three field offices in Portland, Medford, and Eugene, detainees apprehended in Oregon are transferred to NWIPC within hours of processing. Second Chan Decl. ¶¶ 11–12; Cabrera Decl. ¶¶ 6–8; Weiss Decl. ¶¶ 6–8. A majority of the time detainees spend at the Oregon field offices involves booking and processing activities prior to transfer to NWIPC. Second Chan Decl. ¶¶ 13–14; Cabrera Decl. ¶¶ 8–9; Weiss Decl. ¶¶ 8–9. Once detainees arrive at NWIPC, that facility provides in-person and virtual attorney access that enables legal representatives to schedule client meetings in advance and add interpreters to calls, videoconferencing for attorney visits, and legal orientation programs. Cantrell Decl. ¶¶ 11–16. Thus, a detainee who cannot access counsel during their brief stay at one of the Oregon field offices will nevertheless have

access to a variety of communication resources once they arrive at NWIPC shortly thereafter. Unlike the restrictive conditions on access to counsel described in *Torres*, any restrictions on access to counsel experienced by detainees in Oregon are necessarily temporary, unavoidable, and reasonably connected to a valid government interest.

Likewise, Plaintiffs cite *Mercado v. Noem* for the finding that the *Mercado* plaintiffs were likely to succeed in showing that ICE's restrictions on attorney-client communications in a New York detention facility violated the First Amendment. *See* Pls.' Prelim. Inj. Mot. 25 (citing *Mercado v. Noem,* No. 25-cv-06568 (S.D.N.Y. Sept. 17, 2025)). Unlike the present situation in Oregon, the *Mercado* plaintiffs reported that detainees might remain at the New York facility for up to 20 days, that in-person visits were prohibited, that attorneys had been unable to contact their clients at the facility for up to a week, and that calls were time-restricted and non-confidential. *Id.* at 9. This is very different from the situation at the Oregon field offices, where detainees can be held for no more than twelve hours before they are transferred to NWPIC. Second Chan Decl. ¶¶ 10–12. Even for detainees who are unable to contact counsel from the Oregon field offices before transfer, any delay in access to counsel is brief, unavoidable, and reasonably connected to a valid government interest.

While attorney access may not be immediate for some detainees at the Oregon field offices, any delays are quickly remedied after transport. Cantrell Decl. ¶¶ 12–14. Accordingly, Plaintiffs have not alleged a First Amendment violation

under *Turner v. Safley*.

    ii.    *Plaintiff CLEAR Clinic is Unlikely to Prevail on its First Amendment Claim.*

Plaintiff CLEAR Clinic also alleges a First Amendment violation because on certain occasions, CLEAR Clinic personnel have been unable to communicate with prospective clients due to their imminent transfer from the field offices. *See* Pls.' Prelim. Inj. Mot. 28. This argument is unlikely to succeed on the merits for several reasons.

As a threshold issue, the Oregon Rules of Professional Conduct define the term "prospective client" to mean "a person who consults with a lawyer about the possibility of forming a client-lawyer relationship with respect to a matter." *See* Or. Rules of Prof. Conduct r.1.18(a). By contrast, as Plaintiffs use the term, CLEAR Clinic's "prospective clients" encompass any hypothetical individuals who may at some undetermined point in the future engage with CLEAR Clinic about retaining one of their attorneys for legal services. Plaintiffs' "prospective clients" could include anyone, and they provide little evidence that the detainees they wish to contact are either actual or prospective clients. Notably, Plaintiffs have not argued that specific prejudice resulted from any restrictions to accessing the detainees; indeed, such an argument would be speculative and hypothetical, given that no attorney-client relationship existed with the detainees they characterize as "prospective clients."

Plaintiffs also contend that CLEAR Clinic "lost the opportunity to advise" detainees "of their legal rights and is unlikely, without great additional effort, to be able to locate them and provide follow-up legal services." *See* Pls.' Prelim. Inj. Mot.

at 16. Regardless of whether these detainees were prospective clients, this is not a cognizable First Amendment claim. Moreover, the government provides a mechanism for locating detainees in that it maintains an online detainee locator system through which attorneys can locate clients or potential clients. Cantrell Decl. ¶¶ 17–22.

