**SCOTT BRADFORD, OSB # 062824**
United States Attorney
District of Oregon
**SARAH E. FELDMAN, OSB # 141458**
**MICHAEL J. JETER, OSB # 165413**
Assistant United States Attorneys
Sarah.Feldman@usdoj.gov
Michael.Jeter@usdoj.gov
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2936
Telephone: (503) 727-1000
        Attorneys for Respondents

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

|  |  |
|---|---|
| **CLEAR CLINIC; PINREOS Y CAMPESINOS UNIDOS DEL NOROESTE, and LEON X, on behalf of all similarly situated people,** | Case No.: 6:25-cv-01906AA **SECOND DECLARATION OF ASSISTANT FIELD OFFICE DIRECTOR JEFFREY CHAN** |
| Plaintiffs, | |
| v. | |
| **KRISTI NOEM; TODD LYONS; CAMMILLA WAMSLEY; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION,** | |
| Defendants. | |

I, Jeffrey Chan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am employed as an Assistant Field Office Director ("AFOD") with the

U.S. Immigration and Customs Enforcement ("ICE"), Enforcement and Removal

Operations ("ERO") division, assigned to the Portland Office, which falls under the Seattle Field Office Area of Responsibility ("AOR"). I have been employed by ICE since 2006, but employed in Oregon since 2008, and have held various ERO roles involving detention, processing, and removal operations. I have been an AFOD in Portland since June 2024. My duties include overseeing the intake, processing, and transfer of noncitizens detained in Oregon, ensuring compliance with ICE policies, federal laws, and local agreements. I am familiar with the operations of the Portland Field Office located at 4310 SW Macadam Avenue, Portland, OR, as well as ICE's processing, detention and transfer policies, guidance and protocols.

2.      This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("PI") and sets out the current conditions in Oregon with respect to immigration enforcement operations, including ICE's detention and transfer practices in Oregon, access to counsel for individuals arrested in Oregon, and the operational constraints that make the requested relief infeasible and contrary to law. I have reviewed Plaintiff's motion for PI and supporting exhibits.

3.      The statements in this declaration are based on my personal knowledge, information provided to me in the course of my official duties, and records maintained by ICE in the ordinary course of business

**Background**

4.      ICE is the largest investigative branch of DHS and is charged with enforcement of more than 400 federal statutes. The agency was created after the

September 11, 2001, terrorist attacks, by combining components of the former
Immigration and Naturalization Service and the former U.S. Customs Service,
among other agencies, to more effectively enforce federal immigration and customs
laws and to protect the United States against terrorist attacks. The mission of ICE
is to protect the United States from the cross-border crime and illegal immigration
that threaten national security and public safety. To carry out that mission, ICE
focuses on enforcing immigration laws, preventing terrorism, and combating
transnational criminal threats.

5.      ERO is one of three core operational directorates in ICE. ERO
deportation officers are immigration officers under 8 U.S.C. § 1357 and have been
delegated limited customs officer authority under 19 U.S.C. § 1589a. It is the
mission of ERO to identify, arrest, and remove aliens who present a danger to
national security or are a risk to public safety, as well as those who enter the
United States illegally—including those who cross the border illegally, which is a
federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having
been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine
the integrity of our immigration laws and our border control efforts.

6.      The majority of ERO's immigration enforcement operations take place
in the interior of the country. ERO manages all logistical aspects of the removal
process by identifying, apprehending, and, when appropriate, detaining removable
aliens during the course of immigration proceedings and pending physical removal
from the United States. This includes locating and taking into custody fugitive

aliens and at large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

## Immigration Enforcement & Detention in Oregon

7.    Oregon's sanctuary laws and policies, including ORS §§ 180.805, 181A.820, 181A.823, and 181A.826, prohibit local governments, private entities, and law enforcement agencies from entering into agreements with ICE for immigration detention services. Consequently, with no dedicated facilities in operation within Oregon, ICE is no longer capable of providing overnight or dedicated long-term immigration detention space in the state. The last facility providing immigration detention services in Oregon, Northern Oregon Regional Corrections ("NORCOR"), ended its contract with ICE in 2020.

