STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,smanning@ilgrp.com
TESS HELLGREN, OSB No. 191622
tess@innovationlawlab.org
JORDAN CUNNINGS, OSB No. 182928
jordan@innovationlawlab.org
KELSEY LYNN PROVO, OSB No. 145107
kelsey@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No. 223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### Eugene Division

| | |
|---|---|
| CLEAR CLINIC, PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE, and LEON X, individually and on behalf of others similarly situated;<br><br>  *Plaintiffs,*<br><br>  v.<br><br>KRISTI NOEM, Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); TODD LYONS, Acting Director of Immigration Customs Enforcement; LAURA HERMOSILLO,[1] Seattle Acting Field Office Director, Immigration and Customs Enforcement and Removal Operations; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"); PETE FLORES, Acting Commissioner of Customs and Border Protection; and U.S. CUSTOMS AND BORDER PROTECTION ("CBP"),<br><br>  *Defendants.* | Case No. 6:25-cv-01906-AA<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION** |

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Laura Hermosillo has automatically been substituted as a party in her official capacity as the Acting Director of the Seattle ICE Field Office.

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ ii

TABLE OF AUTHORITIES ............................................................................... iii

I.   DEFENDANTS' FACTUAL CONTENTIONS ARE DETACHED FROM THEIR UNPRECEDENTED ENFORCEMENT SURGE. ................................................. 2

II.  THE COURT HAS JURISDICTION. ......................................................... 4

    A.   Defendants are wrong about 8 U.S.C. § 1252(f). ................................. 4

    B.   Defendants are wrong about 8 U.S.C. § 1252(b)(9). ............................ 5

    C.   Defendants are wrong about 8 U.S.C. § 1252(a)(2)(B) & 1252(g). .......... 6

III. PLAINTIFFS HAVE STANDING ................................................................. 7

    A.   The Plaintiffs have standing for Count I and Count II. ....................... 8

        1.   Leon X has individual standing. ...................................................... 8

        2.   PCUN has associational standing. ................................................... 9

        3.   PCUN and CLEAR have third-party standing. ................................ 11

    B.   Plaintiff CLEAR Clinic has organizational standing for Count III ....... 12

IV.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .................. 13

    A.   Plaintiffs are Likely to Succeed on their Fifth Amendment Claim (Count I) .......... 13

        1.   The Fifth Amendment Due Process right to counsel applies to all Oregonians detained by Defendants for purported civil immigration violations. ......................................... 14

        2.   The Due Process right to counsel applies in Oregon. ...................... 16

        3.   Defendants' access to counsel policies and practices in Oregon are tantamount to denial of counsel. ............................................ 21

    B.   Plaintiffs are Likely to Succeed on their First Amendment Claims (Counts II & III). ................................................... 24

V.   PLAINTIFFS HAVE ESTABLISHED A CLEAR LIKELIHOOD OF IRREPARABLE HARM. ........................................................................ 29

VI.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST TIP SHARPLY IN FAVOR OF PLAINTIFFS. ..................................................... 30

VII. PLAINTIFFS' REQUESTED INJUNCTION IS NECESSARY AND PROPER. .......... 33

VIII. THE COURT SHOULD NOT ORDER PLAINTIFFS TO POST A BOND. .......... 35

CONCLUSION ................................................................................................ 35

# TABLE OF AUTHORITIES

**Cases**

*A-B-D- et. al v. Hermosillo et. al.*, 6:25-cv-02014-AA, (D.Or.,Dec. 5, 2025)................................20, 32

*Al Otro Lado v. Exec. Office for Immigr. Review*, 138 F.4th 1102 (9th Cir. 2025.................................5

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ........................................................................................18

*Arrey v. Barr*, 916 F.3d 1149 (9th Cir. 2019) ...................................................................................15

*Bates v. United Parcel Serv., Inc.*, 511 F.3d 974 (9th Cir. 2007) ......................................................8

*Bay Area Peace Navy v. United States*, 914 F.2d 1224 (9th Cir. 1990) .............................................28

*Biwot v. Gonzales*, 403 F.3d 1094 (9th Cir. 2005) ...........................................................................15

*Catholic Social Services, Inc. v. INS*, 232 F.3d 1139 (9th Cir.2000) .................................................5

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) .....................................................................................28

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ..........................................................................9

*D.N.N. et al. v. Bacon et al.*, 2025 WL 352042 (D. Md. Dec. 9, 2025)..............................................24

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021).................................................31

*E.A. T.-B., v. Wamsley*, 795 F. Supp. 3d 1316 (W.D. Wash. 2025)....................................................19

*Escobar Molina v. U.S. Dep't of Homeland Sec.*, 2025 WL 3465518 (D.D.C. Dec. 2, 2025) 5, 9, 32, 36

*Exodus Refugee Immigration, Inc.*, 164 F. Supp. 3d 718 (S.D. Ind. 2016) .........................................12

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) .................................................12, 13

*First Defense Legal Aid v. City of Chicago*, 209 F.Supp.2d 935 (N.D. Ill. 2002) ..............................27

*Foucha v. Louisiana*, 504 U.S. 71 (1992) .........................................................................................19

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ........................11

*Galvin v. Hay*, 374 F.3d 739 (9th Cir. 2004)....................................................................................28

*Gonzales v. DHS*, 508 F.3d 1227 (9th Cir. 2007)................................................................................5

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .....................................................................12

*Heckler v. Chaney,* 470 U.S. 821 (1985)............................................................................................7

*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017) ....................................................................7, 19

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ....................................................11

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977 .................................................. 11

*Immigrant Defenders Law Center v. Noem*, 781 F.Supp.3d 1011 (C.D. Cal. 2025) ........................... 28

*Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972 (9th Cir. 2025) ............................................... 13, 27, 28

*In re Primus*, 436 U.S. 412 (1978) .............................................................................................. 27

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274 (1986) ............................................................................................................................ 10

*J.Y.L.C. v. Bostock*, No. 3:25-cv-02083-AB (D.Or. Nov. 12, 2025) ....................................... 20, 32

*Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984) ........................................................................... 27

*Jimenez v. Bostock*, 2025 WL 2430381 (D.Or. Aug. 22, 2025) ........................................... 18, 19

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) ................................................................ 35

*Kidd v. Mayorkas*, 734 F. Supp. 3d 967 (C.D. Cal. 2024) ........................................................... 5

*League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135 (D.D.C. 2025) ........................................................................................................................ 35

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ......................................................................... 7

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................................................................... 18

*McCullen v. Coakley*, 573 U.S. 464 (2014) ............................................................................... 27

*Mercado v. Noem*, 2025 WL 2658779, (S.D.N.Y. Sept. 17, 2025) ............................ 15, 31, 33, 34

*Mercado v. Noem*, 2025 WL 2658779 (S.D.N.Y. Sept. 17, 2025) ........................................... 24

*Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025) ........................................................ 9

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ................................................................................. 2

*N.A.A.C.P. W. Region v. City of Richmond*, 743 F.2d 1346 (9th Cir. 1984) .......................... 28

*NAACP v. Button*, 371 U.S. 415 (1963) .................................................................................... 27

*NAACP v. State ex rel. Patterson*, 357 U.S. 449 (1958) .......................................................... 27

*Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015) .................................... 9

*Nw. Immigrants Rts. Project v. Sessions*, 2017 WL 3189032, (W.D. Wash. July 27, 2017) ........ 27

*Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990) ........................................ 21

*Oregon v. Trump,* No. 3:25-cv-01756-IM, (D.Or. Nov. 7, 2025) ...................................... 4, 26

*Ortega v. Bonnar*, 415 F. Supp. 3d 963 (N.D. Cal. 2019) ...................................................... 19

*Pennsylvania Psychiatric Soc. v. Green Spring Health Servs.*, 280 F.3d 278 (3d Cir. 2002) .............. 12

*Perera v. Jennings*, 598 F. Supp. 3d 736 (N.D. Cal. 2022) ...................................................... 19

*Powers v. Ohio*, 499 U.S. 400 (1991) ...................................................................... 8, 11

*Ramirez Ovando v. Noem,* 2025 WL 3293467, (D. Colo. Nov. 25, 2025) .................................... 31, 32

*Reno v. Flores*, 507 U.S. 292 (1993) ........................................................................ 15

*Rodriguez v. Robbins,* 715 F.3d 1127 (9th Cir. 2013) ........................................................ 31

*S.Z.D. v. Wamsley et al.*, 3:25-cv-01931-AB, (D. Or., Nov. 12, 2025) ........................................ 20, 32

*Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466 (1988) ........................................................ 27

*Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011) ............................................................. 19

*Southern Poverty Law Center v. U.S. Dep't of Homeland Security*, 2020 WL 3265533 (D.D.C. 2020)
    ......................................................................................................... 8, 29

*Spencer Enterprises, Inc. v. U.S.*, 345 F.3d 683 (9th Cir. 2003) ............................................ 7

*Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023).... 8, 9

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ........................................................ 9

*Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036 (C.D. Cal. 2019 .......................... 6, 15, 29

*Trump v. J. G. G.*, 604 U.S. 670 (2025) .................................................................... 15

*Turner v. Safley* 482 U.S. 78 (1987) ....................................................................... 25

*U.S. v. $100,348.00 in U.S. Currency,* 354 F.3d 1110 (9th Cir. 2004) ...................................... 12

*U.S. v. Trimble,* 487 F.3d 752 (9th Cir. 2007) ............................................................. 18

*Ukrainian-American Bar Ass'n v. Baker*, 893 F.2d 1374 (D.C. Cir. 1990) .................................... 27

*United States v. U.S. Coin & Currency*, 401 U.S. 715 (1971) ................................................ 26, 31

*Valdez v. Rosenbaum*, 302 F.3d 1039 (9th Cir. 2002) ........................................................ 25

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) .............................................. 26, 31

*Vasquez Perdomo v. Noem*, 2025 WL 1915964 (C.D. Cal. July 11, 2025) ...................................... 9, 32, 34

*Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850 (C.D. Cal. 2025) ............................................ 6, 13, 36

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .......................................................... 27

*Warth v. Seldin*, 422 U.S. 490 (1975) .................................................................................. 11

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .................................................................. 15, 19, 25

**Statutes**

8 U.S.C. § 1225(b)(2) ............................................................................................................ 32

8 U.S.C. § 1228(a) ................................................................................................................. 16

8 U.S.C. § 1229(b)(1) ............................................................................................................ 15

8 U.S.C. § 1229a(b)(4)(A) ...................................................................................................... 5

8 U.S.C. § 1252(f)(1) ............................................................................................................... 5

8 U.S.C. § 1252(g) ................................................................................................................... 6

8 U.S.C. § 1362 ...................................................................................................................... 15

**Regulations**

8 C.F.R. § 208.31(c) .............................................................................................................. 14

8 C.F.R. § 208.9 ..................................................................................................................... 14

8 C.F.R. § 244.8 ..................................................................................................................... 14

8 C.F.R. § 287.3(c) ................................................................................................................ 15

8 C.F.R. § 292.5(b) ................................................................................................................ 14

8 C.F.R. § 292.5(b) ................................................................................................................ 17

**Constitutional Provisions**

U.S. Const. amend V. ............................................................................................................. 18

**Rules**

Fed. R. Civ. P. 25(d), .............................................................................................................. i

 Fed. R. Civ. Proc. 65(c) ........................................................................................................ 35

**Dictionaries**

*Prospective*, Merriam-Webster Dictionary, Merriam-Webster, ........................................... 27

**PLAINTIFFS' REPLY ISO MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

The Defendants' system for access to counsel is no system at all. If it ever functioned, no matter, because their so-called "system" has fallen apart under the weight of the mass detention regime they are focused on delivering—to the unlawful exclusion of due process and ordered liberty.

