IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

CLEAR CLINIC; PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE; LEON X,

Plaintiffs,

v.

KRISTI NOEM; U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); TODD LYONS; LAURA HERMOSILLO; PETE FLORES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION,

Defendants.

Civ. No. 6:25-cv-01906-AA

**OPINION & ORDER**

---

AIKEN, District Judge.

This case comes before the Court on a Motion for Preliminary Injunction filed by Plaintiffs Clear Clinic, Pineros Y Campesinos Unidos Del Noreste ("PCUN"), and Leon X, ECF No. 40. The Court held an evidentiary hearing on the motion on December 18, 2025. ECF No. 88. For the reasons set forth below, the motion is DENIED.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show (1) that he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in his or her favor; and (4) an injunction is in the public interest. *Id.* at 20. When the government is a party, the public interest and balance-of equities factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). "Likelihood of success on the merits is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020).

In the Ninth Circuit, courts may apply an alternative "serious questions" test which allows for a preliminary injunction where a plaintiff shows that "serious questions going to the merits" were raised and the balance of hardships tips sharply in plaintiff's favor, assuming the other two elements of the *Winter* test are met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). This formulation applies a sliding scale approach where a stronger showing on one element may offset a weaker showing in another element. *Id.* at 1131. Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion by a "clear showing" of the four elements set forth above. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

## BACKGROUND

### I. Factual Background

#### a. The Parties

Plaintiff CLEAR Clinic ("CLEAR") is a nonprofit organization based in Portland, Oregon. FAC. ¶ 14. CLEAR provides free legal services, including immigration services. CLEAR works with clients in removal proceedings, as well as those who may face detention and removal. *Id.*

Plaintiff Pineros y Campesinos Unidos del Noroeste ("PCUN") is a membership organization which consists in large part of farmworkers and Latino working families. FAC ¶ 15. PCUN provides Know Your Rights ("KYR") presentations to its members and assists in connecting its members to legal representation should the need arise. Campos Decl. ¶ 4.

Plaintiff Leon X is a 32-year-old Mexican national who has been living in Oregon since he was six. Pl. Mot. at 3; Leon X Decl. ¶ 2. He was granted status under the Deferred Action for Childhood Arrivals ("DACA") program over a decade ago, and he also has a pending U Nonimmigrant Status (UVisa) application pending based on being the victim of a serious crime as a child. Leon X Decl. ¶ 3. Leon X seeks to represent a class of individuals who fear arrest and detention by ICE. Pl. Mot. at 3.

Defendant Kristi Noem is the Secretary of the U.S Department of Homeland Security ("DHS"). FAC ¶ 17.

Defendant DHS is a cabinet-level department of the U.S. government. FAC ¶ 18. DHS is responsible for the administration of U.S. immigration laws, including the Immigration and Nationality Act ("INA"). *Id.*

Defendant Immigration and Customs Enforcement ("ICE") is a DHS sub-agency and is responsible for the apprehension, detention, and removal of noncitizens in the United States. FAC. ¶ 21.

Defendant U.S. Customs and Border Protection ("CBP") is a sub-agency agency of DHS and is responsible for the apprehension, detention, and removal of noncitizens near the boundaries of the United States. FAC. ¶ 23.

Defendant Todd Lyons is the acting director of ICE. FAC ¶ 19.

Defendant Pete R. Flores is the acting commissioner of CPB. FAC ¶ 22.

Defendant Laura Hermosillo is the acting director of ICE's Seattle Field Office. She was substituted for Camilla Wamsley, who held that position when this action was filed. Pl. Reply at fn. 1. The Seattle Field Office oversees ICE operations in much of the Pacific Northwest, including ICE facilities and operations in the State of Oregon. FAC ¶ 20.

**b. Immigration Enforcement in Oregon**

Immigration enforcement has been a priority for the current administration, which has set arrest quotas for ICE. FAC ¶ 37. This has led to numerous stops and raids at a wide variety of locations in Oregon. FAC ¶¶ 49-51.

Between September 2023 and December 2024, the number of immigrations arrests per month in Oregon ranged from a low of three arrests to a high of sixteen. Ryo Decl. at Table 1.

The number of immigration arrests escalated rapidly in mid-2025. Beginning in June of 2025 and continuing through October 2025, there have been more than 100 arrests per month in Oregon. *Id.*

Oregon law prohibits the use of state facilities or resources for immigration enforcement purposes and there are no dedicated federal immigration detention facilities in the state. Def. Resp. at 7; Sec. Chan Decl. ¶ 7; s*ee also*, ORS 180.805-810; ORS 181A.820–181A.829. The last facility in Oregon that provided immigration detention services ended its contract with ICE in 2020. Sec. Chan Decl. ¶ 7. Oregon law also prohibits local governments and law enforcement agencies from entering into agreements with ICE regarding detention and limits any cooperation between the state and federal governments in immigration enforcement. ORS 180.805-810; ORS 181A.820–181A.829

ICE operates three field offices in Oregon, located in Portland, Eugene, and Medford. Each field office includes holding rooms for detainees but limits the holding of detainees to a 12-hour maximum. *Id.* ¶ 8. None of the field offices are staffed on a 24-hour basis. *Id.* ¶ 9. The Portland office, located on Macadam Street, ("Macadam") is specifically bound by a conditional use permit that limits the holding of detainees to 12 hours. *Id.* ¶ 10.