Plaintiffs cite several cases in support of their argument that their rights to solicit potential clients, to advocate lawful means of vindicating legal rights, and to disseminate information have been violated by the transfer of detainees to NWIPC. *See* Pls.' Prelim. Inj. Mot. 27–28 (citing *NAACP v. Button*, 371 U.S. 415 (1963); *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011); *In re Primus,* 436 U.S. 412 (1978)) The implication is that any restriction on communication between an attorney and a potential client always implicates profound First Amendment interests that only a compelling state interest can justify.

Indeed, if the restrictions on speech alleged by Plaintiffs were content-based restrictions, they would only be justified if they were narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015) (citations omitted). Yet, the restrictions alleged by Plaintiffs are not content based. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227 (citing *Sorrell v. IMS Health*). Laws that appear content-neutral but "cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message the

speech conveys" are also considered content-based. *Id.* (citations and internal quotations omitted). By contrast, the restrictions Plaintiffs complain of do not concern the subject matter of the speech in question, but are content-neutral restrictions that, under the *Turner* test, are upheld if they advance "important governmental interests unrelated to the suppression of free speech and do [ ] not burden substantially more speech than necessary to further those interests." *Turner Broadcasting System* at 189.

The time, place, and manner restrictions that Plaintiffs complain of are nothing like the content-based regulations that expressly govern the content of speech and conduct in the cases they cite. For example, in *NAACP v. Button*, the statute under review prohibited solicitation of legal business on behalf of an organization. *NAACP v. Button* at 419. *Sorrell v. IMS Health* concerned a law prohibiting the sale of prescriber-identifying information by pharmacies for marketing purposes but permitted the data to be disseminated and used for other purposes, such as medical research. *Sorrell v. IMS Health* at 557. *In re Primus* concerned ethical rules against soliciting legal business on behalf of an advocacy organization. *In re Primus* at 432-39.

These scenarios are very different from the present situation. Here, Plaintiffs assert that quickly transferring detainees out of Oregon impedes CLEAR Clinic's ability to communicate with prospective clients. *See* Pls.' Prelim. Inj. Mot. 28. However, such transfers are not express restrictions on attorney speech or expressive conduct. Rather, they are a reflection of an administrative decision (*i.e.,*

to transport detainees to NWIPC as quickly as practicable) that happens to impact CLEAR Clinic's ability to solicit clients. Moreover, Plaintiffs offer no evidence that the transfers "cannot be justified without reference to the content" of their speech. *See Reed* at 2227. The timing of transport for any given detainee is determined entirely by practical considerations. Accordingly, strict scrutiny does not govern this claim.

Furthermore, none of the Oregon holding facilities are public forums. When the government opens up a nonpublic forum for a limited public purpose, it "may impose some content-based restrictions on speech[.]" *Minn. Voters All. v. Mansky*, 585 U.S. 1, 12 (2018). "Jails, built for security purposes, are not [open to the public]," and neither are Oregon's holding facilities. *Adderley v. State of Fla.*, 385 U.S. 39, 41 (1966). "[T]he 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.'" *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) (quoting *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981)). The government may limit the use of properties under its control to the uses to which the properties are lawfully dedicated. *See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679 (2010) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)). Thus, the government is not required to provide unfettered and immediate access to potential legal service providers as long as the restrictions are reasonable and not content-based. *See Perry Educ. Ass'n*, 460 U.S. at 46.

Plaintiff CLEAR Clinic has not alleged a cognizable First Amendment

Violation. None of the operational, logistical, or security considerations that dictate

the timing of transport constitute content-based restrictions on speech, and any

restrictions on attorney access serve important governmental interests unrelated to

the suppression of free speech.

## VI.    Plaintiffs Fail to Establish a Likelihood of Irreparable Harm

To meet their burden for a preliminary injunction, Plaintiffs must

"demonstrate that irreparable injury is *likely* in the absence of an injunction."

*Winter*, 555 U.S. at 22 (emphasis in original). "Speculative injury does not

constitute irreparable injury sufficient to warrant granting a preliminary

injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.