8.    As a result, ICE relies solely on short-term 12-hour maximum holding areas within ERO's three field offices in Portland, Medford and Eugene. The field offices are processing offices and, as such, the holding rooms within them are not designed or equipped for routine overnight or extended detention. They do not provide routine access to beds, showers[1], on-site medical clinics and mental health care, full-service kitchens, law libraries, virtual visitation equipment, and

---

[1] As an exception, the Portland ERO Office has one shower available in its hold room, which does not allow for separate shower facilities for male and female detainees.

recreational areas typically found in detention facilities equipped for long term detention programs and services.[2]

9.      None of three Oregon offices are routinely staffed on a 24-hour basis and none have adequate personnel levels to provide 24-hour staffing for detention purposes.

10.      The Portland ERO Office's hold rooms operate pursuant to a conditional use permit issued by the City of Portland, which explicitly limits detainee holds to no more than 12 hours. This condition was incorporated into the facility's approval process and has been in place since the office's establishment. ICE has adhered to this limit in almost all cases, with any exceptions being rare, inadvertent, and resulting from exigent circumstances.

11.      Due to the absence of in-state detention options and the 12-hour limit, detainees processed in Oregon are transferred to the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington, the closest immigration detention facility.

12.      In practice, most Oregon detainees are transferred within hours of processing[3] to ensure compliance with local rules, to provide access to full detention programs at the NWIPC, as required by ICE's national detention standards at the

---

[2] The 12-hour limit has been exceeded in the past, but only in emergency situations, such as inclement weather, or other operations emergencies that result in prohibitions on transfer within the 12 hours. In those situations, ERO does make special accommodations to provide appropriate facilities and care for emergency extended stays. ERO is unable to provide appropriate facilities for extended stays on a routine basis.

NWIPC (including beds, showers, onsite medical care, outdoor recreated, etc. as mentioned above) and for a variety of other logistical and operational reasons.

13.     The time an individual spends at the processing office varies based on a number of factors, including whether the individual is cooperative, the number of individuals awaiting processing at that time, the number of ICE personnel available to conduct and complete processing, and the availability and timing of transport. It can be as little as 30 minutes to an hour or it may be several hours. ICE is currently running more than one transport from the Portland ERO office every day.

**Attorney Access in the Portland ERO Office**

14.     Attorney access to an individual in ICE custody is limited while ERO is actively booking and processing the individual, which often accounts for the majority of time spent in the Portland office prior to transfer to the NWIPC. This process includes recording personal information, conducting criminal history checks, taking photographs and fingerprints, and performing screening interview for medical and mental health assessments.

15.     Not all individuals arrested by ICE in Oregon are processed for removal proceedings before an immigration judge pursuant to 8 U.S.C. § 1229a. For example, ICE also processes aliens for expedited removals pursuant to 8 U.S.C. § 1225(b); reinstatement of removal pursuant to 8 U.S.C. § 1231(a)(5), administrative removal pursuant to 8 U.S.C. § 1128, and visa waiver removals pursuant to 8 U.S.C. § 1187. ICE may also exercise its discretion and take aliens already in removal proceedings into custody in order cancel bond or orders of release on recognizance

pursuant to 8 U.S.C. § 1226(b) based on the circumstances of a specific case. Finally, ICE may arrest aliens subject to final removal orders in order to effect removal pursuant to 8 U.S.C. § 1231.

16.    During processing, the individual may choose to remain silent. In such cases, ICE will continue with processing and make determinations based on the information available to the agency at that time. ICE may also serve a variety of documents on the individual during processing. The individual being processed may decline to sign any documents presented. In such cases, documents are marked indicating a refusal to sign and ICE continues with processing.

17.    Individuals are provided a list of free legal service providers during processing. This list is generated by the Executive Office for Immigration Review ("EOIR").[4]

18.    Individuals may contact counsel with the phones which are available for detainee use with collect calls and one free phone call is typically provided prior to transport to the NWIPC, though if time is limited, that phone call may be provided after the individual arrives at the NWIPC.[5]

---

[4] Nonprofit organizations, pro bono referral services and private practice attorneys who wish to be included on the list of pro bono legal service providers may apply with EOIR but must meet the requirements, which include, *inter alia*, that the applicant provide a minimum of 50 hours per year of pro bono legal services to individuals at each immigration court where the organization intends to be included on the list. *See* https://www.justice.gov/eoir/list-pro-bono-legal-service-providers (accessed Nov. 20, 2025); 8 C.F.R. § 1003.62(a)(1). Plaintiffs may apply to be included in the existing EOIR legal service providers list, which ICE already distributes.