Since October 2025, civil immigration arrests in Oregon soared 1,400% over prior months, and more than 7,900% over the prior year, due to the June 2025 imposition of arbitrary quotas and the September 2025 targeting of Oregon's immigrant communities.[2] Even as they unnecessarily push hundreds more Oregonians—each and every one with a right to due process—into their vast *civil* detention system, Defendants have done *absolutely nothing* to address the right to access counsel in Oregon. To the contrary, Defendants have purposely degraded the right to access counsel in Oregon. Plaintiffs seek, though this motion, to return Oregon to the *status quo ante litem* where the right to access counsel was adhered to in the civil immigration detention system. Plaintiffs seek nothing more than what the law requires: for Defendants to exercise their vast immigration detention powers in accordance with due process, allowing reasonable access to *pro bono* counsel at the Oregon ICE Field Offices in the current context of Defendants' surging immigration enforcement.

**DEFENDANTS' POSITION**

Defendants seek to resist the inexorable command of the Fifth and First Amendments. Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Resp."), ECF 66[3] at 2. Defendants assert a litany of facts supported by a few carefully worded declarations to describe their framework for civil immigration apprehensions in Oregon. As to jurisdiction, they argue that four provisions of the Immigration and Nationality Act ("INA") preclude subject matter jurisdiction over Plaintiffs' challenge. Resp. 20-25. Defendants argue that none of the Plaintiffs have standing because, they assert, none of them have suffered an injury-in-fact, claiming it is only a "hypothetical" that

---

[2] *See infra* I. A. Declaration of Emily Ryo ("Ryo Decl.") (detailing data on detentions in Oregon).
[3] All pincites to Respondents' Response, *see* ECF 66, reference internal page numbers.

Defendants will detain individuals in Oregon. Resp. 26. On the merits, Defendants argue that due process does not apply to everyone, and they assert the individuals whom Defendants detain in Oregon are not entitled to due process while they are in Oregon. Resp. 33-44. For the First Amendment claims, they assert that the restrictions they impose on access to counsel in Oregon are reasonable and temporary. Resp. 46-48. Finally, Defendants argue that there is no irreparable harm or equitable or public interest in favor of granting an injunction and that the remedy is overbroad and burdensome.

All of the Defendants' arguments lack merit. Their factual assertions largely concede that the *denial* of access to counsel is their *default* rule. Their jurisdictional arguments misstate Plaintiffs' challenge and thus erroneously conflate the remedy Plaintiffs seek with challenges to removal orders, which Plaintiffs do not raise. Their standing arguments misstate the facts and law. And their merits arguments are inapposite. The Fifth Amendment applies to everyone in Oregon. The Defendants' segmented approach to the Due Process clause is legally incorrect and factually specious. Their First Amendment arguments fail for similar reasons. The rest of their defenses are unpersuasive.

Fundamentally, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 2600, 33 L. Ed. 2d 484 (1972). The particular situation in Oregon demands a brief pause before an individual apprehended in Oregon is transported out of the district so that they can have meaningful access to counsel. Given the high-stakes decisions that are made in Oregon early in the Defendants' detention system, due process demands no less.

## ARGUMENT

### I.   DEFENDANTS' FACTUAL CONTENTIONS ARE DETACHED FROM THEIR UNPRECEDENTED ENFORCEMENT SURGE.

Defendants' factual descriptions of their actions in Oregon are detached from the impact of their unprecedented enforcement operations in Oregon. Defendants submit four declarations in support of their Response. The Declaration of Assistant Field Office Director Matthew Cantrell ("Cantrell Decl.") describes the Defendants' view of access to counsel policies at the NWIPC and describes the operation of the ICE Online Detainee Locator System ("ODLS"). ECF 67. The Second Declaration of Assistant

Field Office Director Jeffrey Chan ("Chan Decl."), ECF 68, and Declarations of Supervisory Detention and Deportation Officers Jason Weiss ("Weiss Decl.") and David Cabrera Jr. ("Cabrera Decl."), ECF 69-70, describe access to counsel at the Portland, Eugene, and Medford ICE Field Offices, respectively.

But Defendants ignore that since June 2025 detentions in Oregon have surged; since September 2025 detentions have escalated even further; and, since October 15, 2025 detentions have increased 7,900% from the prior year. Declaration of Emily Ryo ("Ryo Decl.") at 8 (Table 1 showing October 2024 detentions as 7 and October 2025 as 560). Prior to summer 2025, the average ICE daily arrest rate in Oregon hovered around 0.3 arrests per day; when arrest quotas kicked in the summer, arrests jumped to 1.39 arrests per day. *Id.* ¶ 16-17. In October 2025, ICE daily arrests in Oregon rose literally off the charts. *Id.* at 6 (Figure 2). Beginning on October 15, 2025, ICE arrests took place every calendar day, with daily apprehensions soaring to nearly 30. *Id.* at 32. From September to October 2025, the daily apprehensions and detentions in Oregon increased five-fold. *Id.* at 7 (Figure 3). This surge continues unabated: in October and November, the Portland Immigrant Rights Coalition (PIRC) hotline experienced a surge in calls from community members reporting ICE detentions and requesting legal assistance. Declaration of Alyssa Walker Keller ("Supp. Walker Decl.") ¶ 3. During October, the hotline received reports of over 292 detentions, at a rate of 15-45 detentions reported per day. *Id.* ¶ 4. On October 30, 2025 alone, PIRC received reports of at least 35 people detained in Woodburn, Oregon, and surrounding areas. *Id.* For the month of November, 373 detentions were reported; 94 detentions were reported in just the first week of December. *Id.*

Defendants argue that Plaintiffs' requested relief is unduly burdensome – but their assertions ignore the impact of this unprecedent enforcement surge.[4] Indeed, Defendants themselves acknowledge

---

[4] Defendants' ongoing operations in Oregon, and the concurrent rapid rise in arrests, have increased fear among communities where these actions have taken place. PCUN's members and the Woodburn community have changed their routines and are relying on other community members to help them run day-to-day errands that they are too afraid to do because they could be subjected to an arrest. Declaration of Marlina Campos ("Campos Decl.") ECF 44 ¶ 13. Enforcement tactics are increasingly

that "ICE has recently increased immigration enforcement operations in Oregon, which includes the temporary addition of enforcement personnel form other Areas of Responsibility. As a result, ICE is currently temporarily operating on expanded hours at the Portland ERO Office." Chan Decl. ¶ 21.[5] Yet none of the Defendants' declarants even give a nod to any accommodations made to ensure access to counsel in this new context of heightened enforcement.

## II.     THE COURT HAS JURISDICTION.

Defendants' jurisdictional arguments are wrong. No provision of the INA limits the Court's jurisdiction over the remedy at this preliminary stage, and Plaintiffs have standing for each claim.

### A.     Defendants are wrong about 8 U.S.C. § 1252(f).

Plaintiffs do not seek to enjoin Defendants from any operation of the provisions of the INA referenced in § 1252(f), which govern, in part, procedures for the apprehension and removal of noncitizens. Instead, they seek an order protecting their constitutional rights under the Fifth and First Amendments. *See* ECF 39 at 42-43. Accordingly, Defendants' § 1252(f) argument is meritless.

---

violent,[4] sowing a feeling of powerlessness among the community at large that is only compounded by the lack of access to counsel for Oregonians. *See also* Julia Lopez, *Neighbors: ICE agents arrest dad driving kids to school in N Portland, shoot pepper balls,* Fox 12 News, Dec 11, 2025, https://www.kptv.com/2025/12/12/neighbors-ice-agents-arrest-dad-driving-kids-school-n-portland-shoot-pepper-balls/ (describing the arrest of an individual in front of his children while dropping them off for school and bystanders being shot with pepper balls because they were recording the incident).

[5] These allegations have been confirmed in recent weeks by Defendants in other cases before this District Court. For example, former ICE Seattle Field Office Director, Cammilla Wamsley, testified that her office, which includes Oregon, has set a goal to detain at least fifty immigrants a day. *See Oregon v. Trump,* No. 3:25-cv-01756-IM, ECF 146 at 52 (D.Or. Nov. 7, 2025). Similarly, during a recent evidentiary hearing on a habeas corpus petition, the same Defendants' here revealed that they had been deployed from other states to support "Operation Fortifying the Border," "Operation Black Rose," and "Operation Portland Sweep." Maxine Bernstein, *ICE officers reveal arrest quotas, facial recognition use in Oregon dragnet*, The Oregonian, Dec. 9, 2025, https://www.oregonlive.com/crime/2025/12/ice-officers-reveal-arrest-quotas-facial-recognition-use-in-oregon-dragnet.html. Additionally, during their testimony, these agents disclosed that they had oral instructions to arrest at least eight people a day, *id*. and testimony revealed that the Petitioner had requested to speak to an attorney during her arrest and was only able to meet with volunteer attorneys for ten minutes at the ICE Portland Office *after* she had signed documents waiving her rights. *Id*.

Plaintiffs do not challenge Defendants' authority to lawfully book, process, interview, fingerprint or transfer individuals inside or outside of Oregon, *contra* Resp. 21-23; instead, Plaintiffs seek to enforce the right to access counsel, as enshrined in the Due Process Clause.[6]

The injunctive relief sought here "directly implicates" constitutional rights and any impact on a covered provision is collateral. *See Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007). If an "injunction would have at most a 'collateral' effect on [the] operation of proceedings under covered provisions, it does not fall "within the scope of § 1252(f)(1)." *Al Otro Lado v. Exec. Office for Immigr. Review*, 138 F.4th 1102, 1125 (9th Cir. 2025) (citing *Gonzales*, 508 F.3d at 1233); *Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022) (acknowledging the "proposition that a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision") (emphasis in original). The Ninth Circuit has repeatedly rejected application of § 1252(f)(1) where the case brings claims that do not directly challenge provisions within 8 U.S.C. §§ 1221-1332, even if the result of the requested injunctive relief may have some impact on a covered provision. *See, e.g.*, *Gonzales*, 508 F.3d at 1233; *Catholic Social Services, Inc. v. INS*, 232 F.3d 1139 (9th Cir.2000) (en banc); *see also Escobar Molina v. U.S. Dep't of Homeland Sec.*, Case No. 1:25-cv-03417, 2025 WL 3465518, at *31 (D.D.C. Dec. 2, 2025). (same).

**B.**     **Defendants are wrong about 8 U.S.C. § 1252(b)(9).**

Defendants' argument that 8 U.S.C. § 1252(b)(9) applies here is meritless because they wrongly conflate Plaintiffs' causes of action with challenges to a removal order. Section 1252(b)(9) does not prevent federal courts from hearing cases "that do not directly challenge a final order of removal." *See Trinidad y Garcia v. Thomas*, 683 F.3d 952, 958 (9th Cir. 2012) (Thomas, J., concurring) (citing

---

[6] Although Plaintiffs do not move on their APA claims at this time, 8 U.S.C. § 1252(f)(1) also does not bar those claims. While the right to counsel may be incorporated in the INA at 8 U.S.C. § 1229a(b)(4)(A), it is also rooted in a range of non-covered statutory provisions and regulations. Plaintiffs' requested relief thus "directly implicates" the right to counsel endorsed throughout the INA, not a provision exclusively specified in § 1252(f)(1). *See Gonzales*, 508 F.3d at 1233.