Because the detainees cannot be held in Oregon due to a lack of appropriate facilities, any person detained by ICE who is not released within the 12-hour period is transferred to the Northwest ICE Processing Center ("NWIPC") located in Tacoma, Washington. Sec. Chan. Decl. ¶ 11. ICE runs multiple detainee transports per day from Oregon to NWIPC. *Id.* ¶ 13.

Detainees in Oregon are provided with a list of pro bono counsel provided by the Executive Office for Immigration Review ("EOIR") using information submitted by immigration attorneys and firms that wish to provide theses services. *Id.* ¶ 17. The EOIR List is posted by the phones at each field office; at Macadam, the phones are in the hold rooms themselves. *Id.* ¶ 19. However, not all detainees are allowed to make a phone call prior to transport to NWIPC. *Id.* ¶ 18.

CLEAR's attorneys have attempted to meet with prospective and current clients at Macadam. Tupper Decl. ¶ 23. Attorneys have at times been able to meet with prospective clients for only a few minutes or up to an hour before the person is then transported to NWIPC. *Id.* ¶ 24. ICE asserts that operational and logistical necessity—processing detainees and then transferring them to NWIPC—prevents them from providing time for attorney-client meetings in the field offices for every detainee. Def. Resp. at 16.

Once at NWIPC, some detainees are subsequently transferred to other ICE detention facilities in places such as in New Mexico, Texas, and Louisiana. Garcia Decl. ¶ 13; Denniston Decl. ¶ 11; Hrg. Trans. 50:19.

### c. Rapid Response Network

PCUN and CLEAR have collaborated with other organizations to set up a "rapid response network," for immigration enforcement activities. Pl. Mot. at 6. The Portland Immigrant Rights Coalition ("PIRC") operates a hotline seeking reports of ICE enforcement actions and detentions. *Id.* PIRC then transmits the information to Equity Corps of Oregon ("ECO"), a statewide universal representation program. *Id.* ECO then transmits that information to an ECO-aligned group, such as CLEAR or Innovation Law Lab, to dispatch an attorney for the detainee. Miranda Decl. ¶ 5. Between October 16, 2025, and October 21, 2025, PIRC's hotline received 1,502 calls, which included reports of 67 detentions. Walker Decl. ¶ 4.

### d. Procedural Background

This case was originally filed on October 16, 2025, and Plaintiffs moved for a Temporary Restraining Order ("TRO"). A hearing on the TRO was held October 24, 2025, and the Court denied the motion on October 29, 2025.

Plaintiffs filed a motion for preliminary injunction on November 12, 2025. ECF No. 40. The Court held a hearing on the preliminary injunction December 18, 2025. ECF No. 88

## DISCUSSION

Plaintiffs' motion involves three discrete claims: Claim I, a Fifth Amendment Due Process claim on behalf of all listed Plaintiffs; Claim II, a First Amendment claim by PCUN and Leon X about the ability to communicate with counsel; and Claim III,

a First Amendment claim by CLEAR about the ability to solicit clients and communicate legal information to persons in ICE custody.

Plaintiffs allege that Defendants are preventing attorneys from speaking with represented and unrepresented detainees and, conversely, represented and unrepresented detainees from speaking with attorneys. Plaintiffs allege this practice is in violation of the First and Fifth Amendments and amounts to holding detainees "incommunicado." *See*, Pl. Mot. at 24.

Plaintiffs further allege that detainees are "mak[ing] irreversible decisions" while detained at the Oregon Field Offices, Pl. Reply at 16, including "asking people to sign legal documents, pressuring people to waive important rights like the right to speak with a lawyer, the right to request a hearing before an immigration judge, and the right to apply for relief from removal, including asylum." Sec. Kilgren Decl. ¶ 13.

## I. Jurisdiction

Defendants challenge the Court's jurisdiction over this matter, citing various provisions of the INA, specifically 8 U.S.C. §§ 1252(b)(9), 1252(f)(1), and 1252(a)(2)(B)(ii). Def. Resp. at 20-21. These are familiar arguments in this area of law.

The Supreme Court has rejected an expansive interpretation of § 1252(b)(9). *Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018). While Defendants argue that this case arises from removal proceedings, that appears to be the "uncritical literalism" that the Supreme Court has eschewed. *Id.* As the Supreme Court said in that case,

> "[I]t is enough to note that respondents are not asking for review of an order of removal; they are not challenging the decision to detain them in

> the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances, § 1252(b)(9) does not present a jurisdictional bar."

*Id.* That is as true in this case as it was in *Jennings.* Section 1252(b)(9) is not a bar on the Court's jurisdiction.

The next provision cited as barring this Court's jurisdiction is specific to class-action injunctive relief:

> "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated."