1988). This is because a preliminary injunction is an "extraordinary remedy that

may only be awarded upon a clear showing" that Plaintiffs are "entitled to such

relief." *Winter*, 555 U.S. at 22. Courts cannot presume irreparable harm: there must

be a satisfactory showing— "No such thumb on the scales is warranted." *Monsanto*

*Co.*, 561 U.S. at 157. "Allegations of irreparable harm must be supported with

actual evidence, and not merely conclusory statements or unsupported allegations."

*Nevada v. United States*, 364 F. Supp. 3d 1146, 1151 (D. Nev. 2019).

Plaintiffs' alleged infringements of constitutional and statutory rights are

insufficient to establish irreparable harm where the plaintiffs have not

demonstrated a likelihood of success to warrant an injunction. *Associated Gen.*

*Contractors of California, Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th

Cir. 1991). As discussed above, Plaintiffs are unlikely to succeed on the merits of their Fifth and First Amendment claims. *See Supra* Parts V.A–D.

Because Plaintiffs' claimed fears of future arrest and potential temporary deferral of attorney access do not provide concrete and particularized injuries to establish standing, so too do they fall short of demonstrating irreparable harm. Leon X admits he has no lawful status to remain in the U.S. and could theoretically be subject to removal. *See* Leon Decl. ¶ 3. Assuming this incomplete and unverifiable information about his immigration status is correct, a hypothetical apprehension and initiation of removal proceedings could be lawful but is unlikely given the two sources of deferral (DACA and the U-Visa) that may be applicable to him. Therefore, Leon X's fear of lawful apprehension does not describe a constitutional injury supporting irreparable harm. This applies to the putative class and PCUN members as well who might lack lawful status to remain in the United States. Plaintiffs do not challenge the arrests, have not brought Fourth Amendment claims, and therefore cannot claim the speculative fear of arrest and its potential chilling effects as irreparable harms. The Plaintiffs here are "no more entitled to an injunction" than any other in Oregon "and a federal court may not entertain a claim" by those "who no more than assert that certain practices of law enforcement officers are unconstitutional." *City of Los Angeles*, 461 U.S. at 111–13; *see also Clapper*, 568 U.S. at 409–10. By extension, Plaintiffs' claimed irreparable harms stemming from access to counsel issues at the Oregon field offices are conjectural and not sufficiently concrete and particularized to establish any harm,

let alone irreparable harm warranting extraordinary injunctive relief. *See supra* Part V.B.

Likewise, claimed apprehension about being transferred to the NWIPC and other ICE detention facilities does not establish certainly impending irreparable harm. *See* Pls.' Prelim. In. Mot. 19, 22–24. Plaintiffs primarily rely on *Vasquez Perdomo v. Noem*, involving alleged facility conditions not presented here by individually named plaintiffs who been arrested and detained. *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 867 (C.D. Cal. 2025). That facts of that case are distinguishable, the district court erred, and the parties continue to litigate on appeal up to the Ninth Circuit and Supreme Court. Additionally, Plaintiffs cannot challenge Defendants' well-established discretionary authority to determine the location of detention and transfer detainees. *See supra* Part II.

Plaintiffs also claim they will suffer irreparable harm in the forms of expended attorney "time, money, and resources." Am. Compl. ¶ 84. In their Motion, CLEAR Clinic recasts these alleged harms as their "core business activities" in an attempt to circumvent well-established precedent that such financial harms are per-se reparable. *See* Pls.' Prelim. Inj. Mot. 30–31. "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). For the same reasons discussed above regarding lack of concrete injury in the standing context, here too Plaintiffs cannot claim irreparable harm in the form of speculative and hypothetical future

constitutional injuries to non-parties. *See supra* Part I (citing *Hippocratic Med.,* 602 U.S. at 393–94 (recognizing that impaired ability to provide services and achieve their organization mission are insufficient)).

Moreover, there are adequate legal remedies available to Plaintiffs and their alleged harms are reparable. Plaintiffs claim no access to monetary remedies; however, they may bring actions under the Federal Tort Claims Act, 28 U.S.C. § 1346, 2671-80, and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), seeking money damages for alleged tortious and unconstitutional conduct. Additionally, the INA's zipper clause gives immigration courts exclusive jurisdiction over access-to-counsel claims related to immigration proceedings. *See Supra* Part V.A.ii; *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031–35 (9th Cir. 2016).