[5] There have been occasional, unavoidable brief phone outages at the ERO Portland Office where only the pay phones in the holding rooms had service. The regular phone lines have been physically cut twice over the summer and, in mid-November, the phone company unexpectedly cut service for almost two weeks. During this time, detainee phone access was

19.    **Phones**: In the Portland ERO Office, phones are available in the holding rooms themselves with a list of free legal service providers posted nearby. Again, this is the list of free legal service providers generated by EOIR.

20.    **Office Hours and Security**: The Portland ERO Office is open to the public 8:00a.m.-3:00p.m. Monday through Friday. The building is closed to the public on weekends and holidays. Entry to the building and security screening is not provided by ICE. Security screening, which includes metal detectors, is not available after public hours. Security screening of visitors is necessary to ensure the safety of both ICE personnel and detainees.

21.    Historically, the ERO Portland Office has not been routinely staffed after hours or on weekends or holidays, though that has recently changed since ongoing and disruptive anti-ICE protests outside the building started in June 2025, necessitating the addition of ICE personnel to assist FPS in securing the building. In addition, ICE has recently increased immigration enforcement operations in Oregon, which includes the temporary addition of enforcement personnel from other Areas of Responsibility. As a result, ICE is currently temporarily operating on expanded hours at the Portland ERO Office, though the building remains closed to the public after hours and on weekends and holidays. ICE makes every effort to accommodate attorney access through phone calls during hours when the building is not open.

---

limited to the pay phones in Portland and free phone calls were offered upon admission to the NWIPC.

22. **Visitation Rooms and Space Limitations:** The Portland ERO
Office has three visitation rooms designated for attorney-client and family
visitation. Because they are located in the secured side of the office, they have
plexiglass dividers separating visitor(s) from detainee for safety and security
purposes (see photographs below).[6]

Visitation Room 1 (below) is roughly 8.25'x8.5' on both sides.



---

[6] ERO will facilitate delivery of documents from attorney to client when requested in the
two rooms that do not have pass through openings



Visitation Room 2 (below) is roughly 6.5'x6.5' on both sides.





Visitation Room 3 is the same size and general layout as Room 2.

23.    The visitation rooms are not large enough to accommodate group presentations, nor can ICE prioritize access to all three rooms for attorneys from certain organizations over other attorneys seeking to meet with clients, consular visits, and, for the third room, operational needs.

24.    Attorneys are not restricted from bringing laptops or cell phones into attorney visitation rooms, though they are not permitted to access government wifi systems for security reasons.

25.    The only other detained space in the Portland ERO Office is the Intake room outside the holding cells, where ICE officers are actively engaged in interviewing and processing detainees and the holding rooms. These sit through a secured door in the secured area where attorneys and other members of the public are not permitted for safety and security reasons. Allowing outside access to these areas would violate agency policy. In addition, presentations in holding rooms would also disrupt ICE's ability to process detainees and disturb detainees seeking to use the phones and bathroom facilities (located behind half walls within the holding rooms).

Holding Room 1 with phone for detainee use and the list of free legal service providers posted above the phone. (see below)



Holding Room 2 with phone for detainee use and the list of free legal service providers posted above (see below)



Holding Room 3 with phone for detainee use and list of free legal service providers posted above the phone (see below)



Holding Room 4 with phone for detainee use and list of free legal service providers

posted above (see below)



26.  **<u>Requirements for Attorney Access</u>:** An attorney seeking to visit an individual in custody at an ERO office in Oregon must establish that they have an attorney-client relationship with that individual. This relationship may be established by various means, the easiest being a Notice of Attorney or Representative (Form G-28) signed by the alien, indicating that individual has agreed for that attorney to represent him or her before the agency. However, ICE will also accept other means, including but not limited to, copies of retainer agreements, or having a Notice of Entry of Appearance as an Attorney (Form EOIR-28 or EOIR Form-27) on file with the Executive Office for Immigration Review (EOIR). The form G-28 contains a number of biographic fields of information to be

provided about the alien that the attorney represents, including the individual's
first and last name, A-number, date of birth, country of birth and address. It also
contains a section for the alien to sign specifically waiving their privacy rights
under the Privacy Act. ERO will accept unsigned G-28s in detained cases where the
attorney can provide a minimum basic amount of biographic information concerning
the individual in custody, such as name and A-number or name and date of birth, as
required on the form.