*Nadarajah v. Gonzales*, 443 F.3d 1069, 1075 (9th Cir. 2006)); here, it is not contested that Plaintiffs do not challenge final orders of removal. As organizations, no removal order will ever be entered against Organizational Plaintiffs. Leon X is not currently in removal proceedings, and he seeks to represent a class that Defendants concede encompasses a wide range of immigration postures beyond removal proceedings. *See* Chan Decl. ¶ 15. Putative class members are thus similarly situated to the individuals seeking access to counsel in *Innovation L. Lab v. Nielsen*, where this Court addressed and distinguished *J-E-F-M- v. Lynch*, 837 F.3d 1026 (9th Cir. 2016), finding it inapplicable, in part, because it "did not address whether district courts have jurisdiction over constitutional claims by immigrant detainees whose removal proceedings have not yet commenced." 310 F. Supp. 3d 1150, 1160 (D. Or. 2018). Thus, section 1252(b)(9) does not bar this Court from hearing this case. *Accord Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1048-49 (C.D. Cal. 2019) .

Further, 8 U.S.C. § 1252(b)(9) does not apply to cases that are collateral to the removal process, including challenges to conditions of confinement. *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (holding § 1252(b)(9) does not preclude review of detention claims); *Innovation L. Lab,* 342 F. Supp. 3d at 1076; *see also Nadarajah*, 443 F.3d at 1075-76 (affirming jurisdiction over habeas corpus petition that did not challenge a final removal order). Plaintiffs raise questions about the adequacy of access to counsel at the Oregon ICE Field Offices during Defendants' current enforcement surge. "[C]ramming judicial review of those questions into the review of final removal orders would be absurd." *Jennings*, 583 U.S.at 293; *see also Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 884–85 (C.D. Cal. 2025) ("[B]inding authority dictates that treating everything related to and leading up to removal proceedings as 'arising from' a removal action is an incorrect reading of the relevant statutes."), *stay of injunctive relief granted by Noem v. Vasquez Perdomo*, 2025 WL 2585637 (S. Ct. 2025).

## C.     Defendants are wrong about 8 U.S.C. § 1252(a)(2)(B) & 1252(g).

In arguing that 8 U.S.C. § 1252(a)(2)(B)(ii) operates with § 1252(g) to bar jurisdiction, Defendants mischaracterize Plaintiffs' challenge and proposed remedy. Defendants wrongly paint this case as a direct challenge to their statutory authority to transfer detained individuals. None of Plaintiffs'

claims challenge this provision. *See* First Amended Complaint, ECF 39 ¶¶ 109-41. Nor does any element of their requested injunctive relief reference transfer. *See id.* ¶¶ 42-43. Indeed, Defendants' declarations indicate that access to counsel could be provided to many individuals at the ICE Field Office without *any* impact on the timing of individuals' transfer, let alone Defendants' decision to transfer them. *See, e.g.*, Chan Decl. ¶ 13 (noting that individuals may be held for "several hours" at an Oregon Field Office); Tupper Decl. ¶ 19 (explaining need for a minimum of "one hour" to provide meaningful access to counsel).

Section 1252(a)(2)(B)(ii) states that "no court shall have jurisdiction to review . . . any other decision or action . . . the authority for which is specified . . . to be in the discretion of the . . . Secretary." 8 U.S.C. § 1252(a)(2)(B)(ii). This bar only applies if two conditions are met: (a) the statutory provision at issue "must provide the discretionary authority" and (b) such discretion must be "pure discretion, rather than discretion guided by legal standards." *Perez Perez v. Wolf*, 943 F.3d 853, 866 (9th Cir. 2019) (quoting *Spencer Enterprises, Inc. v. U.S.*, 345 F.3d 683, 689 (9th Cir. 2003)). Section 1252(a)(2)(B)(ii) is inapplicable here because Plaintiffs do not challenge any statutory authority that provides Defendants unfettered discretion; instead, they challenge Defendants' actions denying their constitutional rights. *See* ECF 39 ¶¶ 109-127. Where there are specific standards against which discretionary conduct can be measured, judicial review is available. *Perez Perez*, 943 F.3d at 866; *accord Heckler v. Chaney,* 470 U.S. 821, 830 (1985) (judicial review available where there is "meaningful standard against which to judge the agency's exercise of discretion,"). Here, the law is replete with standards against which the Court may judge Defendants' conduct. *See infra*. And Defendants have no discretion to violate the law. *See, e.g.*, *Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017) ("[T]he government's discretion to incarcerate non-citizens is always constrained by the requirements of due process.").

## III.     PLAINTIFFS HAVE STANDING

Plaintiffs have moved for a preliminary injunction on Counts I, II, and III. For each of these counts, Plaintiffs have Article III standing. The Defendants arguments to the contrary are unpersuasive.

To establish Article III standing, a plaintiff must show an "injury in fact" that is "fairly traceable to the challenged action" and "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotations omitted). An organization can have standing in its own right ("organizational standing") and/or through representation of its members ("associational standing"). *Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (*"SFFA"*). Moreover, the Supreme Court has "recognized the right of litigants to bring actions on behalf of third parties" where three criteria are met:

> The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.

*Powers v. Ohio*, 499 U.S. 400, 410–11 (1991). *See also Innovation L. Lab*, 310 F. Supp.3d at 1150 (finding third-party standing where detained immigrants requested legal services and "the lack of access to immigration lawyers … – poses a significant hindrance to the detainees' ability to advocate on their own behalf"); *accord Southern Poverty Law Center v. U.S. Dep't of Homeland Security*, 2020 WL 3265533, at *14 (D.D.C. 2020).

## A.    The Plaintiffs have standing for Count I and Count II.

### 1.    Leon X has individual standing.

Here, individual Plaintiff Leon X has established standing for himself and the putative class. "In a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc). Leon X reasonably fears immigration arrest for an alleged civil immigration violation resulting in detention and transfer without access to counsel in violation of his Fifth and First Amendment rights. Leon X Decl. ¶¶ 4, 7. Leon X— the son of agricultural workers and PCUN members—was brought to the United States as a child and currently has Deferred Action for Childhood Arrivals (DACA) status. *Id.* ¶ 2-3. He is "terrified that ICE will arrest and detain [him] without a warrant or cause[,]" *id.* ¶ 4, and that he will be "swiftly transferred without the opportunity to consult with [his] immigration counsel," *id.* ¶¶ 4, 7. This fear is "not abstract" but rather "lives in every knock on the door, every commute to work or trip to the grocery

store." *Id.* ¶ 4. His fears are reasonable in light of the surge of immigration enforcement in Oregon. *See supra.* Indeed, Leon X learns of individuals every day who are "taken away." Leon X Decl*.* ¶ 5.

In *Escobar Molina*, the D.C. District Court found that plaintiffs established standing for injunctive relief where defendants' challenged conduct was part of a "a systematic policy and practice," Plaintiffs "proffered evidence suggesting that they were among the group of individuals targeted by defendants[,]" and Plaintiffs showed that "they cannot avoid run-ins with [Defendants'] agents lest they avoid 'going about … daily life." *Escobar Molina*, 2025 WL 3465518, at *16. Such is the case here. "[D]efendants are under pressure from the White Houe to meet increasing goals in the number of arrests of individuals," *id.*, and as such are systematically engaging in warrantless arrests and rapid transfers out of Oregon without affording individuals their right to counsel. Leon X is among the group targeted, and he cannot avoid immigration agents: they could come to his door, stop him on his way to work, or on his way to run errands. *See* Leon X Decl. ¶¶ 3-6. Just like PCUN's members, Leon X reasonably fears *imminent* detention without access to counsel. *See Vasquez Perdomo*, 2025 WL 1915964, at *4-5. In other words, Leon X's injury is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013).

### 2. PCUN has associational standing.

Defendants are wrong to suggest that PCUN must have a "named plaintiff that is a PCUN member" to establish "a concrete and particularized imminent harm". Resp. 31. No specific PCUN member need be identified by name—let alone be a plaintiff— to satisfy Article III standing on an associational standing theory. *See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015); *see also Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025) (similar). PCUN has established associational standing on behalf of its members, who are terrified that they will be arrested, denied access to counsel, and ferreted away beyond the help that an attorney and the courts could provide in violation of their rights.

PCUN satisfies all three associational standing requirements. First, PCUN's members reasonably fear being detained without access to counsel, at least one of them "ha[s] suffered or [will]

suffer harm," *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009), and they "would otherwise have standing to sue in their own right," *SFFA*, 600 U.S. at 199. PCUN has roughly nine thousand registered members, many of whom live in Oregon's Willamette Valley, and it serves farmworker and Latinx communities statewide. Lopez Decl. ¶¶ 8, 10. PCUN's farmworker members include Latinx people and people with varying immigration statuses. Lopez Decl. ¶¶ 14, 20. Defendants' aggressive enforcement tactics have targeted farmworker and Latinx communities as they go about their everyday lives, leaving these communities subject to rapidly increased surveillance, detention, and denial of access to counsel. *See* Lopez Supp. Decl. ¶¶ 4-5 (describing at least five sites of ICE enforcement activity verified by PCUN between October 14 and 17, 2025 and the October 21, 2025 arrest of worker near Monrovia Nursery, where PCUN's members were working); *see also* Lopez Decl. ¶¶ 25, 28-29; Campos Decl. ¶¶ 5-11 (describing increase in ICE enforcement since October 2025 and October 30 enforcement action resulting in arrest of two PCUN members and at least 30 people overall). PCUN's members have communicated to their leadership that they are fearful to go to work, participate in the organization's programing, take their children to school, or do anything that requires leaving their home. Campos Decl. ¶¶ 12-14. Indeed, to date, PCUN has confirmed the detention of two of its members who, despite having requested legal assistance while attorneys were present at the ICE facility, were unable to access counsel but were instead transported to Tacoma where they remain unrepresented. Campos Decl. ¶¶ 8-9. PCUN is thus similarly situated to the organization with associational standing in *Vasquez Perdomo*, whose members had a "reasonable fear of imminent detention without access to counsel." 2025 WL 1915964, at *11.

Second, the interests at stake in this case are germane to PCUN's purpose because Defendants' denial of access to counsel affects PCUN's goals and work. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 26 (1986). PCUN is a membership organization that "advocates for and empowers Oregon farmworkers and Latinx families to advance their communities' goals" and works to promote "immigrant rights[.]" Lopez Decl. ¶ 6. Standing in the shoes of its immigrant community members to vindicate their rights is squarely germane to PCUN's purpose. *See Vasquez Perdomo*, 148 F.4th at 676 (concluding that the interest that association plaintiffs

sought to protect was germane to their mission to defend the rights of low-wage workers with various immigration statuses).[7]

Finally, "neither the claim asserted, nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). "[M]embership organizations may bring constitutional claims on behalf of their members", particularly where a broad change in procedure rather than individualized relief is sought. *Vasquez Perdomo*, 148 F.4th at 677. Here, Plaintiffs ask the court to fashion not individualized relief, but rather injunctive and declaratory relief that would remedy actual or imminent constitutional and statutory violations against PCUN's membership as whole. PCUN has therefore established associational standing.