8 U.S.C. § 1252(f)(1).

Here Plaintiffs are not challenging or seeking to restrain the operation of the covered provisions of the INA: they are not seeking to stop detentions, transfers, or removals (i.e. "restrain[ing] the operation of the provisions of part IV of this subchapter."). What they challenge are conditions of confinement, specifically the restrictions on communication which implicate the rights of both detainees and organizational Plaintiffs. *See Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1049-1050 (C.D. Cal. 2019)

Defendants invoke § 1252(a)(2)(B)(ii), which, bars jurisdiction over any "decision or action of the Attorney General or the Secretary of Homeland Security" which, under the INA, is specified as "in the discretion" of those officials. Defendants couple that provision with § 1231(g)(1), which states, in pertinent part, that "[t]he

Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or decision on removal." § 1231(g).

This Court does not doubt that the Government has latitude in "arranging for appropriate places of detention." But the statute does not use the phrase "discretion," nor, if discretion is inferred, is it unfettered. *Cf.* 8 U.S.C. § 1157(c)(1) ("Subject to the numerical limitations established pursuant to subsections (a) and (b), the Attorney General may, in the Attorney General's *discretion*. . .") (emphasis added); see also *Kucana v. Holder*, 558 U.S. 223, 247-248 (2010) (discussing "discretion" as used specifically in various statutes).

The statute does not say that the Government determines what is an *appropriate place*, rather it contemplates that the attorney general's decision is limited to those places which are *appropriate*. By its terms, it recognizes that some places of detention would be *inappropriate*. If not, "appropriate" would become surplusage—a word with no effect—and this is to be avoided. *See Koonwaiyou v. Blinken*, 69 F.4th 1004, 1007 (9th Cir. 2023). All this to say, the Government is the decision-maker in terms of where to detain a person but being the decision-maker is not the same as having unfettered—and unreviewable—discretion under this jurisdictional stripping statute.

Additionally, Courts have recognized that some decisions on where to house a detainee are inappropriate. Relevant here, distance to established counsel has been a factor. *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1438 (9th Cir. 1986), *amended on other grounds*, 807 F.2d 769 (9th Cir. 1986)

Defendants cite *Geo Group Inc. v. Newsom*, 50 F.4th 745,754 (9th Cir. 2022), for "recognizing DHS's broad discretion in arranging detention[.]" Def. Resp. at 25. However, that case was about DHS's ability to determine *where* to build detention *facilities*, not the discretion to determine where to house particular detainees. In that case, state laws ran afoul of the Supremacy Clause, which is not germane to the question of this Court's jurisdiction.

Defendants also cite *Gandarillas-Zamrana v. Bd. of Immigr. Appeals*, 44 F.3d 1251, 1256 (4th Cir. 1995), quoting that court as saying DHS's predecessor, the INS, "necessarily has the authority to determine the location of detention of an alien in deportation proceedings." Def. Resp. at 25. But that court also acknowledged that authority is not without limits. The court noted that the plaintiff, who had been transferred from Virginia to Louisiana did not argue that the "transfer had disrupted his relationship with counsel previously retained elsewhere," and the court also noted he did not support his allegation that "counsel was unavailable to him in Louisiana." *Gandarillas-Zamrana*, 44 F.3d at 1256. To this Court, it seems that those are factors in determining whether the Government's choice of detention facility is "appropriate." While a detainee "does not have the right to be detained where his ability to retain representation is the greatest[,]" *id.*, that does not mean that the availability of counsel or the disruption of a current relationship is not a factor.

In sum, the INA does not strip all jurisdiction from the Court under any of the provisions cited by Defendants.

## II. Standing

Defendants challenge Plaintiffs' standing, saying they "do not have standing to obtain relief on behalf of non-party hypothetical individuals, and anecdotal concerns about past conduct not before this Court cannot supply a basis for injunctive relief for others." Def. Resp. at 26-27.

To establish Article III standing, a plaintiff must demonstrate that: (1) she suffered an injury in fact that is concrete, particularized, and actual or imminent (not conjectural or hypothetical); (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). For purposes of the standing analysis, the Court accepts "as true all material allegations of the complaint" and "construe[s] the complaint in favor of the complaining party." *Maya v. Centex Corp.,* 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Warth v. Seldin,* 422 U.S. 490, 501 (1975)). The imminence requirement has been explained thus:

> "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending. Thus, we have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient."

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398,409 (2013) (quotation marks and citation omitted) (emphasis in original).

### 1. CLEAR Clinic

"Th[e] standing inquiry is the same for individuals and for organizations." *Arizona All. for Retired Americans v. Mayes*, 186 F.4th 622, 630 (9th Cir. 2026).

"'There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 511, (1975)).

"But just like any individual bringing a case in federal court, an organization needs a direct stake in the outcome of a case." *Id.* (internal quotation and citation omitted). "What matters for standing is the nature of the injury, not the legal form of the injured." *Id.* "Plaintiffs cannot manufacture standing in the absence of an independently sufficient injury-in-fact, even where that diversion is 'costly and burdensome.'" *Id.* at *7. The challenged conduct must "'directly affect[] and interfere[][ with' the plaintiff organizations' core activities." *Id.* (quoting *Food and Drug Administration v. All. for Hippocratic Med.,* 602 U.S. 367, 395 (2024)).