## VII. The Balance of Equities and Public Interest Disfavor a Preliminary Injunction

In preliminary injunction proceedings, a party seeking injunctive relief "must [also] establish . . . that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. To determine how the balance of equities tips, "a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Hawai'i Pro. Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). A court must then weigh "the hardships of each party against one another[.]" *Id*. "In exercising their sound discretion, courts of equity should pay particular regard for

the public consequences in employing the extraordinary remedy of injunction."
*Winter*, 555 U.S. at 24 (internal quotation omitted).

But, even if Plaintiffs could satisfy one or both of the first two factors, the remaining factors tip decisively in Defendants' favor. There is a recognized public interest in the enforcement of United States law, including the immigration laws. Indeed, "[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (cleaned up); *see also Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2581 (2025) (quoting the same).

"In considering [the merged final two stay factors], courts must be mindful that the Government's role as the respondent in every removal proceeding does not make the public interest in each individual one negligible[.]" *Nken v. Holder*, 556 U.S. 418, 435–36 (2009); *see also Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant."). The government has a compelling interest in the steady enforcement of its immigration laws. *See, e.g., Demore v. Kim*, 538 U.S. 510, 523 (2003); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (holding that the court "should give due weight to the serious consideration of the public interest" in enacted laws); *see also Ubiquity Press Inc. v. Baran*, No 8:20-cv-01809-JLS-DFM, 2020 WL 8172983, at *4 (C.D. Cal. Dec. 10, 2020) (explaining that "the public interest in the United States' enforcement of its immigration laws is high"); *United States v. Arango*, No. CV 09-178 TUC DCB,

2015 WL 11120855, at 2 (D. Ariz. Jan. 9, 2015) (finding that "the Government's interest in enforcing immigration laws is enormous").

Additionally, restrictions on the Government's enforcement of immigration laws constitutes irreparable harm, "particularly given the millions of individuals illegally in the United States, the myriad 'significant economic and social problems' caused by illegal immigration and the Government's efforts to prioritize stricter enforcement of the immigration laws enacted by Congress." *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *4 (U.S. Sept. 8, 2025) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)) (citation omitted).

Moreover, in the context of detention, the Supreme Court has recognized that such problems "require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Procunier v. Martinez*, 416 U.S. 396, 404–05 (1974), *overruled by Thornburgh v. Abbott*, 490 U.S. 401 (1989). "[C]ourts," by contrast, "are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Id.* at 405.

The speculative risks of harms to Plaintiffs and other hypothetical individuals not before this Court must be weighed against the obstruction of legitimate government functions that could result if the Court entered Plaintiffs' proposed injunction. *See Winter*, 555 U.S. at 24. The possible harms to Defendants by an injunction here are especially acute given that the injunction Plaintiffs propose would have the predicable effect of requiring the release of individuals for

whom Defendants have probable cause to arrest. While it is "always in the public interest to protect constitutional rights," effectively preventing transfer to the NWIPC would not actually protect those rights. *See Innovation L. Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1163 (D. Or. 2018). But doing so would drastically undermine the public interest in enforcement of existing laws and protection of public safety. *See Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005).

## VIII. Plaintiffs' Proposed Injunction is Improper.

Plaintiffs' proposed injunction is overbroad, duplicative of Defendants' preexisting programs, and unworkable. *See* Second Chan Decl. ¶¶ 41–43; Cabrera Decl. ¶¶ 24–26; Weiss Decl. ¶¶ 24–26. Even if the Court were to disagree with Defendants' arguments and conclude an injunction was appropriate, any preliminary relief granted must be no broader than necessary to remedy any demonstrated irreparable harms to Plaintiffs in this case. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018); *see also California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018) ("highlight[ing] several concerns associated with overbroad injunctions"). Generally, the Court lacks jurisdiction to order class-wide injunctive relief in this matter and is limited to orders regarding individual aliens. *See supra* Part V.A.i; 8 U.S.C. § 1252(f)(1); *Aleman Gonzalez*, 596 U.S. at 548–50.