      27.    ICE does not systematically deny access to counsel. In the recent
enforcement actions, attorneys presenting a valid Form G-28 have been granted
access where feasible. Denials, if any, occur only for legitimate reasons such as
incomplete documentation, ongoing processing (e.g., fingerprinting or interviews),
security risks, or the detainee's refusal. For instance, if a detainee is in transit or
has already been transferred due to the 12-hour limit, in-person access at the field
office may not be possible, but counsel can coordinate visits at the receiving facility
in Tacoma, which offers robust legal access programs, including a Virtual Attorney
Visitation (VAV) program that enables legal representatives to schedule client
meetings in advance and add interpreters to calls, video teleconferencing for
attorney visits, and legal orientation programs.

      28.    **<u>Factors Impacting Attorney Access:</u>** For a variety of operational,
logistical and security reasons, ICE cannot always accommodate visitation requests
at the processing offices prior to transport to the NWIPC.

29.     Transportation plays a significant factor in the timing of transfers from all ERO offices in Portland.  ICE often relies on transportation services provided by a private contractor based out of the NWIPC in Tacoma, Washington. Transportation personnel are paid by the hour.  Drivers are also subject to Department of Transportation requirements restricting the number of hours that they can work, which must be factored into transportation plans.  *See* Federal Motor Carrier Safety Administration at  https://www.fmcsa.dot.gov/regulations/hours-service/summary-hours-service-regulations (accessed Nov. 21, 2025) (stating commercial drivers carrying passengers may drive a maximum of 10 hours after 8 consecutive hours off duty).  Extending wait times prior to transferring detainees to the NWIPC incurs additional expenses.

30.     Transportation runs are limited, and ICE often tries to coordinate transport between the three offices for efficiency and best use of time and resources. Individuals processed in Medford must often be transported to the Euguene area so that individuals processed in both locations can be transported together. Similarly, these transportation runs may or may not meet to pick up individuals processed in the Portland office. Travel time from Medford to Tacoma takes approximately seven hours, depending on traffic.  It is approximately five hours from Eugene to Tacoma. Additional wait times at coordinated locations to transfer detainees takes additional time. Given the travel time and the need to coordinate transport runs, ICE cannot always accommodate visitation requests at the processing offices.

31.     Safety and security concerns may also impact attorney access at ERO offices. For example, during the COVID-19 pandemic, ERO offices were closed to the public due to health and safety concerns, and attorney-client consultation could only be handled remotely by phone. Since early June 2025, disruptive protesters have targeted all three ERO offices in Oregon, periodically forcing ICE to close them to the public to protect the safety of officers and other individuals therein. For example, the ERO Portland Office was closed for three weeks from June 13, 2025, to July 7, 2025, as a result of physical damage inflicted on the building by protesters.

32.     As a result of these types of operational challenges, ICE has also prioritized the efficient and speedy processing of individuals arrested in Oregon to minimize risk to the safety of its officers and individuals in ICE custody. ICE officers and transport vehicles in Oregon have become a particularly frequent target of protesters, who harass, vandalize and attempt to prevent ICE from moving individuals from all three Oregon ERO offices. At this time, the longer an individual remains in custody in an ERO office in Oregon prior to transport, the higher the risk to officer and detainee safety as more protesters are drawn to that location and become more likely to physically attempt to disrupt operations. For this reason, ICE is limiting the amount of time individuals remain in ERO offices in Oregon and is processing and transporting individuals to the NWIPC as expeditiously as possible.

33.     **Copies of Documentation:** ICE serves arrested individuals a variety of notices and documents during processing, as required by agency policy, regulations and statutes. The exact documents vary depending on the

circumstances and type of processing being conducted for each case. Detained individuals are provided copies of any documents served on them and should have them in their possession while at the Portland ERO Office unless they elect to put them in their property, in which case they can retrieve those documents from their property when they arrive at the NWIPC. ICE may rely on and produce a number of other documents for arrest and processing that ICE does not serve on the arrested individual. In addition, ERO Portland may produce certain documents, depending on the type of case, that may not require immediate service at the time of arrest and processing, after the arrested individual has been transferred. Those documents are later transmitted to ERO Tacoma.