### 3. PCUN and CLEAR have third-party standing.

Plaintiffs have established third-party standing to seek temporary injunctive relief at this preliminary stage on behalf of Oregonians who are deprived access to counsel while detained by Defendants. While a "plaintiff *generally* must assert his own legal rights and interests[,]" Resp. 27 (quoting *Warth v. Seldin*, 422 U.S. 490, 29 (1975)), here Plaintiffs meet the threshold for establishing third-party standing as set forth in *Powers v. Ohio. See Powers*, 499 U.S. at 410-11.

First, as described above, CLEAR Clinic has suffered injury-in-fact. So too has PCUN. Second, both organizations demonstrate a sufficiently close relationship to the detained Oregonians they seek to protect, who are far from "non-party hypothetical individuals," Resp. at 26. The close relationship "requirement is not formidable [,]" and an attorney-client relationship is a quintessential example. *See*

---

[7] While Defendants intimate that an individual must be detained to be a proper plaintiff, Resp. at 30 ("No detainee is a party to this case"), PCUN representing its members is particularly appropriate where Defendants' challenged conduct—denying access to counsel—makes it all but impossible for a detained individual to timely participate in this lawsuit. *See* Campos Decl. ¶¶ 8-9. Associational standing is also appropriate because PCUN members may be fearful of bringing suit themselves. *See Vasquez Perdomo*, 148 F.4th at 677 (finding associational standing where "intense fear of discriminatory stops that Defendants' roving patrols have provoked may prevent the association plaintiffs' members from active participation in the lawsuit"); *see also* Lopez Supp. Decl. ¶¶ 5, 9-10; Campos Decl. ¶ 12-16 (describing fear among its members).

*U.S. v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1127-28 (9th Cir. 2004). Many detained Oregonians are formal clients of CLEAR Clinic already, Moberg Decl. ¶¶ 16, 23; Tupper Decl. ¶ 23; others have requested CLEAR Clinic's legal services directly or through family members' calls to rapid response channels, Moberg Decl. ¶ 6, 7; Tupper Decl. ¶ 10; Tupper Supp. Decl. ¶¶ 2-3, and all such individuals are eligible to be considered for their free legal services. Tupper Decl. ¶ 11; Supp. Tupper Decl. ¶¶ 2-3. The numerous requests that CLEAR Clinic receives to provide legal services to detained Oregonians "sufficiently demonstrate that [it] has a close relation to the detainees, even if Defendants' policies, practices, and actions have prevented [its] attorneys from formalizing their legal relationship with many of those detainees." *Innovation Law Lab*, 310 F.Supp.3d at 1162.

Third, the nature of this entire case demonstrates why there exists "some hindrance" to detained Oregonians' ability to protect their own interests. A party need not face "insurmountable hurdles to warrant third party standing," making it a "relatively low threshold" to meet. *Pennsylvania Psychiatric Soc. v. Green Spring Health Servs.*, 280 F.3d 278, 290 (3d Cir. 2002) (quoting *Exodus Refugee Immigration, Inc.*, 164 F. Supp. 3d 718, 732 (S.D. Ind. 2016)). Plaintiffs have clearly met that threshold.

**B.        Plaintiff CLEAR Clinic has organizational standing for Count III**

Plaintiffs establish organizational standing where Defendants' actions have "directly affected and interfered with [Plaintiffs'] core business activities." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394(2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). This injury is precisely what CLEAR Clinic has demonstrated.

Contrary to Defendants' assertions, Resp. 27-28, CLEAR Clinic has not "spen[t] its way into standing by expending money to gather information and advocate against the defendant[s'] action[s]." *Hippocratic Medicine*, 602 U.S. at 394. While Defendants are correct that the Supreme Court "has been careful not to extend the *Havens* holding beyond its context," Resp. 28 (quoting *Hippocratic Medicine*, 602 U.S. at 395), they are wrong that CLEAR Clinic is an extension of that context. As in *Havens*, CLEAR Clinic has established organizational standing because Defendants' actions interfered with its core business activities by "perceptibly impair[ing] [its] ability to provide counseling" and other

services, thus interfering with its First Amendment rights. *Id.* (quoting *Havens Realty* at 379); *see also Vasquez Perdomo,* 790 F. Supp. at 875 n.11 ("In light of the holding in *Alliance for Hippocratic Medicine*, albeit in a different 'context' than *Havens Realty*, the Court finds Defendants' warning that *Havens Realty* should not apply here unavailing."). Starting at least in June 2025, the Portland ICE Office has regularly denied CLEAR Clinic attorneys the ability to speak with their clients; restricted client meetings to brief encounters; forced attorneys to wait for hours to meet with clients; denied attorneys a confidential meeting space, interpretation options, and ability to give documents to or obtain documents from prospective and current clients; and refused to provide justifications for detention of clients. *See* Tupper Decl. ¶¶ 22-29; Tupper Supp. Decl. ¶ 9; Third Tupper Decl. ¶¶ 8-11. CLEAR Clinic's formal request to leadership at the ICE Field Office to conduct group legal rights presentation has also gone unacknowledged. *Id.* ¶ 7. Due to these denials of access, CLEAR Clinic has been forced to expend additional time, effort, and resources on even establishing contact, Tupper Decl. ¶ 10; Tupper Supp. Decl. ¶ 7; Third Tupper Decl. ¶¶ 14-15, in order "to continue advancing its core business activities and longstanding mission of providing direct representation, counseling, and legal assistance." *See Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 989 (9th Cir. 2025).[8]

## IV.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.  Plaintiffs are Likely to Succeed on their Fifth Amendment Claim (Count I)

Defendants assert that the Fifth Amendment's Due Process Clause applies only to a narrow subset of immigrant Oregonians and, for those Oregonians within that narrow subset, the Fifth Amendment does not apply in Oregon. Resp. 32-44. They argue that any deprivation of access to

---

[8] Defendants' contention that "Plaintiffs should expect to spend less time, money, and resources … by utilizing the NWIPC's amenities," Resp. 29, is not supported by the realities on the ground at NWIPC, *see, e.g.,* Declaration of Lynn Stopher ("Stopher Decl.) ¶¶ 5, 7, 17-19; Pritchard Decl. ¶¶ 4 8, 10-17, Tupper Supp. Decl. ¶¶ 13-18. Moreover, far from "anecdotal concerns about past conduct," Resp. 26, the repeated nature of these concrete and particularized harms evidenced in Plaintiffs' declarations, "establishes a sufficient likelihood of future injury." *Hippocratic Med.*, 602 U.S. at 381; *see also Vasquez Perdomo*, 790 F. Supp. at 877 (finding that immigrant legal services provider that had been repeatedly denied opportunity to "meaningfully meet" with detained clients had established standing).

counsel in Oregon is merely a brief deferral and that Oregonians detained by ICE will have meaningful access to counsel elsewhere, such as at the NWIPC in Tacoma. Defendants' position is factually and legally wrong.

1. **The Fifth Amendment Due Process right to counsel applies to all Oregonians detained by Defendants for purported civil immigration violations.**

Defendants argue that the Fifth Amendment right to counsel does not apply to all Oregonians. Resp. 34. Defendants rely heavily on statutory citations to support their argument that detained Oregonians in the putative class are not "a single category of arrestees with standardized universal rights." Resp. 34-38. Defendants' argument is an incorrect interpretation of the statutory right to counsel, improperly conflates the statutory right to counsel with the Fifth Amendment right to counsel, and misstates Plaintiffs' challenge.

While Defendants are correct that the individuals detained at the Oregon field offices are in a range of immigration statuses – indeed, some individuals are U.S. citizens, Moberg Sup. Decl. ¶ 6; Lerner Supp. Decl. Ex. B ¶ 4; *see also supra* § II.B (discussing range of immigration postures), Defendants ignore that the Due Process Clause applies to *all of these individuals*.

Defendants' analysis of the statutory right to counsel is wrong and conveniently ignores the additional provisions that further establish noncitizens' right to counsel beyond removal proceedings. *See, e.g.*, 8 U.S.C. § 1158(d)(4)(A) (right to legal representation when filing asylum application); 8 C.F.R. § 292.5(b) (right to counsel "whenever an examination is provided for in this chapter"); 8 C.F.R. § 208.9 (an asylum applicant interviewed by an asylum officer may have counsel or a representative present); 8 C.F.R. § 208.31(c) (representation by counsel during a reasonable fear interview); 8 C.F.R. § 103.2(a)(3) (representation before U.S. Citizenship and Immigration Services); 8 C.F.R. § 244.8 (representation for applicants for Temporary Protected Status). Defendants fail to grapple with these regulatory provisions which clearly extend the right to counsel beyond removal proceedings. *See, e.g.*, *L-J-P-L- v. Wamsley*, No. 3:25-cv-01390-IM, Dkt. 63 at 14-15 (D.Or. Oct. 28, 2025) (finding violation of right to counsel for noncitizen subject to final removal order).

In focusing narrowly on the statutory right to counsel in removal proceedings, Defendants also conflate the statutory right to counsel in removal proceedings with the Due Process right to counsel. It is undisputed that the Due Process Clause of the Fifth Amendment applies to immigrant Oregonians in Department of Homeland Security (DHS) custody regardless of their immigration status or case posture and regardless of whether they are represented or unrepresented. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent."); *Trump v. J. G. G.*, 604 U.S. 670, 673 (2025) (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)); *Mercado v. Noem*, — F. Supp. 3d —, No. 25-CV-6568 (LAK), 2025 WL 2658779, at *34 (S.D.N.Y. Sept. 17, 2025) ("detained [noncitizens] are entitled to the minimum levels of humane treatment and access to counsel that are required by the Constitution"). A noncitizen's statutory right to counsel is rooted in the Due Process Clause – but the Fifth Amendment right to counsel encompasses more than just this statutory right. *See Arrey v. Barr*, 916 F.3d 1149, 1157 (9th Cir. 2019) ("Both Congress and [the Ninth Circuit] have recognized the right to retained counsel as being among the rights that due process guarantees to petitioners in immigration proceedings."); *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) (The right to counsel in immigration proceedings is rooted in the [Fifth Amendment] Due Process Clause[.]").

Importantly, while 8 U.S.C. § 1229a and 8 U.S.C. § 1362 do indeed provide a statutory right to counsel for noncitizens in removal proceedings, *see* Resp. 34, that right to counsel is not limited to those provisions nor is it limited to removal proceedings. Courts recognize that for the statutory right to counsel to be effective, it must extend beyond the removal proceedings. *Torres*, 411 F. Supp. 3d at 1061 ("[C]aselaw suggests the right to counsel codified in the INA extends beyond the removal proceeding itself."). Indeed, the right "begins before any court proceeding, with notices from the agency to the immigrant and with the detention itself." *Id.* at 1061–62 (citing 8 U.S.C. § 1229(b)(1) ("In order that an alien be permitted the opportunity to secure counsel *before the first hearing date* ... the hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear[.]") (emphasis added); 8 C.F.R. § 287.3(c) (providing that an immigrant arrested

without a warrant must be notified of her "right to be represented at no expense to the Government"); 8 U.S.C. § 1228(a) (requiring the agency, while removing immigrants with certain convictions, to "make reasonable efforts" to ensure "access to counsel and right to counsel under [8 U.S.C. § 1362] are not impaired.").