Here, CLEAR and the other Plaintiffs allege the lack of access to detained persons in Oregon has led CLEAR to devote time and resources to achieve that access. See Tupper Decl. ¶¶ 10 ("CLEAR Clinic attorneys are pulled from other existing casework and pre-planned responsibilities in order to travel to the Portland ICE field office to serve individuals' legal needs given the risk of rapid transfer out of the state."), 32 ("This includes corresponding with state and federal agents to request access to clients, corresponding and working with partner organizations and attorneys to secure access for client visits, and informing state and federal congressional representatives about the issues of access to legal visits, in addition to

the hours spent waiting in person at the Portland ICE field office only to be denied access.").

Plaintiff CLEAR provides counsel for detained immigrants. That is a core activity. They allege that Defendants practices and policies have regularly interfered with their access to these detained individuals and have required them to expend considerable resources. This establishes an injury in fact. CLEAR has been directly affected and thus has organization standing to pursue its claims.

**2. PCUN**

"Organizations can assert standing on behalf of their members ('associational standing'), or in their own right." *Oregon Moms Union v. Brown*, 540 F.Supp.3d 1008, 1013 (D. Or. 2021). To achieve associational standing (sometimes called representational standing), courts use a three part test that requires the organization to "show that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025) (quoting *Students for Fair Admissions, Inc. v. President of Harvard Coll.*, 600 U.S. 181, 199 (2023)).

Additionally, to meet the injury-in-fact requirement, the association must put forth "specific allegations establishing that at least one *identified member* had suffered or would suffer harm." *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. California Dept. of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013)

(internal quotation and citation omitted, emphasis in original); *see also*, *Satanic Temple v. Labrador*, 149 F.4th 1047, 1050 (9th Cir. 2025) ("Despite the general requirement to name affected members, [plaintiff association] names no member, even by pseudonym, who would have standing to sue.")

Here, while a PCUN employee alleges that some members of PCUN would have individual standing, Campos Decl. ¶¶ 6-8 (stating that two members were detained and denied the opportunity to speak with an attorney), no individual member who was detained is named, either in full or by pseudonym (Leon X is not a member, and his standing is addressed below). The lack of an identified member is fatal to associational standing.

**3. Leon X**

Leon X is fearful that he will be arrested by ICE, regardless of his DACA or UVisa applicant status, and then quickly transferred outside of Oregon. His basis for this is the general increase in enforcement activity in Oregon, coupled with stories of DACA and UVisa applicants being detained.

This is an allegation of possible future injury. Nothing in the record makes the arrest of Leon X more likely than any other immigrant in Oregon, and some factors—his DACA and UVisa statuses—make it less likely than undocumented immigrants who have not participated in such programs.

Leon X does have a reasonable fear that he could, at some point and in some place, be stopped, questioned, and possibly detained by ICE despite his DACA and UVisa status. But that is neither concrete, nor particularized; it is the same fear any

immigrant in any immigration program in the US might feel in the current climate. For purposes of standing, that is not enough.

In sum, only Plaintiff CLEAR has standing to pursue its claims and a preliminary injunction.

**III. Plaintiffs Seek a Mandatory Injunction**

Plaintiffs seek "a preliminary and permanent injunction enjoining further violations of Plaintiffs' rights by requiring Defendants to provide meaningful access to counsel for individuals held in their civil immigration custody before transferring such individuals outside of the District of Oregon." Pl. Mot. at 3. Plaintiffs describe this as "restor[ing] the *status quo ante litem*." *Id.*

Despite claiming to restore the status quo, Plaintiffs are seeking a mandatory injunction, which is subject to a higher standard than a more conventional prohibitory injunction: a mandatory injunction should not be granted when there is some doubt about the likelihood of success on the merits. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015); *see also*, *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) ("Mandatory injunctions, while subject to a higher standard than prohibitory injunctions, are permissible when extreme or very serious damage will result that is not capable of compensation in damages and the merits of the case are not doubtful." (internal quotation marks and citation omitted)).

The distinction between a mandatory injunction and a prohibitory injunction "can fairly be categorized as one of action versus inaction," and "[t]he inquiry is whether the party seeking the injunction seeks to alter or maintain the status quo."

*Fellowship of Chirstian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023). The "status quo is the legally relevant relationship between the parties before the controversy arose." *Id.* (internal quotation marks and citation omitted).

Plaintiffs request that the Court apply a detailed list of requirements to federal actors. Pl. Mot. at 32-34 First, Plaintiffs ask that if a detained person requests an attorney, ICE shall send the person's information to Plaintiffs and others, and ICE shall arrange a meeting between pro bono attorneys and detainees. *Id.* at 32. Plaintiffs also want ICE to provide them all paperwork related to detained individuals, even before any attorney-client relationship has been established. *Id.* Additionally, detainees shall be allowed to attend KYR trainings in Oregon Field Offices and cannot be transported if they request to attend one. *Id.* at 32-33. Further still, Plaintiffs ask that such KYR system be opt-out: "[a]ny declination of participation from individuals must be done in the presence of at least one of the pro bono attorneys of the program." *Id.* at 33. Plaintiffs also wish to set the hours or operations for all Oregon Field Offices, including having them open on weekends and holidays, and until 8 p.m. every night. *Id.* And if anyone is detained outside those hours, Plaintiffs ask for ICE to notify them and give access at any time. *Id.*

There is no claim or evidence that the facilities at issue were previously open on weekends, on holidays, or past five o'clock. Neither is there a claim that Oregon Field Offices held KYR trainings. These conditions do not restore the *status quo*. Plaintiffs have asked this Court to create new operational rules—and many of them—

for any building hosting ICE facilities in Oregon. Therefore, the requested relief is a mandatory injunction.