Plaintiffs demand for injunctions requiring additional attorney access and legal group presentations at the Oregon field offices are based on standards that do not apply. Plaintiffs cite the PBNDS in their Amended Complaint and at the TRO hearing to justify their requested relief. *See* Am. Compl. ¶¶ 24, 30–32; TRO Tr.

12:18–24; 16:15–17:3; 19:15–20:7; 21:19–22:4; 29:5–23, ECF No. 37. Tellingly, those

same standards are entirely absent from the Preliminary Injunction motion

because, as Plaintiffs know, they *do not apply to the Oregon field offices*. The

PBNDS only apply to detention centers and certain facilities where individuals are

held for more than 72 hours. *See* PBNDS §§ 1.1, 5.7, 6.4. And the reason for this is

clear, requirements regarding robust attorney access and legal group presentations

are meant for long-term detention facilities where those standards can be

reasonably met and not for pit stops at the Oregon field offices on the way to the

detention center. There is no legal or factual basis to disrupt this regulatory scheme

for facility standards by imposing requirements on the Oregon field office that they

are exempted from by design.

Turning to Plaintiffs' proposed injunction, Defendants will address each

component in the order it was presented. *See* Pls.' Prelim. Inj. Mot. 32–34.

## A.    *Notice*

Plaintiffs demand an injunction that is duplicative of ICE's preexisting

measures to provide detainees with access to pro bono counsel and it gives Plaintiff

CLEAR Clinic[7] unwarranted, impractical, and exclusive preferential access to

unrepresented individuals over attorneys on the EOIR list. *See* Pls.' Mot. 31–32.

First, Plaintiffs request that Defendants provide notice of pro bono attorney. *Id.* at

31. Defendants already provide detainees at all Oregon field offices with the EOIR

---

[7] While the injunction is written broadly to give *all* Plaintiffs, including PCUN, Leon X, and putative class members, access to individual detainee's information, Defendants construe the request as applying solely to Plaintiff CLEAR Clinic.

list of pro bono legal service providers as well as phone access to contact counsel if they so wish. Second Chan Decl. ¶ 17; Cabrera Decl. ¶ 10; Weiss Decl. ¶ 10. This is also done again at the NWIPC. Cantrell Decl. ¶ 12. Plaintiff CLEAR Clinic has indicated that they are part of an organization already included in the EOIR list. *See* Pls.' Prelim. Inj. Mot. 6–7.

Plaintiff CLEAR Clinic also requests that Defendants allow document passing at the field offices and provide all documents related to the arrest and detention. Presumably this request is premised on guaranteeing in-person meetings at the field offices with detainees who request counsel. Defendants may serve a variety of notices and documents during processing depending on the circumstances and type of processing being conducted in each case. Second Chan Decl. ¶ 33. Detained individuals are provided with copies of documents unless they elect to have them put with their property to be retrieved upon arrival at the NWIPC. *Id.* Detainees and their attorneys are free to request the detainee's Immigration Court files from EOIR or submit a FOIA request.[8] *See* Cantrell Decl. ¶ 11 (National Handbook 38–39).

Because the majority of detainees' time at the field offices is spent in processing, it is not feasible to guarantee that Plaintiff CLEAR Clinic will gain exclusive priority in-person access to detainees in the limited available visitation rooms before the detainees are transferred to the NWIPC. Second Chan Decl. ¶¶

---

[8] NWIPC, *FOIA*, *available at* https://www.ice.gov/detain/detention-facilities/northwest-ice-processing-center-nwipc

26–32; Cabrera Decl. ¶¶ 19–26; Weiss Decl. ¶¶ 19–26.