34.    **Request to Conduct Legal Presentations:** Earlier this month, I was contacted by Plaintiff's counsel, who formally requested permission for plaintiff, CLEAR Clinic, to conduct group legal rights presentations at the Portland ERO Office. This communication was made without authorization from counsel. The proposed presentation by the plaintiff, CLEAR Clinic, relies on similar materials from the "Know Your Rights" sessions already conducted at the NWIPC in Tacoma, Washington by the Northwest Immigrant Rights Project ("NWIRP"). Due to the time and space constraints discussed above, ICE cannot operationally accommodate this request. Because the request concerns this lawsuit and both parties are represented by counsel, my understanding is that future communications between the parties must be through counsel.

**Response to Plaintiffs' Supporting Declarations**

35.    I have reviewed the first declaration of attorney Alena A. Tupper, ECF 7. She alleges, "On at least one occasion, after our attorneys arrived at the Portland ICE field, requested to meet with a client, and waited in the lobby, officers took the client out the back door of the ICE field office and transferred him out of state to the NWIPC." ECF 7 at para. 26. Without any identifying information about the detainee, or at least a date and time of the alleged incident, I am unable to meaningfully investigate or respond to these specific allegations.

36.    I have reviewed the third declaration of attorney Alena A. Tupper. ECF 55.  Ms. Tupper alleges that another CLEAR Clinic attorney reported that an ICE Officer "told a client he 'had no right to an attorney'" on October 24, 2025. ECF at para. 2. ICE is unable to fully investigate and respond to this vague allegation because Ms. Tupper provides no detail or context for the allegation. Ms. Tupper does not provide the name or A-number of the individual to whom this statement was allegedly made. She does not state whether the other attorney who reported the allegation was actually present in the room at the time the alleged statement was made; whether the attorney is repeating something told to her later by the individual to whom the statement was purportedly made, or by that individual's family member, or some other third party (or, if it was reported by a third party, whether that person was actually present at the time the statement was allegedly made).[7] Ms. Tupper does not provide an alleged time or location this incident

_____

[7] From the context of the allegation, i.e. that the alien was detained without access to counsel and quickly removed, I understand that the reporting attorney, Alondra Duran,

purportedly occurred (e.g. in an interview room on the non-secured side of the Portland office, in the intake room during booking and processing, while sitting in the holding cell, etc.); the alleged ICE officer's name or description; or the circumstances under which this event purportedly occurred at the Portland ICE office that would assist ICE in investigating the claim. As previously stated, there are times during arrest and processing that an alien may not have an immediate right to have an attorney present, though they may contact and secure counsel later. Portland ERO officers do not routinely deny access to counsel.

37.    I have further reviewed Ms. Tupper's third declaration regarding some of the visitation rooms occasionally being used for other purposes. ECF 55 at para. 9-11.  As stated in my prior declaration, the three visitation rooms at the Portland Office are not exclusively attorney-client visitation rooms.  ECF 21 at para. 15. Individuals detained by ICE have the right to have their consulate notified of their presence in ICE custody and to meet with their consular representatives. ICE also allows individuals to meet with their family members, where time and space permit. ICE does not give priority to one visitor over another. Access is provided on a first come, first serve basis. Due to lack of space in the Portland ERO Office, ICE also uses the third room for processing, when needed, in order to increase efficiency and reduce delay in processing and transferring detainees. Because of this, the third

---

who did not provide a declaration with further context, was not present when the alleged statement was made but is repeating hearsay provided by an unidentified person at a later date and time. It is unclear when, why or how this report came to be.

room is outfitted with processing equipment, such as biometric fingerprinting equipment.

38.     I have reviewed the first declaration of Attorney Josephine Moberg. Ms. Moberg alleges that ICE officers in Portland blocked or delayed her access to clients or prospective clients. For instance, she stated that on August 18, 2025, she was "repeatedly denied meaningful access to clients," and that ICE refused to let her meet her client until after multiple requests despite having a "valid, signed G-28," and that officers claimed her client "was being uncooperative." ECF 5, para. 4, 15-21. She further claims that on September 30, 2025, she was only allowed a "brief" 30-minute meeting with her client before they were transported out of state. *Id*. at para. 30. Ms. Moberg does not provide the name or A-number of the individual to whom this statement was allegedly made. Ms. Moberg also does not provide alleged ICE officer names or descriptions that would assist ICE in investigating the claims. Portland ERO officers do not routinely deny access to counsel. Any delays noted, such as having to return in 15 minutes or brief waiting periods are routine operational necessities. Any timing constraints are purely logistical and tied to ensuring detainees are promptly processed for transport.