Defendants mischaracterize Plaintiffs' access to counsel challenge. Plaintiffs challenge extends beyond removal proceedings – they challenge Defendants' policies and practices that systematically deny immigrant Oregonians their right to counsel at a pivotal moment in time, when the government is depriving them of their liberty and often pressuring them to waive their rights. When Defendants exponentially ramp up enforcement efforts in Oregon, arresting and detaining hundreds of Oregonians over the span of just months, and seek to deprive them of their rights and liberty, they are entitled to procedural protections – including access to counsel – in order to challenge an unlawful arrest or detention and, above all, to ensure the government follows the law.

## 2. The Due Process right to counsel applies in Oregon.

Defendants argue that even if due process applies to certain Oregonians, it does not apply at the ICE offices in Oregon. Resp. 37. Defendants are incorrect. The Fifth Amendment's due process protections clearly apply to every person detained at the ICE offices in Oregon because the Fifth Amendment applies everywhere in Oregon. Moreover, the Fifth Amendment right to counsel must attach at the Oregon ICE offices for the Fifth Amendment right to counsel to be meaningful because that is a pivotal moment in an individual's case. Defendants' concept that the Fifth Amendment can be deferred until people are transferred out of state misses the point that it is *in Oregon* that Defendants make irreversible decisions respecting custody and rights. *Cf.* Resp. 40 *with* Tupper Supp. Decl. ¶ 12.

Defendants minimize what occurs at the Oregon ICE offices as merely "ministerial processing" *see* Resp. at 41, a clear mischaracterization of what actually takes place. Indeed, at the ICE offices in

Oregon, DHS officers conduct examinations,[9] which consist of interviewing, screening, collecting personal and biometric information, and running criminal history and immigration history checks. *See* Resp. at 14. The purpose of these examinations is to determine inadmissibility or removability, and the information collected may be used to advocate for the individual's removal from the United States. *See* Chan Decl. ¶ 33 (referencing various documents during processing). The right to counsel is implicated even further as DHS is making a custody determination – determining whether to detain or release the individual – and engaging in a widespread practice of pressuring individuals to waive important rights and to make important legal decisions about their case at the Oregon ICE field offices prior to transfer. *See, e.g.*, Gill Decl. ¶ 14; Pritchard Decl. ¶ 10, Tupper Supp. Decl. ¶ 35; Lerner Supp. Decl. Ex. B ¶ 10.[10] Defendants' attempt to characterize the government's detention system in Oregon as merely a "deferral" of the right to counsel is thus not so. For many Oregonians, access to counsel in Tacoma, even if it comes, comes too late. *See* R-J-S-V- Decl. ¶¶ 8 (describing that "ICE officers spoke to a group . . . about leaving voluntarily," offered him $1000, spoke to him individually, and "wanted [him] to sign paperwork to end my order of supervision"), 10 (describing being taken outside NWIPC "[i]n the middle of the night" on October 19 or 20, that officers "told me we had to go to the airport," and that "[t]hey tried to get me to sign something to leave the country, and I told them I did not want to sign it and that I have a lawyer"); Kilgren Supp. Decl. Ex. A ¶¶ 19-20 (client describing being denied access to an attorney call, and that "ICE officers had a big group meeting with all of us newly arrived detainees and told us we could sign a form to leave the United States").

---

[9] Importantly, as laid out in Plaintiffs' Motion for Preliminary Injunction, *see* ECF 40 at 21-22, at the Oregon ICE offices, the government engages in examinations under 8 C.F.R.§ 292.5(b), which provides "[w]henever an examination is provided for in this chapter, the person involved shall have the right to represented by an attorney," with only narrow exceptions.

[10] *See also* Ted Hesson and Kristina Cooke, *As Trump misses deportation goals, ICE pushes migrants to give up their cases*, Reuters, Dec. 11, 2025, https://www.reuters.com/world/us/ice-threatens-family-separation-indefinite-detention-satisfy-trump-deportation-2025-12-11/ (describing how Defendants are "relying on threats to separate families and other aggressive tactics to pressure people into accepting deportation - even if they have submitted legal claims"); Bernstein, *supra* n.5 (describing how detained noncitizen was coerced to agree to deportation at Portland ICE office by signing document she could not read)

Defendants' cursory application of the *Mathews* balancing test grossly misstates the interests at stake and ignores the wealth of evidence that the deprivation of counsel in Oregon is not merely a "brief deferral" and there is no "swift vindication of rights within hours." *See* Resp. at 42-43. Rather, the *Mathews* balancing test falls in Plaintiffs' favor. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law." U.S. Const. amend V.  Due process requires that government action be rational and non-arbitrary. *See U.S. v. Trimble*, 487 F.3d 752, 757 (9th Cir. 2007). Due process also requires notice and "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); *Jimenez v. Bostock*, 2025 WL 2430381, at *6 (D.Or. Aug. 22, 2025).Where the government seeks to deprive an individual of a protected interest, the Supreme Court has directed that courts balance three factors to determine what process is due:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335. Applying this balancing test, Defendants' policies regarding access to counsel at the Oregon ICE offices violate due process because they provide inadequate protections in light of the Plaintiffs' affected interests and the grave risk of erroneous deprivation.

Plaintiff Leon X and Plaintiff PCUN's members, including proposed class members, detained by ICE have an exceptionally strong interest in freedom from physical confinement and in an opportunity to be heard prior to any restraint of their liberty. Defendants vastly understate the interests at stake, minimizing them as "an opportunity to be informed of their rights by a third party and be solicited as a client". Resp. 43. In reality, the life and liberty interests at stake could not be greater, as immigrant communities are living in fear of an unlawful arrest and detention that could result in permanent separation from their families and communities. Leon X Decl. ¶¶ 4-7; Lopez Decl. ¶¶ 15,

17, 27; Muñoz Decl. ¶¶ 5, 14; Cabrales Decl. ¶¶ 4, 13; Campos Decl. ¶ 13. "Freedom from imprisonment . . . lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690; *see also Jimenez*, 2025 WL 243038 *6-7. Thus, "[d]etention, including that of a non-citizen, violates due process if there are not 'adequate procedural protections' or 'special justification[s]' sufficient to outweigh one's 'constitutionally protected interest in avoiding physical restraint.'" *Perera v. Jennings*, 598 F. Supp. 3d 736, 742 (N.D. Cal. 2022) (second alteration in original) (quoting *Zadvydas*, 533 U.S. at 690). Similarly, the Ninth Circuit has held that "[i]n the context of immigration detention, it is well-settled that 'due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" *Hernandez*, 872 F.3d at 990 (quoting *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011)). The Supreme Court has long underscored this point. *See, e.g.*, *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." (citation omitted)). The liberty interest for Plaintiff Leon X, Plaintiff PCUN's members and proposed class members is particularly weighty given the civil context of immigration detention. *See Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019) (explaining that "[g]iven the civil context, [a noncitizen's] liberty interest is arguably greater" that the interest of parolees in the criminal context).

Second, "the risk of erroneous deprivation of [Plaintiffs'] liberty interest in the absence of a pre-detention hearing is high." *E.A. T.-B., v. Wamsley*, 795 F. Supp. 3d 1316, 1321 (W.D. Wash. 2025). Currently, DHS officers are conducting widespread warrantless arrests across the state as the agency continuously ramps up enforcement in Oregon. Ryo Decl. ¶¶ 17-18; Walker Decl. ¶¶ 3, 4; Walsh Decl. ¶ 16; Lopez Decl. ¶¶ 15-16; Supp. Walker Decl. ¶¶ 3-5. This has resulted in a high volume of daily arrests, straining ICE's detention system in Oregon and causing the prioritization of speed over process. *See* Second Chan Decl. ¶¶ 41 (referencing "surging enforcement needs"), 32 (explaining that ICE has "prioritized efficient and speedy processing"), 42 (describing "rapid transfers" as "essential"); Weiss Decl. ¶¶ 6 (describing limited staffing at Eugene ICE facility and explaining that requiring officer to expend more time at the Eugene office would significantly impact the agency's ability to conduct

enforcement operations in the field), 23 (explaining that ICE has "prioritized efficient and speedy processing"), 24 (referencing "surging enforcement needs"); Cabrera Decl. ¶¶ 7 (describing limited staffing at Medford ICE facility and explaining that requiring officer to expend more time at the Eugene office would significantly impact the agency's ability to conduct enforcement operations in the field), ¶ 23 (explaining that ICE has "prioritized efficient and speedy processing"), 24 (referencing "surging enforcement needs"). Importantly and unsurprisingly, against this backdrop, many federal courts have found these detentions to be unlawful. *See, e.g., A-B-D- et. al v. Hermosillo et. al*., 6:25-cv-02014-AA, ECF 25 (D.Or., decided on Dec. 5, 2025), *S.Z.D. v. Wamsley et al.*, 3:25-cv-01931-AB, ECF 12 (D. Or. granted in part on Nov. 12, 2025).[11]

While Defendants' claim that "any risk of erroneous deprivation is nominal," Resp. 43, Defendants' assertion is premised on the availability of access to counsel at the NWIPC, which is not, in practice, what Defendants' paint it to be. *See* Resp. 8-12. The overwhelming evidence demonstrates the serious impediments to access at the NWIPC. Stopher Decl. ¶¶ 17-18; Pritchard Decl. ¶¶ 4, 7-17; Gill Decl. ¶ 14; Lerner Decl. Tupper Supp. Decl. Yet even if there were eventual access to counsel at the NWIPC as Defendants say, for most individuals in their custody, that access would come too late, as they have been pressured or coerced to waive important rights and to make irreversible decisions about their case while detained at the Oregon ICE offices or before they can speak to counsel elsewhere. *See, e.g.*, Supp. Tupper Decl. ¶ 12; Pritchard Decl. ¶¶ 10, 14, 16; Gill Decl. ¶ 14; R-J-S-V- Decl. ¶ 8; Kilgren Supp. Decl. Ex. A ¶ 20. And importantly, in those circumstances in which a detention is unlawful, access to counsel in Oregon prior to transfer could prevent an illegal deprivation of liberty.

The procedural safeguard that Plaintiffs seek is merely a brief pause for an opportunity to meaningfully exercise their right to counsel before ICE transfers them out of district, away from their communities and free local counsel. To achieve meaningful access to counsel, Plaintiffs ask only for a

---

[11] *See also J.Y.L.C. v. Bostock,* No. 3:25-cv-02083-AB (D.Or. Nov. 12, 2025) (citing over 30 habeas corpus cases across the country rejecting Defendant's improper invocation of their 8 U.S.C. § 1225(b)(2) custody authority).

procedure that provides time and space for meaningful access to counsel, as required by the Constitution. The parameters of the process can be flexible so long as core components of meaningful access to counsel are met. *See* Tupper Decl. ¶ 19 (describing what meaningful access would entail).

Finally, the government does not have an interest in depriving Plaintiff Leon X and Plaintiff PCUN's members, including proposed class members, of their procedural rights. According to Defendants, the government's interest here is in the "safe and efficient processing and transfer of [noncitizens]." Resp. at 43. While Plaintiffs do not contest the government's stated interest, the government may not violate the law to achieve it.