## IV. Success on the Merits

### A. Claim I: Fifth Amendment Due Process

"The right to counsel in immigration proceedings is rooted in the Due Process Clause [of the Fifth Amendment] and codified at 8 U.S.C. § 1362 and 8 U.S.C. § 1229a(b)(4)(A)." *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005). "To infuse the critical right to counsel with meaning, we have held that [Immigration Judges] must provide aliens with reasonable time to locate counsel and permit counsel to prepare for the hearing." *Id.* at 1098-99.

> No bright line guides our consideration of what constitutes reasonable time. The inquiry is fact-specific and thus varies from case to case. We pay particular attention to the realistic time necessary to obtain counsel; the time frame of the requests for counsel; the number of continuances; any barriers that frustrated a petitioner's efforts to obtain counsel, such as being incarcerated or an inability to speak English; and whether the petitioner appears to be delaying in bad faith.

*Id.*

"Government practices that effectively deny access to counsel include the detention of aliens far from where potential or existing counsel was located, limited attorney visitation hours, and the processing of aliens at locations where telephones were not available to them." *Innovation L. Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1162 (D. Or. 2018).

While the right to counsel is rooted in the Due Process clause, the right is tied to immigration proceedings. Plaintiffs, on the other hand, state that "[n]oncitizens

detained by ICE and held at an ICE facility in Oregon have the right to access counsel before ICE transfers them out of the state and that meaningful access to counsel requires access to counsel prior to transfer." Pl. Mot. at 21.

Plaintiffs cite no case for the proposition that access to counsel before transfer to NWIPC is required. And, while it is true that detention far from counsel is a factor in this inquiry, Tacoma is about as far from Portland as Portland is from Eugene, and Tacoma is much closer to Portland than Medford. As Plaintiff CLEAR itself declares, "CLEAR Clinic works to defend the rights of all noncitizens in Oregon." FAC at 5-6. Tacoma is closer to CLEAR's headquarters in Portland than the headquarters are to most of Oregon. That also says nothing of virtual meetings, which do not require physical presence at the facility.

Plaintiffs argue that under 8 C.F.R. § 292.5(b), "whenever an examination is provided under this chapter the person involved shall the right to be represented by an attorney." *Id.* at fn. 9 (quoting the regulation), and that ICE conducts these examinations at the Oregon Field Offices, Pl. Mot. at 21 and Pl. Reply at 17.

Plaintiffs do not acknowledge the rest of that sentence of the regulation. The rest of the sentence reads: "[the attorney or representative] shall be permitted to examine or cross-examine such person and witnesses, to introduce evidence, to make objections which shall be stated succinctly and entered on the record, and to submit briefs." 8 C.F.R. § 292.5(b).

When read in full, the sentence uses "examination" in the context of an on-the-record proceeding, particularly when the verbs "examine and cross-examine" follow

the noun “examination.” “Witnesses,” “introduce evidence,” “make objections” to be “entered on the record,” and “submit briefs” all indicate a proceeding as well. Plaintiffs do not acknowledge the context of the rule and focus only on one word: examination. Plaintiffs claim that any “questioning of a noncitizen for purposes of immigration enforcement” is an “examination” as used in this rule, Pl. Mot. at 21, as is “interviewing, screening, collecting personal and biometric information, and running criminal history and immigration history checks.” Pl. Mot. at 17. Plaintiffs’ reading of the regulation would give immigrant detainees a more robust due process requirement at this stage than those being booked in jail on criminal charges. *See*, *United States v. Zapien*, 861 F.3d 971, 975 (9th Cir. 2017) (explaining “booking” exception to Fifth Amendment).

The regulation, when read in full, does not mean what Plaintiffs present it as meaning with their selective quotation, nor how the context of the rule—witnesses, briefs, and a record—can jibe with the act fingerprinting or running a background checks. Plaintiffs may develop this argument further but should not use selective quotations that misrepresent that authority and should be mindful that if they alter a quotation, that must be acknowledged in the customary manner.

Plaintiffs also cite 5 U.S.C. § 555(b) as requiring access to counsel at Oregon Field Offices. Plaintiffs go as far as to say, “there is no question that an ICE arrest and subsequent custody determination is the compulsion of appearance before an immigration agency under 5 U.S.C. § 555(b).” Pl. Mot. at 22.