Plaintiffs also request that Defendants provide notice of KYR sessions at the field offices and allow detainee attendance prior to transfer. *See* Pls.' Prelim. Inj. Mot. 32–33. This request is impossible to accommodate and is preemptive and duplicative of the twice weekly KYR presentations put on by a different immigration attorney group, NWIRP, at the NWIPC. *See* Cantrell Decl. ¶¶ 15–16; Second Chan Decl. ¶¶ 23, 41–43; Cabrera Decl. ¶¶ 15–16; 24–26; Weiss Decl. ¶¶ 15–16, 24–26. Such relief would effectively allow Plaintiff CLEAR Clinic to dictate who gets processed and when, giving the group the ability to delay and even prevent detainee transfer to the NWIPC if said detainee had not yet attended one of their KYR presentations and one-on-one attorney sessions by the time transportation arrives.

This request also short-circuits the PBNDS requirements regarding legal group presentations applicable to the NWIPC. *See* PBNDS § 6.4 (providing detailed requirements for approval of legal group presentation requests, presentation guidelines, approval of written materials, and a process for suspending or terminating such presentations). Plaintiff CLEAR Clinic requests carte blanche to conduct unlimited KYR presentations unapproved by Defendants, monopolize the limited visitation space over all competing demands, and delay or prevent required transfer to the NWIPC.

## B. *Time*

Plaintiffs demand 12-hours of attorney access from 8:00a.m. to 8:00p.m.

seven days a week at all the Oregon field offices. *See* Pls.' Mot. 33. This request

ignores the realities that such access is impossible at those facilities and that

NWIPC provides in-person and VAV attorney meeting spaces in its 21 visitation

rooms from 8:00a.m. – 10:00p.m., seven days per week including holidays. Cantrell

Decl. ¶ 14. The Oregon field offices have limited hours in which they are open to the

public and access to those buildings is limited by local land use regulations, leasing

agreements, the buildings' private owners, and independent security contractor

operations. Second Chan Decl. ¶¶ 20–21; Cabrera Decl. ¶¶ 6, 12; Weiss Decl. ¶¶ 12–

13. ICE makes every effort to accommodate attorney access through phone calls

during hours when the buildings are not open. Second Chan Decl. ¶ 21; Cabrera

Decl. ¶ 11; Weiss Decl. ¶ 11.

### C.   *Space*

Finally, Plaintiffs demand exclusive access to the field office's visitation

rooms—three in Portland and one in Eugene and Medford respectively—to conduct

group orientations and individual attorney access. *See* Pls.' Prelim. Inj. Mot. 33. As

discussed above, these visitation rooms are not large enough to accommodate group

presentations. *See supra Part* IV; Second Chan Decl. ¶¶ 22–23; Cabrera Decl. ¶¶

14–15; Weiss Decl. ¶¶ 14–16. Additionally, mandating that all detainees be allowed

to attend a KYR session and engage in an in-person attorney visit with Plaintiff

CLEAR Clinic for an hour is unduly burdensome and will unreasonably interfere

with Defendants' booking, processing, and prompt transfer of detainees to the

NWIPC where Detainees will have even greater access to counsel than what

Plaintiffs demand here. Second Chan Decl. ¶¶ 41–43; Cabrera Decl. ¶¶ 24–26; Weiss Decl. ¶¶ 24–26.

## IX.    Plaintiffs Must Post a Bond

If the Court is inclined to grant a preliminary injunction, it must do so "only if the movant gives security in an amount that the court considers proper to pay the posts and damages sustained by any party to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Accordingly, the Court should require Plaintiffs to post a bond pursuant to Rule 65(c).

**CONCLUSION**

Based on the foregoing, Defendants respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction, ECF No. 40.

DATED this 26th day of November 2025.

SCOTT E. BRADFORD
United States Attorney
District of Oregon

*/s/ Michael J. Jeter*
MICHAEL J. JETER
Assistant United States Attorney
Attorneys for Defendants

## WORD COUNT CERTIFICATE

The preceding memorandum complies with the applicable word-count limit under LR 7-2(b), because it contains 17,251 words, based on the word-count function of the word processing system used to prepare the memorandum. This word count includes headings, footnotes, and quotations, but excludes the caption, table of contents, table of authorities, signature block, and certificates of counsel.

Respectfully submitted this 26th day of November 2025.

SCOTT E. BRADFORD
United States Attorney
District of Oregon

*/s/ Michael J. Jeter*
MICHAEL J. JETER
Assistant United States Attorney
Counsel for Defendants