39.     I have reviewed Ms. Moberg's supplemental declaration where she alleges that ICE delayed her access to meet with a prospective client, who she alleges is a U.S citizen-and that ICE refused to let her into the Portland ERO Office despite presenting a birth certificate and an unsigned G-28. She further claims ICE gave her inconsistent information, kept her waiting outside, and that the client was

ultimately transported to Multnomah County Detention Center on federal charges
for a crime committed during another client's arrest, which prevented her from
advising him on his due process rights. ECF 33, para. 7-12, 19. Additionally, Ms.
Moberg alleges that she met with another prospective client a later point who
claimed he was required to sign paperwork by ICE, which he would not recall.
Following the meeting, she claimed that ICE provided her with a copy of the signed
G-28, but not the document her client claims ICE required him to sign noting that
ICE told her to file a FOIA request to obtain them. Id. at para. 17. She later claimed
her client was transported to Tacoma.  As noted above, Attorneys visiting
individuals in custody at an Oregon ERO office must prove an attorney-client
relationship, typically via Form G-28 or other documentation, such as retainer
agreements or EOIR representation forms. ICE follows standard procedures to
verify representation. Ms. Moberg has not provided adequate information to support
an investigation into her claims, including the names or descriptions of ICE officers
involved, as well as the names of the clients referenced in her statement. ICE
routinely serves documents on individuals during processing and requests
signatures for purposes of acknowledging service. Without further information, it is
unclear whether ICE was simply effecting proper service on the individual who
later became her client. All individuals being processed by ICE may refuse to sign
documents. In such cases, ICE will mark the documents as "refused to sign" and
proceed with processing. ICE does not force individuals to sign documents.  As
stated above, copies are provided to detained individuals of anything served on

them by ICE, and the individuals should have those documents in their possession while at the Portland ERO Office unless they elect to put them in their property, in which case they can retrieve those documents from their property when they arrive at the NWIPC.  The detained individual can elect to share those documents with any person or counsel that they choose, but ICE does not generally provide copies of documents served on individuals during processing.  ICE does not systematically deny access to counsel, though aliens may not have an immediate right to representation during arrest and processing but can secure counsel afterward.

40.     I have reviewed the declaration of attorney Claire Fawecett, which alleges she called the Portland ERO Office on October 14, 2025 asking for her client and was informed he was not at the office and that she later learned he was in Tacoma. ECF 52 at para. 5. It is unclear if this declaration is intended to insinuate that an ICE officer misrepresented her client's location to Ms. Fawcett, but because Ms. Fawcett does not provide a name or A-number for the client referenced in the declaration, ICE is unable to determine if the client was actually at the Portland ERO office at the time she claims she called.

**Infeasibility and Burdens of the Requested PI Relief**

41.     The requested relief would impose undue burden on ICE amid surging enforcement needs. Requiring ICE to provide time for each arrested individual processed in the Portland ERO Office to meet with an attorney prior to transfer to Tacoma would significantly delay transport, creating additional burden on detained individuals awaiting transport and ICE personnel. Moreover, it is impossible for

ICE to comply with an order to allow groups presentations as the Portland ERO Office lacks available space to accommodate such presentations. Further, requiring transport to wait for such presentations in Portland would only create additional burden on both detainees and personnel and incur further expenses to the agency in additional personnel and transport costs. The Portland ERO is not equipped for lengthy detention. It has no kitchens and no on-site medical staff beyond basic first aid.

42.    Rapid transfers to Tacoma are essential to provide detainees with access to PBNDS compliant facilities, including medical and mental health care, recreation, and expanded legal services. The NWIPC offers a variety of options for attorney visits, legal orientation programs, access to a law library and proximity to Seattle-area counsel. Delaying transfers would strain resources, increase costs, and potentially expose ICE to liability under local zoning laws.

43.    ICE's practices in Oregon comply with federal law, ICE policies and guidance, and local agreements. The PI would compromise ICE's ability to carry out its enforcement responsibilities. It would also create irreparable harm to government operations while providing no meaningful benefit, as detainees gain better access to legal resources, including counsel, and due process upon transfer to appropriate facilities.

I declare under penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge and belief.

Executed at Portland, Oregon on November 26, 2025.

Digitally signed by
JEFFREY K CHAN
Date: 2025.11.26
15:32:23 -08'00'

Jeffrey Chan
Assistant Field Office Director
United States Department of Homeland Security
United States Immigration and Customs Enforcement
Portland, Oregon