### 3. Defendants' access to counsel policies and practices in Oregon are tantamount to denial of counsel.

Instead of taking heed of the "warning" to "not treat [the right to counsel] casually," ICE is doing exactly that at the Oregon ICE Field Offices. *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 554 (9th Cir. 1990). Defendants claim that ICE does not systematically deny access to counsel, *see* Second Chan Decl. ¶ 27; Weiss Decl. ¶ 18 (same); Cabrera Decl. ¶ 18 (same), yet simultaneously assert the unilateral right to deny access to counsel when a myriad of circumstances are in play. *See id* (explaining that ongoing processing, security risks, imminent transfer are bases ICE uses to deny an individual access to counsel). And according to Defendants, these circumstances *are always in play* such that access to counsel at the field office is available in theory but not practice. Second Chan Decl. ¶¶ 14 (access to counsel is limited while active booking and processing is in progress, which often accounts for the majority of time spent at the Portland ICE office), 28 (transport plays a significant factor in the timing of transfers and transport runs are limited), 31 (safety and security concerns impact attorney access), 32 (asserting expeditious transfer necessary because "the longer an individual remains in custody in an ERO office in Oregon prior to transport", the higher the security risk).

Defendants admit that they have erected arbitrary barriers which impede access to *pro bono* counsel. Attorneys may only access individuals detained in the Portland, Eugene, or Medford Office if they "establish that they [already] have an attorney-client relationship," Chan Decl. ¶ 26; Weiss Decl. ¶ 17; Cabrera Decl. ¶ 17, and even then, they are only granted access "where feasible." Chan Decl. ¶

27. Defendants deny access because of "incomplete documentation, ongoing processing (e.g. fingerprinting or interviews), security risks, or the detainee's refusal" or where "a meeting would delay imminent transfer" or "the visitation room is already in use." Weiss Decl. ¶ 18; Cabrera Decl. ¶ 18; *see also* Chan Decl. ¶ 30 (describing how transport schedule is prioritized and "ICE cannot always accommodate visitation requests at the processing offices"). While Defendants assert "there is a constitutional difference" in the right to counsel for represented noncitizens and unrepresented noncitizens, *see* Resp. at 38-39, there is copious evidence demonstrating that ICE routinely deprives even represented noncitizens of their right to counsel at the Oregon ICE offices. Kilgren Decl. ¶ 8 (describing ICE depriving access to current clients); Eddie Decl. ¶¶ 2-10 (same); Martinez Decl. ¶ 6 (same); Gill Decl. ¶ 8 (same); Fawcett Decl. ¶¶ 5-8 (same); Moberg Decl. ¶¶ 16-32 (same); R-J-S-V-Decl. ¶ 8 (describing ICE refusal to allow him to contact his attorney despite his request).[12]

Defendants admit that they permit access to counsel in Oregon *only* at their discretion and *only* then when they unilaterally decide that such access "is feasible". Chan Decl. ¶¶ 27-32. In Oregon, "[a]ttorney access to an individual in ICE custody is limited while ERO is actively booking and processing the individual, which often accounts for the majority of time spent in the [Oregon Field Office] prior to transfer to the NWIPC." Chan Decl. ¶ 14; *see also* Weiss Decl. ¶ 9 (same); Cabrera Decl. ¶ 9 (same). Defendants also make numerous legal determinations without any consideration of access to counsel. Director Chan explains that ICE officers process individuals into a range of immigration postures, noting that "[n]ot all individuals arrested by ICE in Oregon are processed for removal proceedings before an immigration judge." *Id.* ¶ 15. He also notes that "ICE may also exercise its discretion" to make custody determinations and "arrest [noncitizens] subject to final removal orders." *Id.* According to Officer Chan, "ICE may also serve a variety of documents on the individual

---

[12] Despite Defendants' unsupported claims to the contrary, *see* Resp. 38-39., if Leon X is arrested, he is likely to be denied access to counsel at an Oregon ICE office. To the extent Defendants question Leon X's suitability as a class representative, Plaintiffs will address this argument in full in their class briefing.

during processing," which individuals are asked to sign, which "vary" and may not be served on arrested individuals. *Id.* ¶¶ 16, 33.

Defendants further admit that existing telephone and visitation access is inadequate at the Field Offices. Although "[i]ndividuals are provided a list of free legal service providers during processing," *see e.g.*, Chan Decl. ¶ 17, they must then pay to make a call to such free legal service – if phones are operational or even available in the holding rooms. *Id.* ¶ 18, n.5; *see also* Cabrera Decl, ¶ 11 n. 2 (noting that pay phones in Medford Office holding rooms "are not operational"); Weiss Decl. ¶ 11 (admitting Eugene Office "does not currently have phone service within the holding rooms"). At all three Oregon Field Offices, a free phone call is "typically provided . . . though if time is limited, that phone call may be provided after the individual arrives at the NWIPC." Chan Decl. ¶ 18; Cabrera Decl. ¶ 11; *see also* Weiss Decl. ¶ 11 (same). The Portland Office "is open to the public 8:00am-3:00pm Monday through Friday." *Id.* ¶¶ 20-21. The Eugene and Medford Offices have similar public hours. Weiss Decl. ¶ 12 (open to public 8am-4pm, although ERO closes at 3pm); Cabrera Decl. ¶ 12 (Medford Office open to public 8am-4pm). This is so even though apprehensions and detentions occur nearly *every* calendar day. Ryo Decl. Table 1.

Defendants also reveal that they use transport to arbitrarily disrupt access to counsel. Due to "a variety of . . . logistical and operational reasons," Defendants transfer individuals from all three Oregon Field Offices to NWIPC "within hours of processing." Chan Decl. ¶ 12; Weiss Decl. ¶ 8; Cabrera Decl. ¶ 8. Due to "a variety of operational, logistical and security reasons," "ICE cannot always accommodate visitation requests" before transport to NWIPC. Chan Decl. ¶ 28; Weiss Decl. ¶ 19; Cabrera Decl. ¶ 19. Such reasons include "additional expenses" incurred to pay transportation personnel by the hour and "efficiency and best use of time and resources" for transportation "runs" to NWIPC. Chan Decl. ¶ 30; Weiss Decl. ¶¶ 20-21; Cabrera Decl. ¶¶ 20-21. In determining the amount of time a detained individual spends in Oregon, Defendants do not consider whether an individual has or seeks legal representation when deciding when to transfer them. Chan Decl. ¶¶ 12-13. Although Defendants cite the 12-hour limit as an important factor motivating prompt transfer, *see* Chan Decl. ¶¶ 11-12; Weiss Decl. ¶ 7; Cabrera Decl. ¶¶ 5, 6, Director Chan also recognizes that the time individuals spend at the Field Office may

vary, "ICE is currently running more than one transport from the Portland ERO office every day," and the 12-hour limit has been exceeded "in emergency situations, during which "ERO does make special accommodations to provide appropriate facilities and care for emergency extended stays ." *Id.* ¶¶ 8 n.2, 13. These facts indicate that Defendants could accommodate attorney visits prior to transfer, but simply do not. Defendants also provide inadequate notice to attorneys prior to transfer. *See* Cantrell Decl. ¶ 20 (explaining that "[n]otifications are not sent prior to transfer or for book-ins at staging facilities, holding facilities or hospitals"). In response to five declarations describing limitations of ODLS, Director Cantrell reaffirms these limitations. Cantrell Decl. ¶ 27.

Ultimately, the government presents a false choice: Defendants would have the Court believe that any modifications to ICE's detention procedures at the Oregon ICE offices would result in violation of federal rules and state lease requirements and would force ICE to detain Oregonians in deplorable and inhumane conditions that other federal courts have held to be unlawful. *See* Resp. 42. That is simply not the case. Defendants have voluntarily flooded their system and refuse to make any adjustments to that system to ensure that detained individuals' rights are upheld. Due process requires more. Plaintiffs merely ask for a proportionate remedy to ensure meaningful access to counsel. "Defendants may not properly choose a facility that is unfit for a particular purpose and then use the inadequacies of the facility as a justification to deprive detainees of meaningful, confidential access to legal counsel to the extent demanded by the Constitution." *Mercado*, 2025 WL 2658779, at \*34; *see also D.N.N. et al. v Bacon et al.*, No. 1:25-cv-01613-JRR 2025 WL 352042 \*27 n.20 (D. Md. Dec. 9, 2025) ("To the extent the Government bases its argument on the fact that the . . . short-term detention facility[] is not set up to accommodate the need, the court is not persuaded") (citing *Mercado*, 2025 WL 2658779).

**B.  Plaintiffs are Likely to Succeed on their First Amendment Claims (Counts II & III).**

All Plaintiffs are likely to prevail on their First Amendment claims. The parties do not dispute that Plaintiffs have First Amendment rights, *see* Resp. 46 (acknowledging "Plaintiffs' First Amendment rights to communicate with counsel"), nor that the government places restrictions on the exercise of such rights, *see id.* at 55 (acknowledging the lack of attorney access at Oregon field offices).

Defendants claim that their restrictions satisfy the *Turner v. Safley* test, *id.* at 45-48, but it is not clear that these factors even apply here, as that case expressly examines the relationship between detention regulations and "legitimate *penological* interests." 482 U.S. 78, 107 (1987) (emphasis added). Immigration detention is civil; Defendants have *no* authority in this context to advance interests related to punishment. *See Zadvydas*, 533 U.S. at 690 (2001) (civil detention, including immigration detention, is permissible only in special narrow nonpunitive circumstances).

Assuming the test could apply, however, Plaintiffs can still show a likelihood of success on the merits. *Turner*'s "reasonableness" inquiry asks "(1) whether there is a valid, rational connection between the restriction and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) whether accommodating the asserted constitutional right will have a significant negative impact on prison guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are obvious, easy alternatives to the restriction showing that it is an exaggerated response to prison concern." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1049 (9th Cir. 2002) (citing *Turner*, 533 U.S. at 1048-49). All factors weigh in favor of Plaintiffs.

Here, Defendants have a de facto policy of primarily denying attorney access to those held at Oregon field offices. *See supra* § IV.A.3; Chan Decl. ¶¶ 27-32 (describing the myriad reasons for which access is denied). They claim that the "alternative means" available is access to counsel post-transfer. ECF 66 at 58. But that alternative is insufficient because, in order to be meaningful, access to counsel must be provided *before* someone is forced to make meaningful decisions about their rights. *See supra* Part IV. A. (explaining due process right to access counsel when detained). Accommodating the right would also not have a "significant negative impact" on Defendants' agents; Plaintiffs only request the opportunity to consult with available counsel (or, in CLEAR's case, clients) before being asked to waive their rights or being transferred thousands of miles away. This was the status quo before Defendants dramatically increased immigration enforcement in Oregon in mid-October; Ryo Decl. ¶ 18 (noting "extraordinary increase in October 2025"); Supp. Walker Decl. ¶¶ 3-4; if Defendants could provide

access before, they certainly have the capability, and resources, to provide such access now.[13] Indeed, the "obvious, easy alternative" (*Valdez*'s fourth factor) is return to that status quo.

Defendants claim two "valid government interests": the right to enforce immigration law and the need to "protect the safety and security" of officers and detainees. Resp. 46. Plaintiffs do not contest that the federal government may enforce immigration law, but Defendants lack a valid interest in enforcing it in a way that violates people's rights. *See United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971) (Brennan, J., concurring); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). And after hearing extensive evidence, a judge in this district has already soundly rejected Defendants' purported safety concern. *See Oregon v. Trump*, No. 3:25-cv-1756-IM, 2025 WL 3126773, at *34 ("The facts on the ground show that since a high watermark of unlawful activity in mid-June, the protests outside the Portland ICE facility did not significantly impede the ability of federal officers to execute the immigration laws.") (cleaned up). In short, all four *Turner* factors favor Plaintiffs.