The Court disagrees. The statute says a "person compelled to appear in person before an agency[.]" 5 U.S.C. § 555(b). Someone detained by ICE is not obviously "compelled to appear." "Appearance" is a term of art, particularly when coupled with "compel" and "before" a government body. That implies that the statute involves a proceeding of some sort. *See*, *Does v. McAleenan*, 415 F. Supp.3d. 971, 978 (S.D. Cal. 2019) (immigrant detainees have right to counsel under § 555(b) for non-refoulement interviews); *United States v. McPhaul*, 617 F.Supp. 58 (W.D.N.C. 1985) (applicable to summons requiring the production of documents); *United States v. Weiner*, 578 F.2d 757 (9th Cir. 1978) (applicable to investigative hearings); *Matter of Alleged Prohibited Political Activity Philadelphia Redevelopment Authority Philadelphia, Pa.*, 443 F.Supp. 1194 (E.D. Pa. 1977) (applicable to subpoena to testify before United States Civil Service Commission);

Plaintiffs rest on the conclusion that "there is no question" that statute means what they assert it means. That is not enough to meet the high burden for the issuance of a mandatory preliminary injunction.

More generally, Plaintiffs seek to rely on a line of recent cases involving claims superficially similar to those made here: the First and Fifth Amendment rights of immigrant detainees and lawyers seeking to assist them. *See, Mercado v Noem*, 800 F.Supp.3d 526 (S.D.N.Y 2025); *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850 (C.D. Cal. 2025), and *Gonzalez et al v. Noem*, No. 1:25-CV-13323 2025 WL 3170784 (N.D. Ill. Nov. 5, 2025). Since the hearing on this motion, Plaintiffs have filed several additional authorities. ECF Nos. 96, 98, and 101.

The issue that ties these cases together can be stated thus: ICE field offices, designed to hold detainees for short periods of time, like the ICE field offices in Oregon, began holding detainees for multiple days, if not multiple weeks, instead of transferring them to a standard detention facility and during such time did not allow the detainees to contact counsel or, more generally, the outside world. *See Mercado,* 800 F.Supp.3d at 550-51 ("Attorneys attest that ICE representatives advised them that [the field office] does not schedule legal calls because it is a holding facility and that counsel 'unfortunately' must wait until transfer to a detention center even when detainees remain at [the field office] 'for up to 20 days.'"); *see also Vasquez Perdomo*, 790 F.Supp.3d at 868-69 (plaintiffs had been held for multiple days in basement at a Los Angeles field office, and "[the field office] is a facility for immigrant detainees designed to hold a limited number of individuals *temporarily* so they can be processed and released, or processed and transported to a long-term detention facility.") (emphasis in original); and *see also*, Civil Rights Class Action Complaint for Declaratory and Injunctive Relief ¶ 62, *Gonzalez et al.*, 22025 WL 3170784, (ECF No. 1), 2025 WL 3072132 (factual allegations supporting granted TRO: "On June 4, 2025, the median time a detainee was held at Broadview was nearly 48 hours. . . . By mid-June, according to data provided by ICE, the median time a detainee was held at Broadview had risen to three days, meaning half of the detainees were held for more than three days . . . Now, some detainees are being held for up to a week or more at a time.")

The length of detention created issues with, among other things, feeding, bathing, and sleeping, in addition to a lack of access to counsel. *See Mercado* 800 F.Supp.3d at 546-48; *Vasquez Perdomo*, 790 F.Supp.3d at 867-68; and *Gonzalez et al.,* 2025 WL 3170784 at *1 (granting TRO requiring hygiene supplies, showers every other day, meals, and bedding for detained immigrants).

Here, Plaintiffs turn the cited precedents on their heads. In each of the cases, the extended length of detention in field offices was a crucial factor to the cited courts. Here, there is no allegation that detainees have been held for more than 12 hours at any Oregon field office. In fact, the allegations are the opposite: according to Plaintiffs, detainees are being transferred from Oregon field offices to a long-term detention facility *too quickly*. Plaintiffs ask the court to require Defendants to hold detainees at the field offices for *longer* periods of time. The Court cannot draw support from these cases for Plaintiffs' position.

Turing to other cases, Plaintiffs cite *Immigrant Defs. L. Ctr. v. Mayorkas,* No. CV-209893, 2023 WL 3149243 (C.D. Cal. Mar. 15, 2023) for support. To explain the holding of the case, Plaintiffs write "detained individual adequately alleged First Amendment violated where represented individuals could only speak with their lawyers non-confidentially for up to an hour, and unrepresented individuals could not access counsel at all." Pl. Mot. at 26.

In their characterization of the case, Plaintiffs skip or change important details in the case. Importantly, Plaintiffs use the term "detained individuals," but the issue with access to counsel in this line of cases has nothing to do with *detention*—the point

of the immigration process at issue in that case was to force asylum seekers to stay outside the US rather than to detain them. *Immigrant Defs. L. Ctr.*, 2023 WL 3149243 at *5 (the challenged "policy orchestrated by Defendants trapped nearly 70,000 asylum seekers in Mexico in dangerous conditions that impeded their ability to access the U.S. asylum system or obtain legal representation."). Had these applicants been detained in U.S. detention centers, applicants would have had *better* access to counsel, in addition to access to law libraries, meeting spaces, etc.—the lack of which were noted by the court in its reasoning.