Additionally, Defendants are incorrect to claim that CLEAR's First Amendment rights are limited because they seek, in part, to exercise their First Amendment right to speak to "prospective" clients. Resp. 50. While the Oregon Rules of Professional Conduct define "prospective client" for the purposes of setting an attorney's ethical duties, under Oregon law, *see* ORPC 1.18(a), the use of the word "prospective" does not limit CLEAR to this context-specific definition. "Prospective" means "likely to be or become" or "expected"; a synonym is "potential". *Prospective*, Merriam-Webster Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/prospective (12th ed. 2025). And case law makes abundantly clear that legal services organizations, like CLEAR, have a First Amendment right to advise not only current clients but also future (prospective, potential) clients. *See, e.g.*, *Immigrant Defenders Law Center v. Noem*, 145 F.4th at 996 (limiting at § 705 stay order to "current

---

[13] This is especially true considering the vast influx of resources Defendants are receiving after the passage of July 2025's "Big Beautiful Bill". *See* Dep't of Homeland Sec., *Secretary Noem Commends President Trump and One Big Beautiful Bill Signing into Law: Historic Win for the American People and the Rule of Law*, July 4, 2025, https://www.dhs.gov/news/2025/07/04/secretary-noem-commends-president-trump-and-one-big-beautiful-bill-signing-law (describing the appropriation of $165 billion to the Department of Homeland Security).

and future" clients of plaintiff legal services organization, in part due to the likelihood of success on its First Amendment claim); *First Defense Legal Aid v. City of Chicago*, 209 F.Supp.2d 935, 940 (N.D. Ill. 2002) (noting the "constitutional existence of lawyers' First Amendment rights . . . to have access even to potential clients . . . 'free from governmental interference') (citation omitted); *cf. Jean v. Nelson*, 727 F.2d 957, 984 (11th Cir. 1984) ("The Supreme Court has repeatedly emphasized that counsel have a first amendment right to inform individuals of their rights, at least when they do so as an exercise of political speech without expectation of renumeration.") (citation omitted).[14]

Defendants make much of the fact that the restrictions at issue are, according to them, "content-neutral" and therefore subject only to intermediate scrutiny. Resp. 52. But their policies can withstand such scrutiny only if they are "narrowly tailored to serve a significant governmental interest and . . . leave open ample alternative channels for communication of the information." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). A "narrowly tailored" restriction cannot "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. To determine if an "ample alternative channel" exists, the Court considers factors including whether a speaker can still reach the intended audience, *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990); whether the activity's location is part of the expressive message, *Galvin v. Hay*, 374 F.3d 739, 756 (9th Cir. 2004); the opportunity for spontaneity, *N.A.A.C.P. W. Region v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1984); and the cost and convenience of alternatives, *City of Ladue v. Gilleo*, 512 U.S. 43, 57 (1994).

Defendants do not attempt to explain how their functional ban on attorney access at the Oregon field offices is "narrowly tailored" to further their interests. They do claim an "alternative channel" is provided at NWIPC, but they conveniently ignore the significant barriers to counsel access there and at other facilities to which putative class member plaintiffs (and Plaintiff PCUN's members) are

---

[14] Moreover, CLEAR Clinic also alleges unlawful interference with its ability to meet with its *current* clients. *See* First Tupper Decl., ECF 7 ¶ 27 (referencing a refused visit with a "detained client"); First Moberg Decl. ECF 5 ¶¶ 23-31 (describing ICE's efforts to prevent meeting with her client A.J.R.).

transferred. *See* Stopher Decl. ¶¶ 17-18; Pritchard Decl. ¶ 17; Haddy Gassama, *Detained Immigrants Detail Physical Abuse and Inhumane Conditions at Largest Immigration Detention Center in the U.S.* ACLU, Dec. 8, 2025, https://www.aclu.org/news/immigrants-rights/detained-immigrants-detail-physical-abuse-and-inhumane-conditions-at-largest-immigration-detention-center-in-the-u-s (describing severe limitations on access to counsel for facility detaining 3,000 individuals). In *Immigrant Defenders Law Center v. Noem*, the district court found that the government "burdened substantially more speech than necessary to further the Government's interests" by, in the context of the Remain in Mexico program, imposing strict time and conditions limitations on the plaintiff legal services organization's ability to meet with existing clients, preventing communication with and advice to potential clients, and restricting Know Your Rights presentations. 781 F.Supp.3d 1011, 1047 (C.D. Cal. 2025), *vacatur affirmed in part by* 145 F.4th 972, 996 (9th Cir. 2025). So too here, where Defendants only allow attorney access during narrow times when they are not concerned about "security risks" or engaged in "ongoing processing," Chan Decl. ECF 68 at ¶ 27, and limit such access to a matter of minutes, without the ability to contact interpreters, *see, e.g.,* First Tupper Dec. ECF 67 ¶ 24 (describing ten-minute meeting limit and lack of access to interpretation).

Moreover, while Defendants may have a legitimate interest in immigration enforcement and in protecting the safety of their officers, *see* Resp. 46, they cannot radically increase the scale, and intensity, of their enforcement policies without a corresponding accommodation in the facilitation of access to rights, including the right to counsel. Defendants would pretend that their sharp enforcement increase, *see* Ryo Decl. ¶¶ 15, 17-18, coupled with efforts to pressure immigrants in their custody to waive their rights and accept deportation as quickly as possible, *see supra* § IV.A.2, have *no* impact on the need for timely access to counsel early in the immigration enforcement process. Defendants are obligated to increase the ability of counsel to access persons in detention under such circumstances. *Cf. Southern Poverty Law Center*, 2020 WL at *29 (finding the government's limited efforts to improve legal service provider access to detainees during the COVID-19 pandemic "are not proportionate to the increased demand for remote legal visitation" due to the pandemic, in part because "these are not normal circumstances").

Defendants claim this case is unlike *Torres v. U.S. Dep't of Homeland Sec.*, in which conditions "hindere[ed] attorneys from speaking with clients for days or weeks." 411 F.Supp.3d. at 1044. On the contrary, that is precisely the fact pattern shown in this case: after transfer, people often disappear into the detention center for precisely these amounts of time and may be transferred anywhere in the country. Pritchard Decl. ¶ 17; Supp. Walker Decl. ¶¶ 7-8; Lerner Decl. ¶¶ 11,16-17. Contrary to Defendants' contention, Plaintiffs do not request "unfettered and immediate access" to their clients without restriction, Resp. 53. They only request what the First Amendment (and due process) require: a meaningful opportunity to counsel persons whom Defendants seek to swiftly detain and remove from the United States, regardless of their legal rights, at a time *before* they are forced to make dispositive decisions about their legal cases. Plaintiffs should prevail on their First Amendment claims.

## V. PLAINTIFFS HAVE ESTABLISHED A CLEAR LIKELIHOOD OF IRREPARABLE HARM.

Defendants' arguments that Plaintiffs have not established a clear likelihood of irreparable harm are unconvincing.

The harm to Plaintiff Leon X, putative class members, and Plaintiff PCUN's members is not speculative because Defendants have asserted their intent to deport as many people as possible from the United States, as quickly as possible. *See, e.g.,* The White House, *Protecting the American People Against Invasion*, Jan. 20, 2025, https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/; Associated Press, *Trump vows to 'permanently pause' migration from poor nations in social media screed*, NPR, Nov. 28, 2025, https://www.npr.org/2025/11/28/nx-s1-5623787/trump-vows-to-permanently-pause-migration-from-poor-nations-in-social-media-screed. Indeed, while Defendants claim here that Plaintiff Leon X's apprehension is "unlikely" given his status as a DACA holder with a pending U visa, their recent actions and statements in other cases belie this assertion. *See, e.g.,* Andrea Ramos, *DACA Recipients Keep Getting Detained, Despite Protections*, American Immigration Council, Aug. 14, 2025, https://www.americanimmigrationcouncil.org/blog/daca-detained-despite-protections/ (describing detentions of three DACA recipients); Cureton Cook, *Hillsboro man released after alleged wrongful*

*detention by ICE*, OPB, Nov. 8, 2025, https://www.opb.org/article/2025/11/08/hillsboro-immigration-customs-enforcement-victor-cruz-ice-oregon-washington-county-democrats/ (ICE asserted "no one was arrested by mistake" in response to questions about the unlawful arrest of a man who holds U Visa deferred action).

Moreover, Defendants continued reference to the legality of their transfer authority is a red herring. Resp. 56. Plaintiffs challenge not the transfer practice itself, but the denial of access to counsel in Oregon *before* Defendants disappear them into their vast detention system, which in many locations provides extremely limited, or no, access to counsel.[15] The harm challenged here is not the transfer; the harm is the impact of the denial of access to counsel, which can result in prolonged detention and swift removal. Plaintiff Leon X, putative class members, and members of Plaintiff PCUN can certainly show that they are suffering, or will suffer, irreparable harm on account of Defendants' unlawful policy.

Finally, Defendants misconstrue Plaintiff CLEAR Clinic's harm. CLEAR does not allege "hypothetical constitutional injuries to non-parties", Resp. 56-57, but harm to its *own* organizational mission and programs. *See* Tupper Dec., ECF 7 ¶¶ 30-36, Suppl. Tupper Dec.¶¶ 6-7, 13, 20, 22. These intangible injuries to core activities can be irreparable where monetary damages are unavailable. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).[16]

## VI.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST TIP SHARPLY IN FAVOR OF PLAINTIFFS.

The balance of equities and the public interest clearly favor Plaintiffs. Defendants' assertion that the government's compelling interest in immigration enforcement outweighs the Plaintiffs' interest in preventing violations of constitutional rights is without merit. Resp. 58. Defendants have no

---

[15] *See, e.g.*, Haddy Gassama, *Detained Immigrants Detail Physical Abuse and Inhumane Conditions at Largest Immigration Detention Center in the U.S.*, ACLU, Dec. 8, 2025, https://www.aclu.org/news/immigrants-rights/detained-immigrants-detail-physical-abuse-and-inhumane-conditions-at-largest-immigration-detention-center-in-the-u-s (describing severe limitations on access to counsel for facility detaining 3,000 individuals).

[16] Contrary to Respondents' argument, CLEAR Clinic is not a proper party to seek redress for its organizational harms through a tort action. *Contra* Resp. 57.

legitimate interest in exercising their immigration enforcement authorities in violation of the Constitution or federal law. *See U.S. Coin & Currency*, 401 U.S. at 726 (Brennan, J., concurring); *Valle del Sol Inc.,* 732 F.3d at 1029. Defendants' argument that they will suffer irreparable injury from being "enjoined by a court from effectuating statues enacted by representatives of its people" misses the mark entirely. Resp. 67. To the contrary, Plaintiffs seek to enjoin continued violations of the First and Fifth Amendments and ask merely that Defendants comply with the law. *See Ramirez Ovando v. Noem,* No. 1:25-CV-03183-RBJ, 2025 WL 3293467, at *24 (D. Colo. Nov. 25, 2025) (finding that "[n]either the government nor the public can claim any legitimate interest in the systemic violation of § 1357(a)(2)'s prohibition against warrantless arrests except upon individualized probably cause of flight risk"). Further, "deference [to executive judgments in detention administration] is not permissible in the face of continuing constitutional violations." *Mercado,* 2025 WL 268779, at *36. Defendants cannot suffer harm from an injunction that merely ends an unlawful practice. *See Rodriguez v. Robbins,* 715 F.3d 1127, 1145 (9th Cir. 2013).