Additionally, Plaintiffs fail to tie the one-hour limit to a final proceeding in their explanation. Under existing law, the proceeding is crucial, as the statutory right to counsel is tied to representation in immigration proceedings. Under the Fifth Amendment analysis, the due process question is also tied to the fairness of the hearings. The policy challenged in *Immigrant Defenders Law Center* gave represented plaintiffs "one hour to consult with counsel while physically located in the United States for their hearings[.]" Again, crucial to understanding the challenged policy is that the plaintiffs were not detained in the United States but were allowed entry only for their hearings. The one-hour limit was not per meeting, but the total amount of time on U.S. soil that an asylum applicant could speak with counsel before going directly into a hearing. Plaintiffs have misstated the case and failed to grapple with its facts.

Plaintiffs also seek to rely on the *Orantes-Hernandez* line of cases, such as *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 565 (9th Cir. 1990), cited for the

proposition that the "'cumulative effect' of Defendants' actions is 'to prevent [noncitizens] from contacting counsel and receiving any legal advice." Pl. Mot. 19.

This Court recognizes that a combination of conditions can create a cumulative effect that amounts to denial of counsel. Plaintiffs have not presented an argument that the conditions at the Oregon field offices at issue are analogous to the extreme conditions in *Orantes-Hernandez*, which involved an actual detention facility, distinct from the facts here.

Closer is the newer case *Advocates for Human Rights v. U.S. Dept. of Homeland Sec.*, 825 F. Supp. 3d 858 (D. Minn. 2026). In that case, the court had issued a temporary restraining order that required DHS to hold detainees at an ICE Field Office in Minnesota for 72 hours to facilitate access to counsel and prevent rapid transfer out of state. *Id.* at 870. In the ruling on the preliminary injunction, the court opined that the 72-hour hold had improved access to counsel.

The Court notes several distinctions between *Advocate for Human Rights* and the instant case. First, a 72-hour hold would create issues with the land use restriction at the Macadam facility that limits the amount of time a detainee can spend there to 12 hours. Also, this runs counter to the previously cited cases, namely, it would clearly create issues of sanitation, food, and bedding. This is trading one alleged constitutional violation for others.

Additionally, *Advocates for Human Rights* had testimony from people who had experienced detention. That testimony contradicted the assertions of DHS. Here, no person who had been detained at an Oregon field office testified, and as discussed

below, the evidence presented by Plaintiffs is not persuasive. Plaintiffs evidence does not amount to a clear showing that DHS was untruthful in this matter and that its evidence should be disregarded, as happened in *Advocates for Human Rights*.

The Court is also concerned by the evidence presented by Plaintiffs, and how that evidence is cited in the briefs. For example, Plaintiffs claim that:

> "At the ICE facilities in Oregon. . . [ICE agents] are pressuring individuals to waive important rights, such as the right to seek asylum or other relief and the right to a hearing before an immigration judge, and to make important decisions about their case, including whether to accept a voluntary departure or an order of deportation."

Pl Mot. at 21.

The evidentiary support for this proposition is limited. The Plaintiffs provide citations to five declarations to support the assertion that ICE agents at Oregon facilities are pressuring individuals to waive important rights. But none of the citations support the assertion. Gill Decl. ¶ 14 (declarant recounts story of client who was pressured to accept voluntary departure, but that happened in Vancouver, Washington and the client never passed through Oregon facility); Pritchard Decl. ¶ 10 (attorney recounting story of client who was pressured to sign paperwork in Tacoma, Washington); RJSV Decl. (same as Gill Decl.—RJSC is the client whose story Ms. Gill explains); Tupper Supp. Decl. ¶ 35 (no such paragraph exists in Ms. Tupper's supplemental declaration; only her original declaration has a 35th paragraph, and that discusses NWIPC and pro hac vice admission to the District of Washington); Lerner Supp. Decl. Ex. B ¶ 10 (declaration of attorney in another matter which states "We also understood from prior experience that both prior to and after transfer, ICE

pressures people to sign documents waiving important rights[,]" but this is too vague and attenuated to support the specific assertion made in the motion.).

In sum, Plaintiffs make an assertion in their motion about what is happening inside Oregon field offices, but the five evidentiary documents they cite provide minimal, if any, support for the proposition.

Plaintiffs have not shown a likelihood of success on the merits for Claim I necessary for the issuance of a mandatory injunction.

**B. Claim II: PCUN and Leon X's First Amendment Rights.**

As stated above, neither PCUN nor Leon X have standing to pursue claims. As such, they cannot show a likelihood of success on the merits.

**C. Claim III: CLEAR's First Amendment Rights.**

CLEAR claims that the lack of access at Oregon Field Offices is a violation of their First Amendment rights to solicit clients and disseminate information. Plaintiffs assert that "[t]he First Amendment also protects legal service providers from government interference when they are 'advocating lawful means of vindicating legal rights,' *NAACP v. Button*, 371 U.S. 415, 437 (1963), or engaged in the 'creation and dissemination of information', see *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011)." Pl. Mot. at 27.