Defendants argue that their interest is "particularly acute given that the injunction Plaintiffs propose would have the predictable effect of requiring the release of individuals for whom the Defendants have probable cause to arrest." Resp. 60. They claim that "the goal of Plaintiffs' lawsuit is to grind immigration enforcement in Oregon to a halt and delay detainee transportation to Tacoma" to allow "Plaintiffs to file habeas petitions in Oregon," which in turn forces them to release the people they detain when a court issues a temporary restraining order, and that is an "intolerable outcome" for them. Resp. at 3. This is a bold argument. First, Plaintiffs have not filed any such challenge. They are seeking to restore the status quo of access prior to the immigration surge. Second, Defendants seem to suggest that they disfavor individuals having access to counsel because that translates into access to courts and they would prefer that courts not review their actions related to the surge.

Courts have repeatedly found that Defendants' policy and practice[17] of performing warrantless arrests pursuant to detentive stops to execute immigration enforcement unlawful without an individualized assessment on probable cause for both flight risk and unlawful presence, granting preliminary relief or enforcement of settlements in a classwide setting.[18] This District Court, and courts around the country, have also rejected Defendants' arguments that they have sweeping detention authority under 8 U.S.C. § 1225(b)(2).[19] In other words, the facts and caselaw indicate that Defendants are engaged in a widespread practice of routinely arresting people *unlawfully*. These unlawful arrests require attorney access and federal court intervention to ensure that those wrongly arrested are released. And the vast majority of individuals subject to arrest in Oregon are unable meet with counsel in the Oregon ICE offices to assess the legality of their arrest – resulting in prolonged unlawful detention.

Defendants  have not explained how the provision of attorney access at its Oregon ICE offices, as guaranteed by the Fifth Amendment and consistent with Defendants' own nationwide standards

---

[17] Defendants' agents recently confirmed this policy and practice before this District Court during an evidentiary hearing, where they described the widespread issuance of post-hoc arrest warrants and use of template language they were instructed to insert in arresting documents. *See* Maxine Bernstein, *ICE officers reveal arrest quotas, facial recognition use in Oregon dragnet*, The Oregonian, Dec. 9, 2025, https://www.oregonlive.com/crime/2025/12/ice-officers-reveal-arrest-quotas-facial-recognition-use-in-oregon-dragnet.html. During this same hearing, Defendants' agents also detailed how they targeted "target rich" areas and performed arrests without any confirmation of the identity or unlawful presence of the individuals they apprehended. *Id.*

[18] *Escobar Molina,* 2025 WL 3465518, at *38–39 (preliminarily enjoining Defendants from performing warrantless arrests in the District of Columbia without a pre-arrest individualized determination by the arresting agent of probable cause under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii)); *Vasquez Perdomo v. Noem*, Case No.: 2:25-cv-05605-MEMF-SP (C.D.Cal.) (enjoining Defendants from conducting detentive stops in the Central District of California without reasonable suspicion), *stay of preliminary injunctive relief granted by* 2025 WL 2585637 (S. Ct. Sept. 8, 2025); *Ramirez Ovando v. Noem*, Case No. 1:25-cv-03183-RBJ  at *23-24 (D.Col.) (enjoining Defendants from further violating the requirement of the individualized-assessment-of-flight-risk "enshrined in § 1357(a)(2) and § 287.8(c)(2)(ii)").

[19] S*ee, e.g., A-B-D- et. al v. Hermosillo et. al.*, 6:25-cv-02014-AA, ECF 25 (D.Or., decided on Dec. 5, 2025), *J.Y.L.C. v. Bostock et. al.*, 3:25-cv-02083-AB, ECF 15, (D. Or., decided on Nov. 12, 2025), and *S.Z.D. v. Wamsley et al.*, 3:25-cv-01931-AB, ECF 12 (D. Or. granted in part on Nov. 12, 2025).

governing its detention facilities, infringes upon the lawful exercise of their enforcement authority.[20] Instead, any "logistical difficulties defendants invoke flow from their own decision to place the volume of arrests above their duty to adhere to the law in the treatment of those arrested." *Mercado,* 2025 WL 268779, at *81. Defendants may not "bootstrap the consequences of ignoring the Constitution and their own standards into cognizable harm that outweighs ongoing constitutional injury." *Id.* Here, an injunction would halt ongoing constitutional injuries and merely require Defendants to adhere to the law and their previously adopted standards for other immigration detention facilities. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Innovation Law Lab,* 310 F.Supp.3d at 1162. The balance of equities and public interest decisively favor Plaintiffs.

## VII.   PLAINTIFFS' REQUESTED INJUNCTION IS NECESSARY AND PROPER.

Defendants argue simultaneously that Plaintiffs' requested relief is "duplicative of Defendants' preexisting programs" and also "overbroad . . . and unworkable." Resp. at 60. It is neither.

Defendants' misconception that Plaintiffs' sole goal is to delay and impede transfer is, again, misconception. Plaintiffs' lawsuit and requested relief is *to ensure access to counsel.* For individuals who are already being held for "several hours" at an Oregon Field Office, *see* Chan Decl. ¶ 13, providing the requested access to counsel is unlikely to delay transfer. For those held for "as little as 30 minutes to an hour," a small, reasonable delay before transfer must occur to enable them to meaningfully engage with counsel. Such delay should not cause undue burden to Defendants, who are currently running multiple transports to NWIPC every day. *See id.*

The Notice, Time, and Space requests that Plaintiffs make are tailored to enable meaningful access to counsel in the current context of Defendants' surge in immigration enforcement. *See* Tupper Decl. ¶ 19 (describing necessary components of "[m]eaningful access to counsel," based on her fifteen years of experience in immigration law); Ryo Decl. (summarizing data showing drastic increase in ICE

---

[20] *See* U.S. Customs Enforcement, *Performance-Based National Detention Standards 2011* (rev. Dec. 2016), https://www.ice.gove/doclib/detention-standards/2011/pbnds2011r2016.pdf (requiring that facilities permit legal visitation seven days a week, including holidays, for a minimum of eight hours a day on weekdays and four hours on weekends and holidays).

arrests in Oregon); Supp. Keller Decl. ¶¶ 4-5 (describing ongoing surge in detention reports to community hotline since October 2025).[21]

**1) Notice.**

Plaintiffs' requests are not duplicative of Defendants' current practices. Defendants currently provide a written list of legal service providers; Defendants submit no evidence that this information is presented in multiple languages or communicated in any way to non-literate individuals. *See* Chan Decl. ¶¶ 17-18; Weiss Decl. ¶ 10; Cabrera Decl. ¶ 10. Individuals may pay for phone calls only when pay phones are working in the Portland Office, Chan Decl. ¶ 18, n.5; there are no operational phones in the holding rooms of the Eugene or Medford Offices, Weiss Decl. 6 11; Cabrera Decl. ¶ 11 n.2. Free phone calls to free legal service providers are "typically" offered unless "time is limited," Chan Decl. ¶ 18; Cabrera Decl. ¶ 11; *see also* Weiss Decl. ¶ 11 (same). Defendants' declarations represent their view that time is always limited. Chan Decl. ¶ 32; Weiss Decl. ¶ 23; Cabrera Decl. ¶ 23. Defendants' declarations also make clear that documents are currently only served on individuals at Defendants' discretion. *See, e.g.*, Chan Decl. ¶ 33 (explaining that many "documents for arrest and processing" are not served, and others are served "later . . . to ERO Tacoma", not to the individual).

**2) Time.**

Defendants argue that attorney access from 8:00am to 8:00pm "is impossible" at the Oregon ICE Field Offices. But all three Field Offices are open to the public from 8:00am to 3:00pm, with the Eugene and Medford Field Offices open to the public from 8:00am to 4:00pm. Chan Decl. ¶¶ 20-21;

---

[21] Plaintiffs' motion does not raise arguments pertaining to Defendants' Performance-Based National Detention Standards ("PBNDS") because it is based solely on Plaintiffs' constitutional claims. *Contra* Resp. at 60-61. Nevertheless, Defendants' own standards – both the PBNDS and the similar National Detention Standards ("NDS"), which apply to "Service Processing Centers" – are at minimum a "valuable point of reference" for the Court when considering the access to counsel that should be required in a detention space where Defendants are making important decisions, interrogating individuals, and requesting waivers that have significant impacts on individuals' rights and liberties. *Mercado*, 2025 WL 2658779, at *33 n.293; *see also Perdomo v. Noem*, 2025 WL 3192939, at *12 (C.D. Cal. Nov. 13, 2025) (finding requested attorney visitation schedule reasonable with reference in part to Defendants' own National Detention Standards).

Weiss Decl. ¶ 12; Cabrera Decl. ¶ 12. Moreover, ICE is already operating on expanded hours at the Portland ERO Office" because "ICE has recently increased immigration enforcement operations in Oregon, which includes the temporary addition of enforcement personnel." Chan Decl. ¶ 21. Plaintiffs' visitation hours request in no way violates the 12-hour limit on Field Office detention that Defendants repeatedly cite. *See* Chan Decl. ¶¶ 11-12; Weiss Decl. ¶ 7; Cabrera Decl. ¶¶ 5, 6.

**3) Space.**

Plaintiffs do not "demand exclusive access" to any space, Resp. 64; to the contrary, they will "work in good faith with Defendants" to accommodate other entities who seek to use available spaces, *see* ECF 40 at 33-34. Plaintiffs request access to "an adequate space for group orientations" and "an individual and confidential space" for legal consultations. *See* ECF 40 at 33; Tupper Decl. ¶ 19 (describing "confidential space" as necessary for "[m]eaningful access to counsel").

## VIII.   THE COURT SHOULD NOT ORDER PLAINTIFFS TO POST A BOND.

If the Court grants preliminary relief, it has discretion over whether to require a security payment under Fed. R. Civ. Proc. 65(c). *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). "Exercising that discretion, federal courts typically require substantial bonds only in suits between private parties with significant monetary interests at stake." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 224 (D.D.C. 2025). Here, because Plaintiffs request relief that merely requires "compliance with the existing law," no bond is necessary or appropriate. *See Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 896 n.36 (C.D. Cal. 2025). In the alternative, Plaintiffs request a nominal bond of $1.00, similar to the bond recently set by the District Court for the District of Columbia in a putative class action addressing the impacts of Defendants' widespread warrantless arrests. *See Escobar Molina*, 2025 WL 3465518, at *37–38.

## CONCLUSION

The Court should grant the preliminary injunction.


Dated: December 15, 2025.                              Respectfully submitted,

*/s/   Stephen W Manning*

STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,
smanning@ilgrp.com
TESS HELLGREN, OSB No. 191622
tess@innovationlawlab.org
JORDAN CUNNINGS, OSB No. 182928
jordan@innovationlawlab.org
KELSEY LYNN PROVO, OSB No. 145107
kelsey@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No. 223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

Attorneys for Plaintiffs