"[T]he First Amendment broadly protects groups who 'unite to assert their legal rights as effectively and economically as possible.'" *N.W. Immigrant Rights Project v. Sessions*, No. C17-716 RAJ, 2017 WL 3189032 (W.D. Wash. July 27, 2017) (quoting *United Transp. Union v. State B. of Mich.*, 401 U.S. 576 (1971)). "[C]ollective

activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *United Transp. Union*, 401 U.S. at 585.

First, the Court must determine the nature of the challenged restriction. Content-based restrictions are analyzed under strict scrutiny. To withstand a challenge, content-based restrictions must be narrowly tailored to serve a compelling government interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). On the other hand, content-neutral restrictions are analyzed under intermediate scrutiny. To withstand a challenge, content-neutral restrictions must advance "important governmental interests unrelated to the suppression of free speech" and the regulation "[must] not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997).

Plaintiffs do not articulate a standard of review. The section of the motion devoted to this claim is only two paragraphs. The first puts forth broad legal principles, and the second is about attorneys not being able to communicate with prospective clients and citations to declarations. Defendants propose the *Turner* test, Def. Resp. at 51-52, and the Court concludes that this is a reasonable framework for the analysis.

*Turner* is the appropriate standard because the practice at issue is content neutral. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Plaintiffs have not shown that access to Oregon Field Offices for family, friends, journalists, or any other category of persons is better or worse than for attorneys. Based on the record before the Court, Defendants limit meetings between persons and detainees for a list of reasons—logistics, security, space constraints, and processing—not for particular content, such as legal advice. The record shows that attorneys have been able to access clients, though not to the degree or for the length of time that they wish, nor at all hours that Plaintiffs wishes. Defendants practice is content neutral.

On the other side of the analysis, the Government has "interests of the highest order" in enforcing immigration laws and detaining undocumented aliens. *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1208 (9th Cir. 2022).

Additionally, another court in this circuit has found that "civil detainees in CBP holding cells, face conditions of confinement after 12 hours which are substantially worse than detainees face upon commitment to either a civil immigration detention facility or even a criminal detention facility, like a jail or prison" and that "the conditions of detention in CBP holding cells, especially those that preclude sleep over several nights, are presumptively punitive and violate the Constitution." *Unknown Parties v. Nielsen*, 611 F.Supp.3d 786, 793 (D. Az. 2020). The holding cells at issue were "stations and holding facilities [that] are designed within the context of . . . short-term holds, lasting hours not days." *Id.* at 792.

This accords with the cases Plaintiffs cited for Claim I: extending detention beyond the necessary time to process and transfer detainees can itself be a

Constitutional issue. The Government has a very strong interest in not violating the Constitution.

Finally, Defendants cite operational, logistical, and security considerations. Those are important interests in the context of processing and transferring detainees to an appropriate facility. Defendants have shown they have important interests undergirding the time, place, or manner restriction at issue.

The two remaining questions are: (1) does the practice at issue burden substantially more speech than necessary to further those interests; and (2) whether there are ample alternative channels for communication of the information. *Turner Broad. Sys., Inc.*, 520 U.S. at 189.

Here, attorneys have been able to meet with prospective clients. While there may be a burden on Plaintiffs' ability to solicit clients detained at ICE field offices, it is not absolute. Plaintiffs do not provide examples of ICE restricting access to detainees that are held for hours at a time. Rather, Plaintiffs provides numerous declarations attesting to the fact that ICE is putting detainees in transport vans quickly. Plaintiffs have not shown that Defendants' practice burdens substantially more speech than necessary.

In regard to alternative channels of communication, the EOIR pro bono list "(EOIR List") allows any lawyer or law firm, with some conditions, to have their contact information given to every detainee and posted in each ICE field office within the jurisdiction of a specific immigration court (lists are maintained for each

immigration court and are updated quarterly). See 8 C.F.R. § 1003.61. That is an alternative channel for soliciting detained clients.

Being on the EOIR List offers a host of advantages to an organization. First, the list is posted conspicuously next to the phones at each facility in Oregon. *See* Chan Decl. at 14-17 (photos of telephones in holding rooms with visible lists next to them that are claimed to be the EOIR List). Also, detainees at NWIPC can place free phone calls and video calls to any group listed on the EOIR List. Def. Resp. at 11.

Defendants provided the Court with the EOIR List. Def. Resp. at 11 fn 2. ECO, a group that works with CLEAR, appears on the EOIR List for the Portland Immigration Court, but not the Tacoma Immigration Court. CLEAR appears on neither list. Because detainees cannot be held in Oregon for more than 12 hours, detained Oregonians will be in almost every case transferred to NWIPC. Plaintiffs make no argument that the EOIR List is not an ample alternative channel for connecting with detainees. Whether or not CLEAR chooses to use it, the Court concludes that it is.

Plaintiffs have not made the necessary showing of likelihood of success on the merits for Claim III to meet its burden for the issuance of a mandatory injunction.

Because Plaintiffs have not shown a likelihood of success on the merits of any claim necessary to obtain a mandatory injunction, the Court does not reach the other parts of the preliminary injunction analysis.

**CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction, ECF No. 40 is DENIED.

It is so ORDERED and DATED this 30th day of September 2026.

/s/Ann Aiken
ANN AIKEN
United States District Judge